# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DOROTHY K. MARTIN,             :
                              :
        **Plaintiff**          :      **CIVIL ACTION**
                              :
    **v.**                     :
                              :      **JURY TRIAL DEMANDED**
AVANT PUBLICATIONS, LLC,       :
d/b/a TIMES LEADER d/b/a TIMES :      **THE HONORABLE**
LEADER MEDIA GROUP             :      **RICHARD D. MARIANI, JUDGE**
                              :
                              :      No.    3:22-cv-00276
                              :
        **Defendant**          :


## PLAINTIFF'S BRIEF IN OPPOSITON TO DEFENDANT'S MOTION TO DISMISS


RESPECTFULLY SUBMITTED:

/s/ Kimberly D. Borland
KIMBERLY D. BORLAND, ESQUIRE
11th Floor, 69 Public Square
Wilkes-Barre, PA 18701
(570) 822-3311
Attorney ID.#23673
kborland@borlandandborland.com
Attorney for Plaintiff


Dated:  May 23, 2022

# TABLE OF CONTENTS

Page

I.   INTRODUCTION                                                          1

II.  ISSUES                                                                5

     A.   What is the standard of review for a motion to
          dismiss?                                                         5

     B.   Has Ms. Martin stated claims for illegal discrimination,
          retaliation and for failure to reasonably accommodate
          for her disability under the ADA and the PHRA
          (Counts I-VI)?                                                   5

     C.   Has Ms. Martin stated claims for the illegal termination
          of her employment, denial of medical leave, and
          interference with the obstruction of her right to medical
          leave in violation of the FMLA (Counts VII-IX)?                  5

     D.   Has Ms. Martin stated claims for illegal discrimination
          under the ADEA and the PHRA (Counts X-XI)?                       5

III. ARGUMENT                                                             6

     A.   The standard of review for consideration of a motion to
          dismiss pursuant to F.R.C.P. 12(b)(6) is that the Court
          must accept as true the allegations made in a plaintiff's
          complaint and draw all reasonable inferences in favor
          of the non-moving party.                                        6

     B.   Ms. Martin has stated claims for illegal discrimination
          retaliation and for failure to reasonably accommodate
          her disability under the ADA and the PHRA (CountsI I-VI)        8

C.   **Ms. Martin has stated claims for the illegal termination of her employment, denial of medical leave, and interference with and obstruction of her right to medical leave in violation of the FMLA (Counts VII-IX)**   17

D.   **Ms. Martin has stated claims for illegal discrimination under the ADEA and the PHRA (Counts X-XI)**   20

IV.   CONCLUSION   25

CERTIFICATE OF SERVICE   26

CERTIFICATE OF WORD COUNT   27

# TABLE OF AUTHORITIES

Page

**Statutes**

*42 U.S.C. § 12101 et seq* ........................................................................................ 1

*42 USC §1983*........................................................................................................ 13

*43 P.S. § 955 (a) and (d)* ........................................................................................ 1

**Cases**

*ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 863 n.17 (3d Cir. 1994).* ........................... 12

*Alja-Iz v. United States V.I. Bd. of Educ.,* 625 F. App'x 591, 593 (3d Cir. 2015) ................. 10

*Alston v. Parker,* 363 F.3d 229, 236 (3d Cir. 2004);......................................................... 25

*Angelastro v. Prudential-Bache Secur.,* 764 F.2d 939 (3d Cir. 1985) ................................. 11

*Armstrong v. Burdette Tomlin Mem'l Hosp.,* 438 F.3d 240 (3d Cir. 2006)........................... 13

*Ashcroft v. Iqbal,* 556 U.S. 662, 667-68 (2009)............................................................... 1

*Atchison v. Sears,* 666 F. Supp. 2d 477 (E.D. Pa. 2009) ..................................................... 19

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).......................................................... 1

*Blakney v. Philadelphia,* 559 F. App'x 183, 186 (3d Cir. 2014) ......................................... 16

*Blassingame v. Sovereign Sec., LLC*, No. 17-1351, 2017 U.S. Dist. LEXIS 123980, at *23 n.5 (E.D. Pa. Aug. 7, 2017) ............................................................................. 9

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ........................... 11

*Buskirk v. Apollo Metals*, 307 F.3d 160 (3d Cir. 2002) ......................................................... 8

*Capps v. Mondelez Glob., LLC,* 847 F.3d 144, 155 (3d Cir. 2017) ..................................... 18

*Centennial Sch. Dist. v. Phil L.*, 559 F. Supp. 2d 634 (E.D. Pa. 2008) ............................... 13

*Christopher v. Harbury*, 536 U.S. 403, 406 (2002) ................................................................ 6

*Clark Cty. Sch. Dist*, 532 U.S. 268, at 273-74 (2001) ........................................................ 15

*Colwell v. Rite Aid Corp.,* 602 F.3d 495 (3d Cir. 2010) ....................................................... 13

*Connelly v. Lane Const. Corp.,* 809 F.3d 780, 790 (3d Cir. 2016); .................................. 6,7

*Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) ..................................... 20

*Cullison v. Dauphin Cty., Pa.*, No. 1:10-CV-00705, 2012 U.S. Dist. LEXIS 102575, 2012 WL 3027776, at *11 (M.D. Pa. May 18, 2012) ........................................................................ 16

*Davis v. Tammac Corp.*, 127 F. Supp. 2d 625, 633 (M.D. Pa. 2000) ................................. 21

*Deserne v. Madlyn & Leonard Abramson Ctr. for Jewish Life, Inc.*, No. 10-03694, 2012 U.S. Dist. LEXIS 68852, 2012 WL 1758187, *3 n.3 (E.D. Pa. May 17, 2012) ............................ 8

*Drummer v. Trustees of Univ. of Pennsylvania*, 286 F. Supp. 3d 674, 682 (E.D. Pa. 2017) ........................................................................................................................................... 9,10,21

*Edgar v. Avaya, Inc.*, 503 F.3d 340 (3d Cir. 2007) .............................................................. 13

*Emmell v. Phoenixville Hosp. Co., LLC,* 303 F. Supp. 3d 314 (E.D. Pa. 2018) .................. 13

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007).......................................................................... 6

*Eskridge v. Phila. Housing Auth.*, 722 F. App'x 296, 299 (3d Cir. 2018). ........................... 15

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-81 (3d Cir. 20000; ........................... 19

*Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005) ...................................................... 20

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007)
................................................................................................................................................ 25

*Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002);..................................... 20

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009 ............................................ 12

*Gaul v. Lucent Techs.*, 134 F.3d 576 (3d Cir. 1998)] .............................................................. 9

*Giuliani v. Polysciences, Inc.*, 275 F. Supp. 3d 564, 576 (E.D. Pa. 2017).......................... 22

*Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) ........................ 21

*Gross v. FBL Fin. Servs.*, 557 U.S. 167, 129 S. Ct. 2343 (2009)......................................... 20

*Hernandez v. Temple Univ. Hosp.*, No. 17-4381, 2019 U.S. Dist. LEXIS 2853, at *21-22
(E.D. Pa. Jan. 8, 2019)........................................................................................................ 16

*Hodson v. Alpine Manor, Inc.*, 512 F. Supp. 2d 373 ........................................................... 13

*Holyk v. Scranton Counseling Ctr.*, No. 3:17-0435, 2018 U.S. Dist. LEXIS 13999 (M.D. Pa.
Jan. 29, 2018) ...........................................................................................................10,21.25

*IJalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) ................................................. 16,19

*Johnson v. Del. Cty. Juvenile Det. Ctr.*, 545 F. App'x 135, 139 (3d Cir. 2013) ................... 11

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 65 Fed. App'x 803, 805 (3d Cir. 2003) . 6

*Kercher v. Reading Muhlenberg Career & Tech. Ctr.*, No. 15-6674, 2017 U.S. Dist. LEXIS 145013, at *17-18 (E.D. Pa. Sep. 6, 2017) ...................................................................... 18

*LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 232 (3d. Cir. 2007) ................. 15,19

*Lehenky v. Toshiba Am. Energy Sys. Corp.*, No. 20-4573, 2022 U.S. Dist. LEXIS 30344 (E.D. Pa. Feb. 22, 2022)................................................................................................... 10

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) ................. 19

*Lombardo v. Air Products and Chemicals, Inc.*, No.06-1120, 2006 U.S. Dist. LEXIS 46077, 2006 WL 2547916, at *11 (E.D. Pa. July 7, 2006) .......................................................... 18

*Martinez v. UPMC Susquehanna*, 986 F.3d 261,266 (3d Cir. 2021) ...................................... 7

*Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 430 (W.D. Pa. 2009).................... 18

*Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997 ........... 22

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817 (1973).......................... 10

*Mejias v. C&S Wholesale Grocers, Inc.*, No. 5:20-cv-1435, 2020 U.S. Dist. LEXIS 123690 (E.D. Pa. July 14, 2020) ...................................................................................................... 7

*Mohney v. Pennsylvania*, 809 F. Supp. 2d 384, 401 (W.D. Pa. 2011 ................................. 10

*Morris v. Phila. Hous. Auth.*, No. 10-5431, 2011 U.S. Dist. LEXIS 46465, at *8-9 (E.D. Pa. Apr. 28, 2011)................................................................................................................... 7,10

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008).................................................... 13

*Reinhart v. Mineral Techs., Inc.*, No. 05-4203, 2006 U.S. Dist. LEXIS 89279 (E.D. Pa. Nov. 27, 2006) .......................................................................................................................... 19

*Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 587 (E.D. Pa. 2017) ............ 16

*Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) ............................................. 8

*Ross v. Gilhuly*, 755 F.3d 185 (3d Cir. 2014) ................................................................. 18,20

*Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa. 2014) .............. 9

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) ............................................ 21

*Scheuer v.Rhodes*, 416 U.S. 232, 236 (1974) ...................................................................... 7

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) ................................. 19

*Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). ....................................................... 25

*Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000), ........................................................... 9

*Shellenberger v. Summit Bancorp*, 318 F.3d 183 (3d Cir. 2003) ......................................... 14

*Showers v. Endoscopy Ctr. of Cent. Pa., LLC*, 58 F. Supp. 3d 446 (M.D. Pa. 2014) .......... 13

*Stultz v. Reese Bros.*, 2003 PA Super 408, 835 A.2d 754 .................................................... 13

*Sulima v. Tobyhanna Army Depot*, 602 F.3d 177 (3d Cir. 2010) .......................................... 13

*Sylvester v. DGMB Casino, LLC*, No. 15-8328 (RMB/KMW), 2017 U.S. Dist. LEXIS 143920,
    at *33 (D.N.J. Sep. 6, 2017); ......................................................................................... 18

*Szarawara v. Cnty. of Montgomery*, 12-5714, 2013 U.S. Dist. LEXIS 90386, 2013 WL
    3230691, at *2 (E.D. Pa. June 27, 2013) ........................................................................ 8

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) ........................................... 13

*United States ex rel. Wilkins v. United Health Grp., Inc.,* 659 F.3d 295, 302 (3d Cir. 2011).. 6

*W. Penn Allegheny Health Sys. v. UPMC,* 627 F.3d 85, 98 (3d Cir. 2010) ........................... 7

*Weisman v. Buckingham Twp.,* No. 04-4719, 2005 U.S. Dist. LEXIS 11696, 2005 WL
   1406026, at *11 (E.D. Pa. June 14, 2005)))................................................................. 18

*Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 994 (8th Cir. 2011) ................................. 19

*Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015). ............. 20

*Winer Family Tr. v. Queen,* 503 F.3d 319, 328-29 (3d Cir. 2007) ....................................... 11

## I.   **INTRODUCTION**

Dorothy K. Martin has properly pleaded her claims under the Americans With Disabilities Act, *42 U.S.C. § 12101 et seq,* (hereinafter "ADA");  Title I of the Family and Medical Leave Act of 1993, *29 U.S.C.S. § 2601 et seq.* ("FMLA"); the  Age Discrimination in Employment Act (ADEA), *29 USC §621(a)*; and, the Pennsylvania Human Relations Act, *43 P.S. § 955 (a) and (d)* ("PHRA") against her former employer, Avant Publications, LLC, d/b/a Times Leader, and d/b/a Times Leader Media Group,  ("Avant ") in accord with the requirements of *Ashcroft v. Iqbal,* 556 U.S. 662, 667-68 (2009) and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

Ms. Martin, who was born in 1955, was employed by Avant as an editor continuously since 2007.  (¶¶ 15-17)   Ms. Martin was the oldest editor on the staff of Avant. (¶ 51)

Ms. Martin suffers from arthritis, particularly affecting her legs, which has substantially limited her major life activities, including walking and standing.  (¶¶ 18-19)  Avant was aware of Ms. Martin's diagnosis and impairments.  (¶ 20)

Since or about 2017, Ms. Martin was permitted by Avant to perform her duties from her home.  On February 7, 2020, Avant directed Ms. Martin to work from Avant's Wilkes-Barre office, effective February 10, 2020.   Avant stated no business reason for its direction to Ms. Martin to now work from Defendant's Wilkes-Barre office, and had no business reason for its direction. (¶¶ 25-28)

On Saturday, February 8, 2020, Ms. Martin requested from Avant the reasonable disability accommodation of being permitted to continue to work from home and informed Avant that she would provide it with a note from her doctor regarding the necessity of her working from home, which she requested from her doctor on Monday, February 10, (¶¶ 29-31)

Ms. Martin worked from her home, and not from Avant's Wilkes-Barre office, on February 10, 2020.  (¶ 32)

On Friday, February 14, 2020, Avant issued a written reprimand to Ms. Martin for not working from Avant's Wilkes-Barre office on February 10, 2020 and for not having provided a doctor's note regarding her request for the reasonable accommodation of being permitted to perform her duties from home. (¶ 36)

Ms. Martin provided Avant with her doctor's note on the afternoon of February 14, 2020, as soon as she received it from her doctor. (¶ 37)  A copy of the note from Dr. James Galasso stating that Ms. Martin "suffers from disabling hip pain and requires a brace on her right leg for ambulation since May of 2015," and that "it would be an undue hardship to make her leave home for work and that would benefit from continuing to work from home," is attached hereto and made a part hereof as Exhibit A.

Ms. Martin was eligible for leave under the FMLA and on February 20, 2020, Ms. Martin e-mailed Kourtney Richards, Avant's director of human resources, requesting the

necessary paperwork for her to file for leave under the FMLA on account of her disability and Avant's refusal to provide her the requested reasonable accommodation. (¶¶ 38-43)

On February 24, 2020, Ms. Martin reiterated to Roger Dupuis, news editor for Avant, that she was requesting leave under the FMLA, but Avant failed and refused to grant Ms. Martin her requested medical leave under the FMLA, to which she was entitled. (¶¶ 44-45)

Thereafter, Avant terminated Ms. Martin on February 24, 2020 and stated no business reason for the termination. (¶¶ 46, 48)

Upon the termination of Ms. Martin, her duties were assigned to less qualified, younger, non-disabled editors who had not requested reasonable accommodations of their disabilities, nor leave under the FMLA. (¶¶ 52-55)

On account of these adverse employment actions, and upon exhaustion of her administrative remedies (¶¶ 9-10), Ms. Martin filed this action against Avant seeking relief for her termination on account of disability discrimination (Count I [ADA ¶¶ 74-78]; Count II [PHRA ¶¶ 79-82]); for her termination on account of retaliation for requesting a reasonable accommodation of her disability (Count III [ADA ¶¶ 83-85]; Count IV [PHRA ¶¶ 86-88]); for the failure of Avant to reasonably accommodate her disability (Count V [ADA ¶¶ 89-90]; Count VI [PHRA ¶¶ 91-92]); for her termination on account of the denial by Avant for her request for medical leave for which she entitled (Count VII [FMLA ¶¶ 93-97]); for the denial by Avant of her request for medical leave for which she entitled (Count VIII [FMLA ¶¶ 98-102]); for the interference and obstruction by Avant of her right to medical leave (Count IX

[FMLA ¶¶ 103-107]); and, for the termination of her employment on account of her age.

(Count X [ADEA ¶¶ 108-113]; Count XI  [PHRA ¶¶ 114-117])

Avant has filed a Motion to Dismiss as to all counts.

This brief is Ms. Martin's response.

II.    <u>ISSUES</u>

A. What is the standard of review for a motion to dismiss?

<u>Suggested Answer:</u>  The Court, when considering a motion to dismiss pursuant to F.R.C.P. 12(b)(6), must accept as true the allegations made in a plaintiff's complaint and draw all reasonable inferences in favor of the non-moving party.

B. Has Ms. Martin stated claims for illegal discrimination, retaliation and for failure to reasonably accommodate her disability under the ADA and the PHRA (Counts I-VI)?

<u>Suggested Answer:</u>  Yes

C. Has Ms. Martin stated claims for the illegal termination of her employment, denial of medical leave, and interference with and obstruction of her right to medical leave in violation of the FMLA (Counts VII-IX)?

<u>Suggested Answer:</u>  Yes

D. Has Ms. Martin stated claims for illegal discrimination under the ADEA and the PHRA (Counts X-XI)?

<u>Suggested Answer:</u>  Yes

III.   **ARGUMENT**

A.  **The standard of review for consideration of a motion to dismiss pursuant to F.R.C.P. 12(b)(6) is that the Court must accept as true the allegations made in a plaintiff's complaint and draw all reasonable inferences in favor of the non-moving party.**

In considering a motion to dismiss, the Complaint must be viewed in the light most favorable to the non-moving party. *Connelly v. Lane Const. Corp.,* 809 F.3d 780, 790 (3d Cir. 2016); *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *Christopher v. Harbury,* 536 U.S. 403, 406 (2002).

The Court, when considering a motion to dismiss pursuant to F.R.C.P. 12(b)(6), must accept as true the allegations made in a plaintiff's complaint and draw all reasonable inferences in favor of the non-moving party. *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.,* 65 Fed. App'x 803, 805 (3d Cir. 2003)

The standard for determining a motion to dismiss is "not whether the non-moving party will ultimately prevail but whether that party is entitled to offer evidence to support the claims". *United States ex rel. Wilkins v. United Health Grp., Inc.,* 659 F.3d 295, 302 (3d Cir. 2011).

The Court is not making a determination on the viability of the claim but instead is determining whether there is a reasonable expectation that discovery will reveal evidence of the necessary element. *Twombly, supra* at *556*

A well pleaded complaint can proceed even if it strikes a savvy judge that actual proof of those facts are improbable and "that recovery is very remote and unlikely." *Scheuer v.Rhodes, 416 U.S. 232, 236 (1974),* as cited in *Twombly, supra* at 566.

In an employment discrimination case, a plaintiff *may* defeat a motion to dismiss by alleging a *prima facie* case. *Martinez v. UPMC Susquehanna*, 986 F.3d 261,266 (3d Cir. 2021)   However, such a showing is not necessary.   *Id.*   See also *Connelly, supra.* Rather, "[t]he complaint need only allege enough facts to 'raise a reasonable expectation that discovery will reveal evidence of [each] necessary element.'" *Id.; Mejias v. C&S Wholesale Grocers, Inc.,* No. 5:20-cv-1435, 2020 U.S. Dist. LEXIS 123690 (E.D. Pa. July 14, 2020)

"It is "true that judging the sufficiency of a pleading is a context-dependent exercise. Some claims require more factual explication than others to state a plausible claim for relief." *Morris v. Phila. Hous. Auth.,* No. 10-5431, 2011 U.S. Dist. LEXIS 46465, at *8-9 (E.D. Pa. Apr. 28, 2011), citing *W. Penn Allegheny Health Sys. v. UPMC,* 627 F.3d 85, 98 (3d Cir. 2010)  Pleading a civil rights claim may require fewer factual allegations than pleading other claims. *Id.*

B. **Ms. Martin has stated claims for illegal discrimination, retaliation and for failure to reasonably accommodate her disability under the ADA and the PHRA (Counts I-VI).**

The analysis of Ms. Martin's disability and discrimination claims is the same under both the ADA and PHRA. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002), *Buskirk v. Apollo Metals*, 307 F.3d 160 (3d Cir. 2002).

The Americans with Disabilities Act Amendments Act ("ADAAA") enacted in 2009 relaxed the standard for the establishment of a disability, which created a distinction between the federal and state statutes as to this issue, as Pennsylvania has not amended the PHRA in accord. *Szarawara v. Cnty. of Montgomery*, 12-5714, 2013 U.S. Dist. LEXIS 90386, 2013 WL 3230691, at *2 (E.D. Pa. June 27, 2013) (holding that the PHRA has not been amended like the ADAAA to relax the standard for disability, and therefore, it was necessary to analyze plaintiff's ADA and PHRA claims separately); *Deserne v. Madlyn & Leonard Abramson Ctr. for Jewish Life, Inc.*, No. 10-03694, 2012 U.S. Dist. LEXIS 68852, 2012 WL 1758187, *3 n.3 (E.D. Pa. May 17, 2012) ("To date, Pennsylvania has not made parallel amendments to the PHRA or the regulations implementing the PHRA.")

While the disability standards are different, the remaining elements of an ADA and PHRA claim are essentially the same and can be analyzed together here because Avant does not argue that Ms. Martin has not properly pleaded that she is a qualified individual with a disability. *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa.

2014); *Blassingame v. Sovereign Sec., LLC*, No. 17-1351, 2017 U.S. Dist. LEXIS 123980, at *23 n.5 (E.D. Pa. Aug. 7, 2017)

The *prima facie* elements of an ADA discrimination claim under both statutes require a plaintiff to allege that he is"(l) disabled within the meaning of the ADA, (2) can perform essential functions of his job with or without reasonable accommodation, and (3) suffered an adverse employment action as a result of his disability." *Mejias v. C&S Wholesale Grocers, Inc.*, No. 5:20-cv-1435, 2020 U.S. Dist. LEXIS 123690, at *7 (E.D. Pa. July 14, 2020) [citing *Drummer v. Trustees of Univ. of Pennsylvania*, 286 F. Supp. 3d 674, 682 (E.D. Pa. 2017), *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000), and *Gaul v. Lucent Techs.*, 134 F.3d 576 (3d Cir. 1998)]

Avant makes only a single argument that Ms. Martin has not sufficiently pleaded that its termination of her was on account of her disability:  that she did not plead that there was a causal connection between her disability and the termination, inasmuch as there was no assertion that Avant had notice of her disability.  (Counts I and II) (Def. Br. 14)

This argument fails for multiple reasons.

First, Ms. Martin did plead that Avant knew of her disability.

See  ¶¶  20 ("At all times material hereto, Defendant was aware of Plaintiff's diagnosis and physiological impairments.") and 22 ("Defendant regarded and regards Plaintiff as having a disability.")

These averments are factual and meet the requirements *Iqbal, supra* and *Twombly, supra.* See *Alja-Iz v. United States V.I. Bd. of Educ.*, 625 F. App'x 591, 593 (3d Cir. 2015) ("Alja-Iz never alleged that the Board was aware of any purported disability when it made its decision not to grant him the certifications he sought..."), followed by *Lehenky v. Toshiba Am. Energy Sys. Corp.*, No. 20-4573, 2022 U.S. Dist. LEXIS 30344 (E.D. Pa. Feb. 22, 2022). See also *Mohney v. Pennsylvania*, 809 F. Supp. 2d 384, 401 (W.D. Pa. 2011)

Moreover, the context of the pleading must be considered, as well. *Morris, supra, supra.* Here, Ms. Martin has pleaded that she has been continuously employed by Avant since 2007 (¶ 16), that she is substantially limited in the major life activities of walking and standing (¶ 19), and that she had been permitted by Avant to work from home since 2017 (¶ 25).

Further, pleading intentional discrimination can be accomplished in a variety of ways, including pleading that the plaintiff would prevail under the analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817 (1973). See also *Drummer, supra, Holyk v. Scranton Counseling Ctr.*, No. 3:17-0435, 2018 U.S. Dist. LEXIS 13999 (M.D. Pa. Jan. 29, 2018)

At the motion to dismiss stage, Avant is not required to produce a legitimate business reason for its action. Critically, though, Ms. Martin has pleaded that Avant provided **no** business reason whatsoever for her termination; had **no** business reason for her termination;  and, indeed, falsely defended her unemployment compensation by asserting

that she had quit, which assertion, upon hearing, the Unemployment Compensation Board (UCBR) rejected.  (Comp. ¶¶ 27-28, 56-60).  The same evidence (and pleading) which supports a finding of pretext also supports a finding of inference of discrimination at the *prima facie* stage of analysis. *Prima facie* case and pretext inquiries often overlap.  *Johnson v. Del. Cty. Juvenile Det. Ctr.,* 545 F. App'x 135, 139 (3d Cir. 2013)  If Ms. Martin's fact-specific assertions are proven at trial, Ms. Martin will be the verdict winner.

Second, Ms. Martin pleaded that on February 14, 2020, ten days before her termination, she provided Avant with her doctor's note regarding her request for her reasonable accommodation to be permitted to perform her duties from home.  (Comp. ¶¶ 36-37, 46).

That note is attached to this brief as Exhibit A.

As a general matter, a ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment." *Winer Family Tr. v. Queen*, 503 F.3d 319, 328-29 (3d Cir. 2007), citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) and *Angelastro v. Prudential-Bache Secur.,* 764 F.2d 939 (3d Cir. 1985)

Dr. James Galasso's note stated "Dotty suffers from disabling hip pain and requires a brace on her right leg for ambulation since May of 2015.  In my medical opinion, it would

be an undue hardship to make her leave home for work. She would benefit from continuing to work from home."

The content of the note and the temporal proximity of Ms. Martin's termination more than adequately pleads causation.

Third, and finally, Avant attempts to support its argument with cases deciding motions for summary judgment or for post-trial relief, not motions to dismiss under FRCP 12(b)(6).

> It is axiomatic that the standards for dismissing claims under FED.R.CIV.P. 12(b)(6) and granting judgment under either FED.R.CIV.P. 50 or FED.R.CIV.P. 56 are vastly different. As we have explained, "a motion for summary judgment is different in critical respects from a motion to dismiss for failure to state a claim. In addition to the fact that a plaintiff presumably has had an opportunity to obtain admissions during discovery, a motion for summary judgment is reviewed under a much more stringent standard than a motion to dismiss for failure to state a claim.

> *Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir. 2009), citing ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 863 n.17 (3d Cir. 1994).*

Avant concedes that a minimum Ms. Martin has averred notice and causation, arguing that the Complaint presents "significant question as to whether Plaintiff actually provided notice of an alleged disability" (Def.Br.14), which is a sufficient reason alone to deny its motion.

Avant persisted in questioning the strength of Ms. Martin's evidence, not her pleading. Each of the following cases cited by Avant were dispositions of motions for summary judgment:

- *Showers v. Endoscopy Ctr. of Cent. Pa., LLC*, 58 F. Supp. 3d 446 (M.D. Pa. 2014)

- *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177 (3d Cir. 2010)

- *Emmell v. Phoenixville Hosp. Co., LLC,* 303 F. Supp. 3d 314 (E.D. Pa. 2018)

- *Hodson v. Alpine Manor, Inc.,* 512 F. Supp. 2d 373

- *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296 (3d Cir. 1999)

- *Colwell v. Rite Aid Corp.,* 602 F.3d 495 (3d Cir. 2010)

Each of the following cases cited by Avant were dispositions of motions for post-trial relief:

- *Stultz v. Reese Bros.,* 2003 PA Super 408, 835 A.2d 754

- *Armstrong v. Burdette Tomlin Mem'l Hosp.,* 438 F.3d 240 (3d Cir. 2006)

Avant's citation to *Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008) is inapt because it was a *42 USC §1983* case in which the plaintiff had not pleaded facts demonstrating intention, as the claim was based on omissions, rather than commissions.

Avant's citation to *Centennial Sch. Dist. v. Phil L.,* 559 F. Supp. 2d 634 (E.D. Pa. 2008) was *dicta* in reference to standard of review generally in an Individuals with Disabilities Education Act (IDEA) and Rehabilitation Act case.

*Edgar v. Avaya, Inc.,* 503 F.3d 340 (3d Cir. 2007) was an ERISA case, with no application to notice or causation.

Avant cited no case in which a motion to dismiss in an ADA or PHRA disability case was granted on account of lack of notice of disability to the employer, particularly in which such notice is expressly pleaded.

Accordingly, Avant's motion to dismiss Counts I and II should be denied.

As to Counts III and IV (ADA and PHRA retaliation), Avant concedes that a request for a reasonable accommodation of disability constitutes protected activity under both statutes. *Shellenberger v. Summit Bancorp*, 318 F.3d 183 (3d Cir. 2003)

Avant incorrectly asserts that "the Complaint does not identify or make any averment or claim that Martin was engaged in protected activity." (Def. Br. 16)

To the contrary, Ms. Martin pleaded "On Saturday, February 8, 2020, Ms. Martin requested from Avant the reasonable accommodation of being permitted to continue to work from home." (¶ 29)

Avant ignores this express request for a reasonable accommodation and argues, instead, that the denial of vacation time, previously requested by her and approved by Avant, was what is asserted by Ms. Martin as her request for a reasonable accommodation. (¶33-35, Def. Br. 16-17)

This is a misreading of the clear averments of the Complaint.

Ms. Martin does not assert that her timely and properly made request for vacation time was a request for a reasonable accommodation. Rather, she clearly states "Avant denied Ms. Martin's vacation request in **retaliation for her request for the reasonable**

accommodation of being permitted to perform her duties from home."  (¶ 35) (emphasis added)

The denial of the vacation time occurring **four days** after making her request for a reasonable accommodation of her disability demonstrates retaliatory animus on the part of Avant, which is why it was pleaded.  (¶¶ 29, 33)  The same is true of the reprimand issued on February 14, 2020, **six days** after she had made her reasonable accommodation request.  (¶¶ 29, 36)

This timing is so extremely close, that it is not merely evidence of retaliatory intent on the part of Avant, but it can be conclusive in favor of Ms. Martin even without her pleading of other evidence of intent or pretext, such as the lack of any business reason for the actions of Avant (¶¶ 48-49), the direct linkage of the reprimand to the taking of leave (¶36), and Avant's false defense to the unemployment compensation claim (¶¶ 55-60).

As the United States Supreme Court has recognized, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist*, 532 U.S. 268, at 273-74 (2001); accord *Eskridge v. Phila. Housing Auth.*, 722 F. App'x 296, 299 (3d Cir. 2018). "[T]here is no bright-line rule as to what amount of time is unusually suggestive." *LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 232 (3d. Cir. 2007)

The Third Circuit "ha[s] found that a temporal proximity of two days is unusually suggestive of causation." *Blakney v. Philadelphia,* 559 F. App'x 183, 186 (3d Cir. 2014) (citing *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989)). That court also "ha[s] held that a temporal proximity greater than ten days" is not itself sufficiently suggestive to establish causation but instead, "requires supplementary evidence of retaliatory motive." Id. at 186. Ms. Martin has pleaded a substantial number of supplementary facts evidencing retaliatory motive.

See also *Reyer v. Saint Francis Country House,* 243 F. Supp. 3d 573, 587 (E.D. Pa. 2017) (stating that "[w]hen a causal connection relies on temporal proximity alone, courts generally require that the termination occur within a few days of the protected activity"); *Cullison v. Dauphin Cty.,* Pa., No. 1:10-CV-00705, 2012 U.S. Dist. LEXIS 102575, 2012 WL 3027776, at *11 (M.D. Pa. May 18, 2012) (stating that "for a causal connection to be made [based on proximity alone], the temporal proximity between the occurrences has generally been in terms of hours or days, not months"), report and recommendation adopted, No. 1:10-CV-705, 2012 U.S. Dist. LEXIS 102576, 2012 WL 3026784 (M.D. Pa. July 24, 2012). See also *Hernandez v. Temple Univ. Hosp.,* No. 17-4381, 2019 U.S. Dist. LEXIS 2853, at *21-22 (E.D. Pa. Jan. 8, 2019)

Accordingly, Avant's motion to dismiss Counts III and IV should be denied.

Avant makes only the same notice of disability arguments with respect to Counts V and VI (failure to accommodate) as it did with respect to Counts I and II (discrimination) and Ms. Ms. Martin reiterates and incorporates her responses to those arguments here.

Ms. Martin reiterates and incorporates, as well, her arguments concerning Counts III and IV (retaliation) that her request for vacation time, first approved and then revoked, was not her request for a reasonable accommodation. Rather, it was her request to work from home.

Accordingly, Avant's motion to dismiss Counts V and VI should be denied.

C. **Ms. Martin has stated claims for the illegal termination of her employment, denial of medical leave, and interference with and obstruction of her right to medical leave in violation of the FMLA (Counts VII-IX).**

At Counts VII-IX of the Complaint, Ms. Martin has pleaded facts in support of her claims that she was terminated on account of request for leave under the FMLA, that she was denied leave under the FMLA; and, that Avant obstructed and interfered with her right to leave under the FMLA.

Avant does not contest that Ms. Martin was eligible for leave under the FMLA whe she requested it.

In its motion to dismiss all three counts, Avant argues only that Ms. Martin's claim for leave under the FMLA was defective because her original request for FMLA did not include a completed application, nor was it accompanied by a medical certification.

Neither is required to support the FMLA claims.

44.  On February 24, 2020, Plaintiff reiterated to Roger Dupuis, news editor for Defendant, that she was requesting leave under the FMLA.

45.  Defendant failed and refused to grant Plaintiff her requested medical leave under the FMLA, to which she was entitled.

46.  Defendant terminated Plaintiff on February 24, 2020.

48.  Defendant stated no business reason to Plaintiff for her termination.

49.  Defendant had no business reason for Plaintiff's termination.

There is no authority for the proposition that Ms. Martin's FMLA claims depend upon pleading the presentation of a completed application for leave or a medical certification of the need for leave.

To the contrary, all that Ms. Martin was required to plead was that **she gave notice to the defendant of her intention to take FMLA leave.** *Capps v. Mondelez Glob., LLC,* 847 F.3d 144, 155 (3d Cir. 2017) (quoting *Ross v. Gilhuly,* 755 F.3d 185, 191-92 (3d Cir. 2014)); *Sylvester v. DGMB Casino, LLC,* No. 15-8328 (RMB/KMW), 2017 U.S. Dist. LEXIS 143920, at *33 (D.N.J. Sep. 6, 2017); *Mascioli v. Arby's Rest. Grp., Inc.,* 610 F. Supp. 2d 419, 430 (W.D. Pa. 2009)(citing *Lombardo v. Air Products and Chemicals, Inc.,* No.06-1120, 2006 U.S. Dist. LEXIS 46077, 2006 WL 2547916, at *11 (E.D. Pa. July 7, 2006) (citing *Weisman v. Buckingham Twp.,* No. 04-4719, 2005 U.S. Dist. LEXIS 11696, 2005 WL 1406026, at *11 (E.D. Pa. June 14, 2005))); *Kercher v. Reading Muhlenberg Career & Tech. Ctr.,* No. 15-6674, 2017 U.S. Dist. LEXIS 145013, at *17-18 (E.D. Pa. Sep. 6, 2017)

*Weisman v. Buckingham Twp.*, No. 04-4719, 2005 U.S. Dist. LEXIS 11696, 2005 WL 1406026, at *11 (E.D. Pa. June 14, 2005))); *Kercher v. Reading Muhlenberg Career & Tech. Ctr.*, No. 15-6674, 2017 U.S. Dist. LEXIS 145013, at *17-18 (E.D. Pa. Sep. 6, 2017)

That is precisely what Ms. Martin pleaded, first on February 20, 2020 and then on February 24, 2020, immediately before she was terminated.  (¶¶ 38,44)

The four day period between notice and termination and the reiteration of the request on the date of the termination is sufficient to establish the inference of retaliation, interference and obstruction.

Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-81 (3d Cir. 20000; *LeBoon, supra* at 233, the temporal proximity in *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (seven days) and others is in the realm of what has been found sufficient at the *prima facie* stage, see, *e.g.*, *Jalil, supra* at 708  (finding two days unduly suggestive); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (three weeks); *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (four days).

See also, generally, the authority referenced previously in the section on disability accommodation request retaliation.

Avant also suggests, again with summary judgment disposition cases only, [*Atchison v. Sears*, 666 F. Supp. 2d 477 (E.D. Pa. 2009); *Reinhart v. Mineral Techs., Inc.,*

No. 05-4203, 2006 U.S. Dist. LEXIS 89279 (E.D. Pa. Nov. 27, 2006); and, *Ross v. Gilhuly*, 755 F.3d 185 (3d Cir. 2014)] that Ms. Martin's FMLA claims be dismissed at the pleading stage because she would have been discharged by Avant notwithstanding any request of leave under the FMLA.

There is no basis in the pleadings for this defense, which is appropriately made, if at all, only at the summary judgment stage.

Accordingly, Avant's motion to dismiss Counts VIII and IX should be denied.

### D. **Ms. Martin has stated claims for illegal discrimination under the ADEA and the PHRA (Counts X-XI).**

At Counts X-XI of the Complaint, Ms. Martin has pleaded facts in support of her claims that she was terminated on account of her age

For the purpose of a motion to dismiss, the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA, the analysis of the age discrimination claims is the same under both statutes. *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005) (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) ("There is no need to differentiate between . . . ADEA and PHRA claims because . . . the same analysis is used for both."). See also *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015). The only exception may be the application of the "but for" analysis of the ADEA under *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 129 S. Ct. 2343 (2009), which has no application to this case at this stage.

Avant's sole argument as to these two counts is that Ms. Martin did not use the phrase "sufficiently younger" in her pleading.  There is no authority that at this motion to dismiss that the phrase "sufficiently younger" must be used by the plaintiff to survive dismissal.

Where, as here, a plaintiff relies on indirect evidence to allege age, sex, or race discrimination in violation of the ADEA, the complaint must first allege facts that, if true, would establish the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position he held; (3) the plaintiff suffered an adverse employment action; and (4) **the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination**. *Drummer*, supra at 68; *Holyk, supra* (emphasis added)

To plausibly allege the fourth element, the complaint may either: (1) allege that "similarly situated employees who . . . were not members of the same protected class . . . were treated more favorably under similar circumstances" or (2) **allege facts that "otherwise show[ ] a causal nexus between [the employee's] membership in a protected class and the adverse employment action."** *Drummer,* supra at 681; *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003); *Greene v. V.I. Water & Power Auth.,* 557 F. App'x 189, 195 (3d Cir. 2014) (emphasis added)

It is not necessary to plead the existence of employees comparable to the plaintiff. The entire context of the pleading must be considered.

See *Davis v. Tammac Corp.*, 127 F. Supp. 2d 625, 633 (M.D. Pa. 2000) ("Although age discrimination may be inferred from a showing that the plaintiff was replaced by a sufficiently younger person, or that other younger persons were treated more favorably, the Third Circuit has held that a plaintiff does not have to prove replacement or favorable treatment of a person outside the protected class in order to establish a *prima facie* case of employment discrimination."), citing *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997*). Giuliani v. Polysciences, Inc.*, 275 F. Supp. 3d 564, 576 (E.D. Pa. 2017)

The following averments support an inference of discrimination.

14.   Plaintiff was born on March 10, 1955.

15.   Plaintiff has been continuously employed by Defendant, or its predecessors, since 2007.

46.   Defendant terminated Plaintiff on February 24, 2020.

47.   Defendant stated no business reason to Plaintiff for her termination.

48.   Defendant had no business reason for Plaintiff's termination.

49.   Plaintiff was the oldest editor on the staff of Defendant.

50.   Plaintiff was, and is, capable of performing the duties of the remaining, younger editors.

51.   Upon the termination of Plaintiff, her duties were assigned to younger, less qualified editors.

The entire context of Ms. Martin's Complaint demonstrates the plausibility that she will be able make her case of age discrimination upon the development of evidence through discovery. *Fowler, supra*

Instead of cases dealing with Rule 12(b)(6) motions to dismiss, Avant relies upon summary judgment motions and post-trial relief motions, to wit:

- *Burton v. Teleflex Inc.,* 707 F.3d 417 (3d Cir. 2013) (summary judgment)

- *Carter v. Mid-Atlantic Healthcare, LLC,* 228 F. Supp. 3d 495 (E.D. Pa. 2017) (summary judgment)

- *DeCicco v. Mid-Atl. Healthcare, LLC,* 275 F. Supp. 3d 546 (E.D. Pa. 2017) (summary judgment)

- *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S. Ct. 1701 (1993) (judgment nov)

- *USPS Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S. Ct. 1478 (1983) (post-trial motions)

- *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089 (1981) (post-trial motions)

- *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 98 S. Ct. 2943 (1978) (post-trial)

- *Briggs v. Temple Univ.,* 339 F. Supp. 3d 466 (E.D. Pa. 2018) (post-trial)

This Honorable Court should follow the direction of *Acevedo v. Monsignor Donovan High Sch.*, 420 F. Supp. 2d 337, 344 (D.N.J. 2006):

> The defendants' arguments in support of their motion to dismiss are more appropriate for a motion for summary judgment after the parties have engaged in discovery. Accordingly, the Court will deny the defendants' motion to dismiss G. Acevedo's ADEA claim insofar as the motion claims that G. Acevedo has failed to set forth a *prima facie* case of age discrimination under the ADEA.

Accordingly, Avant's motion to dismiss Counts X and XI should be denied.

## IV.   CONCLUSION

Avant has failed to show that Ms. Martin has failed to sufficiently plead her claims under the ADA, the FMLA, the ADEA and the PHRA.

Each count stands as pleaded.

However, in the event that as to any count which this Honorable Court determines has been insufficiently pleaded, leave should be granted to Ms. Martin to amend her Complaint. *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004); *Holyk, supra* at *2-3

Avant's motion should be denied and dismissed in its entirety.

RESPECTFULLY SUBMITTED:

Borland & Borland, L.L.P.

By:   /s/ Kimberly D. Borland
      KIMBERLY D. BORLAND, ESQUIRE
      11th Floor, 69 Public Square
      Wilkes-Barre, PA 18701
      (570) 822-3311
      (570) 822-9894 (fax)
      Attorney ID #23673
      Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I, Kimberly D. Borland, Esquire hereby certify that on this 23rd day of May 2022 ,

true and correct copy of the foregoing Plaintiff's Brief in Opposition to Defendant's Motion to

Dismiss ,to be served to the following person via the Court's CM/ECF system as follows:

William E. Vinsko, Jr., Esquire
Brian M Vinsko, Esquire
37 North River Street
Wilkes-Barre Pa  18701


RESPECTFULLY SUBMITTED:

/s/ Kimberly D. Borland
KIMBERLY D. BORLAND, ESQUIRE
11th Floor, 69 Public Square
Wilkes-Barre, PA 18701
(570) 822-3311
Attorney ID.#23673
kborland@borlandandborland.com
Attorney for Plaintiff

## CERTIFICATION OF WORD COUNT

I hereby certify that according to the word count function provided in Microsoft Word contains 5,565 words.  The text of the brief is composed in monospaced, 14 point Arial Narrow typeface.

Respectfully Submitted:

/s/ Kimberly D. Borland, Esquire
Kimberly D. Borland, Esquire
Pa Supreme Court ID # 23673
Borland & Borland, LLP
11th Floor
69 Public Square
Wilkes-Barre Pa  18701
(570) 822-3311
kborland@borlandandborland.com
Attorney for the Plaintiff

27



**James W. Galasso, III, D.O.**
**Kari E. Nargoski, PA.C.**

*Family Health Center*

February 14, 2020

RE: Dotty Martin

DOB: 03/10/1955

To Whom It May Concern:

Dotty suffers from disabling hip pain and requires a brace on her right leg for ambulation since May of 2015. In my medical opinion, it would be an undue hardship to make her leave home for work.  She would benefit from continuing to work from home.

Please contact my office with any questions.

Sincerely,

James W. Galasso, III DO



EXHIBIT

A

Diplomate
American Board of Family Practice
American Board of Osteopathic Examiners

1200 Main Street  •  Swoyersville, PA 18704  •  570-283-3301  •  Fax 570-283-3304

🛈 Cited
As of: May 20, 2022 9:15 PM Z

## *Blassingame v. Sovereign Sec., LLC*

United States District Court for the Eastern District of Pennsylvania

August 7, 2017, Decided; August 7, 2017, Filed

CIVIL ACTION NO. 17-1351

**Reporter**

2017 U.S. Dist. LEXIS 123980 *; 2017 WL 3390199

YVETTE BLASSINGAME v. SOVEREIGN SECURITY, LLC

**Counsel:** [*1] For YVETTE BLASSINGAME, Plaintiff: CARRIE LYNN DAVIS, LEAD ATTORNEY, PHILADELPHIA, PA.

For SOVEREIGN SECURITY, LLC, Defendant: NEIL ALAN MORRIS, LEAD ATTORNEY, GABRIEL V. CELII, OFFIT KURMAN PA, PHILADELPHIA, PA; KATHARINE THOMAS BATISTA, OFFIT KURMAN, PHILADELPHIA, PA.

**Judges:** THOMAS N. O'NEILL, JR., J.

**Opinion by:** THOMAS N. O'NEILL

## Opinion

### MEMORANDUM

In the amended complaint presently before me, plaintiff Yvette Blassingame alleges that her employer, Sovereign Security, LLC, subjected her to sexual discrimination, a sexually hostile work environment, retaliation, disability discrimination and negligent and intentional infliction of emotional distress. Defendant now moves to dismiss the entire complaint under *Federal Rule of Civil Procedure 12(b)(6)*. For the following reasons, I will grant the motion as to the claims of sexual discrimination, hostile work environment and intentional/negligent infliction of emotional distress, but deny it as to the remainder of the claims.

### FACTUAL BACKGROUND

According to the facts set forth in the amended complaint, plaintiff began working for defendant on August 14, 2011, as a certified armed guard. Am.

Compl., Dkt. No. 9, ¶ 13. She worked forty hours per week, as well as regular additional overtime of approximately ten hours [*2] per week. Id. ¶ 16. Because defendant was contracted by the Philadelphia Housing Authority (PHA) to provide security services at PHA locations, plaintiff was stationed at various PHA sites throughout Philadelphia. Id. ¶¶ 17-18.

Beginning in September 2014, plaintiff was stationed at PHA's Information Systems Management (ISM) Building to provide security services. Id. ¶ 19. She was one of the very few women who regularly worked at the ISM Building and was defendant's only employee during her shifts. Id. ¶ 22. During her time at the ISM Building, Plaintiff reported to Mr. Richard Brown, a PHA employee and site supervisor. Id. ¶ 20. Mr. Brown was responsible for overseeing her day-to-day duties while she was stationed at the ISM Building. Id. ¶ 21.

In December 2015, a male PHA employee named Shannon (whose last name is unknown), used the women's bathroom at the ISM Building on at least six occasions while plaintiff was occupying it. Id. ¶ 23. On several of these occasions, plaintiff came in contact with Shannon while inside the bathroom and called out from inside the bathroom to let Shannon known she was there so that he would leave. Id. ¶¶ 24-25. He disregarded these alerts. Id. ¶ 25. [*3] Both the women's and the men's bathrooms in the ISM building are clearly and visibly labeled as such on the exterior. Id. ¶ 26.

Sometime in early December 2015, plaintiff complained about Shannon's use of the women's bathroom to both Mr. Christopher Moore, plaintiff's direct supervisor and defendant's employee, and Mr. Brett Treat, an employee and manager of defendant. Id. ¶ 27. Neither Mr. Moore nor Mr. Treat indicated to plaintiff that any corrective action would be taken and, in fact, took no corrective action as a result of her complaint. Id. ¶¶ 28-29. Plaintiff also complained to Mr. Brown about Shannon's use of the women's bathroom while plaintiff was occupying it.

Id. ¶ 30.

On December 22, 2016, Mr. Brown witnessed Shannon exit the women's bathroom as plaintiff was entering it. Id. ¶ 31. That same day, Mr. Brown asked plaintiff if she wanted to file a formal complaint against Shannon. Id. ¶ 32. Plaintiff declined, but "asked Mr. Brown in good faith to verbally counsel Shannon for creating a sexually hostile environment." Id.

On December 31, 2015, Mr. Treat notified plaintiff that he was immediately removing her from the ISM Building and assigning her to another site. Id. ¶ 33. [*4] When plaintiff questioned the reason for her removal, Mr. Treat stated that Officer Kyle (last name unknown), a PHA employee and liason between PHA and defendant, instructed Mr. Treat that plaintiff was to be fired or, at a minimum, removed from the ISM Building due to an alleged complaint. Id. ¶ 34. Although plaintiff asked defendant and Mr. Brown for additional information regarding the complaint, Mr. Brown provided no such information. Id. ¶ 35. To plaintiff's knowledge, no investigation was made into this alleged complaint and plaintiff was not asked any questions about it by defendant or PHA. Id. ¶ 36. When plaintiff asked Brown about the complaint, he responded that he was not aware of it—even though it would have been customary for him to have been made aware of it—and not to worry about it. Id. ¶¶ 37-38. Throughout her employment with defendant, plaintiff had never received a complaint and, in fact, was often recommended and personally requested by clients for additional shifts or special events. Id. ¶ 39.

Defendant replaced plaintiff with a male employee at the ISM Building and, on January 5, 2016, placed plaintiff at the Richard Allen site, also a PHA location, with a less [*5] favorable work schedule. Id. ¶¶ 40-41. The Richard Allen site was undergoing construction at that time and, therefore, had excess dirt and dust, which aggravated plaintiff's asthma condition. Id. ¶¶ 12, 42. Defendant was aware of plaintiff's disability before her employment began, as plaintiff had listed her asthma diagnosis and medications on her employment application. Id. ¶¶ 43-44.

On January 5, 2016, plaintiff told Mr. Treat that she was having severe asthma complications due to the conditions at the Richard Allen site and asked him to send a relief person so that she could go to the emergency room. Id. ¶ 45. Even though Mr. Treat stated that he would send a relief person, plaintiff took it upon herself to contact a co-worker to relieve her at the

Richard Allen site. Id. ¶¶ 46-47. Plaintiff then immediately went to the emergency room at Lankenau Hospital in Wynnewood, Pennsylvania. Id. ¶ 48. Upon discharge, plaintiff contacted Mr. Treat and gave him a summary of her diagnosis and hospital discharge instructions, which included not being around excessive dirt and dust that could aggravate her medical condition. Id. ¶ 50. Because of the construction at the Richard Allen site, she [*6] was unable return to that site after the emergency room visit. Id. ¶ 51.

On January 6, 2016, defendant removed plaintiff from full-time work and placed her on unpaid leave, claiming that there was "nothing available." Id. ¶ 52. Beginning on January 7, 2016, defendant offered plaintiff on-call assignments at various locations from time to time while plaintiff remained on unpaid leave. Id. ¶ 53. These on-call assignments were neither regular nor full time, which resulted in a significant reduction in plaintiff's hours. Id. ¶ 54. Plaintiff remains on an unpaid leave of absence. Id. ¶ 55.

On January 14, 2016, plaintiff filed a timely written charge of discrimination against defendant with the Equal Employment Opportunity Commission (EEOC), which was also dual filed with the Pennsylvania Human Relations Commission (PHRC). On or about January 11, 2017, the EEOC issued plaintiff a Notice of Right to Sue. Id. ¶ 10.

On March 27, 2017, plaintiff initiated the current litigation and, on June 20, 2017, she filed her first amended complaint. The amended complaint sets forth nine causes of action as follows: (1) sex discrimination in violation of *Title VII*; (2) harassment and hostile and abusive working [*7] environment in violation of *Title VII*; (3) retaliation in violation of *Title VII*; (4) disability discrimination in violation of the *Americans With Disabilities Act (ADA)*; (5) sex discrimination in violation of the *Pennsylvania Human Relations Act* (PHRA); (6) harassment and hostile and abusive working environment in violation of the PHRA; (7) retaliation in violation of the PHRA; (8) disability discrimination in violation of the PHRA; and (9) intentional infliction of emotional distress.

On July 6, 2017, Defendant filed the current motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, Dkt. No. 11, and plaintiff responded on July 20, 2017, Dkt. No. 12.

**STANDARD OF REVIEW**

Under *Federal Rule of Civil Procedure 12(b)(6)*, a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*; see also *Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)*. The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. "A claim has [*8] facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. *Id.*

The Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard. *Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014)*. First, the court outlines the elements a plaintiff must plead to state a claim for relief. *Id. at 365*. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id.* Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" *Id.*, quoting *Iqbal, 556 U.S. at 679*. The last step is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.*, quoting *Iqbal, 556 U.S. at 679*.

## DISCUSSION[1]

### I. Failure to Exhaust

Defendant first argues that plaintiff has failed to exhaust

her administrative remedies with respect to her sexually hostile work environment claims set forth in Counts [*9] II and VI of the Amended Complaint. Specifically, defendant contends that, in her charge of discrimination filed with the EEOC and the PHRC, plaintiff checked off "retaliation" and "disability" as bases for alleged discrimination, without ever identifying "sex" as an additional basis of discrimination. Accordingly, defendant asserts that any sex-based discrimination claims must be dismissed. I agree.

A Title VII plaintiff is required to exhaust all administrative remedies before bringing a claim for judicial relief. *42 U.S.C. § 2000e-5(e)*; *Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir.1996)*; *DeLa Cruz v. Piccari Press, 521 F. Supp. 2d 424, 431 (E.D. Pa. 2007)*. To do so, the plaintiff must "file[] a timely discrimination charge with the EEOC." *DeLa Cruz, 521 F. Supp. 2d at 431, citing Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)*. The purpose of this requirement is "(1) to ensure 'that an employer is made aware of the complaint lodged against him and is given the opportunity to take remedial action,' and (2) to give 'the EEOC the opportunity to fulfill its statutory duties of eliminating unlawful practices through the administrative process.'" *O'Donnell v. Michael's Family Rest., Inc., No. 07-5386, 2008 U.S. Dist. LEXIS 52018, 2008 WL 2655565, at *2 (E.D. Pa. July 1, 2008)*, quoting *Jackson v. J. Legis Crozer Library, No. 07-481, 2007 U.S. Dist. LEXIS 61582, 2007 WL 2407102, at *5 (E.D. Pa. Aug. 22, 2007)*, citing *Bihler v. Singer Co., 710 F.2d 96, 99 (3d Cir.1983)*.[2] In *Title VII* actions, failure to exhaust administrative remedies is an affirmative defense on which the defendant bears the burden of proof. *Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997)*.

The administrative exhaustion requirement "is tempered by a fairly liberal construction given to [*10] EEOC charges." *Schouten v. CSX Transp., Inc., 58 F. Supp. 2d 614, 616 (E.D. Pa. 1999)*. Generally, a Title VII plaintiff cannot bring claims in a civil lawsuit that were not first included in an EEOC charge and exhausted at

---

[1] Plaintiff does not contest either the dismissal of her sexual discrimination claims in Counts I and V or the dismissal of her tortious infliction of emotional distress claim in Count IX. Accordingly, I will grant the motion to dismiss these claims without discussion of defendant's arguments.

[2] "Although the PHRA does not contain an analogous [exhaustion of administrative remedies] requirement, courts have held that the PHRA should be interpreted consistently with *Title VII*." *McLaughlin v. Rose Tree Media Sch. Dist., 52 F. Supp. 2d 484, 492 (E.D. Pa. 1999)* (citations omitted). "To bring suit under the PHRA, a plaintiff must have first filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination." *Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997)*, citing 43 Pa. Cons. Stat. §§ 959(a), 962.

Case 3:22-cv-00276-JKM   Document 12   Filed 05/23/22   Page 41 of 169

Page 4 of 10
2017 U.S. Dist. LEXIS 123980, *10

the administrative level. _Burgh v. Borough Counsel of Montrose, 251 F.3d 465, 469-70 (3d Cir. 2000)_. It is well-established that merely checking off the box on the charge form is insufficient to exhaust it as a claim. _McCutchen v. Sunoco, Inc., No. Civ.A.01-2788, 2002 U.S. Dist. LEXIS 15426, 2002 WL 1896586, at *3 (E.D. Pa. Aug. 16, 2002), aff'd 80 Fed. Appx. 287 (3d Cir. 2003)_. Rather, a plaintiff that checks off a box for a particular type of discrimination on a Charge form, but then leaves the form bereft of any allusion to allegations of such discrimination cannot be deemed to have exhausted that claim. _Id._

On the other hand, the mere failure to check a specific box on the EEOC charge form is not a fatal error. _Doe v. Kohn Nast & Graf, P.C., 866 F. Supp. 190, 196 & n.2 (E.D. Pa. 1994)_. Rather, "[t]he most important consideration in determining whether the plaintiff's judicial complaint is reasonably related to his EEOC charge is the factual statement." _Id. at 197_. Thus, "if the allegations made in the complaint filed in this Court could be 'reasonably expected to grow out of' those contained . . . in the EEOC charge, the pleading of the plaintiff will withstand a motion to dismiss, as the administrative remedies available to plaintiff will have been exhausted." _Schouten, 58 F. Supp. 2d at 616_, quoting _Page v. ECC Mgmt. Servs., No. 97-2654, 1997 U.S. Dist. LEXIS 19547, 1997 WL 762789, at *3 (E.D. Pa. Dec. 8, 1997)_ (further quotations omitted). Stated differently, where a plaintiff [*11] attempts to assert a claim at the district court level than was not raised in the administrative charge, the claim is considered exhausted if it is "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." _Antol, 82 F.3d at 1295_, quoting _Waiters, 729 F.2d at 237_. A reasonable EEOC investigation should include claims not specifically mentioned in the EEOC charge "where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint." _Pourkay v. City of Philadelphia, No. Civ.A.06-5539, 2009 U.S. Dist. LEXIS 53111, 2009 WL 1795814, at *5 (E.D. Pa. June 23, 2009)_, citing _Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984)_. "In such a case, the Court may reasonably expect an awareness on the part of the defendant that such allegations are likely." _Schouten, 58 F. Supp. 2d at 616-17_.

Plaintiff concedes that only "retaliation" and "disability" were specifically checked off on her charge of discrimination filed with the EEOC and PHRC. Nonetheless, she asserts that the particulars of her charge should have put the EEOC and PHRC on notice

that sexual harassment was involved. Specifically, in support of her charge, she alleged as follows:

On August 14, 2011 I was hired by Respondent as an Armed Guard. Throughout my employment I was placed at multiple buildings managed by the Philadelphia Housing Authority (PHA) to perform security. From September 2014 through November [*12] 2015 I was stationed at PHA's Information Systems Management (ISM) building. I never had any performance issues nor was ever disciplined. In early December 2015, a PHA employee, Mr. Shannon LNU [last name unknown] used the women's bathroom while I was occupying it. I complained to his supervisor, Mr. Richard Brown. About a week later, Mr. Shannon LNU was caught using the woman's restroom again. Mr. Brown asked if I'd like to file a formal complaint. I declined and asked Mr. Brown to verbally counsel Mr. Shannon LNU for creating a sexually hostile environment. On December 31, 2015 Sgt. Kyle LNU of the PHA instructed my supervisor Mr. Brad Treat that I was to be removed from the ISM building due to an alleged employee complaint. On January 5, 2016 Respondent placed me at another PHA site (Richard Allen site). Due to the site undergoing construction, creating an abundance of dirt and dust, my disability was aggravated forcing me to visit the emergency room. Following my hospital visit, I have yet to return to work.

Mr. Brad Treat, supervisor, removed me from my post at the ISM building at the request of Sgt. Kyle LNU and removed me from my post at the Richard Allen site and informed me [*13] that there [were] no other vacant posts for reassignment.

I believe, in violation of _Title VII of the Civil Rights Act of 1964_, as amended, I was reassigned to a less desirable assignment and had my hours reduced in retaliation for opposing unlawful harassment. Upon being transferred, I further allege being denied a reasonable accommodation for my disability, in violation of the Americans with Disabilities Act of 1990, as amended. Mr. Treat failed to engage in the interactive process and placed me on an unpaid leave of absence.

Compl., Ex. A.

Reading these allegations liberally, I find that plaintiff has not exhausted her claim of hostile work environment. A plaintiff alleging a hostile work environment claim "must establish that: (1) [s]he

2017 U.S. Dist. LEXIS 123980, *13

suffered intentional discrimination because of [her] [gender]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected [her]; (4) it would have detrimentally affected a reasonable person of the same protected class in [her] position; and (5) there is a basis for vicarious liability." *Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005)*, quoting *Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)*. "For a hostile work environment claim to succeed, the conduct complained of must be adverse, severe, pervasive or regular and of the kind [*14] that would have detrimentally affected a reasonable person in like circumstances." *Harley v. U.S. Sec'y of Treasury, 444 F. App'x 594, 595 (3d Cir. 2011)*, citing *Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009)*. The Court of Appeals found a hostile work environment claim to be within the scope of an initial EEOC charge where the charge "alleged the plaintiff was subjected to an 'abusive atmosphere,' a phrase which is interchangeable with 'hostile work environment.'" *See Barzanty v. Verizon PA, Inc., 361 F. App'x 411, 414 (3d Cir. 2010)*; *see also Raffaele v. Potter, No. 09-3622, 2012 U.S. Dist. LEXIS 1552, 2012 WL 33035, at *5 (E.D. Pa. Jan. 6, 2012)* ("[A] claim for hostile work environment is based on the 'pervasiveness' of the employer's discriminatory conduct and is fundamentally different from a claim for disparate treatment, which focuses on discrete events.").

In this case, plaintiff's administrative charge does not alert the agency to any severe, pervasive or regular behavior that detrimentally affected her. Rather, she described a total of two incidents in which "Mr. Shannon," a PHA employee and not an employee of defendant, used the women's bathroom while plaintiff was occupying it. Plaintiff alleges no other sexually harassing conduct that accompanied these events. After the first instance, plaintiff reported it to Mr. Shannon's supervisor, who was also not one of defendant's employees. A week later, Mr. Shannon was caught using the women's bathroom again and [*15] Mr. Brown immediately acted upon the matter, asking if plaintiff wanted to file a formal complaint. Plaintiff expressly declined to file any such complaint, but simply asked that Mr. Shannon be counseled. Although plaintiff used the buzzwords "sexually hostile work environment," it was solely in the context of requesting that Mr. Shannon be made aware that his use of the women's bathroom created such a situation. At no point does plaintiff allege that defendant either perpetuated or permitted any ongoing sexually hostile environment. Quite to the contrary, plaintiff's allegations suggest that defendant was not made aware of the situation, and that PHA, who

managed the site, promptly addressed the offensive behavior. Nothing in the charge indicates that the behavior became pervasive. While plaintiff's amended complaint now suggests that Mr. Shannon's behavior was, in fact, repeated and that defendant was notified but failed to act, no such facts were before any administrative agency. This absence of allegations from which the agency could infer a hostile work environment, together with plaintiff's failure to check the box for either "sex" or "continuing" action, compels the conclusion that [*16] plaintiff's administrative complaint does not "fairly encompass" a hostile work environment claim.

In light of the foregoing, I find that plaintiff has not exhausted her hostile work environment claims (Counts II and VI). As exhaustion is a prerequisite to bringing such claims in this court, I will grant defendant's motion to dismiss on this ground.

## II. Retaliation Claim

Counts III and VII of the amended complaint allege claims of retaliation. *Section 704(a) of Title VII* provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*42 U.S.C. § 2000e-3(a)*. To establish discriminatory retaliation under *Title VII*, a plaintiff must demonstrate that: (1) she engaged in activity protected by *Title VII*; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.[3] *Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995)*.

Defendant now asserts that plaintiff's retaliation claim fails for two reasons. First, it claims that plaintiff has not alleged any [*17] protected activity. Second, it argues that plaintiff cannot establish a causal connection between her complaints and her termination.

---

[3] The analysis required for adjudicating Plaintiff's *Title VII* and PHRA claims is identical. See *Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n. 3 (3d Cir. 2000)*. Accordingly, I address the *Title VII* and PHRA claims jointly.

Considering each argument separately, I will decline to grant defendant's motion to dismiss.

## A. **Protected Activity**

Under *Title VII*, it is unlawful for an employer to discriminate against an employee who either "[1] . . . has opposed any practice made an unlawful employment practice by this subchapter, or [2] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a)*. Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity he or she opposes is unlawful under *Title VII*. *Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006)*, as amended (Sept. 13, 2006).

Under the *Rule 12(b)(6)* standard of review, I find that plaintiff has plausibly pled that she engaged in protected activity. Plaintiff alleges that she was one of the very few women who worked in her section of the ISM building. Am. Compl. ¶ 22. Beginning in December 2015, a male employee of PHA, Shannon, used the women's bathroom at the ISM Building site on at least [*18] six occasions while plaintiff was occupying it. Id. ¶ 23. Plaintiff complained to her supervisors, Mr. Moore and Mr. Treat, and one of PHA's employees, Mr. Brown. Id. ¶¶ 27, 30. Although plaintiff declined to file a formal complaint, she asked Mr. Brown to verbally counsel Shannon for creating a "sexually hostile environment," thus demonstrating plaintiff's good faith belief that the activity she was opposing was unlawful.

In its reply brief, defendant contends that although plaintiff may have had a "good faith" belief about the nature of Shannon's conduct, it was not objectively reasonable as is also required for a retaliation claim. Defendant asserts that plaintiff fails to allege that Shannon made a single comments toward her, touched her or even did anything other than wholly ignore her, making her current claims of harassment unfounded. In support, defendant cites to a case from the Western District of Pennsylvania in which the court found that "no reasonable person could conclude that a few isolated incidents involving a man's use of the women's bathroom, without more—particularly when one did not witness the conduct—constituted unlawful harassment or discrimination." *Reynolds v. Port Auth. of Allegheny Cnty., No. 08-268, 2009 U.S. Dist. LEXIS 54760, 2009 WL 1837917, at *7 (W.D. Pa. June 26, 2009)*.

*Reynolds* [*19] , however, is distinguishable from the present case in several respects. In Reynolds, the court considered the retaliation claim on a motion for summary judgment after discovery. *2009 U.S. Dist. LEXIS 54760, [WL] at *1*. Moreover, the plaintiff had never seen her supervisor use the women's restroom, but only heard from another employee that the supervisor had urinated in the ladies' room "on a number of occasions"—conduct that the plaintiff believed was *racially* discriminatory. *2009 U.S. Dist. LEXIS 54760, [WL] at *6*. On a single occasion, plaintiff blocked her supervisor from entering the ladies' room by commenting that she did not want him to enter, and later claimed that this statement constituted protected speech. *2009 U.S. Dist. LEXIS 54760, [WL] at *7*. The court remarked that, aside from the fact that the plaintiff did not witness the conduct, it was not "objectively reasonable to believe that a supervisor's very occasional entrance into an otherwise empty ladies' room was proscribed by *Title VII*." Id.

By contrast, the motion currently before me is not a motion for summary judgment, but rather a motion to dismiss under *Rule 12(b)(6)* for which I must take all well-pled allegations in the amended complaint as true. That amended complaint explicitly alleges Shannon used the women's bathroom on at least six occasions [*20] in less than a month and, unlike in Reynolds, plaintiff came into contact with him on several occasions. Am. Compl. ¶¶ 23-25. Further, plaintiff called out to Shannon from inside the bathroom to get him to leave, requests which he ignored. Id. ¶¶ 24-25. Finally, plaintiff did not simply address her complaint to the offending employee, as the plaintiff did in Reynolds, but actually spoke to both her supervisor and Shannon's supervisor, explaining that she felt Shannon's actions created a sexually hostile environment. Id. ¶¶ 27-29, 31-32. At this juncture of the case, I find that such allegations are sufficient to plead that plaintiff engaged in protected activity for the purposes of her retaliation claim.

## B. **Causation**

To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d*

*259, 267 (3d Cir. 2007)*. The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her *First Amendment* rights is probative, but not dispositive, of the causation element. *Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003)*; *see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)* (stating that "temporal proximity [*21] merely provides an evidentiary basis from which an inference can be drawn"). For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Marasco, 318 F.3d at 512*, quoting *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997))*. The Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, *see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 & n.5 (3d Cir. 2000)*, whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of . . . wrongdoing, *Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003)*." *Conklin v. Warrington Twp., No. 06-2245, 2009 U.S. Dist. LEXIS 36256, 2009 WL 1227950, at *3 (M.D. Pa. April 30, 2009)*. "This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence." *Id.*

In the Amended Complaint, plaintiff alleges that she complained to both her employer, through Mr. Treat and Mr. Moore, and to Mr. Brown about Shannon's behavior sometime in "early December 2015." Am. Compl. ¶¶ 27, 30. On December 22, 2015, after Shannon was caught using the women's bathroom, plaintiff made a request that Shannon be verbally counseled for creating a sexually hostile environment. Id. ¶ 32. Only nine days later—and without any obvious intervening incident besides a mysterious "complaint" [*22] against plaintiff—Mr. Treat notified plaintiff that he was immediately removing her from the ISM building and reassigning her. Id. ¶¶ 33-34. Although defendant argues that plaintiff includes no allegations of animus by Mr. Treat, such allegations are unnecessary given the suggestive temporal proximity between her complaint and the retaliatory action.[4] Moreover, defendant's

argument that "Plaintiff offers no evidence to support that [Mr.] Treat would fabricate the complaint against her or that he had any retaliatory animus against her for complaining about Shannon," Def.'s Mem. Supp. Mot. to Dismiss, ECF No. 11-1, 16, is misplaced as plaintiff has no burden to either produce evidence in response to a motion to dismiss or discredit any possible innocent motivations for Mr. Treat's actions. Taking the alleged facts and all reasonable inferences therefrom in the light most favorable to plaintiff, I find that plaintiff has plausibly pled causation between her complaint about Shannon and her subsequent transfer.

### III. Disability Discrimination

Finally, defendant moves to dismiss plaintiff's claims of disability discrimination in Counts IV and VIII of the amended complaint. As I find that plaintiff [*23] adequately pleads disability discrimination, I decline to dismiss these causes of action.

The ADA[5] was enacted in 1990 to "prevent otherwise

---

sexually hostile work environment was her complaint to Mr. Brown on December 22, 2015, which is temporally proximate to the December 31, 2015 request by Officer Kyle. Although such allegations will be insufficient to establish causation at the summary judgment stage of litigation, they suffice for purposes of the present motion.

[5] In the past, courts in this Circuit analyzed ADA and PHRA claims simultaneously, because the "PHRA [wa]s basically the same as the ADA in relevant respects, and 'Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts." *Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002)*, quoting *Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)*. The ADA amendments (ADAAA), however, relaxed the ADA's standard for disability effective January 1, 2009, but the Pennsylvania legislature has failed to enact a similar amendment to the disability standard under the PHRA. *Szarawara v. Cnty. of Montgomery, 12-5714, 2013 U.S. Dist. LEXIS 90386, 2013 WL 3230691, at *2 (E.D. Pa. June 27, 2013)* (holding that the PHRA has not been amended like the ADAAA to relax the standard for disability, and therefore, it was necessary to analyze plaintiff's ADA and PHRA claims separately); *Deserne v. Madlyn & Leonard Abramson Ctr. for Jewish Life, Inc., No. 10-03694, 2012 U.S. Dist. LEXIS 68852, 2012 WL 1758187, *3 n.3 (E.D. Pa. May 17, 2012)* ("To date, Pennsylvania has not made parallel amendments to the PHRA or the regulations implementing the PHRA."). Nevertheless, while the disability standards are different, the remaining elements of an ADA and PHRA claim are essentially the same and can be analyzed together. *Rubano v. Farrell Area Sch. Dist., 991 F. Supp. 2d 678, 689*

---

[4] In its reply brief, defendant argues that I must focus on the timing between plaintiff's complaint to Mr. Treat in "early" December 2015 and Officer Kyle's request to have plaintiff transferred, rather than on plaintiff's complaint to Mr. Brown and Officer Kyle's request for plaintiff's transfer. Based on the allegations of the amended complaint, however, plaintiff's first expression of her belief that Shannon's actions created a

qualified individuals from being discriminated against in employment based on a disability." *Gaul v. Lucent Techs. Inc., 134 F.3d 576, 579 (3d Cir. 1998)*, citing 29 C.F.R. pt. 1630, app. at 347-48 (1997). Under the ADA, employers are prohibited from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*. A prima facie case is established by showing three elements. First, the plaintiff must allege that he is disabled within the meaning of the ADA. *Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006)*. Second, the employee must establish that she is a qualified individual within the meaning of the ADA. *Turner, 440 F.3d at 611*. A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*. Finally, the plaintiff must establish that he has suffered an "adverse employment decision as a result of discrimination." *Turner, 440 F.3d at 611*. An "adverse employment [*24] decision" under the ADA "encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)*.

Defendant does not dispute that plaintiff suffered from a disability. It claims, however, that plaintiff has failed (1) to make a showing that she suffered an adverse employment action causally related to her disability; and (2) to allege facts that defendant unlawfully failed to provide a reasonable accommodation. I hold that plaintiff's claim survives a motion to dismiss.

## A. Adverse Employment Action

Defendant first disputes plaintiff's claim that she suffered an adverse employment action related to her disability. Specifically, it contends that (a) plaintiff fails to allege facts that anyone employed by defendant was aware of her asthma and (b) it was upon her request that she

was removed from the Richard Allen site and no one gave her a hard time about it.

The amended complaint, however, belies this contention, alleging that "[d]efendant was aware of [p]laintiff's disability before [p]laintiff's employment with [d]efendant began in August 2011" as defendant required her to list medications [*25] and purpose, and plaintiff stated "that she was taking medication for asthma on her employment application." Am. Compl. ¶¶ 43-44. Further, when she left her position at the Richard Allen site, she contacted Mr. Treat and told him she was having severe complications from her asthma due to the conditions there. Id. ¶ 45. Following discharge from the hospital, plaintiff contacted Mr. Treat and explained that her medical instructions included not being around excessive dirt and dust. Id. ¶¶ 48-49. While plaintiff voluntarily chose to leave her position at the Richard Allen site, defendant placed her on an unpaid leave instead of moving her to a new full-time position at a different site. Id. ¶¶ 52-53. These allegations permit a plausible inference that plaintiff suffered a reduction in hours that was causally connected to her disability.

## B. Failure to Accommodate or Engage in the Interactive Process

Defendant's second argument challenges plaintiff's claim that defendant failed to provide her with a reasonable accommodation to allow her to perform her job. Specifically, defendant contends that plaintiff fails to allege that she requested a reasonable accommodation or made any representation [*26] that she needed an accommodation. I disagree and find that the amended complaint allows the inference that plaintiff sufficiently communicated her need for reasonable accommodation.

To show that an employer violated its duty to engage in the interactive process under the ADA, an employee must show:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonable accommodated but for the employer's lack of good faith.

*Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 330-31 (3d Cir. 2003)*. "'Once a qualified individual with a

---

*n.7 (W.D. Pa. 2014)*.

Defendant, in this case, does not challenge plaintiff's status as disabled, but rather focuses on the other elements of the ADA and PHRA claims. Because those elements are identical for both statutes, I analyze them together.

disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.'" *Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000)*, quoting 29 C.F.R. Pt. 1630, App. *§ 1630.9*, at 361. "Under the ADA, an employer discriminates against an employee by not making 'reasonable accommodations to the known physical or mental limitations of the [employee] unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" *Colwell v. Rite Aid, 602 F.3d 495, 504-05 (3d Cir. 2010)*, quoting *Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 761 (3d Cir. 2004)* (internal quotations and [*27] citations omitted).

Notably, "[t]he law does not require any formal mechanism or 'magic words' to notify an employer that an employee needs an accommodation." *Conneen, 334 F.3d at 332*. The law only requires that "[t]he employer . . . have enough information to know of 'both the disability and desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation." *Id.*, quoting *Taylor, 184 F.3d at 313*. "Once proper notice has been provided, 'both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith.'" *Colwell v. Rite Aid Corp., 602 F.3d 495, 507 (3d Cir. 2010)*, quoting *Conneen, 334 F.3d at 330* (further quotations omitted).

Notwithstanding defendant's contrary argument, I find that the amended complaint plausibly pleads a request for a reasonable accommodation. As noted above, plaintiff alleges that defendant was well aware of plaintiff's disability from the date she was hired. On the date she left her job to go to the emergency room, she contacted her employer to indicate that she was having severe complications from her disability due to the conditions at the Richard Allen site. Am. Compl. ¶ 45. Following her discharge from the hospital, plaintiff told her [*28] employer that her discharge instructions included not being around excessive dirt and dust which would aggravate her medical condition. *Id.* ¶¶ 49-50. Plaintiff further avers that throughout her employment with defendant, she had been stationed at various sites throughout Philadelphia. *Id.* ¶ 17. Such allegations allow for the reasonable inferences that (a) by providing defendant with notice of both her disability and her hospital discharge instructions, plaintiff was requesting a reasonable accommodation of transfer to full-time work at a different work site, as she had previously; and (b)

because defendant had employees stationed at multiple work sites in Philadelphia, its refusal to provide plaintiff with full-time work at another site constituted a failure to engage in the interactive process. While discovery may ultimately fail to uncover sufficient evidence to support this theory,[6] the well-pled allegations of the amended complaint require that this claim survive *Rule 12(b)(6)* scrutiny.

## CONCLUSION

In light of the foregoing, I will grant defendant's motion to dismiss Counts I, II, V, VI and IX with prejudice. To the extent, however, that defendant seeks dismissal of plaintiff's allegations [*29] of retaliation or disability discrimination, as set forth in Counts III, IV, VII, and VIII, I find that the amended complaint plausibly pleads these causes of action and I will deny the motion to dismiss on those grounds.

An appropriate Order follows.

## ORDER

AND NOW, this 7th day of August, 2017, upon consideration of defendant Sovereign Security, LLC's motion to dismiss the amended complaint, Dkt. No. 11,

---

[6] In its reply brief, defendant attaches various documents showing that, in March 2016, defendant actually placed plaintiff in a position at PHA Admissions, which was a position defendant believed would not affect plaintiff's asthma. Def.'s Reply Brief, ECF No. 13, at p. 14. The first day that plaintiff was assigned to this new role, she claimed to have gotten her chair caught in the floor tiles and fallen, injuring herself. Id. Plaintiff has not been able to work since and has a worker's compensation claim pending. Id. This evidence, according to defendant, establishes that it accommodated plaintiff's initial request and found her another work location, where plaintiff would presumably still be working had she not fallen.

While defendant's argument may ultimately be successfully in a properly-filed motion for summary judgment after the exchange of discovery, it is not a proper basis for *Rule 12(b)(6)* dismissal. As a primary matter, defendant relies on documents outside the pleadings and has not established that I may take judicial notice of these documents for purposes of this motion. Moreover, nothing in defendant's reply brief or supporting documents establishes that plaintiff's new position was a full-time position as she had previously held. Therefore, I do not find that this argument provides grounds for dismissal of plaintiff's disability discrimination claims.

2017 U.S. Dist. LEXIS 123980, *29

plaintiff's response, Dkt. No. 12, and defendant's reply brief, Dkt. No. 13, it is ORDERED that the motion is GRANTED IN PART and DENIED IN PART as follows:

1. The motion to dismiss Counts I, II, V, VI and IX of the amended complaint is GRANTED and these counts are DISMISSED WITH PREJUDICE.

2. The motion to dismiss Counts III, IV, VII and VIII of the amended complaint is DENIED.

*/s/ Thomas N. O'Neill, Jr.*

THOMAS N. O'NEILL, JR., J.

**End of Document**

 Positive
As of: May 22, 2022 3:45 PM Z

# *Cullison v. Dauphin County*

United States District Court for the Middle District of Pennsylvania

May 18, 2012, Decided; May 18, 2012, Filed

NO.: 1:10-CV-00705

**Reporter**
2012 U.S. Dist. LEXIS 102575 *; 2012 WL 3027776

STEPHEN H. CULLISON, Plaintiff v. DAUPHIN COUNTY, PA DONNA MILLER, Individually, KELLY WOLF, Individually, Defendants

**Subsequent History:** Adopted by, Summary judgment granted by, Objection denied by *Cullison v. Dauphin County, 2012 U.S. Dist. LEXIS 102576 (M.D. Pa., July 24, 2012)*

**Counsel:** [*1] For Stephen Cullison, Plaintiff: Lisa Matukaitis, LEAD ATTORNEY, Matukaitis Law LLC, Harrisburg, PA.

For Dauphin County Pennsylvania, Donna Miller, Individually, Kelly Wolf, Individually, Defendants: David L. Schwalm, LEAD ATTORNEY, Lindsey E. Snavely, Thomas, Thomas & Hafer, LLP, Harrisburg, PA.

For Mediator, Mediator: Gregory R. Lyons, LEAD ATTORNEY, Office of the U.S. Trustee, Harrisburg, PA.

**Judges:** MILDRED E. METHVIN, U. S. MAGISTRATE JUDGE. JUDGE JONES.

**Opinion by:** MILDRED E. METHVIN

# Opinion

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### (Doc. 37)

Steven H. Cullison began working for the Dauphin County Department of Solid Waste and Recycling in 2004 as a part-time recyclable materials collector. When Cullison was hired, the County was aware that he suffered from blood clots in his legs, degenerative disc disease, and diabetes. In 2006, Cullison became a full-time recycling maintenance worker. Cullison was fired in 2009 at age 59 without ever having a negative performance review. Defendants contend Cullison was fired for filing a false report concerning an accident involving his county vehicle.

Cullison brings this complaint for declaratory, injunctive, and monetary relief raising several claims:

> *Count [*2] I - FMLA Interference Claim* under the Family and Medical Leave Act, *29 U.S.C. §§ 2601-2654*.

> *Count II - FMLA Retaliation Claim*

> *Count III - Age Discrimination Claim (ADA)* in violation of the Americans with Disabilities Act of 1990 (ADA), *42 U.S.C. §§ 12101-12300*;

> *Count IV - Age Discrimination Claim (PHRA)* in violation of the Pennsylvania Human Relations Act (PHRA), *43 P.S. §§ 951-63*;

> *Count V - Disability Discrimination Claim (ADA)* in violation of the Americans with Disabilities Act of 1990 (ADA), *42 U.S.C. §§ 12101-12300*;

> *Count VI - Disability Discrimination Claim (PHRA)* in violation of the Pennsylvania Human Relations Act (PHRA), *43 P.S. §§ 951-63*.

Cullison filed his original complaint on April 2, 2010. (Doc. 1). He was granted leave to file an amended complaint on January 4, 2011 after receiving his right to sue letter from the EEOC (Doc. 24-1, Doc. 51).

Defendants filed a motion for summary judgment with exhibits on September 1, 2011 (Docs. 37-1 to 37-22), along with a brief and a statement of material facts (SMF) (Docs. 38, 39). Cullison filed an opposing brief on October 11, 2011 (Doc. 46), together with a response to defendants' SMF and counter-statement of material

[*3] facts (Doc. 45), and forty-four exhibits with an appendix (Docs. 45-1 to 45-45). The County filed its reply brief on November 1, 2011 (Doc. 49).

The matter was referred to the undersigned magistrate judge for report and recommendation on September 7, 2011 (Doc. 40) and is now ripe for disposition.

### Issues Presented

Defendants seek summary judgment on all claims, and present several issues for the consideration:

    1. The FMLA claims against Donna Miller should be dismissed as she is not an "employer" under the Act.

    2. Cullison is unable to establish a claim under the FMLA because:

        a. His FMLA interference claim fails because he cannot show injury or prejudice.

        b. Cullison's FMLA retaliation claim fails because he cannot establish a prima facie case by demonstrating a causal connection between his attempts to exercise FMLA rights and his termination.

    3. The ADEA/PHRA age-discrimination claims fail because Cullison has not offered sufficient proof of age discrimination and, further, cannot demonstrate that defendants' reason for his termination is pretextual.

    4. Cullison has not established his claims under the ADA/PHRA:

        a. His disability discrimination claim fails because, even if Cullison established [*4] a prima facie case, the County puts forth a legitimate, non-discriminatory reason for termination, and Cullison cannot demonstrate pretext.

        b. The failure-to-accommodate claim fails because the County provided Cullison with adequate accommodations.

    5. Cullison is not entitled to punitive damages because they are unrecoverable as a matter of law.

### FINDINGS AND CONCLUSIONS

### I. Factual Background

In 2004, Cullison applied for the position of Part-Time Recyclable Material Collector for Dauphin County. (Docs. 39, 45 ¶¶ 30-31). He was interviewed by, and subsequently hired by, Wolf, the Director of the County's Department of Solid Waste Management and Recycling, who would be one of Cullison's supervisors. (Doc. 45-2 at 10:22-25). During the interview, Cullison told Wolf that he had "DVTs [1] [sic] in both legs" as well as a "back condition," but he didn't discuss with her how these conditions affected him. (Doc. 37-4 at 11).

On October 13, 2004, Cullison was hired as a part-time Recyclable Materials Collector by the Dauphin County Department of Solid Waste and Recycling. (Doc. 45-13 at 2). After working part-time for the County for two years, he transferred to a newly-created full-time position of Recycling Maintenance Worker. (Docs. 39, 45 ¶ 33; 45-13 at 9). At this time, he had no physical restrictions. (Docs. 39, 45 ¶ 37).

In September, 2006, Cullison was at work, pushing barrels up an incline, when he experienced severe stomach strains. (Docs. 39, 45 ¶ 65). Shortly afterward, Cullison gave the County a note from Dr. Don DeArmitt, M.D., dated September 20, 2006, stating: "Please amend Mr. Cullison's profile to state 'Limited walking of steps and inclines' and 'No pushing over 100 lb.'" (Doc. 45-13 at 30). Cullison was instructed by his supervisor to request inmate assistance to help [*6] with duties he could not perform because of his restrictions. (Docs. 39, 45 ¶ 67). Of the hundred or so times that Cullison guessed that he requested inmate assistance, he says he received it about seventy-five times; he otherwise performed the duties in question himself. (Id. at ¶¶ 68-70). For any of those roughly twenty-five times he requested but received no inmates' assistance, he never reported to Wolf or anyone else at the County that the requested help never came. (Id. at ¶ 71).

In March 2008, Wolf asked Cullison to clean up a briar patch. (Id. at ¶ 72). He said he couldn't do that without assistance because of the DVT in his legs. (Id.). As of March 4, 2008, given Cullison's DVT, his assignment to clear a briar patch, and the danger he said that

---

[1] Deep venous thrombosis, most commonly abbreviated "DVT," is the formation of a blood clot deep inside the body, usually the legs. The clots can cause swelling, pain, and difficulty in maintaining proper blood flow. Suffers of DVT are also at risk of having an embolism, in which [*5] a clot breaks off and enter the bloodstream, sometimes causing severe damage wherever it gets stuck, including the brains, lungs, and heart. David C. Dugdale, III, M.D., Prof. of Med., Univ. of Wash. Sch. of Med., *Deep Venous Thrombosis* (Feb. 13, 2011), MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/000156.htm.

presented him, Cullison was told not to come to work. Schreiber testified that Miller and Wolf told Cullison not to work because of his medical condition. (Doc. 45-6 at 12:15-13:7). Wolf denied having anything to do with that decision. (Doc. 45-3 at 172:21-173:6). Miller, too, denied making such a decision, stating that Cullison's doctor, Dr. DeArmitt, as the one who that made the decision. (Doc. 45-4 at 21:21-22:5; 38:15-23). [2] Following [*7] the County's receipt of the letter from Cullison's physician, he was instructed not to return to work until clarification was received as to what Cullison's functional restrictions were. (Doc. 45-4 at 22:9-15). [3] As a result, Cullison did not work from March 4 to April 9, 2008, a total of 184 hours. (Doc. 45-13 at 126). Cullison testified that, during this period, no one from Dauphin County ever told him that he could take FMLA leave or that he could possibly apply for unemployment compensation benefits. (Doc. 45-3 at 185:2-10).

After resolving the limitations issues, Miller [4] wrote Cullison a letter dated April 9, 2008, that it was "mandatory" for him to wear personal protective equipment (PPE) "at all times" while doing any outside garden or work "that could risk [his] health[.]" (Doc. 45-13 at 44). Cullison returned to work in the same position

---

[2] Dr. DeArmitt had written a note on prescription pad, dated March 6, 2008, which read: "Limit pushing to 100 lb. Limit lifting to 50 [lb]. Avoid situations that could cause skin damage to legs due to slow healing. No strenuous activity for more than 45 min. without a 15 min. break."

[3] Miller wrote to Dr. DeArmitt and asked specific questions as to his Cullison's physical limitations as they related to his essential job functions. De. DeArmitt responded, noting that Cullison could do yard work and the like but couldn't work in green briar or poison ivy because of possible skin damage. He further stated that regarding breaks during strenuous activity, Dr. DeArmitt [*8] clarified that Cullison may "drive or do light work" during the fifteen-minute breaks from strenuous activity.

[4] Miller was Dauphin County's Insurance and Safety Program Administrator for the Risk Management Department since December 27, 2004. (Docs. 39, 45, ¶¶ 2, 3). Her job duties include responsibility for "insurances, bonds, flood policies, writing policies, working with insurance companies, investigation reports, doing depositions, preparing other people for depositions for workers' compensation, [and] meeting with judges." (Doc. 45-4 at 17-18.). According to her deposition testimony, [*9] she was "in charge of determining whether or not somebody can perform the essential functions of their job at Dauphin County." (Id. 20:7-12, Doc. 45-4, at 21.) Miller testified that as of springtime 2009, she received all accident reports for every Dauphin County employee that was involved in an accident. (Doc. 45-4 at 13.)

on April 10, 2008. (Doc. 45-13 at 126; Doc. 45 ¶ 81). [5] He contends, however, that "he was subjected to a series of [ongoing] harassment, including being denied pay, being written up for unwarranted reasons, being subject to discriminatory comments, and eventually fired." (Doc. 45, ¶ 81).

To accommodate Cullison's limitations, Dauphin County chose a Tyvek suit as an adequate form of PPE that would accommodate Cullison's sensitivity to briars and poison. (Id. at ¶ 83). The Tyvek suit went over Cullison's regular clothing. (Id. at ¶ 84). Cullison does not dispute that this suit adequately protected him from poison ivy and briars (Id. at ¶ 86), but objected to being the only employee in the [*10] Department who had to wear the suit (Id. at ¶ 85). [6]

Additionally, Cullison wanted a chair to be placed in the locker room shower so that he could put on the protective gear. (Id. at ¶ 87). Davies declined to allow Cullison to have a chair in the bathroom, as there was a couch and padded chair in the conference room that Cullison could use for changing. (Id. at ¶¶ 88, 89). Every time Cullison put a chair into the shower area, Davies took it back out again. (Id. at ¶ 88).

In late 2006, Davies issued a memorandum addressed to Cullison addressing automotive-accident procedures. (Doc. 45-13 at 109). This policy required that a police report be filed for any incident involving county vehicles, no matter how minor. (Id.) Dauphin County's own accident-report form also needed to be filled out as soon as possible following any such incident. (Id.).

Subsequently, the vehicle policy was revised as of April 15, 2009. (Doc. [*11] 37-19 [hereinafter 2009 Vehicle Policy]). The new policy allows, in the event of an accident, twenty-four hours for the completion of a County auto-accident report and a police report, copies

---

[5] By July 2008, Dauphin County management had decided on a compensatory measure for the 184 hours of work that Cullison missed in March and April. On July 24, 2008, the County informed Cullison he was being reinstated seven days' sick leave. (Doc. 45 ¶ 82). Cullison appealed in writing the failure to restore his sick leave. (Id.). The record, as presented by the parties' statements of facts, reveals no further development of Cullison's sick-leave-reimbursement appeal.

[6] Cullison contends that other employees, or even inmates, could have mowed the bushes and briars. (Id. ¶ 86). Zapata testified that he mowed sometimes on his own initiative, even though it wasn't in his job description to do so, but he never helped Cullison with the mowing. (Id.).

KIMBERLY BORLAND

of which were required to be submitted to the County's Risk Management Department. (Doc. 37-19 at 6-78). According to the policy, police reports were necessary even if no one was hurt. (Id. at 7). If an employee driving a county vehicle were in an accident and found to be at fault, that employee would be responsible for the first $100 of the resulting cost. (Id.). However, employees were typically not disciplined under the 2009 vehicle policy if they took more than twenty-fours to turn in an accident-investigation form or failed to call the police after being in an accident, and Wolf testified that despite the policy's requirement that employees at fault in accidents had to pay the first $100 of the repair costs, this policy was not enforced during Cullison's employment. (Id. at ¶¶ 103-05).

On May 5, 2009, Cullison was driving his county-owned Ford pick-up truck when an accident occurred that resulted in the passenger-side mirror breaking. (Docs. 39, 45 ¶ 106). Cullison submitted a Vehicle Accident [*12] Investigation Form the same day. (Id. at ¶ 107). The form indicates that at the time of the accident, Cullison was traveling eastbound on Route 283. (Doc. 45-28 at 2). It was 6:00 AM, and Cullison's report describes the conditions as rainy, wet, and dark. (Id. at 3). Cullison reported that a "bird (Hawk) struck pass[enger] side mirror & broke it." (Docs. 39, 45, ¶ 109, Doc. 45-28, at 2). Davies reviewed the report and signed off on it on the same date. (Doc. 45-28, Exhibit 27). Cullison testified in his deposition that after the accident, Jeffrey Karl, a fellow County employee, told Cullison that he had been following Cullison and saw something fall to the ground from Cullison's vehicle, but he could not identify the object. (Docs. 39, 45 ¶ 110).

The County conducted an investigation into Cullison's accident (Docs. 39, 45 ¶ 113). Davies took some photos of the mirror and sent them to Miller along with an email which stated, "You should have (finally) received the report from Steve's 'bird strike' incident . . . Anyway, I've attached a few photos that I took of the mirror that broke. It looks like he backed into a wall; the edge of the mirror is scraped up and the mirror frame was cracked. [*13] . .". (Docs. 39, 45 ¶¶ 116-117). Davies testified that at the time he took the photographs, he saw no feathers in the mirror, but that at some point later, feathers appeared in the mirror. (Id. at ¶¶ 118-19).

Miller, who considered Cullison's original accident report incomplete, asked him to "fill out an actual step-by-step description of what happened," so he wrote and signed a one-page supplement to his May 5 accident report. (Doc. 45-4 at 64:3-17; Doc. 37-21). The supplement is

undated, but in a different hand is written "Rec'd 5-13-09." (Id.)

The original report listed no witnesses, but the supplement mentioned that Jeffrey Karl said he saw the impact: "At the time I also contacted Jeff Karl . . . on my CB radio and ask[ed] him if he saw what struck my truck. He replied that he did not but he did see 'something flying to the ground off of it, but could not identify what the object was.'" (Id.) And in fact, on the same day that Cullison's supplemental was marked received, Karl sent an email to Donna Miller corroborating several details of Cullison's reports. [7]

GPS tracking reports for Cullison's and Karl's vehicles were pulled. (Docs. 39, 45 ¶¶ 121-122). [8] Data from the GPS reports revealed discrepancies between where Cullison and Karl reported they were and the GPS location data for their vehicles. Wolf testified that the GPS report for Cullison's vehicle revealed that the accident could not have occurred where he said it did. Cullison's supplementary report gave the accident location somewhere between the Tollhouse Road and Elizabethtown exits on Route 283 East, but Wolf said that was impossible: "He never was between Toll House Road and Elizabethtown exit. He got off at the Toll House Road. The Elizabethtown exit is a few miles down the road." (Doc. 45-3, Ex. 2 at 237:2-7). The GPS records also revealed that, as long as Karl was actually in his vehicle at the time of the accident, he could not have been a witness.

Although the parties [*15] dispute whether it was Wolf or Miller who fired Cullison, the evidence suggests that both may have played a part in the process. (See Doc. 45-4 at 12-13 (describing the working relationship between Miller and Wolf). On May 18, 2009, Miller wrote a letter on Dauphin County letterhead to Faye Fisher and Kelly Wolf:

> As you can tell the information that Steve has provided is false and not accurate. Steve is not a

---

[7] Karl's email stated:

> "I was following Steve on the morning of 5-5-09 on eastbound 283, between Highspire and the Toll House [*14] Rd. Exit, when I noticed something fly off the right side of the pick-up. It was around day break, so I could not tell what hit the truck. When we arrived at Conewago Twp. the mirror was broke, and parts were missing."

(Doc. 45-35 at 2).

[8] The parties disagree whether it was Davies or Wolf who pulled the reports.

credible employee. According to the employee handbook, page 33 section 12 any employee who provides false information and falsifys [sic] documents that are submitted for insurance purposes should be terminated.

(Doc. 45-37 at 2). Although he had never received any unsatisfactory performance ratings during his employment with the County, on May 20, 2009, the formal termination letter came, signed by "Kelly J. Wolf" as "Manager," and cited "providing false information" as the reason for termination. (Doc. 45-3 at 192:3-5).[9] After Cullison was fired, he was replaced by Zachary Noss, who was 19 years old and had no disability. (Doc. 45-17 at 4, 5; Doc. 45-16 at 7, 9). The present action followed.

## II. Standard of review

Employment-discrimination cases are particularly difficult for an employer-movant to win on a summary-judgment motion, as "the burden of persuasion . . . remains unalterably on the employer as movant." _Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 361 (3d Cir. 2008)_. The employer's challenge is to persuade the court that even if all inferences that "could reasonably be drawn from the evidentiary materials of record . . . were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." _Id._ (citing _Sorba v. Penn. Drilling Co., Inc., 821 F.2d 200, 201-02 (3d Cir. 1987)_). Even under the burden-shifting scheme so frequently applied in several **[*17]** of the claims in this case, the employer's need to tip the scales of persuasion in its favor looms in the background.

The general standard of review for summary-judgment motions applies as well: under _Federal Rule of Civil Procedure 56(a)_, a court "shall grant summary judgment

---

[9] The letter provided:

> After a thorough investigation of the reported incident, our records **[*16]** indicate that the information that you've provided does not coincide with our vehicle tracking system; as well as the whereabouts of the witness that you indicated within your report.
>
> Accordingly, following Dauphin County's Policy and Procedures (Employee Handbook, Page 33, Section 12), your employment termination is effective as of today, May 20, 2009 due to providing false information (for insurance purposes reported on the Vehicle Accident Report, dated May 5, 2009.

(Doc. 27-22).

if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." _Fed. R. Civ. P. 56(a)_. "[T]his standard provides that the mere existence of _some_ alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no _genuine_ [dispute] of _material_ fact." _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)_.

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. _Anderson, 477 U.S. at 248_; _Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)_. A dispute of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. _Anderson, 477 U.S. at 257_; _Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991)_.

When **[*18]** determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. _Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993)_; _Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992)_; _White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988)_. In order to avoid or obtain summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. _Fed. R. Civ. P. 56(c)(1)_; see _Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)_ (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." _Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)_. Parties must produce evidence to show the existence **[*19]** of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." _Celotex, 477 U.S. at 323_; see _Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992)_. Failure to properly support or contest an assertion of

2012 U.S. Dist. LEXIS 102575, *19

fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. *Fed. R. Civ. P. 56(e)*.

## III. Discussion

### (A) Defendant Miller

Defendants first challenge Cullison's claims against Miller, asserting that she is entitled to summary judgment inasmuch as she is not an "employer" under the FMLA. In order for individual liability to attach, the FMLA requires that an individual must maintain control over the terms and conditions of the plaintiff's employment. *See Kilvitis v. County of Luzerne, 52 F. Supp.2d 403, 413 (M.D. Pa.1999)*. Defendants maintain that Miller, the County Insurance and Safety Program Administrator for the risk management department, was not involved in either the FMLA leave or ADA accommodations. [*20] Moreover, she was not Cullison's supervisor and had no authority to hire and fire.

Cullison contends, however, that Miller had control over the terms and conditions of his employment because she made determinations as to whether a person could perform the essential functions of a job. He also argues that Miller was the one who concluded he was unable to work for 28.5 days in March and April, 2008 and the she made the determination that he violated county policies, which she advised was a terminable offense.

*Section 2611(4)(A)(ii)(I)*'s inclusion of "any person who acts, directly or indirectly, in the interest of an employer" plainly contemplates that liability for FMLA violations may be imposed upon an individual person who would not otherwise be regarded as the plaintiff's "employer." This has been interpreted to mean "that an individual is subject to FMLA liability when he or she exercises 'supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation' while acting in the employer's interest." *Haybarger v. Lawrence County Adult Probation and Parole, 667 F.3d 408, 417 (3d Cir. 2012)* (citing *Riordan v. Kempiners, 831 F.2d 690, 694 (7th Cir.1987)* [*21] (discussing individual liability under the FLSA's analogous definition of an "employer")).

In examining supervisory control over an employee under the FMLA, as well as the FLSA, most courts look to the "economic reality" of the employment situation, examining whether the individual supervisor carried out the functions of an employer with respect to the employee. [5] "[W]hether a person functions as an employer depends on the totality of the circumstances rather than on 'technical concepts of the employment relationship.'" *Id.* (citing *Hodgson v. Arnheim & Neely, Inc., 444 F.2d 609, 612 (3d Cir. 1971)*.

Some of the relevant factors in ascertaining the economic reality of the employment situation include whether the individual "(1) had the power to hire and fire the employee [ ], (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Herman v. RSR Security Services Ltd, 172 F.3d 132, 139 (2d Cir. 1999)* [*22] (quoting *Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir.1984)*) (citation omitted). However, courts must consider "any relevant evidence" and "[n]o one of the four factors standing alone is dispositive." *Id.* (citing *Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947))*.

Applying these factors to the present case, a reasonable fact finder could conclude that Miller was Cullison's "employer." Although she may not have had the authority to hire or fire Cullison, Miller had a supervisory role over the terms or conditions of his employment. Miller testified that Cullison was not working in March and April, 2008 because defendants needed clarification from his physician as to the restrictions for his job. (Doc. 45-4, Ex. 3, p. 26:18-20 (deposition p. 25:18-20)). Further, although Miller testified that Cullison's physician, not she, made the decision that he was unable to perform his job in March and April, 2008 due to medical conditions, it was Miller who determined that Cullison could not perform the functions of his job safely. (*Id.* at 22:13-16 (deposition p. 21:13-16; 22:21-23:8 (deposition p. 21:21-22:8)).

Miller testified that she did not make the decision to fire Cullison, [*23] nor did she consult about it with Wolf, who was his supervisor and the person who made the decision to terminate him. (*Id.* at 30:3-11 (deposition p. 29:3-11)). However, Miller did state that she provided Wolf with the "information on documentation from the accident" along with a letter concluding that documents

---

[5] The "economic reality" test is a broad test for determining whether an employment relationship exists, and is not limited to evaluating whether a supervisor is an employer for purposes of individual liability.

2012 U.S. Dist. LEXIS 102575, *23

were falsified, which would be grounds for termination. (*Id.* at 31:18-32:4 (deposition p. 20:18-31:4)).

While there is no evidence to support the third and forth factors, *to wit.*, that Miller determined Cullison's rate or method of pay or maintained records, aside from insurance documents, relating to Cullison, nonetheless the factors are merely guiding and not controlling in ascertaining the economic reality of the employment situation. Therefore, viewing the totality of the circumstances, there in sufficient evidence for a fact-finder to conclude that Miller was Cullison's employer for purposes of FMLA liability. Consequently, Miller is not entitled to summary judgment on Counts I and II. [2]

### (B) FMLA

The FMLA was enacted to balance the demands of the workplace with the needs of employers and to entitle employees to take reasonable leave for medical reasons. *29 U.S.C. § 2601(b)*. To accomplish these goals, the act provides that an eligible employee is entitled to 12 work-weeks of leave during any given 12-month period for certain qualifying events, including a "serious health condition that makes the employee unable to perform the functions of the position of such employee." *29 U.S.C. § 2612(a)(1)(D)*. "Serious health condition," in turn, is broadly defined as an "illness, injury, impairment," or other physical or mental condition that "involves" either (a) inpatient care or (b) "continuing treatment by a health care provider." *Id. §§ 2611 (11)(A), (B)*. The FMLA further entitles eligible employees to reinstatement at the end of FMLA leave to the position of employment held before leave or to an "equivalent position." *29 U.S.C. §§ 2614(a)(1)(A), (B)*. [6]

There are two relatively distinct causes of action under the FMLA: (1) interference provisions declare it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in FMLA, and (2) the statute prohibits an employer from discriminating or retaliating against an employee for exercising rights under the FMLA. *29 U.S.C.A. § 2615(a)* (1, 2). The complaint brings claims for both causes of action. See *Hayduk v. City of Johnstown, 386 F. App'x. 55, 59 (3d Cir. 2010)* (noting that an employee alleging a discharge in violation of the FMLA may proceed under both theories of recovery) (citing *Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir.2009)* (holding that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee" (footnote omitted)).

### (1) Interference

The statute mandates that employers fully accord their employees the right to FMLA leave: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, [*26] any right provided under this subchapter." *Id. § 2615(a)(1)*. The FMLA being a statute concerned with protecting employees' rights, it takes relatively little to trigger its FMLA protections. An employee need only show a failure to have received FMLA benefits that the employer had a duty to provide. *Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)* (citing *29 U.S.C. §§ 2612(a), 2614(a)*). Questions of discrimination have no bearing on an interference claim, which focuses solely on whether an employee receives FMLA-guaranteed benefits.

To state a claim for interference under the FMLA, a plaintiff must show that: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA. *Johnson v. Community College of Allegheny County, 566 F. Supp.2d 405, 446 (W.D. Pa. 2008)*. An employee need not specifically mention the FMLA or assert rights under it to satisfy the notice requirement, but only state that [*27] leave is needed. *29 C.F.R. § 825.302(c)*; *Wilson v. Lemington Home for the Aged, 159 F. Supp.2d 186, 192 (W.D. Pa.2001)*.

Cullison argues that the defendants failed to provide him notice of his FMLA rights when he was unable to work for 28.5 days in March and April, 2008. Defendants argue that Cullison was not denied FMLA benefits. Rather, the county has a policy requiring an employee

---

[2] Nonetheless, for the reasons outlined in the subsequent analysis, in which it is concluded that Cullison has failed to establish a claim under the FMLA for either interference or for retaliation, [*24] it is recommended that summary judgment be entered in favor of the defendants on Counts I and II.

[6] An equivalent position is one which is substantially equal or similar in terms of employment benefits, pay, and other terms and [*25] conditions of employment. *29 U.S.C. § 2614(a)(1)(B)*; *29 C.F.R. § 825.215*

to first utilize accrued leave before the application of FMLA leave. [7] Such a policy is not inconsistent with the statute. See _29 U.S.C. § 2612(d)(2)(B)_ ("[a]n eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee...."); _Majewski v. Fischi, 372 F. App'x. 300, 305-06 (3d Cir. 2010)_ (finding plaintiff's use of any accrued sick and/or personal leave would not have impacted the statutorily required twelve weeks of FMLA leave that he received); _Lynch v. Matthews Intern., No. 08-1717, 2010 U.S. Dist. LEXIS 64261, 2010 WL 2640597, *5 (W.D. Pa. June 29, 2010)_ (employer's FMLA policies that required employee to use vacation days for medical absences did not run afoul of the FMLA);

Defendants further contend that Cullison cannot establish a claim for FMLA interference in the absence of any injury or prejudice. Although Cullison maintains that defendants' failure to ascertain their responsibilities under the FMLA constitutes a violation of the interference provisions, he fails to note that an injury to the plaintiff is required to establish such a violation. It is well-settled in the Third Circuit that a plaintiff may only "show an interference with his right to leave under the FMLA, within the meaning of _29 U.S.C. § 2615(a)(1)_, if he is able to establish that this failure to advise [of his rights under the FMLA] rendered him unable to exercise that right in a meaningful way, thereby causing injury." _Hofferica v. St. Mary Medical Center, 817 F. Supp.2d 569 (E.D. Pa. 2011)_ (quoting _Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004)_); [*29] see also _Fogleman v. Greater Hazleton Health Alliance, 122 F. App'x. 581, 587 (3d Cir.2004)_ ("_Conoshenti_ held that an employer's failure to advise could constitute a violation of one's FMLA rights, but only if the employee could show resulting prejudice.").

Thus, even assuming that they did not apprise Cullison of his FMLA rights, defendants contend he cannot establish an FMLA interference claim because he is unable to demonstrate any injury or prejudice resulting therefrom. To state it another way, had Cullison been notified of his rights under the FMLA, the outcome

would have been the same, i.e, his accrued leave time would have been applied to his absence. When the plaintiff has not presented any evidence that he could have made a different choice had the company informed him of his FMLA rights, he has not made a showing of prejudice. _Conoshenti, supra at 145_; see also _Matthews v. New Jersey Institute of Technology, 772 F. Supp.2d 647, 658 (D.N.J. 2011)_ (plaintiff who claimed he was unaware of his FMLA failed to meet his burden of showing prejudice as there was no evidence that he would have done anything differently had he been informed of his FMLA rights); _Yansick v. Temple University Health System, No. 04-4228, 2006 U.S. Dist. LEXIS 53789, 2006 WL 2243178, *10 n.21 (E.D. Pa. July 27, 2006)_ [*30] (noting a plaintiff's obligation to show that he was eligible for FMLA leave and that the alleged interference caused prejudice; interference alone, even a failure to advise, does not entitle a plaintiff to relief).

Accordingly, in the absence of any injury or prejudice to Cullison, no violation has been established. Summary judgment in favor of the defendants is, therefore, warranted on this issue.

**(2) Retaliation**

An FMLA retaliation claim is contemplated by _section 825.220(c)_ [8] of the regulations implementing _29 U.S.C. § 2615(a)_. _29 C.F.R. § 825.220(c)_ FN5; see _Conoshenti, supra._ To establish a prima facie case for retaliation under the FMLA, a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. _Conoshenti, 364 F.3d at 146_. Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason which provides a basis for plaintiff's discharge. _McDonnell Douglas Corp._

---

[7] The employee handbook references this [*28] policy and provides: "If entitled to FMLA leave, all available paid leave (vacation, sick, personal, comp time and PTO) must be exhausted before an employee goes on unpaid status. Paid leave will count as the number of weeks of leave to which the employee may be entitled under this policy." Doc. 45-27, Ex. 26, p. 48.

---

[8] _29 C.F.R. § 825.220(c)_ provides:

(c) An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

*V. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). If the employer can meet this burden, then the burden shifts back to the employee to prove, by a preponderance **[*31]** of the evidence, that the reasons articulated by the defendant were actually a pretext for discriminatory practices. *Id. at 804.* Summary judgment is appropriate on behalf of the employer if the employee fails to meet her burden at either the prima facie or pretext stage of the framework.

The first two elements are uncontested: Cullison took FMLA leave in March and April, 2008 and he suffered an adverse employment decision when he was fired in May, 2009. The parties dispute whether the third element — a causal relation between his leave and his dismissal — has been established.

With respect to the third **[*32]** factor, Third Circuit cases focus on two main factors in determining whether there is a causal link in an FMLA retaliation claim — timing and evidence of ongoing antagonism. *Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 288 (3d Cir.2001)* ("Temporal proximity ... is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period."). "[T]he mere fact that adverse employment action occurs after [a protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir.1997)* (abrogated on other grounds, *Burlington No. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).* However, if "the timing of the alleged retaliatory action is 'unusually suggestive of retaliatory motive' a causal link will be inferred." *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997).* See also *Pressley v. Johnson, 268 F. App'x 181, 185 (3d Cir.2008)* ("for an inference of retaliation to be plausible, there must **[*33]** not be a significant gap in time between the exercise of protected activity and the purported act of retaliation") (citing *Black v. Lane, 22 F.3d 1395, 1407 (7th Cir.1994)*). While temporal proximity may allow an inference of causal connection to be drawn, the lack of temporal proximity does not necessarily defeat the ability to demonstrate a causal connection. See *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir.2000)* (if the timing of the events is not "unduly suggestive," the plaintiff can still show a causal link with other circumstantial evidence, such as evidence of ongoing antagonism or inconsistent reasons for terminating the employee).

Defendants argue that Cullison is unable to establish a causal connection between these two events given the time lapse of 13-14 months between their occurrences. Indeed, for a causal connection to be made, the temporal proximity between the occurrences has generally been in terms of hours or days, not months. See, e.g., *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir.1989)* (holding that a causal link can be inferred where only two (2) days passed between the employee's protected activity and the adverse employment action); *Whitman v. Proconex, Inc., No. 08-2667, 2009 U.S. Dist. LEXIS 4016, 2009 WL 141847, at * 10-12 (E.D. Pa. Jan.20, 2009)* **[*34]** (finding that discharge within minutes of returning from FMLA leave was "unduly suggestive" of a causal link); *Reinhart v. Mineral Techs. Inc., No. 05-4203, 2006 U.S. Dist. LEXIS 89279, 2006 WL 4050695, at *10-11 (E.D. Pa. Nov.27, 2006)* (finding that the decision to terminate an employee within twenty-four (24) hours after returning from his initial FMLA leave met "the bare minimum of sufficiency to establish causation"). The lapse between his leave in March and April, 2008 and his termination in May, 2009 is insufficient to establish a causal connection between the two events because they are too attenuated. See *Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751, 760 (3d Cir.2004)* (In the absence of very close temporal proximity suggestive of retaliation, additional evidence is required for a causal connection to be made.) Cullison has presented no other evidence to support the existence of a causal connection between his FMLA leave and his termination. Consequently, a prima facie case of FMLA retaliation has not been made. [9]

## (C) ADEA

---

[9] Cullison asserts, for the first time in his brief in opposition to the motion for summary judgment, that he took FMLA leave in April, 2009, a mere month before his **[*35]** termination. This leave, he maintains, is sufficiently temporally proximate to his discharge to establish a causal link between the two events. As this assertion did not appear in the amended complaint, it is not properly pled and it cannot be considered. See *Treaster v. Conestoga Wood Specialties Corp., No. 4:09-cv-632, 2010 U.S. Dist. LEXIS 63255, 2010 WL 2606481, *3 (M.D. Pa. June 25, 2010)* ("It is well settled that courts need not consider additional claims that are raised for the first time in briefing."); *Johnson v. Community College of Allegheny County, 566 F. Supp.2d 405, 449 (W.D. Pa.2008)* (additional FMLA interference allegations raised for the first time in plaintiff's opposition brief inappropriate and not properly before the court).

2012 U.S. Dist. LEXIS 102575, *35

Title VII prohibits discrimination against an individual on the basis of that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Age is not a proscribed basis for discrimination under Title VII. Id. The ADEA, however, is the legislatively enacted provision that prohibits discrimination on the basis of an individual's age and it mirrors Title VII in its substantive provisions. See e.g., Ahlmeyer v. Nevada System of High Ed., 555 F.3d 1051, 1058 (9th Cir. 2009) [*36] ("Title VII of the Civil Rights Act of 1964 provides an avenue for plaintiffs to assert claims for employment discrimination based on 'race, color, religion, sex or national origin ... In its substantive provisions, the ADEA mirrors Title VII...."). The PHRA likewise prohibits discrimination by employers on the basis of age. See 43 P.S. § 954(a). [10]

In the absence of direct evidence, cases such as Cullison's are examined under the evidentiary framework first set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). With respect to an allegation of age discrimination, under the McDonnell Douglas framework:

> the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a prima facie case of discrimination by showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment [*37] action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. Once the plaintiff satisfies these elements, the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action. If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination. At all times, however, the burden of persuasion rests with the plaintiff.

Smith v. City of Allentown, 589 F.3d 684, 689-90 (3d

Cir. 2009).

"If the employer offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the plaintiff must produce evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" Potoski v. Wilkes University, 692 F. Supp. 2d 475, 484 (M.D. Pa. 2010) [*38] (Vanaskie, J.) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). To prevail on such a claim, the plaintiff must establish by a preponderance of the evidence that age discrimination was the "but-for" cause of the challenged adverse employment action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 129 S.Ct. 2343, 2351, 174 L. Ed. 2d 119 (2009). See Henry v. Northern Westmoreland Career & Tech, Slip Copy, 2011 U.S. Dist. LEXIS 31337, 2011 WL 1136792, * 9 (W.D. Pa. March 25, 2011); Akin v. York County Prison, No. 1:09-CV-2484, 2010 U.S. Dist. LEXIS 56223, 2010 WL 2342502, *6 n.4 (M.D. Pa. June 8, 2010) (Rambo, J.) (observing that "[i]n Smith, the Third Circuit reaffirmed that the familiar McDonnell Douglas burden shifting framework applies in ADEA cases despite the Supreme Court's skepticism expressed in Gross"); Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 n. 4 (3d Cir.1995) ("Throughout this burden-shifting exercise, the burden of persuasion, 'including the burden of proving 'but for' causation or causation in fact, remains on the employee.'" (citing Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). Although the prima facie inquiry need not adhere to a rigid formula, a plaintiff cannot shift the burden of production [*39] to the defendant simply by expressing a subjective belief that the challenged employment action was motivated by his or her age. Wilson v. Blockbuster, Inc., 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008).

Cullison has offered evidence to establish a prima facie case of age discrimination. The undisputed factual averments demonstrate that Cullison meets the first two (2) elements of a prima facie case of age discrimination, to wit, that he is within the protected class, having been born in 1949 [11] and that he was terminated from his

---

[10] The court will analyze Cullison's ADEA and PHRA claims under the same standards inasmuch as courts generally have interpreted the PHRA's parallel provisions in Title VII, the ADA, or the ADEA in accordance with its federal counterparts. Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).

[11] Both the complaint and the amended complaint state that Cullison "is a 60 year old man (DOB 12/31/67." (Docs. 1, 51 ¶ 12). However, the listed date of birth would make him 43 at the time [*40] the complaint was filed on April 2, 2010. He

position as a Recycling Maintenance Worker. Moreover, as to the third element, Cullison was presumably qualified for the position, having held it for approximately three (3) years. Finally, he was replaced by a person who was 19 years old, a factor which could lead a reasonable jury to infer discriminatory animus. *See Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995)* (as little as a five year age differential may suffice to raise an inference of age discrimination).

A prima facie case having been put forth, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for their actions. Defendants assert that the basis for terminating Cullison was the falsification of documents related to the broken side mirror of a county-owned vehicle. Accordingly, the burden shifts back to Cullison to establish that the reason proffered by defendant is pretextual. *See e.g., Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir.1997)* (noting that the defendant's burden at this stage is relatively light and that it is satisfied if the defendant articulates a legitimate reason for the adverse employment action).

To rebut defendants' proffered reason and demonstrate pretext, Cullison must offer evidence "from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative [*41] cause of the employer's action." *Showalter v. Univ. of Pittsburgh Medical Center, 190 F.3d 231, 235 (3d Cir. 1999); Keller v. Orix Credit, 130 F.3d 1101, 1108 (3d. Cir. 1997).* "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence.'" *Fuentes, 32 F.3d at 765* (citation omitted). The court must then determine whether the plaintiff's evidence is sufficient "to permit a reasonable fact finder to conclude that the [employer's] reasons are incredible[.]" *Sheridan v. E.I. DuPont De Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996).*

To show that discrimination was more likely than not a cause for the employer's action (the second method of

proving pretext), "the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that" the plaintiff's age "was a motivating or determinative [*42] factor in the employment decision." *Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir.1998).* Among other things, the plaintiff may show that the employer: (1) has previously discriminated against her; (2) has discriminated against other persons within the plaintiff's protected class or within another protected class; or (3) that the employer has treated more favorably similarly situated persons not within the protected class. *Id. at 645* (citing *Fuentes*). The burden of proving pretext is a difficult one. *Fuentes, 32 F.3d at 765.*

Cullison argues that remarks made by Wolf suggest an age-related bias that may have influenced the decision to terminate him. Cullison testified that in December, 2008, Wolf stated that the County was going to hire a young, physically-fit person for the position of warehouse worker. (Docs. 39, 45 ¶ 152). Cullison further testified that Wolf told him not to apply because he could retire at age 60. (*Id.* at ¶ 153). Cullison also stated that neither Wolf nor any other person made comments that he felt were discriminatory based on his age. (Doc. 39 ¶ 155; Doc. 37-4, p. 43:15-25 (deposition p. 198:15-25)). [12]

Statements or comments by others in the workplace may demonstrate discriminatory intent, and thus the court is required to distinguish between those statements that are truly evidence of the employer's intent and those that are merely "stray remarks." *Lloyd v. Washington & Jefferson College, 2007 U.S. Dist. LEXIS 39118, 2007 WL 1575448 at *20 (W.D. Pa. May 30, 2007),* aff'd, *288 F. App'x. 786 (3d Cir.2008)* (citing *Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S.*

---

[12] In his response/answer to the [*43] statement of material facts, Cullison responds that paragraph 155 is "[d]enied as stated." (Doc. 45, ¶ 155). However, the Local Rules require that "[s]tatements of material fact . . . include references to the parts of the record that supports the statements." *LR 56.1.* Moreover, a blanket denial is not in conformity with these rules and, therefore, a responsive denial is required to substantiate Cullison's position with evidentiary support. *See Donohue v. Rineer, No: 1:10-CV-1324, 2011 U.S. Dist. LEXIS 87734, 2011 WL 3439174, *1 n.2 (M.D. Pa. Aug. 5, 2011)* (Noting that "blanket denial" of a statement of material facts that "fails to controvert it by a reference to the part of the record that supports such a denial in accordance with *Local Rule 56.1*" are deemed admitted under the Local Rule.)

---

testified, however, that he was born on November 3, 1949, which would make him 60 years old at the time this action was commenced. (Doc. 37-4, p. 2 (deposition p. 9:16-17)).

*Ct. 1775, 104 L. Ed. 2d 268 (1989))*. [*44] In order to differentiate, the following factors have been utilized: (1) who made the remark, i.e., a decision-maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decision-making process. *Id.* (citing *Pronin v. Raffi Custom Photo Lab., Inc., 383 F. Supp.2d 628, 637-38 (S.D.N.Y.2005))*. Further, "stray remarks by decision makers, unrelated to the decision-making process, are rarely given weight, particularly if they are made temporally remote from the date of the decision." *Silver v. American Inst. of Certified Public Accountants, 212 F. App'x. 82, 85 (3d Cir.2006)* (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir.1992)*.

Defendants submit that even if the isolated remarks attributed to Wolf had been made, they are insufficient to cast doubt on its decision to terminate Cullison for making false statements. *See Logan v. Countrywide Home Loans, No. 04-5974, 2007 U.S. Dist. LEXIS 20088, 2007 WL 879010, *8 (E.D. Pa. March 15, 2007)* [*45] (remarks "too stray and too remote from the [termination] decision to support a reasonable indirect inference of age discrimination" as a motivation for termination) (quoting *Sosky v. Int'l Mill Serv., Inc., No. 94-2833, 1996 U.S. Dist. LEXIS 791, 1996 WL 32139, at *8 (E.D. Pa. Jan.24, 1996)*. The evidence is clear that the remark is not only isolated, but also that it was remote, having been made approximately five months before he was terminated and unrelated to the decision-making process. Additionally, neither the context not the content of the remark clearly indicate an age-related bias as to Cullison's employment. Consequently, it is insufficient to establish pretext.

Moreover, inasmuch as Wolf was the person who made both the decision to hire Cullison as well as the decision to fire him, defendants contend there is a presumption against a discriminatory animus being drawn. Indeed, the Third Circuit has noted that such evidence, while not dispositive, may be relevant to show that no discrimination occurred. *See Waldron v. SL Indus., Inc., 56 F.3d 491, 496 n. 6 (3d Cir.1995)* (noting that in some circumstances, it may be appropriate to apply the Fourth Circuit's logic that a strong inference for non-discrimination [*46] exists where the same actor took both positive and adverse employment actions against plaintiff); *Mease v. Wilmington Trust Co., 726 F. Supp.2d 429, 441 n. 19 (D. Del. July 29, 2010)* (pretext

not shown where person who terminated plaintiff was the same person who promoted him).

Additionally, statements made by Zapata that his father "could ride circles around" Cullison are not material to this claim not only because Cullison testified that he considered no other remarks, aside from the one made by Wolf, as discriminatory based on age but also because it was neither made by a decision-maker nor was it related to the decision-making process. Instead, it was made by made by a low-level co-worker who meant it as a reflection on Cullison's effort, not age. (Doc. 45-7, p. 31 (deposition p. 30)).

Accordingly, Cullison has failed to meet his burden of establishing that the reason put forth by the defendants for his termination, *to wit,* falsifying records, is pretextual for age discrimination. [13] Summary judgment in favor of the defendants is, therefore, recommended on this claim.

## (D) ADA/PHRA

### (1) Discrimination

Congress enacted the ADA in 1990 in an effort to prevent otherwise qualified individuals from being discriminated against in employment based on disability. *See* 29 C.F.R. § 1630. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*.

To establish a prima facie case of discrimination under the ADA, a plaintiff must present evidence that: (1) he has a "disability" within the meaning of the ADA; (2) he was qualified for the position, with or without accommodation; and (3) he suffered an adverse employment decision as a result of the discrimination.

---

[13] Despite his claim that there is an contested factual issue presented which precludes summary judgment on this issue, [*47] viewing facts in a light most favorable to Cullison as the non-movant, as is required by summary judgment standards, reveals that the alleged statements are insufficient to carry his burden to establish that the reason for discharge was a pretext for age discrimination.

*Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir.2000); **[*48]** *Deane v. Pocono Medical Center*, 142 F.3d 138, 142 (3d Cir.1998) (en banc).

The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that individual holds or desires." *Id* at *§ 12111(8)*. An employer discriminates against a qualified individual when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." *Id.* at *§ 12112(b)(5)(A)*. "Reasonable accommodation" means measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities." *Id.* at *§ 12111(9)*.

The parties agree that a prima facie case of disability discrimination can be established. Accordingly, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for its action(s). As noted above, Defendants assert **[*49]** that the basis for terminating Cullison was the falsification of documents related to the broken mirror of his vehicle. Therefore, the burden shifts back to Cullison to establish that the reason proffered by defendant is pretextual. Cullison identifies the following points in support of his pretext argument: (1) defendants, through Wolf, testified that Cullison did not lie on the May, 2009 accident report; (2) that there were similarly situated employees who were treated more favorably; and (3) defendants failed to follow county policy as to disciplinary action.

In her deposition testimony, Wolf stated that the time, location and cause of the May, 2009 accident as reported by Cullison were not accurate. Although at one point in her testimony, Wolf declined to characterize the mistake as a lie, the substance of Wolf's testimony clearly indicates she considered Cullison's report of the accident to be false. *See* Doc. 45-3, p. 130-134 (deposition p. 235-239.) Cullison mischaracterizes Wolf's testimony on this issue as inconsistent with the termination letter, which stated that the reason for his dismissal was document falsification. Both the dismissal letter and Wolf's testimony consistently **[*50]** assert that the defendants considered Cullison's representation of the accident to be inaccurate and contrary to other evidence. Accordingly, there is no inconsistency between his termination letter and Wolf's testimony upon which to base a pretext argument.

Cullison also contends that there are similarly-situated employees who were treated more favorably than he but that those individuals were not disabled, suggesting the reason behind the differential treatment was a discriminatory motive. The persons Cullison identifies as similarly-situated but treated more favorably than he are: Jeff Karl, [14] Hugo Zapata, [15] Roger Thebes, Donna Miller and Matt Davies. [16] Defendants argue, however, that these individuals are improper comparators because they are not similarly-situated to Cullison. Specifically, they assert that none of these individuals were accused of committing the offense for which Cullison was terminated — document falsification concerning a accident in a county vehicle — nor engaged in such behavior and were not terminated.

"In order for employees to be deemed similarly situated, it has been determined 'that the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards, *and have engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ogden v. Keystone Residence*, 226 F. Supp.2d 588, 603 (M.D. Pa. 2002) (emphasis added) (quoting *Morris v. G.E. Financial Assurance Holdings, Civ. A. No. 00-3849, 2001 U.S. Dist. LEXIS 20159, 2001 WL 1558039, at *6 (E.D. Pa. Dec. 5, 2001)* (citations omitted) (alteration in original). *See also Bullock v. Children's Hosp. of Phila., 71 F. Supp.2d 482, 489 (E.D. Pa. 1999)*; **[*52]** *Opsatnik v. Norfolk Southern Corp., 335 F. App'x. 220, 223 (3d Cir. 2007)* ( "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.") (quoting *Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)*); *see*

---

[14] Jeff Karl was a Full-Time Recyclable Materials Collector for the County until he resigned on May 29, 2009 at age 46. (Docs. 39, 45 ¶¶ 25, 26.) He had no **[*51]** known disabilities. (*Id.* at ¶ 27).

[15] Hugo Zapata, a Full-Time Recyclable Materials Collector 2 for the County, was a co- worker of Cullison. (Docs. 39, 45 at ¶ 21; Doc. 45-7 at 6:9-21). At the time of his deposition, Zapata was 47 years old with no work restrictions or disabilities. (Docs. 39, 45 ¶¶ 22, 23).

[16] Matthew Davies, the County's Full-Time Recycling Supervisor, was Cullison's direct supervisor from late 2008 through 2009. (Docs. 39, 45 ¶ 13; Doc. 45-5 at 8:9-17).

Case 3:22-cv-00276-JKM   Document 12   Filed 05/23/22   Page 61 of 169

Page 14 of 17
2012 U.S. Dist. LEXIS 102575, *51

_Lepore v. Lanvision Sys., Inc._, 113 F. App'x. 449, 452 (3d Cir. 2004) (opining that similarly situated employees "work in the same area in approximately the same position") (citing _Anderson v. Conrail, 297 F.3d 242, 249-50 (3d Cir. 2002)_.

Cullison cites the alleged conduct of these individuals as similar to his yet these individuals were not terminated. However, as noted by defendants, none of these individuals is accused of having falsified documents relating to an accident in a county-owned vehicle. Cullison himself does not allege these individuals engaged in such behavior. Rather, he contends that they engaged in the following behaviors: failing to turn in accident reports within 24 hours or failing to include/attach a police report; failing to call the police (presumably with respect to an auto accident in a county-owned vehicle); turning in an insurance claim without a police report; failing to sign [*53] a report; failing to pull GPS records with respect to other employees/accidents; failing to submit police reports or vehicle accident reports; overpayment of wages; and unauthorized use of a county-owned vehicle. These actions, although potentially improper and noncompliant with county policy, are neither as serious nor sufficiently similar to document falsification regarding a accident in a county-owned vehicle so as to be proper comparisons to Cullison's actions which form the basis for his discharge. See _Newring v. PNC Corp., No. 01-1973, 2006 U.S. Dist. LEXIS 18136, 2006 WL 840347, *9 (W.D. Pa. March 28, 2006)_ ("To be similarly situated, employees must have engaged in the same behavior[.]") Consequently, an inference of discrimination cannot be drawn thereon.

Finally, Cullison maintains that the county failed to follow its own policies in terminating him. As noted above, the county had an employee handbook which provided the following disciplinary measures may be issued with respect to employee behavior or performance: (1) verbal reprimand; (2) written reprimand; (3) suspension; or (4) discharge. (Doc. 42-27, Ex. 26, p. 38 (county handbook p. 33)). The policy further provides that discharge may be recommended [*54] "after a conscientious attempt to correct deficient areas or violations." _Id._

However, the policy does not state that these different disciplinary measures must be followed sequentially. Accordingly, is does not appear that there has been violation of the county policy with respect to disciplinary action. Defendants correctly observe, moreover, that a failure to follow an internal disciplinary procedures does

not suggest either a discriminatory intent or pretext, absent evidence of similarly-situated individuals who were treated differently with respect to such policies. _Russell v. Vanguard Group, No. 04-3269, 2006 U.S. Dist. LEXIS 50315, 2006 WL 2077010, *3 (E.D. Pa. July 24, 2006)_ (while employer's violation of its own policy "might afford evidence that improper purposes are playing a role," such a violation does not necessarily constitute evidence of pretext)(citing _Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)_); _Sidique v. University of Pittsburgh Dept. of Dermatology, No. 02-365, 2003 U.S. Dist. LEXIS 20473, 2003 WL 22290334, *7 (W.D. Pa. Oct. 3, 2003)_ (no basis for concluding that the alleged violations of internal policy prejudiced plaintiff more than others nor was there any evidence allowing a reasonable [*55] inference that the alleged violations were used to mask discriminatory animus); _Maull v. Division of State Police, 39 Fed. Appx. 769, 2002 WL 1480774, *4 (3d Cir. 2002)_ ("simply pointing to violations [of internal policy] is inadequate without evidence that [non-protected applicants] were treated differently by [the] Defendants with respect to [the] policies" than protected members.). Having concluded that no similarly-situated employees have been established as proper comparators, Cullison has also failed to establish pretext suggesting a discriminatory motive with respect to the application of policies outlined in the Department's employee handbook.

Inasmuch as Cullison has failed to meet his burned of establishing pretext with respect to his claim of disability discrimination, summary judgment in favor of defendants is recommended on this claim.

**(2) Failure to Accommodate**

"Under the ADA, once an individual is unable to perform the essential functions of the position . . . the inquiry shifts to whether reasonable accommodations can be made which would allow the individual to perform those essential functions." _Freeman v. Rollins Envtl. Servs. of New Jersey, No. Civ. A. 94-1871, 1996 U.S. Dist. LEXIS 11585, 1996 WL 451317, at *6 (D.N.J. Aug. 5, 1996)_ [*56] (citing _Milton v. Scrivner, 53 F.3d 1118, 1123 (10th Cir. 1995)_). An employer discriminates against a qualified individual when the employer does "not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." _Taylor v. Phoenixville School District,_

*184 F.3d 296, 306 (3d Cir.1999)* (citing *42 U.S.C. § 12112(b)(5)(A)*).

Reasonable accommodations include "measures such as 'job restructuring, part-time or modified work schedules ... acquisition or modification of equipment or devices ... and other similar accommodations for individuals with disabilities.'" *Freeman v. Chertoff, 604 F. Supp. 2d 726, 734 (D.N.J.2009)* (citing *42 U.S.C. § 12111(9)(B)*). When making an accommodation claim, "[a]n employee can succeed . . . only if the employee can demonstrate that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job." *Donahue v. Consol. Rail Corp., 224 F.3d 226, 232 (3d Cir.2000)* (internal citations and quotations omitted). If the plaintiff makes this showing, the burden shifts **[*57]** to the defendant to prove that the requested accommodations "are unreasonable, or would cause an undue hardship on the employer." *Turner v. Hershey Chocolate U.S.A., 440 F.3d 604, 614 (3d Cir.2006)*. Generally, the question of whether a proposed accommodation is reasonable is a question of fact. *See Buskirk v. Apollo Metals, 307 F.3d 160, 170-71 (3d Cir.2002)* (citing *Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1101 (3d Cir.1996)*).

Additionally, "[a]n employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Colwell v. Rite Aid Corp., 602 F.3d 495, 504 (3d Cir. 2010)* (citing *Williams, 380 F.3d at 761* (additional citations omitted). However:

> [W]hile "an employer who fails to engage in the interactive process runs a serious **[*58]** risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA," *Deane v. Pocono Med. Ctr., 142 F.3d 138, 149 (3d Cir.1998)* (en banc), failure to engage in the interactive process, in itself, does not constitute such a violation. *See Shapiro v. Twp. of Lakewood, 292 F.3d 356, 359 (3d Cir.2002)*; *Mengine, 114 F.3d at 420-21*; *see also Pathmark Stores, 177 F.3d at 193* (noting that "an employer [who acts on the belief that a perceived disability inherently precludes performance of the

essential functions of a job, with or without accommodation] is failing to make an individualized determination, as the ADA requires, and thus acts at its peril," as "the employer must be correct about the affected employee's ability to perform the job in order to avoid liability").

*Hohider v. United Parcel Service, Inc., 574 F.3d 169, 194 (3d. Cir. 2009)*.

The Third Circuit Court of Appeals has adopted a "middle course" on the burdens of production and persuasion on the issues of reasonable accommodation and undue hardship. *Bisker v. GGS Information Services, Inc., No. 1:07-CV-1465, 2010 U.S. Dist. LEXIS 53879, 2010 WL 2265979, *2 (M.D. Pa. June 2, 2010)*. First, the plaintiff **[*59]** bears the initial burden of proving that "she is otherwise qualified; if an accommodation is needed, the plaintiff must show, as part of her burden of persuasion, that an effective accommodation exists that would render her otherwise qualified." *Id.* (quoting *Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 670 (3d Cir.1999)*). With respect to a reasonable accommodation, the plaintiff is required only to "identify[] an accommodation, the costs of which, facially, do not clearly exceeds its benefits." *Id.* (quoting *Walton, supra*). Once the plaintiff has met this requirement, the burden shifts to the defendant "to prove either that the accommodation is unreasonable or that it creates an undue hardship for the defendant." *Id.* (quoting *Walton, supra*).

Defendants contend that they continually provided Cullison with reasonable accommodations. For instance, Cullison was provided a Tyvek suit as protective gear and he also had a couch and chair available in the conference room to assist him in donning and doffing this equipment. Cullison was also afforded the assistance of inmates in lifting and pushing tasks for which he had medical restrictions. [17]

Although the amended complaint alleges that defendants failed to make reasonable accommodations and to engage in the interactive process, Cullison does not address this claim in his opposition brief. Therefore, to the extent Cullison has not contested defendants'

---

[17] Although he maintains **[*60]** that there were occasions where such assistance was not rendered, Cullison did not inform his supervisors of this fact. Consequently, liability would be difficult to establish if defendants were without knowledge that an accommodation has failed or been unavailable.

position by addressing the issue in his brief in opposition to the motion for summary judgment, he is deemed to have waived any challenge thereto. *See M.D. Pa. L.R. 7.6.* Inasmuch as the evidence presented indicates that defendants reasonable accommodated Cullison's disabilities, defendants are, consequently, entitled to summary judgment on this claim.

### (E) Punitive Damages

Finally, defendants challenge Cullison's ability to recover punitive damages in this cause of action. The argue that punitive damages are not available for either Cullison's FMLA claims nor for his section §1983 claims. Indeed, the FMLA explicitly sets forth in *§ 2617(a)* the types of damages recoverable, **[*61]** and does not include punitive damages. *See 29 U.S.C. § 2617(a) (2006)*. Pennsylvania courts have also interpreted the FMLA as disallowing punitive damages. *Spain v. Colonial Penn Ins., 1997 U.S. Dist. LEXIS 19788, 1997 WL 773053, at * 2-3 (E.D. Pa. Dec.12, 1997)* (granting motion to dismiss requested punitive damages, noting that "a plaintiff may not recover punitive damages under the FMLA, and nothing [a] plaintiff pleads, however true, will alter that."). *See also Brown v. Nutrition Mgmt. Services Co., No. 06-2034, 2009 U.S. Dist. LEXIS 5580, 2009 WL 222352, at *3-4 (E.D. Pa. Jan. 26, 2009)*, *aff'd in relevant part, 370 F. App'x 267, 270 (3d Cir. Mar. 17, 2010)* (no recovery of compensatory or punitive damages under FMLA); *Gagliardo v. Connaught Laboratories, Inc., 311 F.3d 565, 570 (3d Cir.2002)* (punitive damages not available under PHRA); *Kozempel v. Grand View Hosp., No. 10-6839, 2011 U.S. Dist. LEXIS 34843, 2011 WL 1196851 (E.D. Pa. March 30, 2011)*; *McKeirnan v. Smith-Edwards-Dunlap Co., No. 95-1175, 1995 U.S. Dist. LEXIS 6822, 1995 WL 311393, at * 6 (E.D. Pa. May 17, 1995)* ("The FMLA does not provide for punitive damages."). Additionally, defendant correctly observe that punitive damages are not recoverable against a governmental entity or its agents in a §1983 action. *City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S. Ct. 2748, 69 L. Ed.2d 616 (1981)* **[*62]** (absent a statute to the contrary, punitive damages cannot be awarded against a government entity); *Walker v. North Wales Borough, 395 F. Supp.2d 219, 229 (E.D. Pa. 2005)* (Punitive damages may not be awarded against governmental entities or against an officer acting in his or her official capacity).

Moreover, to the extent Cullison has not contested defendants' position by addressing the issue in his brief

in opposition to the motion for summary judgment, he is deemed to have waived any challenge thereto. *See M.D. Pa. L.R. 7.6.* Consequently, the claim for punitive damages should be stricken.

### IV. Conclusion

Accordingly, it is recommended that this defendants' motion for summary judgment be granted.

Signed on May 18, *2012*

/s/ Mildred E. Methvin

MILDRED E. METHVIN

UNITED STATES MAGISTRATE JUDGE

### NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing Report and Recommendation dated May 18, *2012*

Any party may obtain a review of the Report and Recommendation pursuant to *Local Rule 72.3*, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in *28 U.S.C. § 636 (b)(1)(B)* or making a recommendation **[*63]** for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own

2012 U.S. Dist. LEXIS 102575, *63

determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Signed May 18, **_2012_**.

/s/ Mildred E. Methvin

MILDRED E. METHVIN

U. S. MAGISTRATE JUDGE

---

**End of Document**



Positive
As of: May 20, 2022 9:11 PM Z

## *Deserne v. Madlyn & Leonard Abramson Ctr. for Jewish Life, Inc.*

United States District Court for the Eastern District of Pennsylvania

May 17, 2012, Decided; May 17, 2012, Filed

CIVIL ACTION NO. 10-03694

**Reporter**

2012 U.S. Dist. LEXIS 68852 *; 2012 WL 1758193

MARIE PIERRE DESERNE v. MADLYN AND
LEONARD ABRAMSON CENTER FOR JEWISH LIFE,
INC.

**Prior History:** *Deserne v. Madlyn & Leonard Abramson
Ctr. for Jewish Life, Inc., 2011 U.S. Dist. LEXIS 15377
(E.D. Pa., Feb. 16, 2011)*

**Counsel:** [*1] For MARIE PIERRE DESERNE, Plaintiff:
PETER GEORGE MYLONAS, LEAD ATTORNEY, LAW
OFFICE OF PETER GEORGE MYLONAS PC,
BROOMALL, PA.

For MADLYN AND LEONARD ABRAMSON CENTER
FOR JEWISH LIFE, INC., Defendant: BARRY R.
ELSON, LEAD ATTORNEY, THORP REED &
ARMSTRONG LLP, PHILADELPHIA, PA; HEATHER J.
AUSTIN, THORP REED & ARMSTRONG,
PHILADELPHIA, PA.

**Judges:** THOMAS N. O'NEILL, JR., J.

**Opinion by:** THOMAS N. O'NEILL, JR.

## Opinion

### MEMORANDUM

Now before me is a motion for summary judgment filed
by defendant Madlyn and Leonard Abramson Center for
Jewish Life, Inc. For the reasons that follow, I will grant
defendant's motion.

### BACKGROUND

Plaintiff Marie Pierre Deserne claims that defendant, her
former employer, discriminated against her. Counts III
and IV of plaintiff's complaint alleging claims based on
disability discrimination are all that remain in this action.

I previously dismissed plaintiff's race-based
discrimination claims. [1] In Count III, plaintiff asserts a
claim under the Pennsylvania Human Relations Act, *43
P.S. § 951, et seq.* She asserts that her "protected class
is disability — facial disfigurement being Black and
ethnically, a West African National from the Country of
Haiti and Plaintiff was subjected to intentional
discrimination [*2] solely because of her facial
disfigurement — disability." Compl. ¶ 54. In Count IV,
she asserts a claim under Title VII of the Civil Rights Act
of 1964. She alleges that her "protected class is
disability — facial disfigurement and Plaintiff was
subjected to intentional discrimination solely because of
her facial disfigurement — disability." Compl. ¶ 69.

Plaintiff claims that she was disabled because she
developed a skin condition identified as "exogenous
ochronisis" in or about 2006. Compl. ¶ 10. Two of her
treating physicians were deposed. One, Dr. Christina
Chung, testified that plaintiff had a condition identified
as exogenous ochronisis. Def's Ex. 4 at 45:1-46:1;
Def.'s Ex. 4b. The [*3] other, Dr. Toby Shaw, testified
that plaintiff had a condition known as seborrheic
dermatitis with Litchenfield plaques. Def.'s Ex. 5 at
11:13-12:23. Regardless of her diagnosis, each of
plaintiff's treating physicians concluded that "[h]er skin
condition does not preclude her from participating in any
work or activity," Def.'s Ex. 4 at 21:20-22; Def's Ex. 4a at
1, and that she was not "physically limited" as a result of
her condition. Def.'s Ex. 5 at 14:16-17. Indeed, plaintiff
acknowledges that her skin condition "does not preclude

---

[1] Although I dismissed plaintiff's race-based discrimination
claims, her response to defendant's motion for summary
judgment appears to raise issues of race-based discrimination.
See, e.g. Dkt. No. 32 at 13 (asserting claims of discrimination
and wrongful termination based upon her "race and ethnic
Haitian heritage of African descent"); id. at 17 (arguing that
"plaintiff has plead [sic] both race discrimination and hostile
work environment under Title VII and PHRA"). Those
arguments are without merit.

2012 U.S. Dist. LEXIS 68852, *3

[her] from physically participating in any work or activity, whatsoever." Compl. ¶ 10. She has admitted that she could perform the essential functions of her job. Compl. ¶ 16; Def.'s Ex. 4 at 21-23; Def's Ex. 7 at 33:16-21. At her deposition, plaintiff conceded that the only impact of her skin condition was that she was itchy. Def's Ex. 7 at 33:24-34:15.

Defendant hired plaintiff in 2002 as a Certified Nursing Assistant. [2] Compl. ¶ 7. Her job duties included assisting nursing home residents with personal care; rendering assistance with bathing, personal hygiene, dressing, feeding and recreational activities; interacting with and observing assigned residents; [*4] and reporting notable changes regarding the residents. Compl. ¶ 13, Def's Ex. 2 at 1-2.

In April 2009, plaintiff was told that her job performance was "not good." Def.'s Ex. 7 at 64:11-24, 6613-14. In June 2009, a number of residents who were under plaintiff's care asked that she not be their Certified Nursing Assistant. Def.'s Ex. 10 at DEF0292. At the time, defendant noted that "[w]e cannot continue to re-arrange assignments because residents refuse to allow Marie to care for them." Id. According to defendant's discipline report for plaintiff, residents complained "regarding [plaintiff's] poor communication skills and/or poor care." Def.'s Ex. 10 at DEF0292. Plaintiff testified that the residents did not complain that she was not doing her job, but complained about her face; that her "face is ugly." Pl.'s Ex. 3 at 40:5-13. Millie Steur, one of plaintiff's supervisors, testified, however, that "[t]here was no discussion from Marie at any time with [Steur] about any resident or any family harassing her or complaining about her face." Def.'s Ex. 11 at 22:20-23.

Defendant [*5] took steps to respond to concerns about plaintiff's performance. The June 2009 discipline report noted that plaintiff had "already received one-on-one coaching twice with educator and trainer. Received 2 videos and one self study on communication. Completed one month performance improvement plan with supervisor. Referred to ESL classes." Id. Despite this training, in July 2009, a floor nurse working with the residents to whom plaintiff was assigned wrote a note to her supervisor complaining that plaintiff "continues to tell [a resident] to move her legs and we both know that [the resident] has [multiple sclerosis] and cannot move her legs. I have to continually re-educate Marie on [the resident's] disease process and that she is unable to

move her legs on her own but she insists on telling [the resident] to move her legs on the footrest of the lift." Def.'s Ex. 13.

Plaintiff was terminated in July 2009. Compl. ¶ 24. When asked why she was terminated, plaintiff responded that defendant said she was being fired because a resident complained that her face was "ugly." Def.'s Ex. 7 at 88:15-89:8. Plaintiff testified that she was told she was "going to be fired because the residents complain [*6] for me my face is ugly" [sic] and because a resident had complained that the resident had "lost a purse." Pl.'s Ex. 3 at 96:15-17; see also ; Pl.'s Ex. 3 at 117:4-7, 123:15-16. Defendant contends that it "terminated plaintiff for cause, based on poor performance," Dkt. No. 17, 16th Affirmative Defense, and that she "was not qualified to perform the essential duties of her job, or more accurately, she was not receptive to opportunities provided to help her to improve her performance." Dkt. No. 31-2 at 21.

## STANDARD OF REVIEW

The party moving for summary judgment has the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing [*7] law. Id. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish

---

[2] The parties have also referred to the title for this position as Registered Nursing Assistant or Resident Care Associate.

2012 U.S. Dist. LEXIS 68852, *7

the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Fed. R. Civ. P. 56(c)(1)*. The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)*. Summary judgment will be granted "against a party who fails to make **[*8]** a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*.

## DISCUSSION

### I. Count III

In count III of her complaint, plaintiff claims that defendant "violated *Section 5(a)* of the Pennsylvania Human Relations Act[,] *43 P.S. 951-53*," Compl. ¶ 61, because she "was subjected to intentional discrimination solely because of her facial disfigurement — disability." Compl. ¶ 53. Claims for disability discrimination under the PHRA are generally interpreted in accord with claims brought under parallel provisions in the Americans with Disabilities Act, *42 U.S.C. § 12101, et seq.* See *Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)*, citing *Harrisburg Sch. Dist. v. Pa. Human Relations Comm'n, 77 Pa. Commw. 594, 466 A.2d 760, 763 (Pa. Commw. Ct. 1983)*. When a plaintiff claims that she was treated differently based on her disability under the ADA or the PHRA courts apply the three-step, burden shifting analysis set forth in *McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. See *Gourley v. Home Depot, No. 99-5728, 2001 U.S. Dist. LEXIS 9089, 2001 WL 755102, at *2 (E.D. Pa. June 29, 2001)* ("Plaintiff relies **[*9]** on the McDonnell Douglas burden-shifting framework, applicable to claims for disability discrimination under the ADA and PHRA.").

Plaintiff first bears the burden of making a prima facie case of discrimination and must show that "(1) [s]he is a disabled person within the meaning of the [PHRA]; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he suffered an otherwise adverse employment decision as

a result of discrimination." *Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000)*. The PHRA defines a disability as (i) "a physical or mental impairment which substantially limits one or more of such person's major life activities"; (ii) "a record of having such an impairment"; or (iii) "being regarded as having such an impairment." *43 P.S. § 954 (p.1)*. [3] Defendant contends that plaintiff's claim cannot withstand its motion for summary judgment because plaintiff has not set forth sufficient facts to establish that she is a disabled person within the meaning of the PHRA. I agree.

### 1. Substantially Limiting Physical Impairment

Plaintiff has not set forth sufficient evidence to show that her skin condition constitutes an impairment that substantially limits a major life activity. Nor has she set forth evidence of a record of having such an impairment. A physical impairment is defined as "a physiological disorder or condition, cosmetic disfigurement . . . affecting . . . body systems [including] skin." *16 Pa. Code § 44.4.* "'Major life activities' means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Id.* To determine whether a plaintiff is "substantially limited" in performing a major life activity, courts consider: "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration **[*11]** of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Namako v. Acme Mkts., Inc., No. 08-3255, 2010 U.S. Dist. LEXIS 23182, 2010 WL 891144, at *4 (E.D. Pa. Mar. 11, 2010)*.

Plaintiff has not identified a single life activity that has been limited by her skin condition. She has admitted that her skin condition does not limit her ability to perform the essential functions of her job. Compl. ¶¶ 10, 16; Def.'s Ex. 4 at 21-23; Def.'s Ex. 7 at 33:16-21. Instead, at her deposition plaintiff claimed that the only

---

[3] The ADA Amendments Act of 2008, which went into effect on January 1, 2009 and prior to plaintiff's termination, "made **[*10]** it easier for plaintiffs to prove that they are 'disabled' within the meaning of the ADA." *Estate of Murray v. UHS of Fairmount, Inc., No. 10-2561, 2011 U.S. Dist. LEXIS 130199, 2011 WL 5449364, at *5 (E.D. Pa. Nov. 10, 2011)*. Plaintiff's claim, however, is brought under the PHRA and not under the ADA. To date, Pennsylvania has not made parallel amendments to the PHRA or the regulations implementing the PHRA.

impact of her skin condition was that she was "itchy." Def.'s Ex. 7 at 33:24-34:15. The record evidence would not allow for a reasonable jury to conclude that plaintiff has a physical impairment which substantially limits one or more of her major life activities. Cf. *Kennedy v. Glen Mills Sch., Inc.,* No. 10-7450, 2011 U.S. Dist. LEXIS 131441, 2011 WL 5552865, at *4 (E.D. Pa. Nov. 15, 2011) (granting summary judgment where there was no record evidence from which a reasonable factfinder could conclude that any of the plaintiff's major life activities had been affected by his claimed disability).

## 2. Regarded As Disabled

In response to defendant's motion [*12] for summary judgment, plaintiff contends that she is a disabled person because defendant regarded her as disabled. Plaintiff's complaint does not clearly assert a "regarded-as" disabled claim, alleging only that "defendant knew about plaintiff's facial disfigurement impairment disability because it is apparent." [4] Compl. ¶ 14. To the extent that this allegation can be construed as having raised a claim that defendant regarded her as disabled, I find that plaintiff has not made a sufficient factual showing to establish such a claim.

To show that defendant regarded her as disabled under the regulations implementing the PHRA, plaintiff must show that she

> has a physical or [*13] mental impairment that does not substantially limit major life activities but that is treated by an employer or owner, operator or provider of a public accommodation as constituting a limitation; has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward the impairment; or has none of the impairments defined in subparagraph (i)(A) but is treated by an employer or owner, operator or provider of a public accommodation as having an impairment.

16 Pa. Code. § 44.4. [5] Defendant was aware that certain residents made complaints about plaintiff's face. But even if plaintiff's evidence establishes that defendant had knowledge of her skin condition, this alone is insufficient to establish that defendant regarded her as disabled under the definition set forth in the regulations implementing the PHRA. Cf. *Davis v. Davis Auto, Inc.,* No. 10-3105, 2011 U.S. Dist. LEXIS 135186, 2011 WL 5902220, at *9 (E.D. Pa. Nov. 22, 2011) (applying the parallel standard set forth in the pre-ADAAA regulations implementing the ADA to find that the defendants' knowledge of plaintiff's health conditions without more was "not enough to suggest that any of the Defendants perceived [*14] Plaintiff as incapable of or substantially limited in performing her job because of her health"). "Plaintiff has not provided any evidence that her employers perceived her as unable to work in general, or in performing a large range of jobs" and thus has not raised a question of material fact as to whether defendant regarded her as disabled. *Davis, 2011 U.S. Dist. LEXIS 135186, 2011 WL 590550, at *9.*

Because plaintiff has not set forth sufficient facts to establish that she is a disabled person within [*15] the meaning of the PHRA, I will grant defendant's motion for summary judgment with respect to count III of plaintiff's complaint.

## II. Count IV

In count IV of her complaint, plaintiff claims that defendant "violated Title VII of the Civil Rights Act of 1964, *42 U.S.C. Section 2000e, et seq.*," compl. ¶ 75, because she "was subjected to intentional discrimination solely because of her facial disfigurement — disability." Id. ¶ 69. "Title VII, of course, creates a cause of action for discrimination based on an individual's 'race, color, religion, sex or national origin.' Disability is not among

---

[4] "A plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *Bell v. City of Phila.,* 275 F. App'x 157, 160 (3d Cir. 2008) (citations and internal quotation omitted); see also *DeCastro v. Lahood,* No. 04- 2129, 2009 U.S. Dist. LEXIS 33389, 2009 WL 1067030, at *8 (E.D.N.Y. Apr. 21, 2009) (finding that the defendant "did not have an opportunity to fashion discovery toward defense of" the plaintiff's regarded as claim which was raised for the first time in opposition to summary judgment).

[5] Following the ADAAA, the regulations implementing the ADA were revised. As revised, a plaintiff bringing a "regarded-as" claim of disability discrimination under the ADA need only demonstrate that she was subjected to an adverse action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *42 U.S.C. § 12102(3)(A).* Plaintiff points to this standard in her response in opposition to defendant's motion. Dkt. No. 32 at 36. Plaintiff's claim, however, is brought under the PHRA and its unamended implementing regulations and I need not decide whether plaintiff can meet the more lenient standard set forth in the ADA regulations.

2012 U.S. Dist. LEXIS 68852, *15

the enumerated bases for a Title VII suit, and therefore a claim for disability discrimination brought under Title VII cannot survive." *Diep v. Southwark Metal Mfg. Co., No. 00-6136, 2001 U.S. Dist. LEXIS 2953, 2001 WL 283146, at *2 (E.D. Pa. March 19, 2001)*; see also *Warner v. Montgomery Twp., No. 01-3309, 2002 U.S. Dist. LEXIS 13257, I2002 WL 1623774, at *7 (E.D. Pa. July 22, 2002)* (same).

An appropriate Order follows.

## ORDER

AND NOW, this 17th day of May, 2011, upon consideration of defendant's motion for summary judgment, plaintiff's response and defendants' reply, it is ORDERED that the motion is GRANTED and judgment is ENTERED in the above action in favor **[*16]** of defendant Madlyn and Leonard Abramson Center for Jewish Life, Inc and against plaintiff Marie Pierre Deserne.

*/s/ Thomas N. O'Neill, Jr.*

THOMAS N. O'NEILL, JR., J.

**End of Document**

🛈 Cited
As of: May 22, 2022 3:46 PM Z

## *Hernandez v. Temple Univ. Hosp.*

United States District Court for the Eastern District of Pennsylvania

January 8, 2019, Decided; January 8, 2019, Filed

CIVIL ACTION NO. 17-4381

**Reporter**

2019 U.S. Dist. LEXIS 2853 *; 2019 WL 130508

NANCY HERNANDEZ, Plaintiff, v. TEMPLE UNIVERSITY HOSPITAL, Defendant.

**Counsel:** **[*1]** For NANCY HERNANDEZ, Plaintiff: DAVID M. KOLLER, LEAD ATTORNEY, KOLLER LAW PC, PHILADELPHIA, PA.

For TEMPLE UNIVERSITY HOSPITAL, Defendant: JASON K. ROBERTS, LEAD ATTORNEY, RUBIN FORTUNATO HARBISON PC, PAOLI, PA.

**Judges:** MARILYN HEFFLEY, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** MARILYN HEFFLEY

## Opinion

### MEMORANDUM OPINION

Plaintiff Nancy Hernandez ("Plaintiff" or "Hernandez") commenced this action against Defendant Temple University Hospital ("Temple"), alleging that Temple interfered with her exercise of rights under the *Family and Medical Leave Act, 29 U.S.C. §§ 2615-2654* (the "FMLA"), and that it terminated her employment as retaliation for her exercising those rights. Presently before this Court is Temple's Motion for Summary Judgment (Doc. No. 20). For the reasons discussed below, Temple's Motion will be granted.

### I. BACKGROUND

Hernandez was employed by Temple as a medical secretary in its Cardiology practice from July 1, 2008, Def.'s Mot. Summ. J. Ex. 2, until September 30, 2016,

*id.* Ex. 25.[1] Temple terminated her employment on the ground that she had violated the Health Insurance Portability and Accountability Act, *42 U.S.C. §§ 1320a-1320e-3* ("HIPAA"), as well as its own HIPAA Privacy/Security Agreement by examining the medical records of a patient named Shonda **[*2]** Younge ("Younge"), without a legitimate reason for doing so. Def.'s Mot. Summ. J. at 8-10; *id.* Ex. 5, at 11-12. Hernandez contends that the actual reason for her termination was in retaliation for her actions in taking advantage of her rights under the FMLA. Opp'n (Doc. No. 28) at 1-2. She also maintains that her immediate supervisor, Valencia Church ("Church"), interfered with her exercise of her FMLA rights. *Id.* at 2. Hernandez, however, has failed to raise a genuinely disputed issue of material fact in support of those claims.

### A. Hernandez's FMLA Leave Requests

Hernandez has a daughter who suffers from severe asthma symptoms and requires frequent treatment. From 2008 through 2016, Hernandez requested, and Temple approved, numerous periods of intermittent or continuous FMLA leave to allow Hernandez to care for her daughter.[2] Two of those leave periods are potentially at issue in this case. On February 18, 2016, Temple approved intermittent leave for Hernandez to obtain treatment for her daughter two times every three months, with each episode requiring no more than four hours. Def.'s Mot. Summ. J. Ex. 21, at TU 000285. The approval covered the period from February 16, 2016 to

---

[1] Hernandez also was employed by Temple from January 10, 2005 to September 15, 2006. *See* Def.'s Mot. Summ. J. at 4 & Ex. 1. That period is not at issue in the present case.

[2] Temple alleges that it approved 11 separate FMLA leave requests for Hernandez. Def.'s Mot. Summ. J. at 11. The exhibit it cites for that proposition, however, only reflects eight leave requests. *Id.* Ex. 21.

2019 U.S. Dist. LEXIS 2853, *2

February 15, [*3] 2017. Id. In July 2016, Hernandez submitted an application to recertify her to take FMLA leave with greater frequency. Id. Ex. 24, at 21-22, Ex. 25, at TU 000257-62. There is a factual dispute regarding what prompted Hernandez to seek recertification. Hernandez asserts that her supervisor, Church, instructed her that she needed to reapply ("recertify") for her FMLA leave. Dep. Tr. of Nancy Hernandez-Smith, Def.'s Mot. Summ. J. Ex. 4, at 145-46 [hereinafter "Hernandez Dep."].[3] She contends that she was not required to do so because the FMLA did not require her to recertify any more frequently than every six months, and July 2016 was only five months from her prior certification. Opp'n at 19-20. Thomas F. Johnston, Temple's Director of Workers' Compensation and Absence Management, testified that he "vaguely" remembered that some issue had arisen regarding whether Hernandez was using more than her allotted leave and that Hernandez had informed him that she needed more frequent leave periods. Dep. Tr. of Thomas Johnston, Opp'n Ex. E, at 21-22 [hereinafter "Johnston Dep."]. Temple contends that Hernandez needed to recertify because she required more leave than had previously been approved. [*4] [4] Def.'s Mot. Summ. J. at 12. In any event, it is undisputed that Hernandez did submit a request for intermittent leave in July 2016 and that she sought authorization to take FMLA leave much more frequently than had previously been approved for her.[5] Id. at 12-13; Opp'n at 20. Temple approved Hernandez's request on September 1, 2016, granting her intermittent leave of up to two hours per week for her daughter to obtain testing and up to four hours once a month for her daughter's medical examinations. Def.'s Mot. Summ. J. Ex. 25, at TU 000253. Requests for FMLA leave by Temple employees were handled by Temple's Human Resources Department. Dep. Tr. of Valencia Church, Opp'n Ex. B, at 13-14 [hereinafter "Church Dep."]. Church had no involvement in determining whether such leave was granted. Id.

**B. Church's Alleged Harassment of Hernandez for Taking Her FMLA Leave**

Hernandez alleges that Church harassed her regarding taking FMLA leave. Opp'n at 3-4. She contends that Church would question the validity of her daughter's illness, asking "[w]ell, how sick is your daughter? . . . How bad is her asthma? Like, is it really that bad?" Hernandez Dep. at 131; see also id. at 129. She also claims that Church would [*5] demand a doctor's note each time that she took leave even though Temple's policy did not require her to provide such notes.[6] Id. at 129-30. She stated generally that Church gave her "a hard time" each time she took FMLA leave, id. at 129, and that Church was "hostile" to her, id. at 147. She further maintains that when she would return from taking FMLA leave, Church would give her a larger workload as a form of punishment.[7] Id. at 156-64. She contends that other employees who took FMLA leave were not questioned in the same way.[8] Id. at 147-49, 154-55. Hernandez also testified that it was Church who told her, without explanation, that she needed to reapply for her leave in July 2016. Id. at 145-46.

**C. Hernandez's Dispute with Younge**

Hernandez asserts that, beginning in June 2016, id. at 42-43, Younge began harassing her through phone calls and letters to her at her work and through text messages, id. at 39, 42. Hernandez testified that Younge's intention was to take her husband away from her. Id. at 39, 43. Younge stated as much in a text message to her. Id. at 43. On June 24, 2016, Hernandez sent a letter to Younge demanding that she "cease and desist" making those harassing communications. Def.'s Mot. Summ. J. Ex. 10.

---

[3] At the time of these events, Hernandez's name was Hernandez-Smith. Def.'s Mot. Summ. J. Ex. 4, at 7.

[4] As discussed infra in Section III(A), this factual dispute is not material to the outcome of this case.

[5] Hernandez's written application is dated August 12, 2016 because she initially submitted her request via Temple's electronic portal and then delayed in submitting the supporting documents for her request. Johnston Dep. at 22, 49-50, 52.

---

[6] Church testified that she believed an employee approved for intermittent FMLA leave actually took that leave. Church Dep. at 18. However, Church's supervisor, Denise Reynolds, testified that an employee with approved intermittent FMLA leave was not required to submit a doctor's note for each individual time when he or she used that leave. Dep. Tr. of Denise Reynolds, Opp'n Ex. C, at 43-44.

[7] Hernandez also testified, however, that she "probably" was given extra work because she was the most knowledgeable and dependable secretary. Hernandez Dep. at 163.

[8] Notably, Hernandez's testimony that Church treated her differently than other employees who took FMLA undercuts her argument that Church's alleged hostility to her was caused by the fact that she took FMLA leave.

2019 U.S. Dist. LEXIS 2853, *5

Hernandez stated that she obtained Younge's name and address by "googling" the phone number [*6] from the text messages. Hernandez Dep. at 43. The next day, Hernandez filed a complaint against Younge with the police. Def.'s Mot. Summ. J. Ex. 11. On July 29, 2016, Younge sent a letter to Hernandez stating the following: "I wanted to let you know that i [sic] set you up to loose [sic] your job and im [sic] still gonna pursue your husband. You should keep a close eye on your kids." Opp'n Ex. O. On August 5, 2016, Hernandez's attorney sent a letter to Younge demanding that she cease contacting Hernandez in any manner. Def.'s Mot. Summ. J. Ex. 8. On November 10, 2016, Hernandez sent Younge another cease and desist letter. Id. Ex. 12. On November 14, 2016, she filed a second complaint against Younge with the police. Id. Ex. 13.

### D. Temple's HIPAA Policies

Temple requires any of its personnel who may be required to have access to a patient's protected health information to sign and agree to be bound by The Temple University Health System HIPAA Agreement (the "HIPAA Agreement"). Def.'s Mot. Summ. J. Ex. 6, at TU 000001. The HIPAA Agreement provided that an employee would not access a patient's protected health information unless doing so was essential for the employee to perform his or her [*7] duties. Id. The HIPAA Agreement incorporated Temple's Policy Number 220—its Patient Privacy and Confidentiality Policy—and Policy Number 400—its Computer Usage Policy. Id. Policy 220 provided in relevant part that "[o]nly those physicians and healthcare workers who are **directly** involved with the patient's care shall have access to the patient's medical records." Id. Ex. 7, at TU 000704 (emphasis in original). Policy 400 stated in relevant part that "[y]ou may not access or copy directories, programs, files, data, or documents which do not belong to you or which you are not authorized to access and copy." Id. at TU 000712. Both policies contained provisions stating that a violation of the policies "may result in disciplinary action up to and including termination." Id. at TU 000704, TU 000713. In addition, the HIPAA Agreement itself also contained the same provision regarding sanctions for violations of that agreement. Id. Ex. 6, at TU 000002. Hernandez signed the HIPAA Agreement on August 20, 2008. Id.

### E. Events Leading to Hernandez's Termination

Younge was a patient of Temple's Obstetrics and Gynecology ("OBGYN") practice. Dep. Tr. of Denise Reynolds, Opp'n Ex. C, at 23 [hereinafter [*8] "Reynolds Dep."]. She was not a patient of Temple's Cardiology practice, where Hernandez worked. See id. at 11. On Friday, September 23, 2016, Younge made a formal complaint to the administration of the OBGYN practice regarding what she claimed was a breach of her privacy. See Def.'s Mot. Summ. J. Ex. 14, at TU 000507. She informed them that she had previously dated Hernandez's husband for a brief time in May and June of 2016. Id. She believed that Hernandez had obtained her telephone number from her husband's phone. Id. Younge reported that Hernandez had been placing belligerent calls to her and making physical threats. Id. She stated that Hernandez had sent a text message to her indicating that she knew Younge's address and that of her mother and stating their correct addresses. Id. Younge insisted that she had never revealed her mother's address to Hernandez's husband during their brief relationship and that she was convinced that Hernandez had obtained that information from her medical records at Temple. Id. She complained that her rights under HIPAA had been violated and asserted that she feared for her safety and that of her mother. Id. She requested that Temple investigate the situation. [*9] Id.

The manager of Temple's OBGYN practice, Kendra Hines ("Hines"), emailed this information to Temple's Chief Compliance Officer, Annamarie Maikner ("Maikner"), on the next Monday, which was September 26, 2018, and copied both Reynolds and Church on the email. Id. at TU 000510; see also Reynolds Dep. at 11 (identifying Maikner as Chief Compliance Officer). The next day, Maikner requested a member of her staff to run an "audit trail" in their computerized record system in order to determine whether Hernandez had looked at Younge's medical records. Def.'s Mot. Summ. J. Ex. 14, at TU 000509. That system, known as EPIC, permitted Temple's IT staff to identify whether any staff member had reviewed a particular patient's medical records and to provide a second-by-second log of each portion of the records that they reviewed. Dep. Tr. of Alyce Gontz, id. Ex. 16, at 18-19. That audit trail established that Hernandez had accessed Younge's gynecological records on five occasions between June 24, 2016 and July 20, 2016. See id. Ex. 15. In addition, it revealed that, on the first occasion that she reviewed Younge's records, June 24, 2016, Hernandez did so for an extended period from 10:56 to 15:01. [*10] Id. Ex. 15,

at TU 000516-28.[9] Maikner's staff forwarded the audit results to her. Id. Ex. 14, at TU 000509. Based on those results and Younge's complaint, Maikner made the decision to terminate Hernandez's employment. Reynolds Dep. at 11-12. Before she could implement that decision, however, she was required to obtain the approval of an attorney in Temple's Labor Relations Group, Temple's Executive Director of Human Resources and its Chief Operating Officer. Id. at 33-34. Neither Church nor her supervisor, Reynolds, were responsible for determining that Hernandez should be fired. See id. at 11-12, 22; Church Dep. at 24-25.

Reynolds and Church met with Hernandez on September 30, 2016. See Reynolds Dep. at 12; Def.'s Mot. Summ. J. Ex. 26. A union representative participated in the meeting by telephone. Reynolds Dep. at 12-13. The parties dispute what transpired at that meeting. Hernandez testified at her deposition that she recalled "not too much" regarding the content of the meeting. Hernandez Dep. at 114. Nevertheless, she asserts that the only information that she was given regarding the reason for her termination was that it was for "gross neglect" and that Reynolds and Church did not even mention Younge's name [*11] during the meeting. Id. at 104-05. Reynolds testified that she asked Hernandez whether she knew Younge and that Hernandez denied knowing her. Reynolds Dep. at 13-14, 17. She further testified that she informed Hernandez that she had an audit record that showed that Hernandez examined Younge's records multiple times. Id. at 14.

## II. SUMMARY JUDGMENT STANDARD

Under the well-established summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Williams v. Wells Fargo Bank, No. 14-2345, 2015 U.S. Dist. LEXIS 46319, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting Wright v. Corning, 679 F.3d 101, 105 (3d Cir. 2012)).

[T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there [*12] can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his or] her case with respect to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). A material fact is one that "might affect the outcome of the suit under the governing law." Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006). To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on [*13] which the jury could reasonably find for the [non-moving party].'" Burton v. Teleflex Inc., 707

---

[9] Temple asserts that the records Hernandez reviewed included doctors' notes, lab tests results for sexually transmitted diseases, urine analyses, pathology reports and medical insurance information. Def.'s Mot. Summ. J. at 9. Although Hernandez does not dispute that assertion, Temple provided the audit results in a computer-generated chart that is largely incomprehensible to persons not already familiar with their meaning and it did not provide any basis for the Court to interpret them. Nevertheless, the fact that Hernandez reviewed Younge's protected medical records without proper authority to do so renders the specific types of gynecological records she reviewed unimportant.

*F.3d 417, 425 (3d Cir. 2013)* (quoting *Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007))*; see also *Anderson, 477 U.S. at 252*.

## III. DISCUSSION

### A. Temple is Entitled to Summary Judgment on Hernandez's Claim that It Interfered with Her Exercise of FMLA Rights

In Count I of her Complaint, Hernandez claims that Temple violated the FMLA by interfering with her attempts to exercise her FMLA rights. She bases her claim on *29 U.S.C. § 2615(a)(1)*, which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. Opp'n at 14-18. The applicable regulations provide that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *29 C.F.R. § 825.220(b)*. Hernandez asserts that Temple "discouraged" her from exercising her FMLA leave through Church's conduct in questioning the extent of her daughter's illness, demanding a doctor's note for each leave period taken when doctors' notes were not required, increasing her workload and generally giving her "a hard time" for taking leave. Opp'n at 16. She claims that Church's conduct made her "'stressed every **[*14]** time [she] took leave'" and made her feel "'discouraged about taking her allowed leave.'" *Id.* (quoting Hernandez Dep. at 153). She alleges that these allegations create a "reasonable inference . . . that Church discouraged her from using her FMLA leave and made her reluctant to invoke her allotted leave time," thereby "chill[ing her] assertion of her rights under the FMLA." *Id.* at 16-17. She argues that that conduct is sufficient to establish interference for the purposes of defeating summary judgment. *Id.* at 17. Hernandez is mistaken.

To establish a claim for interference under the FMLA, a plaintiff must establish that:

"(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the

FMLA."

*Capps v. Mondelez Global, LLC, 847 F.3d 144, 155 (3d Cir. 2017)* (quoting *Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014))*.

Hernandez fails to satisfy the fifth element of this standard. The FMLA "provides no relief unless the employee has been prejudiced by the violation . . . ." *Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002)*. "The Third Circuit has unequivocally stated that 'for an interference **[*15]** claim to be viable, the plaintiff must show that FMLA benefits were actually withheld.'" *Shann v. Atl. Health Sys., No. CV124822ESMAH, 2017 U.S. Dist. LEXIS 186758, 2017 WL 5260780, at *19 (D.N.J. Nov. 13, 2017)* (quoting *Ross, 755 F.3d at 191-92)*; accord *Capps, 847 F.3d at 156*. An employee who obtains "all of the [FMLA] benefits to which he [or she] is entitled by taking leave and then being reinstated to the same position from which he [or she] left cannot satisfy the fifth prong of the interference analysis, [and thus,] he [or she] fails to make a prima facie showing of interference . . . ." *Ross, 755 F.3d at 192*; accord *Capps, 847 F.3d at 155*.

In this case, Hernandez testified that Temple approved her leave requests "every single time" that she requested leave. Hernandez Dep. at 128. She further testified that, despite Church's alleged harassment of her regarding leave, she took leave whenever she believed that her daughter needed her. *Id.* at 145; see also *id.* at 131-32. She alleged that she felt "stressed" every time she took leave and that the harassment made her feel discouraged from taking leave, but she also stated that she took her leave regardless of those feelings. See *id.* at 153. Hernandez argues that "a reasonable inference from [her] testimony [regarding Church's harassment] is that Church discouraged her from using her FMLA leave and made her reluctant to invoke **[*16]** her allotted leave time to care for her daughter." Opp'n at 16-17. While Church's alleged conduct could be inferred to have discouraged Hernandez from taking leave, the fact is that she testified that it did not do so and that she took leave as needed despite that alleged conduct. Hernandez Dep. at 153. In the absence of proof that the employer's purported discouragement caused the employee not to take leave that he or she otherwise would have taken, the employee cannot establish an interference claim. See *Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 246 (3d Cir. 2016)* (reprimands for taking leave "must occur in tandem with actual harm"

KIMBERLY BORLAND

to constitute actionable interference with FMLA rights); _Shann, 2017 U.S. Dist._ **LEXIS** _186758, 2017 WL 5260780, at *19_ (to establish an interference claim based on discouragement, the employee must show that the discouragement actually resulted in a denial of FLMA benefits); _Griffith v. PNC Bank, No. CIV. 13-5407 RBK/KMW, 2015 U.S. Dist._ **LEXIS** _65748, 2015 WL 2400222, at *13-14 (D.N.J. May 20, 2015)_ (holding that to state an interference claim, a plaintiff must establish that he or she "was chilled from requesting further FMLA leave that he or she would have been entitled to" but for the employer's discouragement or that he or she was denied leave that he or she actually requested). Here, Hernandez cannot show that Church's conduct caused her to take any less leave [*17] time than she otherwise would have. In the absence of such prejudice, her claim that Church interfered with her FMLA rights must fail.

Hernandez's claim that Temple interfered with her FMLA rights by requiring her to recertify after five months instead of six months lacks merit for the same reason. Hernandez cites to _29 C.F.R. § 825.220(b)_ for the proposition that "[a]ny violation of the [FMLA] or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the [FMLA]." Assuming for the sake of argument that Church actually did direct Hernandez that she was required to recertify in July 2016, Hernandez's argument falls short for lack of a showing of actual harm. The United States Supreme Court in Ragsdale rejected the possibility that an employer could be found liable under _§ 825.220_ for violating FMLA regulations without a showing that the violation of the regulations caused the plaintiff actual harm. _535 U.S. at 88-91._ In cases in which an employer has failed to follow the regulations' requirement that it advise the employee of his or her rights under the FMLA, the Third Circuit has repeatedly held that the lack of notice does not lead to a cause of action unless it "'rendered [the [*18] employee] unable to exercise the right to leave in a meaningful way, thereby causing injury.'" _Lupyan v. Corinthian Colls., Inc., 761 F.3d 314, 318-19 (3d Cir. 2014)_ (quoting _Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004)_); accord _Capili v. Whitesell Constr. Co., 271 F. App'x. 261, 267 (3d Cir. 2008)_.

In the present case, Hernandez has failed to present any evidence from which the Court could conclude that she was prejudiced by Temple's alleged violation of the FMLA regulations. In July 2016, she apparently needed a significant increase in her allotted leave frequency in order to take her daughter for testing and treatment. See Def.'s Mot. Summ. J. Ex. 25, at TU 000253, TU

000257-62. Regardless of whether she did so of her own volition or at the direction of Church, Hernandez did apply to Temple's Human Resources Department in July 2016 for more frequent intermittent leave, see Johnston Dep. at 22, and was granted a substantial increase in her allotted frequency, from eight hours every three months to 36 hours every three months, compare Def.'s Mot. Summ. J. Ex. 21 at TU 000253 with id. at TU 000254. Her request was approved on September 1, 2016 and backdated to be effective as of the time she filed her request on July 21, 2016. Id. at TU 000253. She does not allege that Temple prevented her from taking any of the newly allotted leave that she felt was necessary or [*19] that she actually was discouraged to take her leave to the point where she chose not to do so. See Hernandez Dep. at 128, 131-32, 145. Consequently, she cannot show that she suffered any prejudice from allegedly being required to recertify a month earlier than she asserts was required[10] and her claim for interference based on the alleged recertification requirement must fail.

## B. Temple is Entitled to Summary Judgment on Hernandez's Retaliation Claim

### 1. The Legal Standard for Retaliation Claims

Hernandez asserts that Temple violated the FMLA by terminating her employment in retaliation for her exercise of her FMLA rights in taking leave. Opp'n at 24-28. "Since FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. . . . Accordingly, a claim such as [Plaintiff's] FMLA retaliation claim is assessed under the burden-shifting framework established in _McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)_." _Capps, 847 F.3d at 151_(internal citation and quotation marks omitted). In the context of alleged FMLA retaliation, that framework requires that:

> a plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds, the defendant must [*20] articulate a legitimate,

---

[10] In light of the absence of prejudice, it is unnecessary to resolve the parties' dispute regarding whether Church's alleged request that Hernandez recertify for additional leave hours less than six months after the approval of her earlier FMLA application violated the applicable regulations.

nondiscriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination.

Id. at 152 (internal quotation marks omitted).

## 2. Hernandez Has Failed to Establish a Prima Facie Case

To establish a prima facie case of FMLA retaliation, a plaintiff must demonstrate that: (1) he or she took FMLA leave; (2) he or she suffered an adverse employment action; and (3) there was a causal connection between his or her leave and the adverse action. *Conoshenti, 364 F.3d at 146.* Here, the first two requirements of this test are not in dispute. See Def.'s Mot. Summ. J. at 17-18. Temple does challenge, however, whether Hernandez can establish a causal connection between her taking FMLA leave and her termination. Id.

To establish causation, a plaintiff "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with the timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)* (citing *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997)*; *Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)).* "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' [*21] it is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr., 503 F.3d 217, 232 (3d Cir. 2007)* (citing *Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)).*

This is not such a case. As the United States Supreme Court has recognized, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist, 532 U.S. at 273-74*; accord *Eskridge v. Phila. Housing Auth., 722 F. App'x 296, 299 (3d Cir. 2018).* "[T]here is no bright-line rule as to what amount of time is unusually suggestive." *LeBoon, 503 F.3d at 232.* The Third Circuit "ha[s] found that a temporal proximity of two days is unusually suggestive of causation." *Blakney v. Philadelphia, 559*

*F. App'x 183, 186 (3d Cir. 2014)* (citing *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)).* That court also "ha[s] held that a temporal proximity greater than ten days" is not itself sufficiently suggestive to establish causation but instead, "requires supplementary evidence of retaliatory motive." *Id. at 186*; see also *Reyer v. Saint Francis Country House, 243 F. Supp. 3d 573, 587 (E.D. Pa. 2017)* (stating that "[w]hen a causal connection relies on temporal proximity alone, courts generally require that the termination occur within a few days of the protected activity"); *Cullison v. Dauphin Cty., Pa., No. 1:10-CV-00705, 2012 U.S. Dist. LEXIS 102575, 2012 WL 3027776, at *11 (M.D. Pa. May 18, 2012)* (stating that "for a causal connection to be made [based on proximity alone], the [*22] temporal proximity between the occurrences has generally been in terms of hours or days, not months"), report and recommendation adopted, *No. 1:10-CV-705, 2012 U.S. Dist. LEXIS 102576, 2012 WL 3026784 (M.D. Pa. July 24, 2012).*

Hernandez argues that a sufficient inference of causation exists to establish her prima facie case because the one month between September 1, 2016, the date on which Temple approved Hernandez's request for a greater allotment of intermittent leave days, and her termination on September 30, 2016 is itself "unusually suggestive" of retaliation. Opp'n at 25-26. Her argument, however, mistakes the relevant date to be used for comparison to the date of termination. The relevant date for determining proximity is the date the plaintiff "invoke[s] the protections of the [FMLA]." *Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014)*; *Innella v. Lenape Valley Found., 152 F. Supp. 3d 445, 458 (E.D. Pa. 2015)* (same); see also *Blakney, 559 F. App'x at 185-86* (stating measurement of the proximity test as beginning with "the employee's protected activity" (citing *Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000)* (same)). An employee invokes the protections of the FMLA when he or she applies for FMLA leave. See *Budhun, 765 F.3d at 256*; *Innella, 152 F. Supp. 3d at 458.* When the employee has made multiple requests for FMLA leave or a request for intermittent leave, courts look to the last application for FMLA leave or to the last instance in which the worker engaged in the protected activity of taking [*23] FMLA leave. See *Reyer, 243 F. Supp. 3d at 579-80, 587* (finding that for employee who took intermittent leave, proximity was measured from the time of his last leave period when his allotted leave time expired; see also *Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 323-24, 332-33 (3d Cir.)* (measuring proximity based on the last protected activity), cert. denied, *137 S. Ct. 82, 196 L.*

2019 U.S. Dist. LEXIS 2853, *23

Ed. 2d 198 (2016); *Kachmar v. SunGard Data Sys., Inc.,* *109 F.3d 173, 177-78 (3d Cir. 1997)* (measuring proximity from "last protected activity"); *Innella, 152 F. Supp. 3d at 450 n.5, 458* (measuring proximity from the last time the plaintiff requested leave); *Fitzgerald v. Shore Mem'l Hosp., 92 F. Supp. 3d 214, 222-24 (D.N.J. 2015)* (measuring proximity for an employee with intermittent FMLA leave from the last of several times when she took her leave).

In this case, the last date on which it could be argued that Hernandez invoked the protections of the FMLA was the last time that she submitted a request to use her FMLA leave on August 16, 2016.[11] Opp'n Ex. J. Temple terminated her employment on September 30, 2016, Def.'s Mot. Summ. J. at 9-10 (citing Reynolds Dep. at 11-12), which is more than six weeks later. Thus, the termination was significantly more removed from the date of the last protected activity than the "very close" proximity that has been required before a retaliatory motive has been imputed without additional evidence of animus. *Clark, 532 U.S. at 273*; *see, e.g., Blakney, 559 F. App'x at 186* ("we have . . . held that a temporal proximity greater than ten days requires [*24] supplementary evidence of retaliatory motive"); *Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003)* (three weeks was not close enough to raise an inference of causation); *Abdul-Latif v. Cnty. of Lancaster, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014)* (noting that "six days is at the long end of what has been held to be unusually suggestive"). Thus, the six-week proximity of Hernandez's last protected activity to her termination cannot, by itself, provide a basis for finding discriminatory animus sufficient to establish a prima facie case.

Timing that is not sufficiently close to establish an inference of retaliatory intention by itself, however, still may be considered as part of a showing of retaliatory

intent if it is supported by other evidence of such intent. "[W]here the temporal proximity is not so close as to be unduly suggestive," the appropriate test is "timing plus other evidence." *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)*. Such other evidence of retaliation can arise from "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon, 503 F.3d at 232-33* (citing *Farrell, 206 F.3d at 279-81*).

Hernandez seeks to find that other evidence here in her assertion that Church questioned her use of FMLA leave and generally gave [*25] her a "hard time" about it and in her allegation that Temple did not ask her for her version of events before terminating her employment. Opp'n at 26-29. Neither of these alleged events, however, is sufficient to create an inference of discriminatory animus. Although a factual dispute exists regarding Hernandez's allegation that Church harassed Hernandez in connection with her FMLA leave, that dispute is not determinative of the outcome of the present Motion. Hernandez has not alleged that any Temple personnel other than Church ever demonstrated any resistance to her FMLA leave requests. Indeed, she testified to the contrary that Temple had approved every FMLA leave request that she had submitted. Hernandez Dep. at 128, 164. The record is undisputed that Church did not initiate the investigation that led to Hernandez's termination. See Def.'s Mot. Summ. J. Ex. 14. That investigation was initiated by a manager in the OBGYN practice, Hines, in response to a complaint lodged by Younge that Hernandez had violated her HIPAA privacy rights. Id. The investigation was carried out by Temple's Chief Compliance Officer, Maikner. See id. Exs. 14-15; Reynolds Dep., at 11-12. The determination [*26] to terminate Hernandez's employment was made by Maikner, Reynolds Dep. at 11-12, with the approval of an attorney in Temple's Labor Relations Group, Temple's Executive Director of Human Resources, and its Chief Operating Officer, id. at 33-34. Neither Reynolds nor Church participated in making the decision that Hernandez should be fired. See id. at 11-12, 22; Church Dep. at 24-25. Thus, even assuming that Church expressed hostility to Hernandez's use of FMLA leave, Hernandez has failed to raise a genuine question of fact regarding whether Church's alleged animus played any role whatsoever in Temple's decision to terminate her employment.

In addition, even in cases where the proximity of events and/or other evidence of retaliatory animus is sufficient

---

[11] At that time, Temple had yet to approve her July request for increased FMLA leave authorization due to her failure to submit the required documentation. See Opp'n Exs. I-K; Johnston Dep. at 49-50, 52. As a result, Hernandez subsequently withdrew that request and resubmitted it as a request for personal leave. Opp'n Exs. I-K. The last FMLA leave day that Hernandez actually took was July 18, 2016. Opp'n at 5 (citing Johnston Dep. at 40). Although Hernandez later received retroactive approval of her July 21 request for an increase in the frequency with which she could take her leave, neither party asserts that she actually took any of the increased leave time available after that leave request was granted. See Def.'s Mot. Summ. J. at 11-13; Opp'n at 6.

2019 U.S. Dist. LEXIS 2853, *26

to create an inference of causation, "[a] causal link between an employee's protected activity and an adverse employment action can be broken by an intervening event." *Checa v. Drexel Univ., No. 16-108, 2016 U.S. Dist. LEXIS 83524, 2016 WL 3548517, at *6 (E.D. Pa. June 28, 2016)* (citing *Weiler v. R&T Mech., Inc., 255 F. App'x 665, 669 (3d Cir. 2007)).* An act of misconduct occurring between the dates of the protected activity and adverse employment action is the type of intervening event that can destroy what otherwise would be an inference of retaliation. *Id.* (employee's written resignations and their content destroyed the inference of [*27] causation even though adverse action was taken less than two days after the protected activity); *see also Weiler, 255 F. App'x at 667-69* (fourteen-day proximity did not establish causation where, in the interim, employee abandoned a job site causing employer to lose substantial sums of money); *Caplan v. L Brands/Victoria's Secret Stores, LLC, 210 F. Supp. 3d 744, 760 (W.D. Pa. 2016)* (10-day proximity did not create inference of retaliation when employer received an ethics complaint regarding employee during the interim), *aff'd sub nom. Caplan v. L Brands/Victoria's Secret Stores, 704 F. App'x 152 (3d Cir. 2017).*

Thus, here, even if Hernandez's evidence were deemed to create an inference of causation sufficient to state a prima facie case, that inference would be destroyed by Hernandez's intervening misconduct in reviewing a patient's medical records without authority to do so. That misconduct, which under Temple's HIPAA policy was itself sufficient to justify termination, Def.'s Mot. Summ. J. Ex. 7, at TU 000704 (Policy 220), TU 000713 (Policy 400), defeats any inference that could otherwise arise that the termination was caused by Hernandez's previous requests to take FMLA leave. *See Weiler, 255 F. App'x at 668-69; Checa, 2016 U.S. Dist. LEXIS 83524, 2016 WL 3548517, at *6; Caplan, 210 F. Supp. 3d at 760.* Thus, no basis exists to create an inference of causation sufficient to meet Hernandez's obligation to present a prima facie case, and summary judgment is warranted based on that failure [*28] alone.

### 3. Temple Has Stated A Legitimate Nondiscriminatory Basis for Its Termination of Hernandez's Employment

Even if it were to be assumed that Hernandez had established a prima facie case of retaliation, Temple has articulated a legitimate nondiscriminatory reason for her termination—the alleged violation of Temple policy and HIPAA. "The employer satisfies its burden of production

by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).* An employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (quoting *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).* It is beyond doubt that violation of an employer's privacy policies or of HIPAA are a legitimate ground for adverse employment action. *See, e.g., Terrell v. Main Line Health, Inc., 320 F. Supp. 3d 644, 657 (E.D. Pa. 2018); Kopko v. Lehigh Valley Health Network, No. 14-1290, 2016 U.S. Dist. LEXIS 150967, 2016 WL 6442062, at *8-9 (E.D. Pa. Oct. 31, 2016); see also DeCicco v. Mid-Atl. Healthcare, LLC, 275 F. Supp. 3d 546, 555-56 (E.D. Pa. 2017)* (noting that violation of internal company policies may constitute a legitimate, nondiscriminatory reason for termination); *Garrow v. Wells Fargo Bank, N.A., No. 15-1468, 2016 U.S. Dist. LEXIS 139667, 2016 WL 5870858, at *6 (E.D. Pa. Oct. 7, 2016)* ("Violating [employer company] policy is undoubtedly a legitimate and nondiscriminatory reason for termination."). Thus, Temple has satisfied its burden and the burden shifts to Hernandez to prove that stated reason was pretextual.

### 4. Hernandez Has Failed [*29] to Raise a Genuine Factual Dispute Over Whether Temple's Stated Reason for Her Termination Was Pretextual

Where, as here, an employer meets its burden to articulate a legitimate, nondiscriminatory reason for its action, to defeat a motion for summary judgment, a plaintiff must present sufficient evidence to create a genuine factual dispute as to "both [whether] the employer's proffered explanation was false, and [whether] retaliation was the real reason for the adverse employment action." *Krouse, 126 F.3d at 501.* In order to prove pretext, the factfinder must focus on whether there are "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action" that they are "unworthy of credence." *Fuentes, 32 F.3d at 765.* Liability cannot be established based upon a factfinder's "mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the [factfinder's] *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." *Mitchell v. Miller, 884 F. Supp. 2d 334, 370-71 (W.D. Pa. 2012)*

(emphasis in original) (citing *St. Mary's Honor Ctr., 509 U.S. at 519* ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the **[*30]** plaintiff's explanation of intentional discrimination." (emphasis added)). A plaintiff must show "not merely that [Defendants'] proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997).* Accordingly, the question "is not whether the employer made the best, or even a sound, business decision;" it is whether the real reason for the employment decision is discrimination. *Id.*

Hernandez's sole argument for pretext is that Maikner's failure to interview her rendered Maikner's investigation so inadequate that "a factfinder could disbelieve the employer's articulated legitimate reason" for termination. *See* Opp'n at 27-28. Hernandez asserts that Temple's alleged failure to question her about her reasons for reviewing Younge's medical records is sufficient to show that Temple's stated reason for her termination was a pretext and that her termination was caused instead by retaliation for taking FMLA leave. On the evidence presented here, this argument is an insufficient basis to raise a genuine factual dispute regarding whether Temple's stated reason for Hernandez's termination—the alleged violation of HIPAA and of Temple's policies—was **[*31]** pretextual. Temple received a complaint from a patient that one of its employees had violated her right to privacy of her medical records. *See* Def.'s Mot. Summ. J. Ex. 14. It is undisputed that Temple's policies made it a terminable offense for a Temple employee who was not "directly involved" in that patient's care or was not otherwise duly authorized to access the patient's records. *Id.* Ex. 7, at TU 000704, TU 000712-13. Hernandez was not a part of Temple's OBGYN practice, of which Younge was a patient, but was employed by its Cardiology practice, of which Younge had never been a patient. Reynolds Dep. at 8, 11, 14-15. Upon receiving notice of Younge's complaint, Maikner conducted an investigation of whether Hernandez had accessed the records anyway. *See id.* Ex 14; Reynolds Dep. at 25. When the computerized records proved beyond dispute that Hernandez had accessed Younge's records multiple times, including one time that lasted for hours, *see* Reynolds Dep. at 25, 30-31, Maikner concluded that Hernandez should be terminated. *See id.* at 25, 33-34. Reynolds testified that she believed there was no reason for Hernandez, who was a medical secretary in the Cardiology practice, to access the records of **[*32]** a Temple patient who was not a patient of that practice.

*Id.* at 15-16. She testified that she believed it unnecessary to interview Hernandez, because the evidence proved that Hernandez had violated HIPAA on multiple occasions and that those violations rendered any explanation regarding Younge's and Hernandez's dispute and conduct irrelevant.[12] *Id.* at 36-39. Given that Temple's policies made improper access to a patient's records a basis for termination, Reynolds' testimony is not sufficiently unbelievable to cause a reasonable juror to conclude that the alleged HIPAA violation was a pretext and that the actual reason for Hernandez's termination was FMLA retaliation.

Moreover, even if Maikner's investigation was less

---

[12] Hernandez argues that, if she had been asked for her version of events, she could have explained why she might have had a proper reason to review Younge's record because Younge may have asked her to do so. Opp'n at 7-8. Her testimony regarding this purported defense, however, is uncertain and utterly unconvincing. Hernandez testified that Younge "probably—she may have called to just get an appointment where she had at another facility. She may have called to ask, you know for assistance with something else, where another phone number could be at another department. It could be multiple things." Hernandez Dep. at 78. She also testified that she could not remember if Younge had actually called her and asked her to look at Younge's records. *Id.* at 77. When asked if she would have helped Younge if Younge had made such a call, Hernandez testified that "[m]ost likely I probably did." *Id.* at 78. She explained why she would have assisted Younge despite their personal dispute by stating that she would have helped Younge "[i]f I wasn't aware who she was." *Id.* Speculation such as this is not sufficient to give rise to a genuine factual dispute to stave off summary judgment. *Smith v. Henry Branscome, Inc., 161 F. App'x 212, 214 (3d Cir. 2006); Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).* Moreover, the evidence shows that Hernandez took her first and longest look at Younge's files on June 24, 2016, Hernandez Dep. at 83-84, which was the same day on which she sent her initial "cease and desist" letter to Younge, Def.'s Mot. Summ. J. Ex. 10. Hernandez testified that she wrote that letter because Younge had been making harassing phone calls to her work telephone and sending letters to her work address. Hernandez Dep. at 38. The notion that Younge might have called Hernandez that same day after having harassed her at her workplace and asked Hernandez to look at her gynecological records is simply untenable. Similarly, the idea that Hernandez would not have recognized Younge's name and would have agreed to comply with Younge's request that she look into Younge's record is even less tenable. And, the idea that Hernandez would have responded to assist the person she had demanded stop harassing her and then not be able to recall that incident is patently unbelievable.

2019 U.S. Dist. LEXIS 2853, *32

thorough than it arguably should have been, that alone is insufficient to establish pretext. See *Fuentes, 32 F.3d at 765* ("[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). "Because the ultimate question is whether discriminatory animus determined the employer's action, an employee cannot discredit the employer's proffered reason simply by showing that the employer's decision was 'wrong or mistaken.'" *Gardner v. Sch. Dist. of Philadelphia., 636 F. App'x 79, 86 (3d Cir. 2015)* (quoting [*33] *Fuentes, 32 F.3d at 765*). Hernandez's allegation that Temple never asked for her explanation of events is insufficient to raise a genuine factual issue regarding whether Temple's stated reason for her termination was pretextual. There is nothing so inherently unbelievable about Reynolds's testimony that she thought an interview of Hernandez was unnecessary when Temple had discovered conclusive evidence that Hernandez had examined the personal medical files multiple times of a woman with whom Hernandez had a dispute over her husband's affections and in whose medical treatment she had no legitimate involvement. Whether Maikner would have been wiser to obtain any explanation Hernandez might have offered is not the point. Her failure to do so under the circumstances is not a sufficient basis on which a jury reasonably could infer that her real reason for terminating Hernandez's employment was retaliation for Hernandez's use of FMLA leave. Hernandez's retaliation claim, therefore, must be dismissed.

## IV. CONCLUSION

For the reasons stated above, Hernandez has failed to establish that any genuine issues of material fact exist that could allow either her FMLA interference claim or her FMLA retaliation claim to survive [*34] summary judgment against her. Accordingly, Temple's Motion for Summary Judgment will be granted. An appropriate Order follows.

Dated: January 8, *2019*

BY THE COURT:

/s/ Marilyn Heffley

MARILYN HEFFLEY

UNITED STATES MAGISTRATE JUDGE

## ORDER

AND NOW, this 8th day of January, *2019*, upon consideration of Defendant Temple University Hospital's Motion for Summary Judgment (Doc. No. 20), and the briefing in support thereof and in opposition thereto, IT IS HEREBY ORDERED that:

    1. Defendant Temple University Hospital's Motion is GRANTED;

    2. Judgment is ENTERED against Plaintiff Nancy Hernandez and in favor of Defendant Temple University Hospital; and

    3. The Clerk of Court shall mark this matter CLOSED.

BY THE COURT:

/s/ Marilyn Heffley

MARILYN HEFFLEY

UNITED STATES MAGISTRATE JUDGE

_____

**End of Document**

**A** Neutral
As of: May 20, 2022 3:13 PM Z

## _Holyk v. Scranton Counseling Ctr._

United States District Court for the Middle District of Pennsylvania

January 29, 2018, Decided; January 29, 2018, Filed

CIVIL ACTION NO. 3:17-0435

**Reporter**
2018 U.S. Dist. LEXIS 13999 *; 2018 WL 585611

PETER HOLYK, Plaintiff v. SCRANTON COUNSELING CENTER, Defendant

**Subsequent History:** Summary judgment granted by, Judgment entered by _Holyk v. Scranton Counseling Ctr., 2018 U.S. Dist. LEXIS 210468 (M.D. Pa., Dec. 13, 2018)_

**Counsel:** [*1] For Peter Holyk, Plaintiff: W. Charles Sipio, Wayne A. Ely, LEAD ATTORNEYS, KOLMAN ELY, P.C., Penndel, PA.

For Scranton Counseling Center, Defendant: John E. Freund, III, Keely J. Collins, King Spry Herman Freund & Faul, LLC, Bethlehem, PA.

**Judges:** MALACHY E. MANNION, United States District Judge.

**Opinion by:** MALACHY E. MANNION

# Opinion

## MEMORANDUM

Pending before the court are two motions to dismiss the plaintiff's complaints[1]. (Doc. 8, Doc. 19). Based upon the court's review of the motions and related materials, the motions will be granted in part, denied in part, and dismissed as moot in part.

The defendant's motions to dismiss are brought pursuant to the provisions of _Fed.R.Civ.P. 12(b)(6)_. This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which

relief can be granted. The moving party bears the burden of showing that no claim has been stated, _Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)_, and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," _Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)_ (abrogating "no set of facts" language found in _Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)_). The facts alleged must be sufficient to "raise a right to relief above the [*2] speculative level." _Twombly, 550 U.S. 544, 127 S. Ct. at 1965_. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. _Id._ Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." _Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)_ (brackets and quotations marks omitted) (quoting _Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65_).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. _See Sands v. McCormick, 502 F.3d 263 (3d Cir. 2007)_. The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." _Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)_. Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." _Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002)_. However, the court may not rely on other parts of the record in determining a motion to dismiss. _See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261_

---

[1] The plaintiff filed a complaint in the above-captioned matter, as well as a complaint in Civil Action No. 3:17-1091, which was consolidated into this action by order dated June 26, 2017. (Doc. 18).

2018 U.S. Dist. LEXIS 13999, *2

*(3d Cir. 1994)*.

Generally, the court should grant leave to amend a complaint before dismissing [*3] it as merely deficient. See, e.g., *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007)*; *Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002)*; *Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000)*. "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004)*.

The plaintiff alleges that he is an adult male with a birth date of October 17, 1952, who suffered from an arthritic hip which limited his mobility and caused chronic pain. As a result, the plaintiff underwent hip surgery in or around January 2016.

The plaintiff began working for the defendant in or around August 1977. He has over 30 years of experience in the area of intellectual disabilities and was in the upper echelon in terms of manager salary level. At all relevant times, the plaintiff alleges that the defendant, his employer, was aware that he was having medical issues with his hip.

In or around February 2016, one of the supervisors working for the plaintiff, Alex Groysman, gave notice that he was resigning from his position. When he did so, he was told by Dr. Edward Heffron, the Executive Director, and/or Sal Santoli, the Chief Operating Officer, to "be patient" because the plaintiff was going to be "reassigned" and Mr. Groysman could be the next departmental director. Mr. Groysman declined the offer.

The plaintiff alleges [*4] that around this time, Mr. Heffron and Mr. Santoli began summoning him on a regular basis to make issues of things that had been accepted procedure for years, such as providing homeless shelter information when all other efforts for placement had failed. They then began to claim that past employees complained of "lack of training". According to the plaintiff's complaint, Mr. Heffron and Mr. Santoli began to mischaracterize events to make the plaintiff seem at fault and singled him out for the failure of the agency as a whole to have a policy for dealing with threats. The plaintiff alleges that such actions were meant to harass him into resigning or to replace him.

After Mr. Groysman's resignation, he and the plaintiff suggested that an individual in their department be promoted to fill Mr. Groysman's supervisory position. In the past, it was the practice of the defendant to allow the plaintiff and the previous service director to select a replacement. However, senior management transferred Ellen Sechler, another individual from an entirely different department, into Mr. Groysman's vacant position. According to the plaintiff's complaint, Ms. Sechler "quickly fell into disfavor with the [*5] county administrator's office" and she was not as competent as the plaintiff, nor did she have the temperament to succeed. Although senior management received numerous complaints regarding Ms. Sechler, she did not receive any disciplinary action. Instead, the plaintiff was held responsible for Ms. Sechler's shortcomings which included, but was not limited to, deliberately misleading him regarding the completion of training for new employees.

The plaintiff alleges that it became evident to him that the defendant intended to remove him from his position in that he was demoted and the defendant began searching for his replacement. The plaintiff was dropped two supervisory levels with roughly a 10% reduction in salary. When the plaintiff was demoted, he alleges that he was assigned to a position that exposed him to potentially violent and aggressive individuals. The plaintiff believes that the defendant engaged in a concerted effort to damage his professional reputation and put him in a position that could result in an injury due to his medical condition and age in an effort to force him to resign. The plaintiff alleges that the individual who received his position after his demotion was [*6] at least twenty years his junior and lacked his qualifications.

In light of the above allegations, the plaintiff sets forth four counts in his initial complaint: Count I, *Age Discrimination in Employment Act*, ("ADEA"); Count II, *Americans with Disabilities Act*, ("ADA"); Count III, *Rehabilitation Act*, ("Rehabilitation Act"); and Count IV, Pennsylvania Human Relations Act, ("PHRA").

In the subsequent complaint filed by the plaintiff and consolidated into the initial complaint, the plaintiff alleges that he filed an EEOC charge on or about March 16, 2016 relating to the allegations set forth in his initial complaint filed in this court. Thereafter, the plaintiff alleges that the defendant began moving to terminate him. Specifically, the plaintiff alleges that he received a verbal warning document which is the "first step" in progressive disciplinary action, as well as a copy of an email thread which accused him of insubordination. As to the email thread, the plaintiff believes that the defendant was deliberately creating bogus documentation via email to make it appear that the

2018 U.S. Dist. LEXIS 13999, *6

plaintiff was at fault for the actions of his supervisor. The plaintiff alleges that he felt it imperative that [*7] his version of the situation be documented in the email so that he could not be accused of agreeing with the pretext.

Other items listed in the progressive disciplinary action, including missing funds and medications, are alleged to be the result of existing policies that were in effect prior to the plaintiff taking the job and happened numerous times before he assumed the position. The plaintiff believes that no disciplinary action was taken against other supervisory employees for similar items listed in the disciplinary action. According to the plaintiff's complaint, the progressive disciplinary action was taken in retaliation for his first charge of discrimination and had material adverse consequences affecting the terms, conditions, or privileges of his employment that caused objectively tangible harm.

In light of these allegations, the plaintiff's second complaint sets forth three counts of retaliation based on the ADEA, ADA, and the Rehabilitation Act.

In its initial motion to dismiss, the defendant argues that the plaintiff has not established a prima facie case of disability discrimination. However, the plaintiff is not required to establish his prima facie case on a *Rule 12(b)(6)* motion. [*8] The United States Court of Appeals for the Third Circuit recently clarified this point by stating that "a complaint need not establish a prima facie case in order to survive a motion to dismiss." *Connelly v. Lane Constr. Corp., 809 F.3d 780, 788 (3d Cir. 2016)*. What the plaintiff must do is set forth sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence of his claims.

With respect to the factual allegations of the plaintiff's initial complaint, the defendant argues that the plaintiff has failed to properly allege that he is disabled under the ADA or the Rehabilitation Act. In order to properly allege a violation of the ADA or the Rehabilitation Act[2], the plaintiff must present sufficient factual allegations that: (1) he has a disability; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he nonetheless suffered an adverse employment action as a result of discrimination. *Donahue v. CONRAIL, 224 F.3d 226, 229 (3d Cir. 2000)*.

As to the first provision, the plaintiff properly alleges that he suffers from a "disability" where he sets forth sufficient factual allegations demonstrating that: (1) he has a physical or mental impairment which substantially limits one or [*9] more of his major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. See *42 U.S.C. §12102(2)*; *29 U.S.C. §705(20)(B)*.

In this case, the defendant argues that the plaintiff has failed to provide sufficient factual allegations demonstrating that he was "substantially" limited in a major life activity and therefore that he was disabled. Upon review of the complaint, the plaintiff alleges that he suffered from arthritis in his hip. Clearly, arthritis is an impairment. However, simply because one has been diagnosed with an impairment does not mean that he is disabled. See *Tice v. Centre Area Transp. Auth., 247 F.3d 506, 513 n.5 (3d Cir. 2001)*. The plaintiff must sufficiently allege that the impairment substantially limited a major life activity."Major life activities" include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 382-83 (3d Cir. 2004)*. Here, the plaintiff alleges that his hip arthritis limited his "mobility" and caused him chronic pain. The term "mobility" has been used in Rehabilitation Act cases to address the circumstances of individuals who are unable to walk or are wheelchair bound. See *Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 150-51 (2d Cir. 1998)*. The plaintiff in this case has not alleged an inability to walk, nor has he provided any authority [*10] that "mobility" is cognizable as a "major life activity". See id.; *Amorosi v. Molino, 2009 U.S. Dist. LEXIS 23756, 2009 WL 737338, at * 5 (E.D.Pa. Mar. 19, 2009)*. In his opposing brief, the plaintiff appears to equate mobility with walking, but does not allege such in his complaint. In addition, the plaintiff has provided no factual allegations as to the extent that his arthritis caused him limitation. Therefore, the plaintiff has failed to sufficiently allege that he was substantially limited in a major life activity. The defendant's motion to dismiss will be granted as to this argument, without prejudice, to allow the plaintiff to amend his claim to sufficiently allege the major life activity impacted by his hip arthritis, as well as the extent to which his arthritis caused limitation, if he can do so in good faith.

---

[2] The substantive standards for determining liability are the same whether suit is filed under the ADA or the Rehabilitation Act. *McDonald v. Com. of Pa., 62 F.3d 92, 95 (3d Cir. 1995)*.

The defendant further argues that the plaintiff has not sufficiently alleged that his termination was the result of the defendant regarding him as having an alleged impairment.[3] To be "regarded as" disabled within the meaning of *42 U.S.C. § 12102(2)(C)*, an individual must establish that he or she was "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life [*11] activity." *42 U.S.C. §12102(3)(A)*. Citing to *Palish v. K&K RX Servs., L.P., 2014 U.S. Dist. LEXIS 80606, at *25 (E.D.Pa. June 12, 2014)*, the plaintiff argues that it is sufficient that he has alleged that the defendant knew he had medical issues related to his hip and had surgery and that it is no longer required that an employer believe a particular impairment is substantially limiting. However, courts in the Middle District have rejected such a lenient standard and have found that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled." See *Canevari v. Itoh Denki U.S.A., Inc., 2017 U.S. Dist. LEXIS 116058, 2017 WL 4080548 (M.D.Pa. July 24, 2017)* (citations omitted). As such, the court finds that the plaintiff must allege more than that the defendant knew he had an impairment to be regarded as disabled. Given this, the court will grant the defendant's motion to dismiss as to this argument, without prejudice, to allow the plaintiff to amend his complaint to set forth sufficient factual allegations that the defendant regarded him as having an impairment that substantially limited one or more major life activities, if he can do so in good faith.

Basically for the same reasons argued above, the defendant also argues that the plaintiff has failed to sufficiently plead disability discrimination under [*12] the PHRA. The plaintiff has not addressed this claim in his opposing brief. The court will grant the defendant's motion to dismiss. However, dismissal will be without prejudice to allow the plaintiff to set forth sufficient factual allegations alleging a disability discrimination claim under the PHRA, again if he can do so in good faith.

Next, the defendant argues that the plaintiff has failed to properly allege causation under the ADA in that he has failed to provide any factual allegations that could plausibly establish that he was demoted because of his disability. The plaintiff again responds that he need only allege that the defendant knew he had an impairment and, therefore, was not required to set forth any factual allegations with respect to causation. Despite liberalizing the ADA and expanding its scope through changes enacted as part of the ADA Amendments Act of 2008, ("ADAAA"), our courts have found that the law dictates that causation is "an integral part of the threshold finding that a plaintiff is regarded as having a disability." Id. See also *Baughman v. Cheung Enters., LLC, 2014 U.S. Dist. LEXIS 125799, 2014 WL 4437545, at *12 (M.D.Pa. Sept. 9, 2014)*. As such, a plaintiff must set forth factual allegations which show that his disability, or perceived disability, was a determinative factor in the adverse [*13] employment action taken against him. In this respect, the defendant's motion to dismiss will be granted, without prejudice, to allow the plaintiff to set forth sufficient factual allegations of causation as to his ADA, Rehabilitation Act, and PHRA claims.

As to the substantive claims, the defendant finally argues that the allegations of the plaintiff's complaint do not raise a plausible inference of age discrimination. Where, as here, the plaintiff has not alleged direct evidence of purposeful discrimination and relies on indirect evidence to allege age discrimination, the complaint must allege facts that, if true, would establish the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position he held; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination. The defendant argues that the plaintiff's complaint fails as to the fourth element. To plausibly allege the fourth element, the complaint may either: (1) allege that "similarly situated employees who . . . were not members of the same protected [*14] class . . . were treated more favorably under similar circumstances" or (2) allege facts that "otherwise show [ ] a causal nexus between [the employee's] membership in a protected class and the adverse employment action." See *Drummer v. Trustees of Univ. of Pennsylvania, 286 F. Supp. 3d 674, 2017 U.S. Dist. LEXIS 203887, 2017 WL 6336474, at *4 (E.D. Pa. Dec. 11, 2017)*. A plaintiff's bare assertion that he was replaced by a younger individual does not raise his claim above the level of mere speculation. Id. (citing *Cauler v. Lehigh Valley*

---

[3] The defendant also argues that the plaintiff has failed to make factual allegations to establish that the defendant relied upon a record of disability in making its decision to demote the plaintiff. In his opposing materials, the plaintiff indicates only that he has sufficiently pleaded that he was disabled or "regarded as" disabled by the defendant and does not rely upon the provision of having a record of impairment. Therefore, the court will not address the merits of this argument herein.

2018 U.S. Dist. LEXIS 13999, *14

*Hosp., Inc.*, 654 Fed.Appx. 69, 72 (3d Cir.), *cert. denied*, __ U.S. __, 137 S.Ct. 480, 196 L.Ed.2d 385 (2016) ("we agree that the allegation in the complaint that a "substantially younger" person was hired does not give rise to an inference of discrimination"). As the plaintiff in this case has only alleged that he was replaced by a substantially younger individual, the court will grant the defendant's motion to dismiss, without prejudice, to allow the plaintiff to provide sufficient factual allegations as to his age discrimination claims, if he can do so in good faith.

Finally, the defendant argues that certain requests for damages by the plaintiff are inappropriate and must be stricken. Specifically, the defendant argues that the plaintiff is barred from recovering punitive damages under the ADEA, the Rehabilitation Act or the PHRA and that the plaintiff is barred from recovering compensatory damages under **[*15]** the ADEA. In his response to the defendant's initial motion to dismiss, the plaintiff concedes that he is not entitled to such damages and cites to his pleadings seeking only those damages "as permitted by applicable law". To this extent, the defendants motion to dismiss will be dismissed as moot.

The defendant further argues that the plaintiff's request for punitive damages under the ADA should be dismissed. In seeking punitive damages under the ADA, the plaintiff must allege facts which indicate that the defendant engaged in discriminatory practices with "malice or reckless indifference." *Montanez v. Missouri Basin Well Servs.*, 2015 U.S. Dist. LEXIS 46786, 2015 WL 1608804 at *8 (M.D.Pa. Apr. 10, 2015)(citations omitted). Related to his ADA claim, the plaintiff has alleged that, intending to either force him to resign or remove him from his position, the defendant assigned him to an area that exposed him to potentially violent and aggressive individuals. It is unclear at this stage of the proceedings whether the plaintiff can prove such claims. If he can, punitive damages may be warranted. Therefore, the court will deny the defendant's motion to dismiss pending further development of the record.

Finally as to damages, the defendant argues that the plaintiff has not properly alleged a right to recover **[*16]** compensatory damages under the Rehabilitation Act. Here, the defendant argues that the plaintiff must allege facts that demonstrate a showing of intentional discrimination and, at a minimum, that the defendant exhibited deliberate indifference to the underlying act of discrimination. Again, at this stage of the proceedings, the court will deny the defendant's motion to dismiss on

this basis and will allow the plaintiff to proceed with his request for compensatory damages pending further development of the record.

In its second motion to dismiss, the defendant argues that the plaintiff has not alleged facts sufficient to show that he has a plausible claim for relief based on retaliation under the ADEA, the ADA, or the Rehabilitation Act. To state a claim of retaliation, the plaintiff must sufficiently allege: (1) he engaged in a protected activity; (2) he was subject to an adverse action; (3) there was a causal connection between the protected activity and the adverse action. *Cauler v. Lehigh Valley Hosp., Inc., supra* (citing *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir.2005)).

The defendant here argues that the plaintiff has not alleged sufficient facts to show a "materially adverse" action. Specifically, the defendant argues that the plaintiff has alleged only that the defendant **[*17]** "began moving to terminate him" and that he received a "verbal warning document" which was the "first step" in progressive discipline, and a copy of an email thread accusing him of insubordination. The defendant argues that under *Kasper v. Cty. of Bucks*, 514 Fed.Appx. 210 (3d Cir. 2013), the Third Circuit held that a "Step 1" disciplinary warning was not a "materially adverse sanction". *Id. at 213, 216-17.*

The plaintiff argues that, viewed in context with the allegations set forth in his original complaint, he has sufficiently pleaded a materially adverse employment action. Specifically, in his first complaint, the plaintiff alleges that he was demoted to a position that would cause him to resign, a position which included a pay cut and which resulted in him being exposed to potentially violent and aggressive individuals. After refusing to resign and filing an EEOC complaint related to these matters, the plaintiff then alleges in his second complaint that the defendant began moving towards terminating him by issuing him the warning document in accordance with the first step of the disciplinary process. The court agrees that, viewing the plaintiff's allegations as a whole, he has sufficiently alleged a material adverse employment action. Therefore, the defendant's **[*18]** motion to dismiss will be denied on this basis.

The defendant also argues that the plaintiff has not alleged sufficient facts to establish a causal relationship between the filing of his charge with the EEOC and the disciplinary warning, either through temporal proximity or a pattern of antagonism. Again, when considering the

circumstances as a whole presented in both the first and second complaints, the court finds that the plaintiff has, at this stage of the proceedings, sufficiently alleged causation. Therefore, the defendant's second motion to dismiss will be denied on this basis.

With respect to damages, the defendant argues that compensatory and punitive damages are unavailable under the ADEA. In his opposing brief, the plaintiff concedes that neither compensatory nor punitive damages are available under the ADEA. Therefore, the defendant's motion to dismiss will be dismissed as moot as to this argument.

The defendant also argues that compensatory and punitive damages are not available under the ADA's anti-retaliation clause. While the plaintiff does not seem to challenge that punitive damages are unavailable under the ADA's anti-retaliation clause, he does argue that compensatory [*19] damages are available. There is a split of authority on the issue of whether compensatory and punitive damages are available under the ADA's anti-retaliation clause. However, the court finds persuasive those decisions in the Middle District that have found that neither compensatory nor punitive damages are available under the ADA's anti-retaliation clause. *See Wilkie v. Luzeme Cnty., 2014 U.S. Dist. LEXIS 142015, 2014 WL 4977418 (M.D.Pa. Oct. 6, 2014); Baker v. PPL Corp., 2010 U.S. Dist. LEXIS 7591, 2010 WL 419417, at *6 (M.D.Pa. Jan. 29, 2010).* As such, the defendant's motion to dismiss will be granted on this basis.

An appropriate order shall issue.

/s/ Malachy E. Mannion

**MALACHY E. MANNION**

**United States District Judge**

**Date: January 29, 2018**

## ORDER

In accordance with the memorandum issued this same day, **IT IS HEREBY ORDERED THAT**:

(1) The defendant's motion to dismiss, **(Doc. 8)** is **GRANTED** to the extent that the defendant argues that the plaintiff has failed to sufficiently allege that he was substantially limited in a major life activity and therefore that he was disabled under the ADA and Rehabilitation Act. Dismissal is **WITHOUT PREJUDICE** to allow the plaintiff to amend his claim to sufficiently allege the major life activity impacted by his impairment, as well as the extent to which his impairment caused limitation.

(2) The defendant's motion to dismiss, **(Doc. 8)**, is **GRANTED [*20]** to the extent that the defendant argues that the plaintiff has failed to sufficiently allege that he was regarded as having an impairment which substantially limited one or more major life activities. Dismissal is **WITHOUT PREJUDICE** to allow the plaintiff to amend his claim to set forth sufficient allegations that the defendant regarded him as having an impairment that substantially limited one or more major life activities.

(3) The defendant's motion to dismiss, **(Doc. 8)**, is **GRANTED** to the extent that the defendant argues that the plaintiff has failed to sufficiently plead disability discrimination under the PHRA. Dismissal is **WITHOUT PREJUDICE** to allow the plaintiff to amend his claim to set forth sufficient factual allegations of disability discrimination under the PHRA.

(4) The defendant's motion to dismiss, **(Doc. 8)**, is **GRANTED** to the extent that the defendant argues that the plaintiff has failed to properly allege causation under the ADA, Rehabilitation Act and PHRA. Dismissal is **WITHOUT PREJUDICE** to allow the plaintiff to set forth sufficient factual allegations of causation as to his ADA, Rehabilitation Act, and PHRA claims.

(5) The defendant's motion to dismiss, **(Doc. 8)**, is **[*21] GRANTED** to the extent that the defendant argues that the allegations of the plaintiff's complaint do not raise a plausible inference of age discrimination. Dismissal is **WITHOUT PREJUDICE** to allow the plaintiff to provide sufficient factual allegations as to his age discrimination claims.

(6) The defendant's motion to dismiss **(Doc. 8)**, is **DISMISSED AS MOOT** to the extent that the defendant argues that the plaintiff is barred from recovering punitive damages under the ADEA, the Rehabilitation Act or the PHRA and from recovering compensatory damages under the ADEA.

(7) The defendant's motion to dismiss, **(Doc. 8)**, is **DENIED** to the extent that the defendant argues that the plaintiff's request for punitive damages under the ADA should be dismissed and that the

plaintiff has not properly alleged a right to recover compensatory damages under the Rehabilitation Act.

**(8)** The defendant's motion to dismiss, **(Doc. 19)**, is **DENIED** to the extent that the defendant argues that the plaintiff has not alleged facts sufficient to show that he has a plausible claim for relief based on retaliation under the ADEA, the ADA, or the Rehabilitation Act.

**(9)** The defendant's motion to dismiss, **(Doc. 19)**, is **GRANTED** to **[*22]** the extent that the defendant argues that compensatory and punitive damages are not available under the ADA's anti-retaliation clause.

**(10)** The defendant's motion to dismiss, **(Doc. 19)**, is **DISMISSED AS MOOT** to the extent that the defendant argues that compensatory and punitive damages are unavailable under the ADEA.

/s/ Malachy E. Mannion

**MALACHY E. MANNION**

**United States District Judge**

**Date: January 29, 2018**

---

End of Document

**A** Neutral
As of: May 22, 2022 4:42 PM Z

## *Kercher v. Reading Muhlenberg Career & Tech. Ctr.*

United States District Court for the Eastern District of Pennsylvania

September 6, 2017, Decided; September 6, 2017, Filed

CIVIL ACTION NO. 15-6674

**Reporter**

2017 U.S. Dist. LEXIS 145013 *; 2017 WL 3917630

JEAN KERCHER, Plaintiff, v. READING MUHLENBERG CAREER & TECHNOLOGY CENTER, Defendant.

**Prior History:** *Kercher v. Reading Muhlenberg Career & Tech. Ctr., 2016 U.S. Dist. LEXIS 167589 (E.D. Pa., Dec. 5, 2016)*

**Counsel:** [*1] For JEAN KERCHER, Plaintiff: STANLEY J. BRASSINGTON, LEAD ATTORNEY, SCHUYLKILL HAVEN, PA.

For THE READING MUHLENBERG CAREER & TECHNOLOGY CENTER, Defendant: JOHN E. FREUND, III, LEAD ATTORNEY, KEELY J. COLLINS, KING, SPRY, HERMAN, FREUND & FAUL LLC, BETHLEHEM, PA.

**Judges:** HENRY S. PERKIN, United States Magistrate Judge.

**Opinion by:** HENRY S. PERKIN

## Opinion

### MEMORANDUM

Plaintiff, Jean Kercher ("Mrs. Kercher"), alleges that Defendant, Reading Muhlenberg Career & Technology Center ("RMCTC"), violated her due process rights as well as interfering with her rights pursuant to the *Family and Medical Leave Act ("FMLA"), 29 U.S.C. Section 2615*, and retaliating against her for exercising her right to FMLA leave.

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Reading Muhlenberg Career & Technology Center which was filed on June 23, 2017. Having reviewed and considered the contentions of the parties, the Court is prepared to rule on this matter.

### I. JURISDICTION.

The Court has jurisdiction over Mrs. Kercher's federal claims pursuant to *28 U.S.C. § 1331*.

### II. STANDARD OF REVIEW.

Pursuant to *Rule 56(a)*, summary judgment is proper where there is no genuine issue of material fact. *Fed. R. Civ. P. 56(a)*. In viewing the evidence in the light favorable to the non-moving party, [*2] summary judgment will be granted against a party who does not make a sufficient showing to establish "an element essential to that party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)*.

The moving party carries the initial burden to inform the court of the basis for its summary judgment motion; to produce evidence to establish a prima facie case as to each element; and to identify the absence of no genuine issue of material fact. *Id.* When the non-moving party cannot establish an essential element and there is "no genuine issue as to any material fact," the moving party is entitled to summary judgment as a matter of law. *Id. at 322.*

Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)*. Mere factual disputes will not preclude summary judgment when they are irrelevant to the outcome of the suit. *Id.* An issue is "genuine" if a reasonable trier of fact could return a favorable verdict for the non-moving party. *Mengel v. Reading Eagle Co., CIV.A. 11-6151, 2013 U.S. Dist. LEXIS 45300, 2013 WL 1285477 (E.D. Pa. Mar. 29, 2013)*, appeal dismissed (Oct. 30, 2013)(citing *Anderson, 477 U.S. at 248*).

2017 U.S. Dist. LEXIS 145013, *2

To defeat summary judgment, the non-moving party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(c)*. Moreover, the non-moving party cannot rely [*3] on unsupported assertions, conclusory allegations, or mere suspicions to survive a summary judgment motion. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)*(citing *Celotex, 477 U.S. at 325*). Where the non-moving party will have the burden of proof at trial, the moving party can make a showing that there is an "absence of evidence to support the non-moving party's case." *Jones v. Indiana Area Sch. Dist., 397 F. Supp.2d 628, 642 (W.D. Pa. 2005)*(quoting *Celotex, 477 U.S. at 325*).

## III. **BACKGROUND**.

By *Rule 16* Scheduling Order dated February 27, 2017, notice was provided to the parties as follows:

Upon any motion for summary judgment pursuant to *Federal Rule of Civil Procedure 56*, there shall be filed with the motion a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.
The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.
Statements of material facts in support of or in opposition to a motion shall include references to the parts of the record that support the statements.

All material facts set forth in the statement required to be served by the [*4] moving party may be taken by the Court as admitted unless controverted by the opposing party.
If at all possible, any deposition transcripts used as exhibits to these filings shall be submitted in an electronic format, able to be copied into WordPerfect.

Dkt. No. 24, n.1. In the second footnote of the Scheduling Order, any party opposing a motion for summary judgment was directed to also comply with the directives noted in footnote 1 of the Scheduling Order. *Id.*, n.2.

RMCTC filed a motion to dismiss the entirety of Mrs. Kercher's Complaint. By Memorandum and Order dated December 5, 2016, the motion was granted in part as to Counts I and II of the Complaint. In Count I, Mrs. Kercher alleged that RMCTC, her employer at the time, discriminated against her and treated her unfavorably because of her disability. In Count II, she alleged that she was wrongfully terminated. In Count III, Mrs. Kercher alleged that she was discharged from her position for retaliatory reasons. In Count IV, Mrs. Kercher alleged that her discharge is a violation of the Family Medical Leave Act (hereafter "FMLA"). Lastly, in Count V, Mrs. Kercher alleged a violation of her Due Process Rights. Mrs. Kercher was granted [*5] time to amend her Complaint as to Counts I and II, but no amendment was filed.

RMCTC filed a concise statement of facts in support of its motion for summary judgment on June 23, 2017. Dkt. No. 26-8. Plaintiff's Response was filed on July 27, 2017 but in the Response to the Motion, no concise statement of facts *in opposition to* RMCTC's concise statement of facts was filed. Dkt. No. 29. Instead, in the Brief in Response to the Motion, counsel included a recitation of facts without citations to the record. Pl.'s Br., pp. 1-4. Accordingly, the factual assertions set forth by RMCTC in its Statement of Material Facts are deemed admitted. *See Fed. R. Civ. P. 56(e)*(if a party fails to address another party's assertion of fact as required by *Rule 56(c)*, the court may consider the fact undisputed for purposes of the motion); *See also Binder v. PPL Servs. Corp., No. CIV.A. 06-2977, 2009 U.S. Dist. LEXIS 103814, 2009 WL 3738569 (E.D. Pa. Nov. 5, 2009)*; *Higgins v. Hosp. Cent. Servs., No. CIV.A. 04-74, 2004 U.S. Dist. LEXIS 24907, 2004 WL (E.D. Pa. Dec. 9, 2004)*(Gardner, J.); *Kelvin Cryosystems, Inc. v. Lightnin, No. CIV.A. 03-881, 2004 U.S. Dist. LEXIS 23298, 2004 WL 2601121 (E.D. Pa. Nov. 15, 2004)*(Gardner, J.).

Our requirement for a concise statement and a responsive concise statement is consistent with *Rule 56 of the Federal Rules of Civil Procedure*. In addition *Rule 83(b) of the Federal Rules of Civil Procedure* provides that:

A judge may regulate practice in any manner consistent with federal law, rules adopted under *28 U.S.C. §§ 2072* and *2075*, and local [*6] rules of the district. No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or local district rules unless the alleged violator has

been furnished in the particular case with actual notice of the requirement.

Thus, even if our requirement for a separate concise statement is not consistent with *Rule 56*, we gave Mrs. Kercher actual notice of our requirement, and she did not comply. *Binder, 2009 U.S. Dist. LEXIS 103814, 2009 WL 3738569, at *2* (citing *Kelvin Cryosystems, Inc.*).

## IV. FACTS.

Based upon the record papers, exhibits, depositions, and RMCTC's statement of material facts, the pertinent facts are as follows:

Mrs. Kercher was employed by the RMCTC, a vocational/technical school, as the acting Business Office Supervisor for 14 years. Kercher Dep., pp. 87, 124; Pl. Dep., Ex. 1. As the Business Office Supervisor, Mrs. Kercher was responsible for developing, recommending, and administering approved programs for receipt, custody, and disbursement of funds, and debt services; developing and implementing accounting, internal auditing and budgetary control procedures for the school. Pl. Dep., Ex. 1. Mrs. Kercher was also responsible for working with administrative personnel with respect [*7] to fiscal matters, purchasing, personnel, maintenance, data processing services, and negotiations. *Id.* Mrs. Kercher's Position Description lists the essential functions of the Business Office Supervisor position, which includes performing tasks as assigned by the Administrative Director. *Id.*

At all relevant times, Gerald Witmer (hereafter "Mr. Witmer") was the Administrative Director, Plaintiff's direct supervisor. Kercher Dep., pp. 32-33. Because Mr. Witmer believed that Plaintiff showed the Teamsters who worked in Plaintiff's office an email from Mr. Witmer that he viewed as confidential, on March 21, 2011, Plaintiff received a written reprimand. *Id.* at 41; Kercher Dep., Ex. 3. Via correspondence dated August 9, 2012, Mrs. Kercher was informed that she was being placed on a three-day unpaid leave of absence as a consequence of Mrs. Kercher disparaging Michael Zalegowski ("Mr. Zalegowski")[1] to the School Board Treasurer based on a union grievance and expressing vindictiveness toward Mr. Zalegowski. Kercher Dep., Ex. 4. Neither Zalegowski nor Keller held a grudge against

Plaintiff. Kercher Dep., p. 47.

On August 15, 2012, Mrs. Kercher, via her attorney, submitted a complaint of harassment against [*8] Mr. Witmer. Kercher Dep., Exs. 5, 7. After a complete investigation, Mrs. Kercher's allegations were determined to be unfounded. Kercher Dep., Exs. 5, 7.

In April 2014, Plaintiff requested and was granted intermittent leave under Family Medical Leave Act ("FMLA") to address her extreme fatigue. Kercher Dep. at 27-28; Ex. 17. Plaintiff only requested FMLA leave once. Kercher Dep. at 66. While Plaintiff was out on FMLA leave, she would sleep twenty to twenty-two hours per day. *Id.* at 22. During Plaintiff's FMLA leave, a fiscal clerk, Holly Keller, helped to manage Plaintiff's responsibilities. Keller Dep., p. 75.

Even though Plaintiff was tasked with taking measures to avoid audit exceptions, she did not do so, resulting in three audit exceptions during the 2012-2013 fiscal year and three audit exceptions during the 2013-2014 school year. Hearing N.T. 140; Hearing Exs. 29, 30-A, 28, 30. Plaintiff failed to provide department heads with monthly account balances in a timely fashion, notwithstanding the fact that the deadlines were established by Plaintiff herself. Hearing N.T. 165-70; Hearing Exs. 11, 12, 13, 18. Per Plaintiff's own deadline, Plaintiff failed to provide the Administrative Director [*9] with timely bank reconciliation statements nor did Plaintiff reconcile a single journal entry or banking statement for the 2014 fiscal year. Hearing N.T. 171; Hearing Ex. 18. Plaintiff failed to maintain a proper balance in the Public School Employees Retirement System ("PSERS") account. Hearing N.T. 177-178. Plaintiff did not comply with IRS and Pennsylvania Department of Revenue requirements for maintaining a tax exempt status. Hearing N.T. 183. Plaintiff did not maintain existing loans and grants for the RMCTC. Hearing N.T. 186. Plaintiff did not perform many of her job responsibilities in a responsible, timely, or effective manner. *See generally* Hearing N.T., Kercher Dep., Ex. 1.

Even after establishing her own deadlines, Plaintiff did not provide staff with timely financial reports in accordance with her job description. Hearing N.T. 30-36; Hearing Exs. 9-15; Kercher Dep., Ex. 1.[2] In contradiction with the directives that she was issued via memorandums dated April 1, 2014 and August 28, 2014, Plaintiff did not initiate a cross training protocol in

---

[1] Mr. Zalegowski was a friend of Mr. Witmer and a direct report to Mrs. Kercher in the business office.

[2] All references to a hearing refer to the public hearing held on March 31, 2015 and continued on June 9, 2015.

the RMCTC business office. Hearing N.T. 71-72; Hearing Exs. 8, 22; Keller Dep. NT 75-76. Plaintiff left work early. Hearing N.T. 31.

[*10] For the second consecutive year, on June 17, 2014, Plaintiff received an unsatisfactory Administrative Performance Appraisal from the Administration. Kercher Dep. at 63-66; Kercher Dep. Exs. 8, 9; Hearing N.T. 100-105; Hearing Exs. 8, 22. At the time of the June 2014 evaluation, Mrs. Kercher averaged an absentee rate at or around twenty-five percent, due to her husband's health issues, not her own health or FMLA leave. Kercher Dep. at 67, 68.

Although Mrs. Kercher was directed to provide the Assistant Director with a reconciliation of car show profits by July 22, 2014 and September 11, 2014, she did not do so.[3] Hearing N.T. 151-57; Hearing Ex. 25. Mrs. Kercher did not provide the School Board with financial reports for the months of September, October, and November 2014. Hearing N.T. 30-35. Mrs. Kercher did not file a small claims action against an adult student who failed to pay his tuition bill, even though she was directed to do so. Hearing N.T. 162-65; Hearing Exs 26-A, 27.

On November 10, 2014, Mr. Witmer provided Mrs. Kercher with a letter notifying her that she was suspended with pay while the RMCTC Administration investigated her performance as the RMCTC Business Office Supervisor. [*11] Kercher Dep., Ex. 10. In a letter dated November 10, 2014, the Administration notified Mrs. Kercher of the charges against her, based on a list of fourteen separate acts, and that a *Loudermill* hearing was scheduled to take place on November 19, 2014.[4] At the November 19, 2014 *Loudermill* hearing, the Administration was represented by Attorney John M. Stott and Mrs. Kercher was represented by Attorney Stanley Brassington, who is Mrs. Kercher's counsel in the instant action. Kercher Dep., Ex. 4 ¶7. Mrs. Kercher was given the opportunity to respond to the fourteen allegations against her. *Id.*, Ex. 4 ¶8. After the conclusion of the *Loudermill* Hearing, Mrs. Kercher was notified by letter that the Administration would recommend her termination to the School Board and

that she was suspended without pay, effective November 24, 2015. Hearing Ex. 3. On December 2, 2014, the School Board issued Mrs. Kercher a Notice of Right to Hearing and Statement of Charges, which was signed by the President, Secretary, and Treasurer of the Board of Directors. Kercher Dep., Ex. 12.

On March 31, 2015 and June 9, 2015, Mrs. Kercher, represented by Attorney Brassington, was afforded public hearings. Hearing [*12] N.T.; Kercher Dep., Ex. 13. At the beginning of the June 9, 2015 hearing, Mr. Brassington and Mrs. Kercher walked out of the hearing before it began. Hearing N.T. 132. On September 14, 2015, after considering the testimony and evidence presented at the two public hearings, the Board of Directors unanimously approved and authorized the termination of Mrs. Kercher's employment, effective November 10, 2014, and sustained her suspension without pay, effective November 24, 2014. Kercher Dep., Exs. 13, 14. The School Board issued a twelve-page written opinion regarding Mrs. Kercher's termination, including findings of fact and conclusions of law. Kercher Dep., Ex. 13. After hearing all of the evidence supporting Mrs. Kercher's termination, the School Board concluded that Mrs. Kercher's "conduct and actions are, individually and in the aggregate, sufficient to warrant dismissal under *Section 1089* of the School Code."[5] Kercher Dep., Ex. 13 at 12.

## V. DISCUSSION.

### A. Due Process Claim

In Count V of the Complaint, Mrs. Kercher alleges that her due process rights were violated when, at the hearing on June 9, 2015, two new school board members were present who were not in attendance at her March 31, 2015 hearing. [*13] Mrs. Kercher and her counsel left the hearing after objecting and requesting a continuance of the hearing to a date and time that the same board members who were present on March 31, 2015 would be present. The request was denied and Mrs. Kercher's later request for an additional hearing with the same board members present as those that

---

[3] The car show was an event held by the Career and Technical Student Organization, which is a student group that participates in events in and outside of the RMCTC. Hearing N.T. 151.

[4] *See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*

[5] *24 P.S. § 10-1089(c)* provides the following reasons that the school board has a right to remove a school business administrator: "incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth or other improper conduct."

attended the March 31, 2015 hearing was also denied. Thus, Mrs. Kercher contends that she was not afforded her right to a fair, full evidentiary hearing in violation of her due process rights.

RMCTC moves for summary judgment on the basis that the requirements of due process were satisfied. RMCTC correctly notes that Pennsylvania courts have consistently held that a plaintiff is not denied due process by the absence of school board members. Def.'s Br., p. 6 (citing *Lewis v. Philadelphia Bd. Of Ed., 690 A.2d 814 (Pa. Commw. Ct. 1997), Pittsburgh v. Pyle, 37 Pa. Commw. 386, 390 A.2d 904 (Pa. Commw. Ct. 1978)).*

Further, Mrs. Kercher's decision to abandon her termination hearing does not indicate that her due process rights were denied. Again, RMCTC correctly argues that members of boards in Pennsylvania with quasi-judicial functions can decide a case without directly having heard testimony. Def.'s Br. at 7 (citing *Foley Brothers v. Commonwealth, 400 Pa. 584, 163 A.2d 80 (Pa. 1960); Acitelli v. Westmont Hilltop Sch. Dist., 15 Pa. Commw. 214, 325 A.2d 490 (Pa. Commw. Ct. 1974); Lancaster v. Pa. State Horse Racing Commission, 16 Pa. Commw. 85, 325 A.2d 648 (Pa. Commw. Ct. 1974); Fleming v. Commonwealth Civil Service Commission, 13 Pa. Commw. 421, 319 A.2d 185 (Pa. Commw. Ct. 1974)).*

Mrs. Kercher also asserts that summary judgment should be avoided for lack [*14] of evidence that the RMCTC School Board reviewed the record. Pl's Br. at 9. To survive summary judgment, Mrs. Kercher must produce evidence that the RMCTC School Board did not access the record. *Board of Public Education of the School District of Pittsburgh v. Pyle, 37 Pa. Commw. 386, 390 A.2d 904 (Pa. Commw. Ct. 1978)*("It was not proved nor can we assume in these circumstances that the four Board members who did not participate in the dismissal hearing did not give a 'full, impartial and unbiased consideration' to the record produced before the Board.") Mrs. Kercher has produced no evidence that the RMCTC School Board members who did not participate in the hearing did not review the record. In its Statement of Material Facts, RMCTC provided the following citations to the record:

39. On September 14, 2015, after considering the testimony and evidence presented at the public hearing, the Board of Directors unanimously approved and authorized that Plaintiff was terminated from employment, effective November 10, 2014, and sustained her suspension without

pay, effective November 24, 2014.
40. The School Board issued a twelve-page written opinion, including findings of fact and conclusions of law, regarding Plaintiff's termination.

Statement of Material Facts, ¶¶ 39, 40. Neither of these citations to the record [*15] were contradicted or denied by Mrs. Kercher.

In addition, Mrs. Kercher argues that she was denied due process when the RMCTC continued her termination hearing as scheduled after she and Attorney Brassington walked out of the hearing. Pl's Br. at 8-9. There is no support in the law or the record for this assertion. To satisfy the legal requirement of due process, a municipal board must simply offer an evidentiary hearing, notwithstanding known bias. *See Rife v. Borough of Dauphin, 647 F. Supp. 2d 431 (M.D. Pa. 2009)*(holding even where municipal board is biased, a plaintiff's rejection of due process forecloses a claim based on the denial of due process); *Stroudsburg Area Sch. Dist. v. Kelly, 701 A.2d 1000, 1003 (Pa. Commw. Ct. 1997)*(holding due process is not violated even when a majority of school board members attest that they are too biased to hear the case). Mrs. Kercher, represented by counsel, walked out of the hearing before the hearing began. Statement of Material Facts, ¶¶ 37, 38. Without citation to the record, Mrs. Kercher argues that she was denied the opportunity to present evidence and cross-examine witnesses. Pl's Br. at 9. RMCTC correctly argues that Mrs. Kercher's refusal to accept the RMCTC's offer of due process flies in the face of her conclusory claim that she was denied the opportunity to be heard. She [*16] presents no argument or citation to contradict the RMCTC's unequivocal offer of due process.

Finally, in Mrs. Kercher's response brief to the motion to dismiss, she alleged that she did not receive proper notice of the *Loudermill* hearing signed by the appropriate officials in violation of *Section 11-1127* of the School Code, making the letter regarding the hearing effectively unsigned. Pl. Supp. Br. Contra Mot. Dismiss, p. 2. Under *24 P.S. § 11-1127*, a "written notice signed by the president and attested by the secretary of the board of school directors" must be provided to professional employees prior to dismissal, along with a detailed notice of the charges. On December 2, 2014, the School Board issued Plaintiff's Notice of Right to hearing and Statement of Charges, which was signed by the President, Secretary and Treasurer of the Board. Statement of Material Facts, ¶ 36 (citing Kercher Dep., Ex. 12.) On March 31, 2015 and June 9, 2015, Mrs.

Kercher and her counsel were afforded public hearings, and at the beginning of the June 9, 2015, Mrs. Kercher and her counsel abandoned the hearing before it began. *Id.*, ¶¶ 37, 38 (citing Kercher Dep., Ex. 13; Hearing N.T. 132). RMCTC notes that 24 P.S. § 11-1127 does not apply to Mrs. Kercher [*17] because that provision applies to tenured employees which refers to employees holding a certificate from the Pennsylvania Department of Education. As a Business Manager, this does not apply to Mrs. Kercher, but even if it did, the December 2, 2014 letter which was signed by the President, Secretary and Treasurer of the Board complies with proper notice of the *Loudermill* hearing. RMCTC's motion with respect to Mrs. Kercher's due process claim will be granted.

## B. FMLA Interference Claim

The FMLA creates two distinct causes of action: interference and retaliation. *29 U.S.C. § 2615(a)(1)-(2)*. Interference claims arise from violations under *29 U.S.C. § 2615(a)(1)*, which provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right secured by the FMLA. To assert an interference claim, the plaintiff need only show "[s]he was entitled to benefits under the FMLA and that [s]he was denied them." *Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)*. Thus, an interference claim focuses not on discrimination but on whether the employee was denied his or her FMLA rights.

To succeed on a FMLA interference claim, Plaintiff must establish that she was eligible for FMLA leave, she was entitled to FMLA leave, and she was denied benefits [*18] to which she was entitled under the FMLA. *McIntosh v. White Horse Village, 176 F. Supp.3d 480, CIV.A. No. 15-5157, 2017 WL 1303472, at *3 (E.D. Pa. Apr. 4, 2017)*(Rufe, J.)(citing *Capps v. Mondelez Glob. LLC, 147 F. Supp. 3d 327, 334 (E.D. Pa. 2015)* (citing *Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014)))*. Other case law cites the following requirements to establish an FMLA interference claim: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA. *Mascioli v. Arby's Rest. Grp., Inc., 610 F. Supp. 2d 419, 430 (W.D. Pa. 2009)*(citing *Lombardo v. Air Products and Chemicals, Inc., No.06-1120, 2006*

*U.S. Dist. LEXIS 46077, 2006 WL 2547916, at *11 (E.D. Pa. July 7, 2006)* (citing *Weisman v. Buckingham Twp., No. 04-4719, 2005 U.S. Dist. LEXIS 11696, 2005 WL 1406026, at *11 (E.D. Pa. June 14, 2005)))*. Mrs. Kercher contends that RMCTC interfered with her FMLA leave by delaying her FMLA application because she was not provided with paperwork to properly file for FMLA leave when she requested it. Mrs. Kercher contends that she made her request for FMLA leave in March 2014 after she exhausted her sick day allotment, and Mr. Witmer delayed responding to her until after she followed up with him on or around April 10, 2014, when he told her that she was the first employee to request FMLA leave and he had to consult RMCTC's attorney regarding her FMLA request. At the March 31, 2015 *Loudermill* hearing, Mr. Witmer testified as follows:

Q [Mr. Stott, RMCTC's counsel] [*19] : Do you recall that I suggested that FMLA was granted from April 1st ? Do you recall that?
A: Yes. That's what that — that was the first day of her FMLA leave. Correct.
Q: Now — and that's on the same day that you gave her this other obligations to do. Is that correct, by your April 1st letter?
A: Again, I have to explain a little bit about that date. I can't answer that yes or no. I received a phone message from Mrs. Kercher - received a phone message from her on April the 10th . That message requested an FMLA leave at that time.
I immediately emailed Mr. Stott the same day because we had never processed an FMLA leave for an employee since I've been Director to question what our policy said. What I was obligated to proceed with as it related to that policy.
And after that conversation with him on April the 10th, I downloaded forms from the Federal government. I certified mailed those forms to her on the same day. So within one day I sent her the forms she needed to apply for an FMLA leave.
So the answer to my question is I first became aware of it on April the 10th, and I have a document if you would want me to -
Mr. Stott: You testify to it.

Mr. Witmer: So the first time I had any proof [*20] of conversation about her request was on April 10th

Mr. Monsour [School Board counsel]: If I could interject, I would advise the Board later that this is not uncommon for FMLA to be given retroactive. People oftentimes apply for it after they learn the extent or length of the illness of a family member,

themselves, a loved one, et cetera, when they realize the need arises for a lengthy time away from work, they'll ask for leave to be applied back to when they actually incurred that leave.

Mr. Witmer: And I'm not finished with my answer yet. Because that form that was sent to her when I received that form back from the doctor, the doctor signed that form on April 17th and included her notes of absence back to April 1st . So the only reason the two dates coincide is because the doctor excused her back to that date.

Mr. Brassington [Mrs. Kercher's counsel]: But you were aware from November, prior like five months before that she was using her sick time and even vacation time because she was out a lot. Do you recall any conversation with her about her number of absences from the job beginning approximately November, six months, five months before April?

A: Our employees are entitled [*21] to a variety of different mechanisms for leave. So it was at her discretion to use those days as she desired. We did not have conversations.

Yeah, I was aware of some health issues. I was aware, but she specifically can request whatever leave she wants that she's entitled to.

Q: You wouldn't expect an employee, especially one that's been with you some years, to just will-nilly use their sick time because they want to use it otherwise than sick, would you?

A: I think your key here is I wouldn't expect that. No.

Q: So let's assume that Jean Kercher is going to get on the stand, same opportunity as you're having, to say that she spoke to you about her sickness, illness, specifically about her — she didn't know, maybe. At that time, but came to be about her car. She was allergic to her new car. And you knew she was ill during that periods of time even before April 1st . Would you agree?

A: No. Not the car. The car issue came later, that discussion.

Q: But you're aware that she had illness and sickness issues mostly between November, approximately five months before April, all the way through to April.

Would you agree with that?

A: If you ask me specifically what days, I have those days recorded [*22] that were sick.

Q: You do?

A: I'm not going to get into specifically what days, I was aware she had some medical issues. She was

taking sick time, I certainly would be aware of that.

Q: The mere fact that her vacation ran out, her personal time ran out, that's when she was forced to ask for FMLA. Did she tell you that?

A: No.

Hearing N.T., pp. 85-89. Mrs. Kercher requested and was granted FMLA leave.

Mrs. Kercher also contends, without citation, that RMCTC interfered with her FMLA rights because she was given additional duties, tasks and responsibilities designed to enable RMCTC to terminate her when she could not complete the additional tasks along with her normal job duties. She contends that she had to perform these tasks while she was out on FMLA leave, citing nothing other than her own allegations for support of this contention. Such allegations, without further support, do not defeat summary judgment. See Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Engineers, AFL-CIO, 982 F.2d 884, 890 (3d Cir. 1992)(quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3rd Cir.), cert. denied, 502 U.S. 940, 112 S. Ct. 376, 116 L. Ed. 2d 327 (1991))(A non-moving party may not "rest upon mere allegations, general denials or . . . vague statements. . . ."). Moreover, as noted by RMCTC, Plaintiff admitted that she slept twenty to twenty-two hours per day while on FMLA leave. Statement of Material Facts, [*23] ¶ 13 (citing Kercher Dep., p. 22). Summary judgment as to Mrs. Kercher's FMLA interference claim will be granted.

## C. Retaliatory Discharge.

In Count III of her Complaint, Mrs. Kercher claims that she suffered retaliation and was fired for exercising her right to take FMLA leave. The FMLA seeks to "entitle employees to take reasonable leave for medical reasons" while "balanc[ing] the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1)-(2). The FMLA entitles an employee to twelve work weeks of leave during any twelve month period for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Following return from FMLA leave, an employee is entitled to be restored to the same or an equivalent position. 29 U.S.C. § 2614(a)(1)(A)-(B).

A discrimination or retaliation cause of action under the FMLA makes it unlawful for an employer "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by

the FMLA. _29 U.S.C.A. § 2615(a)(2)._ In order to prove FMLA retaliation, an employee must show that her employer intentionally discriminated against her for exercising an FMLA right. _Atchison v. Sears, 666 F. Supp.2d 477, 490 (E.D. Pa. 2009)._ In the absence of direct evidence of FMLA-based discrimination, to establish **[*24]** a prima facie of FMLA retaliation, the plaintiff must show: (1) she is protected under the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between the employee's protected activity and the employer's adverse employment action. _Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508 (3d Cir. 2009)_(citing _Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004))._ Following a showing of a prima facie case, the burden shifts to the defendant pursuant to the McDonnell Douglas framework. _Atchison, 666 F. Supp. 2d at 490._ If the defendant can give a non-discriminatory reason for the adverse employment action, the plaintiff is afforded the opportunity to debunk the defendant's reason and prove an inference of discrimination. _Solomon v. Sch. Dist. of Philadelphia, 882 F. Supp.2d at 782 (E.D. Pa. 2012)._

To establish a _prima facie_ FMLA retaliation case, Plaintiff must establish that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."[6] Moreover, "[t]he Third Circuit has articulated two factors relevant to the analysis of establishing the causal link between the adverse employment decision and the FMLA leave: (1) a showing that the two events were close in time or (2) evidence of ongoing antagonism toward the employee."[7]

The "sheer proximity" between FMLA leave **[*25]** and an adverse employment action is often enough to establish a causal connection for a prima facie FMLA retaliation claim. _Baltuskonis v. US Airways, Inc., 60 F. Supp.2d 445, 448 (E.D. Pa. 1999)_(six day temporal proximity not a factor where employee proffered altered doctor's note and termination for fraudulently attempting to receive sick pay); _Voorhees v. Time Warner Cable Nat'l Div., CIV. A. 98-1460, 1999 U.S. Dist. LEXIS 13227, 1999 WL 673062 (E.D. Pa. Aug. 30, 1999)_

(holding "reasonable jury could infer a causal connection between Voorhees' leaves of absence and her termination from the close proximity in time [of six months] between her leave of absence and the adverse employment actions she suffered").

1. Protection Under the FMLA

The FMLA entitles an employee to a total of twelve workweeks of leave during any twelve month period due to a "serious health condition that makes the employee unable to perform the functions of the position." _29 U.S.C.A. § 2612(a)(1)(D)._ Thus, taking FMLA leave is a protected activity under the FMLA. To be eligible for benefits under the FMLA, an employee must have been employed for at least twelve months by the employer from whom the leave is sought and for at least 1,250 hours of service during the previous twelve month period. _See 29 U.S.C. § 2611(2)(A)._ It is uncontested that Mrs. Kercher worked the requisite number of hours to be considered eligible for benefits under the FMLA.

In providing **[*26]** notice to the employer that she is taking FMLA leave, the employee need not use certain magic words or mention the FMLA; "the critical question is how the information conveyed to the employer is reasonably interpreted." _De Luca v. Trustees of Univ. of Pennsylvania, 834 F. Supp. 2d 282, 290 (E.D. Pa. 2011)_(quoting _Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007)._ The parties do not dispute that Mrs. Kercher was protected under the FMLA nor that she gave sufficient notice that she was taking FMLA leave.

2. Adverse Employment Action

Mrs. Kercher alleges that the adverse employment action she suffered was her termination from employment by RMCTC. Mrs. Kercher contends that RMCTC took no action against her prior to her making a harassment claim against Mr. Witmer and her later request for FMLA leave. Mrs. Kercher argues that

> [i]n her 14 years of employment, [she] only received one written reprimand and a 3-day unpaid suspension, in 2011, and 2012, respectfully. It wasn't until after Plaintiff filed a harassment complaint against Gerald Witmer and made her request for leave under FMLA that she then began to receive constant unsatisfactory performance evaluations. Plaintiff alleges that the unsatisfactory performance evaluation was done in retaliation to both the harassment claim and her leave under FMLA.

---

[6] _See Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012)._

[7] _Capps v. Mondelez Global LLC, 147 F. Supp. 3d 327, 336 (E.D. Pa. Nov. 24, 2015)._

Pl.'s Br., p. 9. RMCTC **[*27]** responds that Mrs. Kercher's claim is not supported by the record. Her harassment complaint against Mr. Witmer was filed in 2012 and her FMLA leave request was made in April 2014. Statement of Material Facts, ¶¶ 9, 11. Mrs. Kercher's performance problems, however, date back to 2011, when she received a written reprimand for a breach of confidentiality and August of 2012, when she was suspended without pay for three days based on her inappropriate communications with the School Board Treasurer. *Id.*, ¶¶ 6, 7, 11, 12 (citing Kercher Dep., pp. 41, 27-28, 66, Kercher Dep., Exs. 3, 4, 17.) By June 17, 2014, Mrs. Kercher had two consecutive unsatisfactory performance evaluations. *Id.*, ¶ 18.

3. Causal Connection

There were approximately eight months between Mrs. Kercher's request for FMLA leave and her suspension with pay to investigate her performance. Statement of Material Facts, ¶¶ 11, 31. There was a two year and three-month time lapse between Plaintiff's August 2012 harassment complaint and her November 2014 dismissal following her suspension with pay. *Id.*, ¶¶ 9, 31. Plaintiff accumulated two negative performance evaluations over two years after her harassment complaint in August 2012. **[*28]** *Id.* RMCTC argues in its Reply Brief that the eight month lapse of time between the commencement of Mrs. Kercher's FMLA leave and her November 2014 dismissal following her suspension with pay is not unusually suggestive of retaliation. Reply Br., p. 6 (citing *Carter v. Midway Slots & Simulcast, 511 F. App'x 125, 130 (3d Cir. 2013)*(holding eighth months insufficient to demonstrate a causal relationship between protected activity filing EEOC race discrimination complaint and adverse action)(citing *Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)* and *Aguilar v. Morgan Corp., 27 F. App'x 110, 112 (3d Cir. 2002)*(eight month time lapse between protected activity and termination unlawful retaliation claim under Title VII, § 1981 and PHRA)). Based on the case law applicable to this issue, Mrs. Kercher arguably does not meet the temporal proximity requirements to show a causal connection between her FMLA leave and her change in employment status.

Mrs. Kercher can rely upon "other evidence" to establish causation, such that RMCTC engaged in a pattern of ongoing antagonism in the time between her protected activity and her termination. *Id.* at 762 (citing *Blakney v. City of Phila., 559 F. App'x. 183, 186* (citing *Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 894 (3d Cir.*

*1993)*). RMCTC argues that Mrs. Kercher has not presented sufficient evidence to demonstrate a pattern of antagonism by her argument that she received negative performance appraisals and additional assignments while on FMLA leave. Reply Br., p. **[*29]** 6. RMCTC cites the non-precedential *Lackey v. Heart of Lancaster Regional Medical Ctr., No. 16-3986, 704 Fed. Appx. 41, 2017 U.S. App. LEXIS 13596, 2017 WL 3189154 (3d Cir. Jul. 27, 2017)*, for support. In *Lackey*, the Plaintiff had ongoing work performance problems and brought claims pursuant to the *Age Discrimination in Employment Act ("ADEA")* and the *Americans with Disabilities Act ("ADA")*. The Court noted that the plaintiff's performance review and subsequent written warnings both before and after her performance review in 2012 echoed the feedback she consistently received between 2006 and 2011. *2017 U.S. App. LEXIS 13596, [WL] at *5*. The Court held that continued monitoring based on poor performance for one and one-half years after the protected activity and after years of repeated errors did not demonstrate a pattern of antagonism under the ADEA. *Id.* RMCTC argues that Mrs. Kercher received her second unsatisfactory evaluation over one year after she filed a complaint against Mr. Witmer. Following this poor evaluation, she continued the same pattern of performance problems which had been identified prior to her complaint and FMLA leave.

Mrs. Kercher arguably makes a *prima facie* claim of FMLA retaliation through her argument that she received additional assignments and negative performance appraisals following her FMLA leave. Under the *McDonnell Douglas* burden-shifting **[*30]** framework, if an employee establishes a *prima facie* case of retaliation under the FMLA, then the employer must articulate a legitimate nonretaliatory reason for the adverse employment action. *Caplan v. L Brands/Victoria's Secret Stores, LLC, 210 F. Supp. 3d 744, 764 (W.D. Pa. 2016)*, aff'd sub nom. *Caplan v. L Brands/Victoria's Secret Stores, No. 16-4009, 704 Fed. Appx. 152, 2017 U.S. App. LEXIS 14664, 2017 WL 3411813 (3d Cir. Aug. 9, 2017)* (citations omitted). If the employer does so, then the burden shifts back to the employee to prove by a preponderance of the evidence that the proffered reason is a pretext for retaliation. *Id.* (citing *Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014)*). The legitimate nondiscriminatory reason proffered by RMCTC is Mrs. Kercher's performance issues. Mrs. Kercher must now present evidence to show that RMCTC's performance reasons for her termination were a pretext for retaliation. To demonstrate pretext under the *Fuentes* test,

Case 3:22-cv-00276-JKM   Document 12   Filed 05/23/22   Page 97 of 169

Page 10 of 11
2017 U.S. Dist. LEXIS 145013, *30

an employee must either: (1) offer evidence that casts sufficient doubt upon the legitimate reason proffered by the defendant so that a fact-finder could reasonably conclude that the reason was a fabrication, or (2) present evidence sufficient to support an inference that discrimination was more likely than not a motivating or determinative factor in the termination decision.

_Sawa v. RDG-GCS Joint Ventures III, No. CV 15-6585, 2017 U.S. Dist. LEXIS 109357, 2017 WL 3033996, at *19 (E.D. Pa. July 14, 2017)_(citing _Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994))_. Under the first prong of the _Fuentes_ test, Mrs. Kercher must

point to "such [*31] weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,'. . . and hence infer 'that the employer did not act for [the asserted] non-[retaliatory] reasons.'" _Fuentes, 32 F.3d at 765_ (internal citations omitted). An employee "cannot simply show that the employer's decision was wrong or mistaken." _Id._ The fact that an employer made a bad decision does not make that decision retaliatory; an employer can have any reason or no reason for its employment action, so long as it is not a retaliatory reason. _See Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995)_. The question at prong one of the _Fuentes_ test "is not whether the employer made the best, or even a sound, business decision;" it is whether the real reason for the employment decisions is retaliation. _Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997)_. Evidence undermining an employer's proffered legitimate reasons must be sufficient to "support an inference that the employer did not act for its stated reasons." _Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995)_.

_Id._ Under prong two of the _Fuentes_ pretext test, Mrs. Kercher must demonstrate that:

retaliation "was more likely than not a motivating or determinative cause of the adverse employment [*32] action." _Fuentes, 32 F.3d at 762_. The kinds of evidence relied upon by the Court of Appeals for the Third Circuit under this prong of the Fuentes test are: 1) whether the employer previously retaliated against the plaintiff; 2) whether the employer has retaliated against other persons;

and 3) whether the employer has previously treated more favorably similarly situated persons who did not engage in the protected activity at issue. _See Simpson, 142 F.3d at 644-45_.

_Caplan, 210 F. Supp.3d at 765_. Mrs. Kercher argues in her Sur-Reply Brief that:

There was never a list of essential job functions listed of Kercher's job to compare the elements of pre-FMLA and post-FMLA outlining the differences, but emphasis placed upon additional listing of jobs and duties over and above the pre-FMLA period of time when Kercher was taking many of her sick and accumulated time off for a period of six months prior to mid-March qualifies for blindness to the law and in retaliation Witmer took extra efforts to document failures of performance to a minute degree which pre-2014 was not implemented. The best time to gauge Kercher's performance was for a period of time upon return from FMLA when she recovered and was capable of performing not only the essentials of the job but the additional [*33] list of items given to Kercher by Mr. Witmer.

Sur-Reply Br., p. 4. Later in the Sur-Reply Brief, Mrs. Kercher argues that:

Plaintiff's position with the defendant was as Business Office Supervisor. The job description for plaintiff's position, at the time of her hiring, is attached hereto as Exhibit, H.T. Loudermill 03/31/15, No 1] After plaintiff's approval for intermittent FMLA leave, Witmer sent numerous memorandums complaining of plaintiff's absenteeism. Defendant alleges that all deadlines missed by the plaintiff were set by herself; however, in these memorandums, Witmer sets deadlines and also demanding that plaintiff work set hours and work from home while not in the building. Witmer also added extra job duties including cross-training co-workers, additional reconciliations, additional reporting, various items regarding budgets, additional end of year items, along with the duties of other employees.

At the first of two formal meeting with the Reading Muhlenberg Joint School, Mr. Witmer vis-a-vie the Board Attorney Stott charged Kercher with "neglect of duty, violation of school laws, and improper conduct in the commissioner omission of 14 Acts", such language of documented as mere [*34] non-performance/failure to perform by Mr. Witmer during the entire period of the FMLA protection from mid-March 2014 and the actual FMLA application,

Exhibit Kercher 17 (although not submitted until 04/15/2014, but granted to 04/01/2014 due to Mr. Witmer's delay of getting the appropriate forms to Kercher). The FMLA was in effect from Or/01/2014 [sic] through her suspension by Mr. Witmer by letter of November 10, 2014 (Exhibit Kercher 10).

For the reasons stated above, Plaintiff has met her burden of proof. There are issues of material fact for a fact finder to consider. Therefore, Defendant is not entitled to Summary Judgment.

*Id.* at 7. It appears to this Court that Mrs. Kercher presents sufficient argument to submit the question to a jury whether the actions of Mr. Witmer establish a pattern of ongoing antagonism toward her in the time between her protected activity and her termination. Accordingly, summary judgment will be denied on Mrs. Kercher's retaliatory discharge claim.

## VI. CONCLUSION

In viewing the facts most favorable to Mrs. Kercher as the non-movant, she fails to present any disputed issues of material fact sufficient to show that there is a genuine issue for trial with respect to **[*35]** her claims for violation of her due process rights and FMLA interference. Summary judgment will be granted as to those claims. Because there exist disputed issues of fact regarding Mrs. Kercher's retaliatory discharge claim, summary judgment is denied as to that claim.

An appropriate Order follows.

## ORDER

**AND NOW**, this 6th day of September, 2017, upon consideration of the Defendant's Motion for Summary Judgment (Dkt. No. 26) filed on June 23, 2017; Plaintiff's Response in Opposition to Defendant's Motion (Dkt. No. 29) filed on July 27, 2017; Defendant's Reply Brief (Dkt. No. 31) filed on August 10, 2017; Plaintiff's Sur-Reply Brief (Dkt. No. 38) filed on August 30, 2017; and for the reasons expressed in the foregoing Memorandum,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** as to Counts IV (Violation of Family and Medical Leave Act) and V (Violation of Due Process Rights) of Plaintiff's Complaint which are **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **DENIED** as to Count III

(Retaliatory Discharge) of Plaintiff's Complaint.

BY THE COURT:

*/s/ Henry S. Perkin*

HENRY S. PERKIN,

United States Magistrate Judge

---

End of Document

🛈 Cited
As of: May 21, 2022 3:53 PM Z

## *Lehenky v. Toshiba Am. Energy Sys. Corp.*

United States District Court for the Eastern District of Pennsylvania

February 22, 2022, Decided; February 22, 2022, Filed

NO. 20-4573

**Reporter**
2022 U.S. Dist. LEXIS 30344 *; 2022 WL 523739

CHERIE LEHENKY, Plaintiff, v. TOSHIBA AMERICA ENERGY SYSTEMS CORPORATION, Defendant.

**Counsel:** **[\*1]** For CHERIE LEHENKY, Plaintiff: LORRIE MCKINLEY, MCKINLEY & RYAN LLC, WEST CHESTER, PA; WILLIAM T. WILSON, BAILEY & EHRENBERG PLLC, WEST CHESTER, PA.

For TOSHIBA AMERICA ENERGY SYSTEMS CORPORATION, Defendant: DENISE ELLIOTT, LEAD ATTORNEY, McNees Wallace & Nurick LLC, LANCASTER, PA.

**Judges:** C. Darnell Jones, II, J.

**Opinion by:** C. Darnell Jones, II

## Opinion

### MEMORANDUM

### JONES, II J.

### I. INTRODUCTION

Plaintiff brings the instant matter against her former employer for terminating her employment after a random drug test showed the presence of marijuana metabolites (specifically, tetrahydrocannabinol, otherwise known as "THC") in Plaintiff's system. Plaintiff is suing under the *Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq.* and the *Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951, et seq.* Defendant has filed a Motion to Dismiss all Counts of Plaintiff's Complaint. For the reasons set forth below, Defendant's Motion shall be granted.

### II. FACTS

Plaintiff's Complaint alleges in pertinent part that in 2018, she was diagnosed with Panniculitis—an inflammatory autoimmune connective tissue disease. (Compl. ¶ 15.) On or about January 5, 2019, Defendant, Plaintiff's employer for approximately eighteen (18) years, informed Plaintiff she had been randomly selected to undergo workplace drug testing in accordance with the company's Drug Free **[\*2]** Workplace Policy. (Compl. ¶ 33, Ex. B.) On February 7, 2018, Plaintiff underwent said testing, at which time she was informed that an over-the-counter CBD product she was taking for her condition would cause a positive result. (Compl. ¶ 35.) After taking the test that day, Plaintiff emailed Defendant to find out what "documentation" she needed to provide regarding her use of the product. (Compl. ¶ 35, Ex. C.) Defendant did not respond. (Compl. ¶ 39.) On February 8, 2019, Plaintiff's drug test came back positive for THC and Plaintiff's employment was immediately terminated by Defendant on the basis of illegal drug use. (Compl. ¶ 38.)

Plaintiff's Complaint further alleges that she began taking the CBD product "after hearing reports of good results about the effectiveness" and "sought the advice of a licensed health care physician to investigate whether this might help control her pain and improve her overall functioning." (Compl. ¶ 19.) Plaintiff avers "[s]hortly thereafter, [she] began using a CBD product and finally found some relief for her symptoms." (Compl. ¶ 20.) In support of this averment, Plaintiff attaches a letter dated *February 8, 2019* from Paul F. Barone, D.O., which simply **[\*3]** states "The above named patient was seen in this office on *1-09-19* and will be able to return to work on *1-9-19*. Patient was treated with CBD that may have a low level of THC." (Compl. Ex. A) (emphasis added). This letter was faxed to an unidentified recipient on February 15, 2019. (Compl. Ex. A.)

## III. STANDARD OF REVIEW

When reviewing a *Rule 12(b)(6)* motion, district courts must first separate legal conclusions from factual allegations. *Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*). Legal conclusions should be discarded, and well-pled facts given the deference of truth. *Id. at 210-211*. Courts must then determine whether the well-pleaded facts state a "plausible claim for relief." *Id. at 211.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." *Iqbal, 556 U.S. at 678* (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler, 578 F.3d at 211* (citing *Phillips, 515 F.3d at 231*).

## IV. DISCUSSION

The first four Counts of Plaintiff's Complaint **[*4]** include claims for Disparate Treatment Under the ADA (Count I); Disparate Treatment Under the PHRA (Count II); Disparate Impact in Violation of the ADA (Count III); Disparate Impact in Violation of the PHRA (Count IIV). As a preliminary matter, this Court notes that its "analysis of an ADA claim applies equally to a PHRA claim[.]" *Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)*. Therefore, the analyses contained within the following discussion shall focus upon the ADA for purposes of both the ADA and PHRA claims presented by Plaintiff.

## A. Counts I and II: Claims under the Americans with Disabilities Act and Pennsylvania Human Relations Act for Disparate Treatment

This Court recognizes that "[a]lthough Plaintiff need not establish a prima facie case of discrimination at this stage, 'the elements of a prima facie claim of disability discrimination remain the Court's "analytical guideline[s] in assessing the plausibility" of [Plaintiff's] discrimination claims.'" *Crawford, Civil Action No. 20-871, 2020 U.S. Dist. LEXIS 110533, at *8 (E.D. Pa. June 24, 2020)*

(citing *Dreibelbis v. Cty. of Berks, 438 F. Supp. 3d 304, 314 (E.D. Pa. 2020)* (first alteration in original) (quoting *Fabian v. St. Mary's Med. Ctr., Civil Action No. 16-4741, 2018 U.S. Dist. LEXIS 147634, at *9 (E.D. Pa. Aug. 30, 2018)*). With that said, "[i]n order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show '(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform **[*5]** the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination.'" *Shaner v. Synthes (USA), 204 F.3d 494, 500 (3d Cir. 2000)* (quoting *Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998)*).

In accordance with applicable statutory law,

> [T]o be considered "disabled" under the ADA, a plaintiff must show that (1) [s/he] has a physical or mental impairment that substantially limits one or more of his major life activities, (2) [s/he] has a record of such an impairment, or (3) [s/he] is regarded as having such an impairment. *See 42 U.S.C. § 12102(2)*. Major life activities consist of tasks such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *29 C.F.R. § 1630.2(i)*.

*Law v. Garden State Tanning, 159 F. Supp. 2d 787, 791 (E.D. Pa 2001)*; *see also Niculcea v. Stone Ridge Towne Ctr., Civil Action No. 1:17-CV-2096, 2020 U.S. Dist. LEXIS 3274, at *8 (M.D. Pa. Jan. 8, 2020)* ("An individual is considered 'disabled' under the ADA if she has a physical or mental impairment that substantially limits one or more of the major life activities of such individual. The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis.'") (internal citations and quotation marks omitted).

To that end,

> A covered entity will be liable under the ADA *only if it knew of the disability at issue*. See *Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002)*; **[*6]** *Jones v. United Parcel Serv., 214 F.3d 402, 406 (3d Cir. 2000)* ("It is, of course, an axiom of any ADA claim that the plaintiff be disabled and that the employer be aware of the disability."). Here, [Plaintiff] never alleged that [Defendant] was aware of any purported disability when it made its decision

2022 U.S. Dist. LEXIS 30344, *6

not to grant him the certifications he sought, which is sufficient on its own to dispose of [Plaintiff]'s claim under the ADA.

*Alja-Iz v. United States V.I. Bd. of Educ., 625 F. App'x 591, 593 (3d Cir. 2015)* (emphasis added).

Further, the ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*. *Fabian, 2018 U.S. Dist. LEXIS 147634, at *20*.

Lastly, for purposes of what constitutes an "adverse action" as it pertains to an ADA discrimination claim, "termination is an adverse action." *Tielle v. Nutrition Grp., 810 F. App'x 160, 163 (3d Cir. 2020)*.

Drawing all reasonable inferences as it must from Plaintiff's Complaint and exhibits thereto, this Court infers Plaintiff suffered from a disability. Specifically, Plaintiff speaks of enduring "a long period of physical discomfort and pain that significantly limited her ability to walk" and "[b]y the time of her diagnosis in 2018, Ms. Lehenky could only walk with the assistance of a cane due to the accumulation of fluid and tissue damage in her [*7] legs." (Compl. ¶¶ 15, 17.)[1] Inasmuch as walking is a major life activity, Plaintiff shall be afforded the inference that she suffered from a disability. *See, 42 U.S.C. § 12102(2)(A)* ("[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, *walking*, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.") (emphasis added).

Notwithstanding the existence of any disability, Plaintiff has failed to sufficiently allege that she was otherwise qualified to perform the essential functions of the job—with or without reasonable accommodations by Defendant—or that she suffered an adverse employment decision *as a result of discrimination*. First, Plaintiff simply concludes she "was qualified" and "faithfully performed her duties in accordance with the Defendant's expectations." (Compl. ¶ 14; *see also* Compl. ¶ 45. ("In spite of her disabilities, Ms. Lehenky, was and continues to be qualified to perform the

essential function of her job either with or without a reasonable accommodation.") For purposes of an ADA assessment, conclusory averments such as these are not sufficient. [*8] Moreover, the Act provides "a qualified individual with a disability *shall not include* any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use[,]" thereby precluding Plaintiff from being deemed "qualified." *42 U.S.C. § 12114(a)* (emphasis added).

Finally, although Plaintiff alleges she suffered an adverse employment action as a result of discrimination, the same is not possible if Defendant was not aware of Plaintiff's medical condition or "disability" when she was randomly selected to be drug tested pursuant to a policy that had been in effect since at least 2016,[2] and was terminated in accordance with said Policy. (Compl. Ex. B.) Plaintiff's agreement to the terms of the Policy was a condition precedent to employment with Defendant, therefore she was presumably aware of its terms and has waived any objection thereto by failing to inform Defendant of her CBD use in accordance with the Policy (prior to undergoing the test) and/or by not refusing to take the test. (Compl. Ex. B, §§ C.) The Policy provides a preemptive requirement for an employee in Plaintiff's situation: any employee taking prescription or over-the-counter drugs [*9] that could otherwise be deemed "illegal" pursuant to the Policy, needs to provide documentation which identified the drug and dosage or else the drug would in fact be deemed "illegal," and "failure to report the use of such drugs to HR may result in disciplinary action, up to and including termination." (Compl. Ex. B, §§ C.) Plaintiff failed to take this preemptive measure, yet her entire Complaint is premised on her contention that she was taking a drug that was legally prescribed by a licensed health care professional to treat her disability. Said contention is belied by review of the physician's note attached to her Complaint, including the date of said note, the date of treatment, and the absence of any indication that said treatment was for her Panniculitis, and/or how long it was to continue and at what dosage. (Compl. Ex. A.)

Plaintiff was notified by Human Resources on February 5, 2019, that she had been randomly selected to undergo drug testing. (Compl. ¶ 33.) Although the Policy requires the testing to occur "immediately" and Plaintiff was instructed via email sent by Human Resources at 9:58 a.m. on February 5, 2019 that she would "need to

---

[1] Although Plaintiff's Complaint speaks to other physical issues that *could* arise from her condition, she does not allege she suffers from said issues. (Compl. ¶ 16.)

[2] The most recent revision of the policy occurred on January 7, 2019. (Compl. Ex. B.)

go to the clinic 'immediately' for [*10] the screening," Plaintiff did not present for screening until two days later. (Compl. ¶ 35, Ex. B, §§ E(5), Ex. C.) On February 7, 2019 at 3:33 p.m.—*after the test had already occurred*—Plaintiff inquired with Defendant's Human Resources Department as to what documentation she would need to provide regarding the "over-the-counter supplement" she was taking for a medical condition. (Compl. ¶ 35, Ex. C.) Human Resources did not respond to Plaintiff's inquiry. (Compl. ¶ 39.) Plaintiff's employment was terminated the following day. (Compl. ¶ 38.)

As previously referenced, attached as an exhibit to Plaintiff's Complaint, is a note dated February 8, 2019 (one day after the drug test) from a doctor in Exton, Pennsylvania, indicating he saw Plaintiff in his office on January 9, 2019, she was treated with CBD on January 9, 2019, and she could return to work on January 9, 2019. (Compl. Ex. A.) The note further states the CBD "may have a low level of THC." (Compl. Ex. A.) Significantly, the note is silent as to the existence of any medical condition, the necessity for continued use of CBD, or the dosage with which she was treated on that day. In fact, Plaintiff tellingly makes no allegation that [*11] she was terminated as a result of Panniculitis. *See Anderson v. Norfolk Southern Ry. Co., Case No. 3:18-cv-0190, 2021 U.S. Dist. LEXIS 62517, at *22-23 (W.D. Pa. March 31, 2021)* ("In this case, it cannot be disputed that [Plaintiff] suffered an adverse employment action. However, that adverse employment action was not taken 'as a result of discrimination.'") (quoting *Gaul v. Lucent Techs, 134 F.3d 576, 580 (3d Cir. 1998)*). By reason of the terms of the Policy pertaining to documentation requirements for situations such as this, the note prepared one day after Plaintiff tested positive for illegal substances is ultimately of no consequence.

Plaintiff's disparate treatment claim alleges in part Defendant "intentionally and/or recklessly proceeded with the automatic termination of her employment upon receipt of the positive drug screen." (Compl. ¶ 47.) However, her assignment of intentional and/or reckless behavior to Defendant's action of termination is not born out by the remaining facts of the Complaint or exhibits attached thereto. Again, although Plaintiff alleges her medical condition "significantly limited her ability to walk," her Complaint contains no facts to demonstrate Defendant was aware of any mobility issues, as Plaintiff had been working remotely from her home since 2014—

four years prior to her diagnosis. (Compl. ¶¶ 13, 15.)[3],[4] Plaintiff's attempt [*12] to "unring" the bell after the test had occurred by now claiming the test was unlawful under the drug-testing provisions of the ADA, is futile. Plaintiff had been made aware of the Policy long before she began using the CBD product yet failed to follow the procedures for informing Defendant of same until after the test had been administered. *See Muhammed v. City of Phila., 186 F. App'x 277, 279 (3d Cir. 2006)* ("We have already held that 'current' drug use is not protected under the ADA.") (citing *Salley v. Circuit City Stores, 160 F.3d 977 (3d Cir. 1998)*). Even then, the notification she provided did not comply with the requirements of the Policy and in fact, was sorely lacking any details relevant to the issue now before the court.

In view of the foregoing, Plaintiff cannot plausibly claim that her termination was the result of her disability and that she was treated in a disparate manner. For this reason, Counts I and II of Plaintiff's Complaint pertaining to same must be dismissed.

---

[3] Although Plaintiff's Complaint is devoid of any facts to indicate Defendant was aware of her disability, she provides information regarding this issue in her Response to the instant Motion. (Pl.'s Resp. Mot. Dismiss, n. 13.) Pleadings may not be amended via briefing on a motion. *See Sonsini v. Leb. Cty., Civil No. 1:20-CV-00392, 2021 U.S. Dist. LEXIS 38047, at *72 n.5 (M.D. Pa. Feb. 16, 2021)* ("Although a court on a motion to dismiss ordinarily must accept the allegations in the complaint as true, it is not compelled to accept assertions in a brief without support in the pleadings. After all, a brief is not a pleading.") (citations and quotation marks omitted). For the reasons discussed more fully above, this deficiency is without consequence.

[4] To the extent Plaintiff also claims she was terminated on the basis of being erroneously and discriminatorily perceived as being an illegal drug user, the same is without merit. *See* Compl. ¶¶ 49-50. Although Plaintiff was terminated for use of an illegal drug without having provided proper prior documentation regarding use of same, there are absolutely no facts contained within Plaintiff's Complaint to plausibly show Defendant's termination decision was based on her disability or a purported "perception" by Defendant that she was an illegal drug "user." *See Salley v. Circuit City Stores, 160 F.3d 977, 981 (3d Cir. 1998)* ("[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action.'") (quoting *Kelly v. Drexel University, 94 F.3d 102, 109 (3d Cir. 1996)*).

2022 U.S. Dist. LEXIS 30344, *12

**B. Counts III and IV: Claims under the Americans with Disabilities Act and Pennsylvania Human Relations Act for Disparate Impact**

Defendant next seeks dismissal of Plaintiff's disparate impact claims. Plaintiff's Complaint alleges in pertinent part that Defendant's Policy violates the ADA and PHRA because it "constitutes [*13] a discriminatory method of administration" and "has a disparate impact on qualified persons with disabilities[.]" (Compl. ¶¶ 57, 61.)

It is well settled . . .

"In order to establish a prima facie case of disparate impact, the plaintiff must provide evidence showing (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Quad Enters. Co., LLC, 369 F. App'x at 206* (citation and internal quotation marks omitted). "Although the plaintiff need not show discriminatory intent under this theory, it must prove that the practice actually or predictably results in discrimination." *Id.* (alteration and internal quotation marks omitted). "This is generally shown by statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." *Cinnamon Hills, 685 F.3d at 922* (alteration, internal quotation marks, and citation omitted).

*W. Easton Two, LP v. Borough Council of W. Easton, 489 F. Supp. 3d 333, 363-364 (E.D. Pa 2020)*; *see also Acevedo v. City of Phila., 680 F. Supp. 2d 716, 741 (E.D. Pa. 2010)* ("'A disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing [*14] a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer.'") (quoting *E.E.O.C. Metal Serv. Co., 892 F.2d 341, 346 (3d Cir. 1990)*).

With specific regard to causation, "'[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.'" *Hanrahan v. Blank Rome LLP, 142 F. Supp. 3d 349, 354 (E.D. Pa. 2015)* (quoting *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc., 576 U.S. 519, 135 S. Ct. 2507, 2523, 192 L. Ed. 2d 514, 538 (2015)*).

In the case now before this Court, Plaintiff has sufficiently identified an "outwardly neutral practice[]": Defendant's Drug Free Workplace Policy. (Compl. ¶ 33, Ex. B.) *See also Hanrahan, 142 F. Supp. 3d at 354* ("A plaintiff must therefore meet two requirements to establish a prima facie case of disparate impact discrimination. First, the plaintiff must identify a specific employment practice or policy to challenge.") (citing *Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988)*).

However, Plaintiff has failed to plausibly plead causation. In fact, her Complaint is completely devoid of any facts to demonstrate Defendant's Policy had a disparate impact on a "protected group" or any other employee, but for her conclusory statement that "Defendant's Drug-free Workplace Policy has a disparate impact on qualified persons with disabilities and is therefore facially invalid[.]" (Compl. ¶ 62.) In [*15] fact, the only termination on the basis of said Policy Plaintiff speaks of, is her own. (Compl. ¶ 57.) This is simply insufficient to sustain such a claim. *See Hanrahan, 142 F. Supp. 3d at 354* ("[T]he plaintiff must demonstrate causation by offering statistical evidence sufficient to show that the practice or policy resulted in discrimination.") (citing *Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988)*).

Accordingly, Defendant's Motion to Dismiss Counts III and IV of Plaintiff's Complaint shall be granted.

**C. Count V: Illegal Medical Inquiry in Violation of the Americans with Disabilities Act**

Plaintiff's final claim is that "Defendant's demand that [she] submit to testing for legal prescription drugs was not job-related or required by business necessity, and it constituted an illegal medical inquiry, in direct violation of the ADA. [sic] *42 U.S.C. § 12112(d)(4)* & *§12114*." (Compl. ¶ 64.)

*42 U.S.C. § 12112(d)(4)* provides as follows:

(4) Examination and inquiry.

(A) Prohibited examinations and inquiries. A covered entity shall not require a medical examination **and shall not make inquiries of an employee as to whether such employee is an**

2022 U.S. Dist. LEXIS 30344, *15

*individual with a disability or as to the nature or severity of the disability*, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 USCS § 12112(d)(4)(A) (emphasis [*16] added).

In this case, Plaintiff makes no allegation that Defendant inquired as to whether she had a disability or as to the nature or severity of any disability. As such, §12112(d)(4)(A) is inapplicable to Plaintiff's situation and she cannot rely upon same for relief.

With respect to 42 U.S.C. § 12114, said Subsection (a) states: "For purposes of this title, a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a). As discussed above, Plaintiff has not sufficiently pleaded she was "qualified" under the ADA. Nevertheless, whether Plaintiff has sufficiently pleaded the element of "qualified" is irrelevant under the ADA if she was engaging in the illegal use of drugs, as provided for in Defendant's Policy. Because Plaintiff was aware of the fact that the CBD she was treated with on January 9, 2019 could "have a low level of THC[,]" Plaintiff's failure to inform Defendant of her continued use of same constitutes an "illegal use of drugs" under the Policy and cannot be deemed an illegal medical inquiry. See Compl. Ex. A.

Section 12114 further provides in pertinent part:

(d) Drug testing.

(1) In general. For purposes [*17] of this title, a test to determine the illegal use of drugs shall not be considered a medical examination.

(2) Construction. *Nothing in this title shall be construed to* encourage, *prohibit*, or authorize *the conducting of drug testing for the illegal use of drugs by* job applicants or *employees or making employment decisions based on such test results*.

42 USCS § 12114(d) (emphasis added).

Plaintiff's claim that she was tested for legal prescription drugs and said testing constituted an impermissible medical inquiry under the ADA is without merit. The drug test report submitted by Plaintiff as an exhibit to her Complaint, indicates she was tested for the following substances:       Amphetamines,       Barbiturates,

Benzodiazepines,      Cocaine      Metabolites,      Marijuana Metabolites, Methadone, Opiates, Phencyclidine, and Propoxyphene. (Compl. Ex. D.) Several of these drugs could be deemed "legal" if properly prescribed by a licensed medical physician and taken accordingly (under said physician's supervision) by the patient. Defendant's Policy provides for this scenario in Subsection C. (Compl. Ex. B, §§ C.) Our sister Circuit has determined that an employer's inquiry into the prescription drugs an employee might be taking for [*18] purposes of enforcing a workplace drug testing policy, is not a disability-related medical inquiry. Turner v. Phillips 66 Co., 791 F. App'x 699, 709 (10th Cir. 2019); see also Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1215-1216 (11th Cir. 2010) ("In addition to allowing inquiries directed at an applicant's ability to perform job-related functions, the ADA recognizes an exemption for drug tests.") (internal citation omitted); Vuono v. Consol. Edison of N.Y., Inc., 18-CV-1635, 2019 U.S. Dist. LEXIS 97930, at *18 (S.D. N.Y. June 11, 2019) ("[I]nterpreting 'inquiry' to encompass drug tests would appear to render Section 12114(d)(1)—which excludes 'a test to determine the illegal use of drugs' from the definition of 'medical examination'—meaningless because the same test Congress intended to allow as a permissible 'medical examination' would be disallowed as an unlawful 'medical inquiry.'"); Upton v. Day & Zimmerman NPS, Civil Action No. 2:15-CV-02231, 2018 U.S. Dist. LEXIS 7758, at *17 (N.D. Ala. Jan. 18, 2018) ("[A] drug test is not a medical inquiry under § 12112(d)(2)(A)."); EEOC v. Grane Healthcare Co., Civil No. 3:10-250, 2015 U.S. Dist. LEXIS 123133, at *141-142 (W. D. Pa. Sept. 15, 2015) (in assessing a drug testing claim under 42 U.S.C. § 12112(d)(2), the court concluded said test "was administered for the sole purpose of detecting illicit drug use. Since [the prospective employee] tested positive for illicit drugs, and [Defendant] had no reason to believe she was treating with legally prescribed Methadone, [Defendant's] failure to hire her was justified.").

Notwithstanding the foregoing, a condition precedent for becoming or remaining an employee of Defendant, was compliance with the company's Drug Free Workplace [*19] Policy. (Compl. Ex. B, § 801(G).) This Policy was included in the Employee Handbook no later than March 1, 2016. (Compl. Ex. B.) It was not until Plaintiff failed the drug test on February 7, 2019, that the requirements of the Policy regarding prescribed and over-the-counter drugs became objectionable to her. Although Plaintiff asserts she had been using the CBD product since 2018, her Complaint is devoid of any

indication she informed Defendant of same prior to the test the following year. Accordingly, Plaintiff's final claim is without merit and shall be dismissed.

### D. Amendment

Amendments to a Complaint may be made as a matter of course, but only if the amendment occurs within: "21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under *Rule 12(b)*, *(e)*, or *(f)*, whichever is earlier." *Fed. R. Civ. P. 15(a)(1)*.

Inasmuch as the conditions for amendment as a matter of course are absent here, amendment is only permitted by leave of court or with the written consent of the opposing party. *Fed. R. Civ. P. 15(a)(2)*. Leave must be freely granted "when justice so requires." *Id.* However, leave may be denied where undue delay, **[*20]** bad faith, dilatory motive, prejudice, or futility are present. *Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000)*. In examining futility, the legal standards of *Rule 12(b)(6)* must be applied. *Id.*

In this case, Plaintiff's Complaint is devoid of any fact to plausibly show her termination was the result of discrimination on the basis of her Panniculitis condition or her use of a an allegedly legal drug that was improperly perceived to be illegal by Defendant. The Policy speaks for itself. Plaintiff failed to comply with said Policy—in several respects. Moreover, Counts I through IV of Plaintiff's Complaint are premised on her contention that she was taking a drug that was legally prescribed by a licensed health care professional to treat her disability. Said contention is belied by review of the facts set forth in the Complaint, in conjunction with the physician's note attached to her Complaint, including the date of said note, the date of treatment, and the absence of any indication that said treatment was for her Panniculitis, and/or how long it was to continue and at what dosage. (Compl. Ex. A.) Just as Defendant's Policy speaks for itself, so too does the physician's note attached to Plaintiff's Complaint.

This Court notes Plaintiff has not requested **[*21]** leave to amend. Nevertheless, based upon the court's review of her Complaint and the discussion set forth above, any attempt to amend would be futile. Accordingly, dismissal of Plaintiff's claims shall be with prejudice.[5]

---

[5] This Court is aware of the Policy's Standard Procedures

### V. CONCLUSION

For the reasons set forth hereinabove, Defendant's Motion to Dismiss shall be granted and Plaintiff's Complaint shall be dismissed with prejudice.

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones, II J.

### ORDER

AND NOW, this 22nd day of February 2022, upon consideration of Defendant's Motion to Dismiss (ECF No. 5) and Plaintiff's Response thereto (ECF No. 6), it is hereby ORDERED that said Motion is GRANTED and Plaintiff's Complaint is DISMISSED in accordance with this Court's accompanying Memorandum.

It is further ORDERED that the Clerk of Court shall mark this matter CLOSED.

BY THE COURT:

/s/ C. Darnell Jones, II J.

---

**End of Document**

---

regarding positive results being reviewed by a Medical Review Officer and discussed with the employee. (Compl. Ex. B §§ F1.) Although Plaintiff's Complaint does not reference this particular provision of the Policy, it does allege she was terminated "with no individualized inquiry as to whether 1) the product she was using was a 'drug' under the Policy and/or the ADA . . . and/or 2) whether the ADA protected Plaintiff's use of the CBD product even if it was a 'drug,' because it was supervised by a licensed health care professional and therefore did not constitute the 'illegal use of drugs.'" (Compl. ¶ 47) (citation omitted). In any event, a potential failure by Defendant to act in accordance with Subsection F1 of Policy does not change the fact that Plaintiff cannot plausibly plead discrimination claims under the ADA and PHRA.

 Positive

As of: May 22, 2022 4:41 PM Z

## *Lombardo v. Air Prods. & Chems., Inc.*

United States District Court for the Eastern District of Pennsylvania

July 7, 2006, Decided

CIVIL ACTION NO. 05-1120

**Reporter**

2006 U.S. Dist. LEXIS 46077 *

LARRY LOMBARDO SR., Plaintiff, v. AIR PRODUCTS AND CHEMICALS INC., f/k/a ASHLAND SPECIALTY CORPORATION, Defendants.

## Case Summary

**Procedural Posture**

Plaintiff former employee filed suit against defendant former employer alleging violations of the Age Discrimination in Employment Act, *29 U.S.C.S. § 621 et seq.*, the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12101 et seq.*, the Pennsylvania Human Relations Act, *43 Pa. Stat. Ann. § 951 et seq.*, and the Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, and a claim of wrongful discharge. The employer moved for summary judgment.

**Overview**

Regarding the FMLA claim, the court found that the fact that the employee was not restored to his position at the end of his FMLA leave did not infringe his FMLA rights because the record showed that at the end of his allowed leave the employee remained unable to perform at least one of the essential functions of the Warehouse Person B position and no reasonable jury could conclude otherwise. Regarding the employee's disability discrimination claims, the court found that because the employee's injury substantially limited the major life activities of reaching and lifting, a reasonable jury could find that he was disabled within the meaning of the ADA as of September 2, 2003. Next, the court found that the employee was not a "qualified individual" within the meaning of the ADA. The court reasoned that as the employee was not capable of performing the physically demanding aspects of the Warehouse Person B position, he had not demonstrated that he could perform the essential functions of the job with or without reasonable accommodations.

**Outcome**

The employer's motion was granted.

## LexisNexis® Headnotes

Labor & Employment

Law > Discrimination > General Overview

*HN1*[ ] **Labor & Employment Law, Discrimination**

Courts generally interpret the Pennsylvania Human Relations Act in accord with its federal counterparts.

Civil Procedure > ... > Summary

Judgment > Entitlement as Matter of Law > General Overview

*HN2*[ ] **Summary Judgment, Entitlement as Matter of Law**

A court may only grant a motion for summary judgement, if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. Pro. 56(c)*. Facts that could alter the outcome are "material," and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.

Civil Procedure > ... > Summary

Judgment > Entitlement as Matter of Law > General

2006 U.S. Dist. LEXIS 46077, *46077

Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

**HN3[↧]  Summary Judgment, Entitlement as Matter of Law**

When a court evaluates a motion for summary judgment, the evidence of the non-movant is to be believed. In addition, all justifiable inferences are to be drawn in the non-movant's favor. Summary judgment may not be granted if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed. However, an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment. The non-movant must show more than the mere existence of a scintilla of evidence for elements on which he bears the burden of production. Thus, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

**HN4[↧]  Family & Medical Leaves, Scope & Definitions**

Courts have recognized that the Family Medical Leave Act (FMLA) creates two types of claims, an interference claim and a retaliation claim. An "entitlement" or "interference" theory claim, is based on _29 U.S.C.S. § 2615(a)(1)_, which makes it unlawful for an employer to interfere with, restrain or deny an employee's rights under the FMLA. Interference claims are not about discrimination; the issue is simply whether the employer provided its employee the entitlements set forth in the FMLA - for example, a twelve-week leave or reinstatement after taking a medical leave.

Labor & Employment Law > ... > Retaliation > Statutory Application > Family & Medical Leave Act

**HN5[↧]  Statutory Application, Family & Medical Leave Act**

A retaliation theory claim under the Family Medical

Leave Act (FMLA) arises under _29 U.S.C.S. § 2615(a)(2)_, which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Burdens of Proof

**HN6[↧]  Family & Medical Leaves, Burdens of Proof**

To prove an interference claim under the Family Medical Leave Act (FMLA), it is the plaintiff's burden to show (1) he was an eligible employee under the FMLA, (2) defendant was an employer subject to the requirements of the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave notice to the defendant of his intention to take FMLA leave, and (5) the defendant was denied benefits to which he was entitled under the FMLA.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Covered Employees

**HN7[↧]  Scope & Definitions, Covered Employees**

Under the Family Medical Leave Act, an "eligible employee" is one who has been employed for at least 12 months by the employer with respect to whom leave is requested and for at least 1,250 hours of service with such employer during the previous 12-month period. _29 U.S.C.S. § 2611(2)(A)_. "Employer" is defined to include any successor in interest of an employer. _29 U.S.C.S. § 2611(4)(A)(ii)(II)_.

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Covered Employers

**HN8[↧]  Family & Medical Leaves, Covered Employers**

Although "successor in interest" is not defined in the Family Medical Leave Act (FMLA), the Department of Labor regulations provide eight factors that should be considered when evaluating whether an employer is a "successor in interest" for purposes of the FMLA: (1) Substantial continuity of the same business operations;

(2) Use of the same plant; (3) Continuity of the work force; (4) Similarity of jobs and working conditions; (5) Similarity of supervisory personnel; (6) Similarity in machinery, equipment, and production methods; (7) Similarity of products or services; and (8) The ability of the predecessor to provide relief. *29 C.F.R. § 825.107(a)*. The regulation further provides that determination of whether or not a successor in interest exists is not determined by the application of any single criterion, but rather the entire circumstances are to be viewed in their totality. *29 C.F.R. § 825.107(b)*. A court should examine these factors from the viewpoint of the employee at or near the time of the change in employer. Though these regulations are not binding on the court, they do provide some guidance in answering the question of successorship.

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Covered Employers

*HN9*[⬚] **Family & Medical Leaves, Covered Employers**

Under the Family Medical Leave Act, when an employer is a "successor in interest," employees' entitlements are the same as if the employment by the predecessor and successor were continuous employment by a single employer. *29 C.F.R. § 825.107(c)*. Thus, a successor employer must continue leave begun while employed by the predecessor, including maintenance of group health benefits during the leave and job restoration at the conclusion of the leave. *29 C.F.R. § 825.107(c)*.

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Restoration of Benefits & Positions

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

*HN10*[⬚] **Family & Medical Leaves, Restoration of Benefits & Positions**

The Family Medical Leave Act (FMLA) provides that an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee. *29 U.S.C.S. § 2612(a)(1)*. The FMLA

further ensures that any eligible employee who takes leave under *29 U.S.C.S. § 2612* for the intended purpose of the leave shall be entitled, on return from such leave--(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. *29 U.S.C.S. § 2614(a)(1)*.

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Restoration of Benefits & Positions

*HN11*[⬚] **Family & Medical Leaves, Restoration of Benefits & Positions**

The regulations interpreting the Family Medical Leave Act (FMLA) state, inter alia, that on return from FMLA leave, if the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA. *29 C.F.R. § 825.214(b)*. Thus, the failure to restore an employee to a position at the end of his allowed leave period does not violate the FMLA if, at the end of that period, the employee remains unable to perform the essential functions of the position. This is the case even if the employer actually terminated the employee before the FMLA leave period expired.

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Restoration of Benefits & Positions

*HN12*[⬚] **Family & Medical Leaves, Restoration of Benefits & Positions**

The Family Medical Leave Act does not require that the employer provide accommodation to an employee to facilitate his return. Rather, the employee must be able to perform the essential functions of the job without accommodation.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Remedies

*HN13*[⬚] **Family & Medical Leaves, Remedies**

2006 U.S. Dist. LEXIS 46077, *46077

An employer who violates the Family Medical Leave Act is not liable for compensatory damages in general; liability is expressly limited to lost compensation and other actual monetary losses. *29 U.S.C.S. § 2617 (a)(1)*.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Remedies

HN14[↧] **Family & Medical Leaves, Remedies**

The Family Medical Leave Act does not provide for nominal damages.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > Discrimination > Disability Discrimination > General Overview

HN15[↧] **Burdens of Proof, Employee Burdens of Proof**

The Americans with Disabilities Act (ADA) prohibits discrimination against a qualified individual with a disability because of the disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. *42 U.S.C.S. § 12112(a)*. In order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > General Overview

HN16[↧] **Scope & Definitions, Disabilities Under ADA**

The Americans with Disabilities Act (ADA) defines "disability" as (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. *42 U.S.C.S. § 12102(2)*. To satisfy the first statutory definition of "disability," a plaintiff must show that he has an impairment; identify the life activity that he claims is limited by the impairment; and prove that the limitation is substantial.

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > Records of Impairments

HN17[↧] **Disabilities Under ADA, Records of Impairments**

For a plaintiff to have a "record of such impairment," he must have a medical history of physical or mental impairment or be misclassified as having such an impairment. *29 C.F.R. § 1630.2(k)*.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Mental & Physical Impairments

HN18[↧] **Mental & Physical Impairments, Mental & Physical Impairments**

Pursuant to *29 C.F.R. § 1630.2(h)*, physical or mental impairment means any physiological disorder or condition affecting one or more of the following body systems: musculoskeletal.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

HN19[↧] **Mental & Physical Impairments, Major Life Activities**

The United States Court of Appeals for the Third Circuit has adopted the EEOC's two-step analysis in determining whether an individual is substantially limited in one or more of the major life activities. 29 C.F.R. pt. 1630, app. *§ 1630.2(j)*. First, the court determines

2006 U.S. Dist. LEXIS 46077, *46077

whether the individual is substantially limited in any major life activity other than working. 29 C.F.R. pt. 1630, app. _§ 1630.2(j)_. If the court finds that the individual is substantially limited in any of these major life activities, the inquiry ends there. On the other hand, if the individual is not so limited, the court's next step is to determine whether the individual is substantially limited in the major life activity of working. 29 C.F.R. pt. 1630, app. _§ 1630.2(j)_. Only extremely limiting disabilities -- in either the short or long-term -- qualify for protected status under the Americans with Disabilities Act.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

_HN20_[⤓]  **Mental & Physical Impairments, Major Life Activities**

Major life activities, other than working, are functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and learning. _29 C.F.R. § 1630.2(I)_. For a plaintiff to be "substantially limited" in his ability to engage in one of these activities, he must be (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner, or duration under which an individual the plaintiff can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. _29 C.F.R. § 1630.2(j)(1)(I)-(ii)_. Factors to be considered in determining whether a plaintiff is substantially limited include: (I) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. _29 C.F.R. § 1630.2(j)(2)(I)-(iii)_.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

_HN21_[⤓]  **Mental & Physical Impairments, Major Life Activities**

"Lifting" and "reaching" are considered major life activities. 29 C.F.R. pt. 1630, app. _§ 1630.2(j)_.

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > General Overview

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

_HN22_[⤓]  **Scope & Definitions, Disabilities Under ADA**

The United States Court of Appeals for the Third Circuit held that an employee's inability to lift more than ten pounds does not constitute a "substantial limitation" on a major life activity as required to establish an Americans with Disabilities Act (ADA) claim. However, the relevant time period of disability for an ADA claim is the period during which the discrimination occurred. _42 U.S.C.S. § 12112(a)_.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

_HN23_[⤓]  **Scope & Definitions, Qualified Individuals With Disabilities**

To state a claim under the Americans with Disabilities Act, a disabled person must show that he was a "qualified individual;" that he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

_HN24_[⤓]  **Scope & Definitions, Qualified Individuals With Disabilities**

A two-part test is used to determine whether an individual with a disability is "qualified." 29 C.F.R. pt. 1630, app. at 368 (2005). First, a court must determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills,

2006 U.S. Dist. LEXIS 46077, *46077

licenses, etc. 29 C.F.R. pt. 1630, app. at 368 (2005). Second, the court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation. 29 C.F.R. pt. 1630, app. at 368 (2005). The purpose of the second step is to ensure that individuals with disabilities who can perform the essential functions of the position held or desired are not denied employment opportunities because they are not able to perform marginal functions of the position. 29 C.F.R. pt. 1630, app. at 368 (2005).

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN25*[↴]  **Scope & Definitions, Qualified Individuals With Disabilities**

The term "essential functions" means the fundamental job duties of the employment position the individual with a disability holds or desires. *29 C.F.R. § 1630.2(n)(1)*. A job function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed. *29 C.F.R. § 1630.2(n)(1)*. Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs. *29 CFR 1630.2 (n)(3)*.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN26*[↴]  **Scope & Definitions, Qualified Individuals With Disabilities**

Under the Americans with Disabilities Act, the plaintiff bears the burden of proving that he is a "qualified individual."

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN27*[↴]  **Scope & Definitions, Qualified Individuals With Disabilities**

The EEOC's Interpretive Guidance indicates that the factors listed in *29 C.F.R. § 1630.2(n)(3)* are only possible types of evidence for determining essential functions. 29 C.F.R. pt. 1630, app. *§ 1630.2(n)*. A task need not meet each factor on the list to be an "essential function."

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN28*[↴]  **Scope & Definitions, Qualified Individuals With Disabilities**

The determination of whether an individual with a disability is qualified to perform the essential functions of a job, with or without reasonable accommodation by the employer, is made at the time of the employment decision, not at the time of the lawsuit.

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

*HN29*[↴]  **Disability Discrimination, Reasonable Accommodations**

Though the Americans with Disabilities Act (ADA) defines the term reasonable accommodation to include "job restructuring," the EEOC regulations interpreting the ADA state that reasonable accommodation means modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position. *29 C.F.R. § 1630.2(o)(1)(ii)*. The regulations state that an employer or other covered entity is not required to reallocate essential functions as a reasonable accommodation. 29 C.F.R. pt. 1630 app. 1630.2(o). Thus, a reasonable accommodation is a change that helps a disabled individual perform the essential functions of the job, not a modification that reinvents the position.

2006 U.S. Dist. LEXIS 46077, *46077

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

**HN30[⤓]  Disability Discrimination, Reasonable Accommodations**

The United States Court of Appeals for the Third Circuit has stated that employers are not required to modify the essential functions of a job in order to accommodate an employee. A request to be exempted from an essential duty is not an accommodation designed to help plaintiff perform the job. Other circuits have more specifically held that eliminating an essential function of the job or reallocating job duties to change the essential functions of a job are not reasonable accommodations under the Americans with Disabilities Act.

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

**HN31[⤓]  Disability Discrimination, Reasonable Accommodations**

Where plaintiffs have sought to lessen their physical duties as a reasonable accommodation for their disability, the courts have not required employers to accommodate their requests where the physical duties were essential to the position.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

**HN32[⤓]  Burdens of Proof, Employee Burdens of Proof**

A plaintiff needs to proffer evidence he suffered an adverse employment decision to prove a prima facie Americans with Disabilities Act claim.

Labor & Employment Law > ... > Disability

Discrimination > Scope & Definitions > General Overview

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

**HN33[⤓]  Disability Discrimination, Scope & Definitions**

Under the Americans with Disabilities Act, an employer may not discriminate against a qualified individual with a disability because of the disability of such an individual in regard to discharge of employees. *42 U.S.C.S. § 12112(a)*.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

**HN34[⤓]  Disability Discrimination, Scope & Definitions**

There is no "successor in interest" language in the Americans with Disabilities Act's definition of employer. *42 U.S.C.S. § 12111(5)*.

**Counsel:** [*1]  For LARRY LOMBARDO, SR., Plaintiff: DAVID DERATZIAN, HAHALIS & KOUNOUPIS, PC, BETHLEHEM, PA.

For AIR PRODUCTS AND CHEMICALS, INC., F/K/A ASHLAND SPECIALTY CORPORATION, Defendant: MICHAEL L. BANKS, MORGAN LEWIS & BOCKIUS LLP, PHILADELPHIA, PA; THERESA J. CHUNG, MORGAN LEWIS & BOCKIUS, PHILADELPHIA, PA.

**Judges:** William H. Yohn, Jr., Judge.

**Opinion by:** William H. Yohn, Jr.

## Opinion

### MEMORANDUM & ORDER

YOHN, J.

Plaintiff Larry Lombardo Sr. brings this lawsuit under the Age Discrimination in Employment Act, *29 U.S.C. § 621 et seq.* ("ADEA"), the Americans with Disabilities Act, *42*

2006 U.S. Dist. LEXIS 46077, *1

U.S.C. § 12101 et seq. ("ADA"), the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 et seq. ("PHRA"), [1] the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), and the state common law for wrongful discharge. Lombardo alleges defendant Air Products and Chemicals Inc., f/k/a Ashland Specialty Corporation ("Air Products"), failed to accommodate a known disability, discharged him because of his age, and retaliated against him for exercising his rights. Presently before the court [*2] is Air Products' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set forth below, I will grant the motion for summary judgment. [2]

[*3] I. FACTUAL BACKGROUND [3]

Larry Lombardo was employed by Ashland Specialty Corporation ("Ashland") from December 8, 1980, through September 2, 2003. Compl. P 24. Beginning in 1999, Lombardo worked as a forklift driver at Ashland's Easton facility, where his job duties included transporting materials and loading and unloading containers and supplies from trailers. Def. Exh. A ("Lombardo Dep.") at 43-4, Def. Exh. L-1.

On May 19, 2003, Lombardo tore his rotator cuff while loading raw materials in an Ashland warehouse. Compl. P 26, Lombardo Dep. 47-49. From May 19, 2003 through July 27, 2003, Lombardo continued to work in a modified position with limited duties for Ashland. [*4]

Compl. P 30, 32. On July 27, 2003, plaintiff began his FMLA leave, [4] which would have expired twelve weeks later, on October 19, 2003. Lombardo Dep. 56. Plaintiff underwent surgery to repair his torn rotator cuff on August 14, 2003. Lombardo Dep. 56-57. While recovering from surgery, plaintiff was unable to return to work at Ashland, even with work restrictions. Lombardo Dep. 83.

Air Products purchased the assets of a division of Ashland, known as the Electronic Materials Business, on August 29, 2003. At that time Air Products began to operate the former Ashland facility in Easton. On August 11, 2003, prior to closing, Air Products sent letters to approximately forty-two Ashland employees, including plaintiff, setting forth conditional offers of employment, contingent upon being [*5] an "active employee" as of the day after closing and successfully completing a drug test. Def. Exh. L-2. In the letter, Air Products offered Lombardo the position of Warehouse Person B. Id. The Warehouse Person B position offered to Lombardo requires an employee to spend one hour per day lifting objects weighing over twenty pounds and to repeatedly reach above his head. Kraft Decl. P 8; Def. Statement of Facts P 18; Pl. Statement of Facts P 18. Lombardo testified that he received a second letter that stated that if an employee was not available for work by September 2, 2003, the employee no longer had a job. Lombardo Dep. 70.

On August 18, 2003, Lombardo went to the Easton facility for a drug test and was unable to enter the facility because his swipe card did not work. Lombardo Dep. 61, 66. However, Lombardo was let into the building by a safety manager and took the drug test. Lombardo Dep. 61. Lombardo was later told by Karl Nolte, the Ashland plant manager, who became Air Products' plant manager, that his swipe card was deactivated in accordance with company procedure. Lombardo Dep. 67.

The workforce at the Easton facility was essentially the same after Air Products' acquisition [*6] as it was under the Ashland regime. Of the forty-two Ashland employees who were offered positions by letter, thirty-nine reported to work on the day after closing and were hired by Air Products. Kraft. Decl. P 6. Air Products extended offers for the Warehouse Person B position,

---

[1] I will not address Lombardo's PHRA claims separately because HN1[↑] courts "generally interpret the PHRA in accord with its federal counterparts." Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) (citation omitted).

[2] Plaintiff concedes that the facts of record as developed during discovery do not support his claims of age discrimination under the ADEA and PHRA. Pl.'s Answer to Def.'s Mot. For Summ. J. P 2. Also, plaintiff did not brief the issues raised by defendants relating to his retaliation and wrongful discharge claims. Id. At oral argument, plaintiff agreed that these claims were not supported by the record and that he did not oppose the motion with regard to the retaliation and wrongful discharge claims. Therefore, summary judgment will be granted with respect to Counts I, III, V, VI, and VIII.

[3] The following account contains undisputed facts and Lombardo's factual allegations because when deciding a motion for summary judgment courts must view all facts and inferences in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[4] Lombardo began receiving workers' compensation benefits four days after he left took leave from Ashland and continued receiving benefits during the "whole period between late 2003 and the summer of 2004." Lombardo Dep. 42, 56.

the same position plaintiff occupied prior to his injury, to three Ashland employees, other than plaintiff. *Id.* These three individuals were active employees on the day after closing and were hired by Air Products. *Id.*

Lombardo did not appear at the Easton facility on September 2, 2003. Sometime within the week after September 2, 2003, Lombardo spoke with Nolte and asked if he was still "an employee there." Lombardo Dep. 67-68. Lombardo states that he called Nolte because of the second letter stating that if he was not available for work by September 2, 2003, he "no longer had a job." *Id.* at 70. Nolte informed Lombardo that he was no longer an employee and that he could come in to clean out his locker. *Id.* at 68. Lombardo did not ask Nolte why he was no longer an employee, whether there were any openings at Air Products, or whether there were any accommodations that could be made for him. **[*7]** *Id.* at 69. At the time of plaintiff's discussion with Nolte he was unable to return to work, even with accommodations. *Id.* at 69. At some point in late August or early September, Nolte allegedly told another Ashland employee, Mike O'Hara, Lombardo's union representative, that Lombardo would not be returning to work because he was "considered a broken asset." Lombardo Dep. 72-3. O'Hara informed Lombardo of Nolte's comment. *Id.* at 73-75. Lombardo did not maintain contact with Air Products with regard to the status of his shoulder and never discussed returning to work with Air Products because he states he was told by Nolte that he no longer had a job. Lombardo Dep. 67-69, Pl. Statement of Facts P 22.

On September 8, 2003, approximately four weeks after the surgery, plaintiff's doctor ordered physical therapy for Lombardo. Def. Exh. L-4, p.4. Plaintiff underwent physical therapy until January 29, 2004. Lombardo Dep. 83-86; Def. Exh. L-4, p. 5.

## II. STANDARD OF REVIEW

*HN2*[↑] A court may only grant a motion for summary judgement, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no **[*8]** genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. Pro. 56(c).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v.*

*John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir. 1996)* (citation omitted).

*HN3*[↑] When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* In addition, "[a]ll justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy, 90 F.3d at 744* (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary **[*9]** judgment." *Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).* The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson, 477 U.S. at 252.* Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citations omitted).

## III. DISCUSSION

### A. FMLA Claim (Count VII)

Plaintiff alleges that Air Products violated his rights under the FMLA, *29 U.S.C. § 2601 et seq. HN4*[↑] Courts have recognized that the FMLA creates two types of claims, an interference claim and a retaliation claim. [5] See *Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 570-71 (M.D. Pa. 2004); Parker v. Hahnemann Univ. Hosp., 234 F. Supp. 2d 478, 485, 487-88 (D.N.J. 2002).* An 'entitlement' or 'interference' theory claim, is based on *29 U.S.C. § 2615(a)(1),* **[*10]** which makes it unlawful for an employer to "interfere with, restrain or deny" an employee's rights under the FMLA. The complaint states that "[b]ecause Plaintiff had

---

[5] *HN5*[↑] A retaliation theory claim under the FMLA "arises under *29 U.S.C. § 2615(a)(2),* which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave." *Bearley, 322 F. Supp. 2d at 571.* Plaintiff, in his complaint, does not allege that Air Products "discharge[d] or in any other manner discriminate[d]" against him "for opposing any practice made unlawful by this title." *29 U.S.C. § 2615(a)(2),* Compl. PP 93-96.

previously utilized less than ten (10) days of Family and Medical leave for a serious medical condition, and because Plaintiff supplied certification from a physician indicating that the condition for which he was terminated was a 'serious health condition,' Defendant knew or should have known that the absences were protected under the Act." Compl. P 95. Interference claims are not about discrimination; "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA - for example, a twelve-week leave or reinstatement after taking a medical leave." *Hodgens v. Gen Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998)*. Thus, Lombardo appears to raise an interference claim.

[*11] *HN6*[⬆] To prove an interference claim, it is the plaintiff's burden to show (1) he was an eligible employee under the FMLA, (2) defendant was an employer subject to the requirements of the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave notice to the defendant of his intention to take FMLA leave, and (5) the defendant was denied benefits to which he was entitled under the FMLA. *Weisman v. Buckingham Twp., No. 04-CV-4719, 2005 U.S. Dist. LEXIS 11696 at *11 (E.D. Pa. June 14, 2005)*, citing *Bearley, 322 F. Supp. 2d at 571*. Air Products argues that Lombardo was not an eligible employee under the FMLA. Def. Br. 17-18. Defendant also claims that even if Lombardo was an eligible employee, Lombardo can not establish that he was denied benefits under the FMLA because he was not capable of returning to work at his prior job at the end of his FMLA leave period. Def. Br. 18-20.

*1. Is Lombardo an "eligible employee"?*

*HN7*[⬆] An "eligible employee" is one "who has been employed for at least 12 months by the employer with respect to whom leave is requested . . . and for at least 1,250 hours of service with such employer during the previous 12-month period. [*12] " *29 U.S.C. § 2611(2)(A)*. "Employer" is defined to include "any successor in interest of an employer." *Id. § 2611(4)(A)(ii)(II)*.

*HN8*[⬆] Although "successor in interest" is not defined in the statute, the Department of Labor regulations provide eight factors that should be considered when evaluating whether an employer is a "successor in interest" for purposes of the FMLA:
(1) Substantial continuity of the same business operations;

(2) Use of the same plant;

(3) Continuity of the work force;

(4) Similarity of jobs and working conditions;

(5) Similarity of supervisory personnel;

(6) Similarity in machinery, equipment, and production methods;

(7) Similarity of products or services; and

(8) The ability of the predecessor to provide relief.

*29 C.F.R. § 825.107(a)*. The regulation further provides that "determination of whether or not a 'successor in interest' exists is not determined by the application of any single criterion, but rather the entire circumstances are to be viewed in their totality." *Id.* at *§ 825.107(b)*. A court should examine these factors from the viewpoint of the [*13] employee "at or near the time of the change in employer." *Vanderhoof v. Life Extension Inst., 988 F. Supp. 507, 513 (D.N.J. 1997)* citing *Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43, 107 S. Ct. 2225, 96 L. Ed. 2d 22 (1987)* (holding that the standards utilized in determining the successor-in-interest question must be interpreted through the employee's viewpoint). Though these regulations are not binding on the court, they do provide some guidance in answering the question of successorship.

Construing the evidence in the light most favorable to the plaintiff, Lombardo has made a sufficient showing from which a reasonable jury could find that Air Products is the successor in interest of his former employer, Ashland. It is undisputed that Air Products acquired a division of Ashland Chemical Company on August 29, 2003. Kraft Decl. P 1. On that day Air Products began to operate the Easton facility where Lombardo was employed. Kraft Decl. P 2. Of the 42 Ashland employees who were members of Lombardo's bargaining unit, 39 continued in the employee of Air Products. Kraft Decl. P 6. Nolte was a supervisor at Ashland and also became a supervisor at Air Products [*14] on the day of the acquisition. Kraft Decl. P 10. The job Lombardo was offered by Air Products, that of Warehouse Person B, would have been essentially identical to the one he had while working for Ashland. Lombardo Dep. 43-44. Based upon a weighing of all of the elements, the court concludes that a jury could find that Air Products was a "successor in interest" to Ashland and thus was Lombardo's employer as

2006 U.S. Dist. LEXIS 46077, *14

contemplated by the FMLA. [6]

*HN9*[⬆] "When an employer is a 'successor in interest,' employees' entitlements are the same as if the employment by the predecessor and successor were continuous employment by a single employer." *29 C.F.R. § 825.107(c)*. Thus, a successor employer, like Air Products, must "continue leave begun while employed by the [*15] predecessor, including maintenance of group health benefits during the leave and job restoration at the conclusion of the leave." *Id.* Therefore, because it is undisputed that Lombardo had worked for Ashland for the requisite twelve months to be protected by the FMLA and a jury could find that Air Products became his employer for purposes of the FMLA upon the acquisition of the Easton facility, Lombardo was an "eligible employee" for summary judgment purposes. *See* Def. Statement of Undisputed Material Facts P 1; Pl.'s Ans. to Def.'s Statement of Undisputed Material Facts P 1.

*2. Was Lombardo denied benefits to which he was entitled?*

*HN10*[⬆] The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *29 U.S.C. § 2612(a)(1)*. The Act further ensures that

> Any eligible employee who takes leave under *section 2612* of this title for the intended purpose of the leave shall be entitled, on return from such leave--
>
> (A) to be restored by the employer [*16] to the position of employment held by the employee when the leave commenced; or
> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

*29 U.S.C. § 2614(a)(1)*.

*HN11*[⬆] The regulations interpreting the FMLA state, inter alia, that on return from FMLA leave, if the "employee is unable to perform an essential function of

the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA." *29 C.F.R. § 825.214(b)*. Thus, the failure to restore an employee to a position at the end of his allowed leave period does not violate the FMLA if, at the end of that period, the employee remains unable to perform the essential functions of the position. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 161 (2d Cir. 1999)*; *see also Cehrs v. Northeast Ohio Alzheimer's Research Ctr., 155 F.3d 775, 785 (6th Cir. 1998)*, *Alifano v. Merck & Co., 175 F. Supp. 2d 792, 796 (E.D. Pa. 2001)* (finding [*17] plaintiff was not qualified for her position and thus did not suffer an adverse employment action under the FMLA where she was unable to perform an essential function of her job upon return from FMLA leave), *Barry v. Wing Mem'l Hosp., 142 F. Supp. 2d 161, 165 (D. Mass. 2001)* ("the employee must be able to return to her prior position before she has a right to reinstatement"). This is the case "even if the employer actually terminated the employee before the FMLA leave period expired, as the plaintiff contends here." *Wilcock v. Nat'l Distribs., Civ. No. 00-298-P-H, 2001 U.S. Dist. LEXIS 11413, *12 (D. Me. Aug. 21, 2001)* citing *Cehrs, 155 F.3d at 784-85*.

It is undisputed that plaintiff began his FMLA leave on July 27, 2003, and that this leave expired twelve weeks later on October 19, 2003. Def. St. of Facts. P 4; Pl. St. of Facts P 4. Lifting and reaching for heavy objects are essential functions of the job at issue. *See infra* Part III.B.3. Air Products claims that Lombardo can not establish he was entitled to reinstatement after taking his medical leave because he was unable to return to work without accommodation as of the end [*18] of his FMLA leave. Def. Br. 18-20. In his brief, plaintiff asserts that he was able to return to work at the end of FMLA leave. Pl. Br. 11. However, it is clear from the record that Lombardo was unable to perform the essential functions of his job as of October 19, 2003 and the evidence provided by the plaintiff, i.e. his deposition testimony and a letter from Dr. Reese, his orthopedist, does not create a question of material fact. *See* Pl. Exh. A; Lombardo Dep. 88. Lombardo's brief asserts "he testified that he would have been released before October 19, but was not since he did not have a job to return to" and "that Dr. Reese would have released him to return to work in October 2003." Pl. Br. 11. However, the passage in the deposition that plaintiff cites to does not contain the cited testimony. *See* Pl. Br. 11, Lombardo Dep. 67. In fact, no where in the deposition transcript provided does Lombardo testify that he would

---

[6] At oral argument, defendant claimed there was a question of fact about whether it qualified as a "successor in interest." However, defendant went on to state that it would assume it was a successor in interest for summary judgment purposes.

have been released for work before October 19, 2003. Instead, while testifying about his January 29, 2004 exam with Dr. Reese, Lombardo stated that he knew Dr. Reese "had wanted me to go back to restricted duty. And I had told him I no longer had a job." Lombardo [*19] Dep. 88. Such testimony does not show that plaintiff was able to perform all of the essential functions of his job before his FMLA leave expired on October 19, 2003.

Dr. Reese's letter also does not create a question of fact as to whether Lombardo could have performed all of the essential functions of his job on October 19, 2003. The letter only supports a claim that Lombardo could have possibly returned to work in some limited capacity prior to March 4, 2004, with no indication as to when this earlier date occurred and whether Lombardo could lift and reach for heavy objects at that time. The letter states:

It is clear from the notes that Mr. Lombardo was unable to work without restrictions. The physical examination revealed significant limitation of motion of the shoulder, and the need for continued physical therapy up until at least March 4, 2004, when note is made of the fact that Mr. Lombardo had reached the point of maximum improvement, and thus, he was able to return to limited duty. Mr. Lombardo did make it plain on March 4, 2004 that his company did not have any position for him to return on a limited basis. Although he was unable to return to full duty prior [*20] to March 4, 2004, it certainly would be my opinion that he would have been able to return to a limited job capacity with certain restrictions regarding the right upper extremity. I was never made aware of any opportunity for him to return to work on a limited basis, and thus, he was certainly not advised to do so.

Pl. Exh. A (emphasis added). Given Dr. Reese's opinion that Lombardo could only have returned in a limited capacity prior to March 4, 2004, it is unreasonable to infer that Lombardo was able to perform all of the essential functions of his job as of October 19, 2003.

The medical records compiled by Dr. Reese show that Lombardo was unable to return to perform all the essential functions of his job as of October 19, 2003. Dr. Reese's notes from October 20, 2003, state that Lombardo's "strength is improving, and he can abduct to 90 degrees. He has a little trouble getting much above that." Def. Exh. L-4, 4. At that time Dr. Reese recommended Lombardo continue with physical

therapy. Id. On January 29, 2004, Dr. Reese noted that Lombardo "can lift a two-pound weight with abduction to 90 degrees." Id. at 5. He also wrote that Lombardo "is unable to return to work [*21] because of his disability at this time but I will see him back here in one month." Id. Thus, if Lombardo was only able to lift two pounds three months after his FMLA leave ended, it is unreasonable to infer he could have performed all of the essential functions of the Warehouse Person B job, including lifting heavy objects weighing over twenty pounds one hour per day and to repeatedly reach above his head, as of October 19, 2003. Dr. Reese first cleared Lombardo for a limited duty position on March 4, 2004. Id.

Even if Lombardo had been able to return to a limited capacity before October 19, 2003, HN12[↑] "[t]he FMLA does not require that the employer provide accommodation to an employee to facilitate [his] return. Rather, the employee must be able to perform the essential functions of the job without accommodation." Fogleman v. Greater Hazleton Health Alliance, 122 Fed. Appx. 581, 587 (3d Cir. 2004), see also Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002) (finding that the district court's jury instruction that "the FMLA does not require an employer to provide a reasonable accommodation to an employee to facilitate his return [*22] to the same or equivalent position at the conclusion of his medical leave, . . . was designed to clarify for the jury the requirements of the FMLA and it did so accurately"), Alifano v. Merck & Co., 175 F. Supp. 2d 792, 795 (E.D. Pa. 2001) ("Unlike the Americans with Disabilities Act (ADA), the FMLA does not require an employer to reasonably accommodate an employee's serious health condition"). Thus, Air Products was not required by the FMLA to accommodate Lombardo's lifting restrictions to facilitate his return from medical leave before October 19, 2003.

In summary, Lombardo's FMLA claim fails because he was not denied a benefit to which he was entitled under the FMLA. The fact that Lombardo was not restored to his position at the end of his FMLA leave did not infringe his FMLA rights because the record shows that at the end of his allowed leave Lombardo remained unable to perform at least one of the essential functions of the Warehouse Person B position and no reasonable jury could conclude otherwise. [7] To the extent that the

---

[7] Lombardo also has no grounds for relief because he lost no pay or benefits for the alleged violation of his FMLA rights. HN13[↑] An employer who violates the FMLA is not liable for

2006 U.S. Dist. LEXIS 46077, *22

record shows Lombardo could have returned to work at the end of his FMLA leave, he could only have done so with some form of accommodation [*23] and the FMLA does not require an employer to make accommodations to facilitate an employee's return from leave. Therefore, Air Products was not obligated by the FMLA to reinstate Lombardo to his same or equivalent position and summary judgment will be granted on this claim in favor of the defendant.

[*24]  B. Disability Discrimination Claims (Counts II and IV)

Plaintiff asserts that Air Products discriminated against him because of his disability in violation of the ADA, 42 U.S.C. § 12101 et seq. in Count II, and the PHRA, 43 Pa. Cons. Stat. § 951 et seq. in Count IV. Lombardo alleges that Air Products "intentionally, knowingly and purposefully violated the [ADA] by invidiously discriminating against the qualified Lombardo who had a disability." Compl. P 78. He claims that despite his disability he was "able to perform all of the essential functions of the position of Warehouse Person B with accommodation," and yet "[d]efendant actually or constructively terminated Plaintiff's employment. Compl. PP 75, 80. He also alleges that defendant "maintained and permitted to be maintained a work environment which was hostile to persons such as Plaintiff who have or are perceived as having a disability." Compl. P 79; see also P 86.

HN15[↑] The ADA prohibits discrimination "against a qualified individual with a disability because of the disability . . . in regard to job application procedures, the hiring, advancement, or discharge [*25] of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §

12112(a). In order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998); see also Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998) (en banc) (citing Gaul).

Air Products contends that Lombardo has not set forth a prima facie case because he has failed to establish that he was ever employed by Air Products or that he suffers from a "disability" as defined by the ADA. Def. Br. 13-16. Defendant also claims that Lombardo was not capable of performing the essential functions of the Warehouse Person B position and he is therefore not a "qualified individual" under the statute. Def. Br. 12-13. The court will [*26] address each of the arguments.

1. Is Lombardo "disabled"?

HN16[↑] The ADA defines "disability" as (1) "a physical or mental impairment that substantially limits one or more of the major life activities of . . . an individual;" (2) "a record of such an impairment; or" (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2). To satisfy the first statutory definition of "disability," [8] a plaintiff must "show that [he] has an impairment; identify the life activity that [he] claims is limited by the impairment; and prove that the limitation is substantial." Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 382 (3d Cir. 2004) citing Bragdon v. Abbott, 524 U.S. 624, 631, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998).

[*27]  Lombardo's rotator cuff injury affected his lifting ability and the use of his arm and therefore constitutes a physical impairment under the ADA. See HN18[↑] 29

---

compensatory damages in general; liability is expressly limited to lost compensation and other actual monetary losses. 29 U.S.C. § 2617(a)(1). Under the FMLA, Lombardo was entitled to twelve weeks unpaid leave. 29 U.S.C. § 2612(a), (c). Thus, he was not denied any compensation from the time of the alleged violation of firing on September 2, 2003, till the end of his FMLA leave. Because plaintiff has no claim for lost wages, he cannot recover liquidated damages or interest. See 29 U.S.C. § 2617(a)(1)(A)(ii)-(iii). Additionally, HN14[↑] the FMLA does not provide for nominal damages, and he is not entitled to any equitable relief. See Walker v. UPS, 240 F.3d 1268, 1270 (10th Cir. 2001) (finding nominal damages are not recoverable under the FMLA because they are not included in FMLA's list of recoverable damages, nor can any of the listed damages be reasonably construed to include nominal damages).

[8] Plaintiff does not meet the second and third definitions of disability. HN17[↑] For a plaintiff to have a "record of such impairment," he must have a medical history of physical or mental impairment or be misclassified as having such an impairment. 29 C.F.R. § 1630.2(k). Lombardo does not allege that he was discriminated against because of his prior medical history or because he was misclassified as disabled. Lombardo also does not claim that his employer regarded him as having a physical or mental impairment that substantially limited his activities though no such impairment existed; Lombardo instead asserts that he was actually impaired by his torn rotator cuff. 29 C.F.R. § 1630.2(l); Lombardo Dep. 22.

Case 3:22-cv-00276-JKM   Document 12   Filed 05/23/22   Page 119 of 169

Page 14 of 18
2006 U.S. Dist. LEXIS 46077, *27

*C.F.R. § 1630.2(h)* ("Physical or mental impairment means . . . [a]ny physiological disorder or condition . . . affecting one or more of the following body systems: . . . musculoskeletal . . ."); *Marinelli v. City of Erie, 216 F.3d 354, 360 (3d Cir. 2000)* (where an accident left plaintiff unable to lift more than ten pounds, plaintiff was found to have a "'condition' that affects his musculoskeletal system" and was therefore physically impaired within the meaning of the ADA).

Air Products argues that Lombardo's impairment does not "substantially limit one or more of the major life activities." *42 U.S.C. § 12102(2).* **HN19**[↑] The Third Circuit has adopted the EEOC's two-step analysis in determining whether an individual is substantially limited in one or more of the major life activities. *Mondzelewski v. Pathmark Stores, 162 F.3d 778, 783-784 (3d Cir. 1998)*; *29 C.F.R. Pt. 1630, App. § 1630.2(j).* First, the court determines whether the individual is substantially limited in any [*28] major life activity other than working. *Id.* "If the court finds that the individual is substantially limited in any of these major life activities, the inquiry ends there. On the other hand, if the individual is not so limited, the court's next step is to determine whether the individual is substantially limited in the major life activity of working." *Id.* "[O]nly extremely limiting disabilities -- in either the short or long-term -- . . . qualify for protected status under the ADA." *Marinelli v. City of Erie, 216 F.3d 354, 362 (3d Cir. 2000)*.

**HN20**[↑] Major life activities, other than working, are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, [and] learning." *29 C.F.R. § 1630.2(h)(2)(i).* For a plaintiff to be "substantially limited" in his ability to engage in one of these activities, he must be "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner, or duration under which an individual [the plaintiff] can perform a particular major life activity as compared to the [*29] condition, manner, or duration under which the average person in the general population can perform that same major life activity." *29 C.F.R. § 1630.2(j)(1)(i)-(ii).* Factors to be considered in determining whether a plaintiff is substantially limited include: "(I) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *29 C.F.R. § 1630.2(j)(2)(i)-(iii).*

The record shows that at the time of the alleged

discrimination a reasonable jury could find that Lombardo's impairment substantially limited a "major life activity." **HN21**[↑] "Lifting" and "reaching" are considered major life activities. *See Marinelli, 216 F.3d at 363*; *29 C.F.R. Pt. 1630, App. § 1630.2(j)* (stating that major life activities include "sitting, standing, lifting and reaching"). Lombardo alleges that the incidents of discrimination took place "[i]n or about September 2, 2003," at which time he was "actually or constructively terminated." Compl. P 80. Lombardo underwent surgery [*30] for his torn rotator cuff on August 14, 2003. Def. Exh. L-4, 3. On September 8, 2003, Dr. Reese, Lombardo's orthopedist, reported that four weeks post operation Lombardo's arm was immobilized in a sling and he was to begin physical therapy. *Id.* at 4. Thus, at the time that Air Products allegedly failed to retain Lombardo, the record shows he was unable to lift or reach for any objects due to the rotator cuff injury. Only on October 20, 2003 do the medical records show Lombardo was first able to reach his arm slightly higher than 90 degrees. *Id.* Lombardo testified that as of January 29, 2004, approximately five months after the alleged discrimination, he was only able to lift a two-pound weight. [9] Lombardo Dep. 85; Def. Exh. L-4, 5. Therefore, because Lombardo's injury substantially limited the major life activities of reaching and lifting, a reasonable jury could find that he was disabled within the meaning of the ADA as of September 2, 2003.

[*31] *2. Is Lombardo a "qualified individual"?*

Defendant also argues that Lombardo can not establish

---

[9] Air Products' argument that Lombardo is not disabled because he can currently lift ten to twenty pounds misses its mark. Pl. Br. 14; Lombardo Dep. 22. In *Marinelli v. City of Erie*, **HN22**[↑] the Third Circuit held that an employee's inability to lift more than ten pounds does not constitute a "substantial limitation" on a major life activity as required to establish an ADA claim. *216 F.3d 354, 364 (3d Cir. 2000).* However, the relevant time period of disability for an ADA claim is the period during which the discrimination occurred. *See 42 U.S.C. § 12112(a).* At the end of August and beginning of September 2003, the time of the alleged discrimination, Lombardo was only weeks post-operative and his arm was immobilized. Exh. L-4, 3-4. He only became able to lift two pounds five months after the alleged discriminatory behavior. Because the record shows that Lombardo was unable to lift anything at the time of the alleged discrimination, the Third Circuit's decision in *Marinelli* does not prevent this court from concluding that a reasonable jury could find that Lombardo was disabled. Lombardo's ability to now lift ten to twenty pounds does not change the fact that he could not do so at the time of the alleged discriminatory action.

2006 U.S. Dist. LEXIS 46077, *31

his claim because he does not meet the second prong of a prima facie case of disability discrimination. Pl. Br. 12. HN23[↑] To state a claim under the ADA, a disabled person must show that he was a "qualified individual;" that he was "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer." *Gaul v. Lucent Techs., 134 F.3d 576, 580 (3d Cir. 1998)*.

HN24[↑] A two-part test is used to determine whether an individual with a disability is "qualified." *29 C.F.R. pt. 1630, App. at 368 (2005)*. First, a court must "determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id*. Second, the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id*. "The purpose of the second step is to ensure that individuals with disabilities who can perform the essential functions of the position held [*32] or desired are not denied employment opportunities because they are not able to perform marginal functions of the position." *Id*.

In the present matter, there is no suggestion Lombardo lacked the requisite experience, skill, or education for the Warehouse Person B position required to meet the first part of the test. The question is whether Lombardo could perform the essential functions of the Warehouse Person B position, with or without reasonable accommodation. HN25[↑] The term "essential functions" means "the fundamental job duties of the employment position the individual with a disability holds or desires." *29 C.F.R. § 1630.2(n)(1)*. A job function "may be essential because of the limited number of employees available among whom the performance of that job function can be distributed." *Id*. Evidence of whether a particular function is essential includes, but is not limited to:

    (i) The employer's judgment as to which functions are essential;
    (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
    (iii) The amount of time spent on the job performing the function;
    (iv) The consequences of not [*33] requiring the incumbent to perform the function;
    (v) The terms of a collective bargaining agreement;
    (vi) The work experience of past incumbents in the job; and/or
    (vii) The current work experience of incumbents in

similar jobs.

*29 CFR 1630.2(n)(3)*.

The record, when juxtaposed against these factors, shows that lifting and reaching for heavy objects are essential functions of the position. Air Products has made it clear that it considers lifting and reaching for objects over twenty pounds an essential function of the job. Kraft Decl. P 8. The written job description for Warehouse Person B includes unloading and loading residue containers and product packaging supplies from trailers as two of the thirteen tasks listed. Def. Exh. L-1. Lombardo does not dispute defendant's evidence. Plaintiff agrees that it may be fairly gleaned from the written job description of "unload from trailers and load onto trailer residue containers" that overhead lifting is an essential function. Pl. Br. 15. It is undisputed that at least one hour each day is spent "lifting objects weighting over 20 pounds" and "engaged in repetitive lifting." Def. St. of Facts, [*34] P 18; Pl. St. of Facts P 18. Lombardo testified that when he worked at Ashland prior to his injury, he was required to lift objects more than twenty pounds or to lift objects over his head, and that he would do so for at least an hour, sometimes longer, during an eight hour shift. Lombardo Dep. 23-24. Lombardo also testified that prior to his injury he routinely unloaded containers weighing at least 50 pounds throughout his shift. Lombardo Dep. 48. It is also undisputed that as of October 2003, there were three individuals employed in the Warehouse Person B position. Def. St. of Facts, P 18; Pl. St. of Facts P 18. Thus, there were a limited number of employees among whom the performance of lifting heavy objects could be distributed. Therefore, the record shows there is no material issue of fact over whether lifting and reaching for heavy objects were essential functions of the Warehouse Person B position.

Plaintiff contends that there is a question of fact as to whether or not lifting overhead is an essential function because defendant has not provided evidence meeting all of the factors listed in *29 C.F.R. § 1630.2(n)(3)*. However, HN26[↑] plaintiff bears the burden [*35] of proving that he is a "qualified individual," and thus providing evidence in support of his argument that lifting and reaching are not essential functions of his job. *Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999)*. Moreover, HN27[↑] the EEOC's Interpretive Guidance indicates that the factors listed in *29 C.F.R. § 1630.2(n)(3)* are only possible types of evidence for determining essential functions. *See 29 C.F.R. pt. 1630,*

*app. § 1630.2(n)*. A task need not meet each factor on the list to be an "essential function." The evidence of record in this case, when viewed in the light most favorable to plaintiff, shows that the tasks at issue meet many of the enumerated factors and no reasonable jury could conclude that lifting and reaching for heavy objects are not essential functions of the Warehouse Person B position.

Given that lifting and reaching are essential functions of the position, the question then becomes whether Lombardo could perform these tasks with or without out reasonable accommodation. *HN28*[⬆] The determination of whether an individual with a disability is qualified to perform the essential functions of [*36] a job, with or without reasonable accommodation by the employer, is made at the time of the employment decision, not at the time of the lawsuit. *Gaul, 134 F.3d at 580*. It is clear from the record that Lombardo was unable to perform the essential functions of the Warehouse Person B position on September 2, 2003, the date of the alleged discriminatory termination. It is undisputed that as of September 8, 2003 Lombardo was unable to return to work in *any* capacity, even with work restrictions. Def. St. of Facts, P 5; Pl. St. of Facts, P 5. Lombardo himself claims only "that he could have returned to work as of October 19, 2003." Pl. St. of Facts, *P7*. Thus, on September 2, 2003, Lombardo could not perform the essential functions of lifting and reaching without some accommodation.

Plaintiff argues there is a genuine issue of material fact regarding his ability to perform the essential functions of the job with a reasonable accommodation. Lombardo claims that he could have returned to work if the essential functions of lifting and reaching were allocated to another employee as a reasonable accommodation. Pl. Br. 15. Defendant claims that the ADA does not extend the [*37] term "reasonable accommodation" to include eliminating an essential function of the position. Defendant argues that it was not required to eliminate the essential functions of lifting and reaching to accommodate plaintiff.

The law supports defendant's view. *HN29*[⬆] Though the ADA defines the term reasonable accommodation to include "job restructuring," the EEOC regulations interpreting the ADA state that reasonable accommodation means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential

functions of that position." *29 C.F.R. § 1630.2(o)(1)(ii)*. The regulations state that "an employer or other covered entity is not required to reallocate essential functions" as a reasonable accommodation. *29 C.F.R. Pt. 1630 App. 1630.2(o)*. Thus, a reasonable accommodation is a change that helps a disabled individual perform the essential functions of the job, not a modification that reinvents the position.

*HN30*[⬆] The Third Circuit has stated that "employers are not required to modify the essential functions [*38] of a job in order to accommodate an employee." *Donahue v. CONRAIL, 224 F.3d 226, 232 (3d Cir. 2000)* (decided under the Rehabilitation Act, *29 U.S.C. § 794*, using the standards applied under the ADA). "A request to be exempted from an essential duty" is "not an accommodation designed to help [plaintiff] perform" the job. *Id*. Other circuits have more specifically held that eliminating an essential function of the job or reallocating job duties to change the essential functions of a job are not reasonable accommodations under the ADA. *See Turco v. Hoechst Celanese Chem. Group, 101 F.3d 1090, 1094 (5th Cir. 1996)* (finding that an accommodation that would result in other employees having to work harder or longer is not a reasonable accommodation under the *ADA.*); *Milton v. Scrivner, Inc., 53 F.3d 1118, 1124-25 (10th Cir. 1995)* ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job. An accommodation that would result in other employees having to work[] harder or longer hours is not required."), *Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991)* [*39] ("'reasonable accommodation' does not mean elimination of any of the job's essential functions."); *Hall v. United States Postal Service, 857 F.2d 1073, 1078 (6th Cir. 1988)* ("an accommodation that eliminates an essential function of the job is not reasonable").

*HN31*[⬆] Where plaintiffs have sought to lessen their physical duties as a reasonable accomodation for their disability, the courts have not required employers to accommodate their requests where the physical duties were essential to the position. *See Rucker v. City of Philadelphia, Civ. No. 94-0364, 1995 U.S. Dist. LEXIS 11104, at *6-8 (E.D. Pa. 1995)* (finding that where plaintiff's back injuries prevented him from performing an essential function of his job, "reasonable accommodation" did not require defendant to eliminate physical requirements of job to accommodate plaintiff since reasonable accommodation does not mean eliminating essential function of job).

2006 U.S. Dist. LEXIS 46077, *39

As stated above, lifting and reaching are essential functions of the Warehouse Person B position. Plaintiff now seeks to have these tasks reallocated to other employees. Eliminating these tasks or reassigning them to other employees was not [*40] required as a 'reasonable accommodation' under the ADA. Such a reassignment of those two responsibilities could not be considered a reasonable accommodation, especially because plaintiff never requested such an accommodation from Air Products prior to bringing this lawsuit and he had not obtained release from his doctor to return to work in any capacity as of September 2, 2003. Lombardo Dep. 68-69. Though Dr. Reese's letter states that Lombardo could have returned to work in a limited job capacity earlier than March 4, 2004, he does not specify on what date Lombardo could have returned or what types of jobs Lombardo could have performed during his continuing recovery. Pl. Exh. A. As Lombardo was not capable of performing the physically demanding aspects of the Warehouse Person B position, he has not demonstrated that he could perform the essential functions of the job with or without reasonable accommodations. Thus, Lombardo is not a "qualified individual" within the meaning of the ADA.

3.  Did Lombardo suffer an adverse employment decision?

Finally, and most importantly of all, HN32[↑] plaintiff needs to proffer evidence he suffered an adverse employment decision to prove a prima [*41] facie ADA claim. Plaintiff asserts that he was "actually or constructively terminated" from employment by Air Products on or about September 2, 2003. Compl. PP 40, 80. Defendant argues that Lombardo was not terminated because it never employed him. Def. Br. 13. HN33[↑] Under the ADA, an employer may not discriminate "against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). However, the record does not show sufficient evidence for a reasonable jury to find that plaintiff was ever employed by Air Products, such that defendant could have fired him.

Plaintiff argues that if he is an employee of Air Products under the FMLA, he is also an employee under the ADA because Air Products was required to hire him back under the FMLA after his FMLA leave ended. But plaintiff states no legal authority to support his argument. The ADA does not contain the successor in interest language of the FMLA. Factually, Air Products was not required to rehire plaintiff even under the FMLA

at the end of his FMLA leave because Lombardo was unable to perform the essential functions of his [*42] job as Warehouse Person B. See supra Part III.A.2. Additionally, plaintiff is considered an employee of Air Products under the FMLA because the FMLA specifically defines "employer" to include "any successor in interest of an employer." 29 U.S.C. § 2611(4)(A)(ii)(II). However HN34[↑] there is no parallel "successor in interest" language in the ADA's definition of employer. [10] See 42 U.S.C. § 12111(5) (defining "employer").

[*43]  Air Products acquired the Easton facility from Ashland as part of a sale of assets on August 29, 2003. Pl. St. of Facts P 13; Def. St. of Facts P 13. When the deal closed, Lombardo did not automatically become an employee of Air Products. For him to become an employee, Air Products had to hire him. In the letter dated August 11, 2003 Air Products offered Lombardo the position of Warehouse Person B, contingent upon his "being an active employee on the day after closing and having successfully completed a controlled substance screening." Def. Exh. L-2. Despite his shoulder injury Lombardo went to the site for a drug test on August 18, 2003. Lombardo Dep. 61. Though the words "active employee" are somewhat ambiguous, Lombardo's shoulder injury did not prevent him from showing up at the Easton facility on September 2, 2003,

_____

[10] "Successor liability" claims do arise under the ADA when a plaintiff attempts to hold a successor company liable for the predecessor company's alleged discriminatory acts. See Rego v. ARC Water Treatment Co. of Pennsylvania, 181 F.3d 396, 401 (3d Cir. 1999) (recognizing that in employment discrimination cases, an aggrieved employee may enforce a claim or judgment against a successor that would have been valid against the predecessor where the assets of the predecessor have been transferred to the successor); See also Brzozowski v. Corr. Physician Servs., 360 F.3d 173, 179 (3d Cir. 2004) ("The doctrine of successor liability is premised on the idea that the creditor cannot obtain satisfaction from the predecessor"); Shevack v. Litton Applied Tech., 95 Civ. 7740, 1998 U.S. Dist. LEXIS 12748 at *7 (S.D.N.Y. Aug. 17,1998) (citations omitted) (granting defendant's summary judgment motion because defendant, a purchaser of assets, had no notice of plaintiff's discrimination claim prior to its dealings with the predecessor-violator). Here, plaintiff argues that he was terminated by Air Products, not Ashland. Plaintiff does not claim that Air Products should be held liable for Ashland's discriminatory acts or that Ashland committed any discriminatory act, and thus there is no successor liability under the ADA.

KIMBERLY BORLAND

[11] or at a minimum, calling in to confirm his employment status. Lombardo never indicated to Air Products on the date designated in the offer letter, September 2, 2003, his intention to accept Air Product's offer of employment. Thus, he was never hired.

**[*44]** Lombardo knew that if he was not available for work on September 2, 2003, he was not hired. He testified that he received a "letter stating that if I wasn't available for work September 2nd, that I no longer had a job." Lombardo Dep. 70. Lombardo did not go to the Easton facility on September 2, 2003 and did not call Nolte, the plant manager, until sometime in the week after September 2, 2003, to discuss this letter. *Id.* Lombardo then asked Nolte if he was employed and Nolte said no. *Id.* at 67-8. Lombardo did not ask Nolte why he was no longer employed, whether there were any other openings at the facility, or whether any accommodations could be made in the future for him to return to work. [12] *Id.* at 68-69. Thus, Lombardo was aware that his offer was contingent upon being available for work on September 2, 2003, and he took no steps on that date or in his conversation with Nolte a week later to indicate that he accepted the offer, so no employment relationship was formed.

**[*45]** In summary, Lombardo's status as an employee of Air Products under the FMLA did not make Lombardo an employee under the ADA. Ashland's sale of the Easton facility to Air Products was a sale of assets and as such Lombardo did not automatically become an employee of Air Products upon closing. The record shows that no reasonable jury could find that Lombardo was ever actually hired by Air Products and thus he was never terminated by the defendant. Accordingly, the plaintiff did not suffer an adverse employment decision.

Defendant's motion for summary judgment on Lombardo's ADA and PHRA claims will be granted. Plaintiff has failed to put forth sufficient evidence to show that he suffered an adverse employment action.

**IV. CONCLUSION**

For the reasons explained above, I will grant Air Products' motion for summary judgment. An appropriate order follows.

**ORDER**

AND NOW, this __ day of July, 2006, upon consideration of defendant Air Products' motion for summary judgment (Doc. No. 7), plaintiff Larry Lombardo's response, and Air Products' reply, and after oral argument, it is hereby ORDERED that defendant's motion for summary judgment is GRANTED and judgment is **[*46]** ENTERED in favor of defendant Air Products and Chemicals Inc. and against plaintiff Larry Lombardo.

/s William H. Yohn, Jr., Judge

---

End of Document

---

[11] Air Product's purchase of assets closed on August 29, 2003. The first business day after the closing was September 2, 2003.

[12] Lombardo also testified that he never called Air Products or Nolte to ask for his job back once he was able to work. Lombardo Dep. 71-73.

KIMBERLY BORLAND

No *Shepard's* Signal™
As of: May 20, 2022 3:33 PM Z

## *Mejias v. C&S Wholesale Grocers, Inc.*

United States District Court for the Eastern District of Pennsylvania

July 14, 2020, Decided; July 14, 2020, Filed

No. 5:20-cv-1435

**Reporter**
2020 U.S. Dist. LEXIS 123690 *

KENNETH MEJIAS, Plaintiff, v. C&S WHOLESALE GROCERS, INC., Defendant.

**Counsel:** [*1] For KENNETH MEJIAS, Plaintiff: REBECCA E. MITCHELL, LEAD ATTORNEY, DAVID DERATZIAN, HAHALIS & KOUNOUPIS, P.C., BETHLEHEM, PA.

For C&S WHOLESALE GROCERS, INC., Defendant: CYNTHIA B. MORGAN, MICHAEL J. FORTUNATO, LEAD ATTORNEYS, RUBIN FORTUNATO & HARBISON PC, PAOLI, PA.

**Judges:** JOSEPH F. LEESON, JR., United States District Judge.

**Opinion by:** JOSEPH F. LEESON, JR.

# Opinion

**Defendant's Motion to Dismiss the Amended Complaint for Failure to State a Claim, CF No. 10— GRANTED, in part, and DENIED, in part**

**Joseph F. Leeson, Jr.**

**United States District Judge**

## I. INTRODUCTION

This case involves allegations of disability-based discrimination and retaliatory practices. Plaintiff Kenneth Mejias ("Mejias") was an employee of Defendant C&S Wholesale Grocers ("C&S"), located in Bethlehem, Pennsylvania. Mejias claims he was fired because of a disability and his exercise of rights and benefits under the *Americans with Disabilities Act ("ADA")* and *Family Medical Leave Act ("FMLA")*. He has filed suit against C&S asserting claims of: (1) discrimination under the ADA; (2) retaliation under the ADA; (3) failure to

accommodate under the ADA; (4) hostile work environment under the ADA; (5) interference[1] under the FMLA; and (6) retaliation under the **[*2]** FMLA.

Before this Court is C&S' motion to dismiss for failure to state a claim in response to Mejias' Amended Complaint. For the following reasons, the motion is granted as to Mejias' ADA hostile work environment claim and an FMLA interference claims, and denied as to all other claims.

## II. BACKGROUND

### A. Factual Allegations[2]

Mejias was hired by C&S as an order "picker" at its Bethlehem location, on or about August 31, 2011. Plaintiff's Amended Complaint ("Am. Compl."), ECF No. 8, ¶ 20. On or about July 14, 2018, Mejias was involved in a motorcycle accident that led to serious injuries. *Id.* ¶ 22. Mejias' injuries limit him in one or more life activities, including lifting, carrying, standing, and walking. *Id.* ¶ 23. Mejias is also limited in the usage of his shoulder. *Id.* ¶

---

[1] As explained in further detail below, it is unclear whether Mejias is truly raising this claim.

[2] These facts are taken from the Amended Complaint and accepted as true, with all reasonable inferences drawn in Mejias' favor. *See Lundy v. Monroe Cty. Dist. Attorney's Office, No. 3:17-CV-2255, 2017 U.S. Dist. LEXIS 204146, 2017 WL 9362911, at *1 (M.D. Pa. Dec. 11, 2017)*, report and recommendation adopted, *2018 U.S. Dist. LEXIS 81349, 2018 WL 2219033 (M.D. Pa. May 15, 2018)*. Except where necessary for context, the Court's recitation of the allegations of the Amended Complaint does not include conclusory assertions or legal contentions, neither of which need be considered by the Court in determining the viability of Mejias' claims. *See Brown v. Kaiser Found. Health Plan of Mid-Atl. States, Inc., No. 1:19-CV-1190, 2019 U.S. Dist. LEXIS 221471, 2019 WL 7281928, at *2 (M.D. Pa. Dec. 27, 2019)*.

26.

Following the motorcycle accident, Mejias returned to work on November 1,2018. *Id.* ¶ 28. At the time C&S had a "warm-up" program, where employees returning from medical leave could perform their jobs for a fixed hourly rate, instead of the normal incentive-based payment plan used **[*3]** by the company. *Id.* ¶ 30. Mejias opted for a "warm-up" period as a picker, so he could ease into the physical demands of the job. *Id.* ¶¶ 31-32. At this time he continued to have issues with the use of his shoulder and was more limited in this respect than members of the general public. *Id.* ¶ 29. C&S denied Mejias' request to participate in the "warm-up" program and instead assigned him to work as a trainer, which resulted in a $12/hour decrease in pay. *Id.* ¶¶ 33-34. However, C&S still expected Mejias to perform duties associated with the order picker position, and without just compensation. *Id.* ¶ 35. Mejias viewed this as a failure to accommodate his request, because he continued to act as an order picker for C&S. *Id.*

When Mejias requested to return to his old order picker position, supervising employees for C&S categorized Mejias as a "liability," and denied his request. *Id.* ¶¶ 36-39. At various times between November 2018 and March 2019, Mejias complained to C&S management that he felt he was being treated differently by the company since his accident, and that he feared C&S was looking to "get rid of him." *Id.* ¶ 40. These claims were never investigated by C&S. *Id.* ¶ 41. Mejias also **[*4]** complained on various occasions of issues he was having with a coworker, to which C&S also failed to respond and/or investigate. *Id.* ¶ 43.

On February 24, 2019, Mejias was assaulted by this coworker, and he responded in a manner of self defense. *Id.* ¶ 42. Mejias contends that C&S had never fired an employee for a physical altercation in which he or she was defending him or herself. *Id.* ¶ 45. However, on March 3, 2019, C&S terminated Mejias. *Id.* ¶ 44.

**B. Procedural Background**

Mejias commenced this action on March 16, 2020. ECF No. 1. C&S responded with a motion to dismiss on April 6, 2020. ECF No. 5. On April 27, 2020, Mejias filed an Amended Complaint in response to C&S's motion to dismiss. ECF No. 8. Currently, before this Court is C&S's second motion to dismiss for failure to state a claim upon which relief can be granted, which was filed on May 11, 2020. ECF No. 10.

**III. LEGAL STANDARD**

In bringing a motion to dismiss for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, the burden is on the defendant to demonstrate that the plaintiff has failed to state a claim upon which relief can be granted. *See Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)* (citing *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*). The plaintiff has only stated a plausible claim if "the '[f] actual allegations ... raise **[*5]** a right to relief above the speculative level.'" *Phillips v. Cty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

In deciding a motion to dismiss, this Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips, 515 F.3d at 233* (quoting *Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)*) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft, 556 U.S. at 678* (explaining that determining "whether a complaint states a plausible claim for relief... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

**IV. ANALYSIS**

As noted, Mejias brings six claims: (1) discrimination under the ADA; (2) retaliation under the ADA; (3) failure to accommodate under the ADA; (4) hostile work environment under the ADA; (5) interference under the FMLA; and (6) retaliation under the FMLA. C&S argues that Mejias fails to establish the prima facie elements of disability-based discrimination required to survive a **[*6]** *Rule 12(b)(6)* motion to dismiss.

At the outset, it is worth noting that with respect to certain claims brought under the ADA and FMLA, a plaintiff need not plead the prima facie elements to survive a motion to dismiss. *See Dreibelbis v. Cnty. of Berks, No. 5:19-cv-4946, 2020 U.S. Dist. LEXIS 21142,*

*2020 WL 605884, at *7 (E.D. Pa. Feb. 7, 2020)*. In *Dreibelbis v. Cnty. of Berks*, this Court explained why claims of ADA and FMLA discrimination and retaliation only require facial plausibility. *See Dreibelbis, 2020 U.S. Dist. LEXIS 21142, 2020 WL 605884, at *6* (explaining that "the plaintiff '[is] not required to plead a prima facie case in order to survive a motion to dismiss.'" (quoting *Kelly v. H.D. Supply Holdings, Inc., No. CIV. 14-372, 2014 U.S. Dist. LEXIS 154711, 2014 WL 5512251, at *3 (D.N.J. 2014)*)); *see Swierkiewicz v. Sorema N. A, 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (explaining that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case" of employment discrimination). For a claim to be "facially plausible," it must be the case that the allegations state "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the claim's] necessary element[s]" *Dreibelbis, 2020 U.S. Dist. LEXIS 21142, 2020 WL 605884, at *7* (quoting *Connelly v. Lane Const. Corp., 809 F.3d 780, 789 (3d Cir. 2016)*). As in *Dreibelbis*, Mejias "need not plead all of the prima facie elements of a discrimination [or retaliation] claim 'because those elements may not be required at trial.'"[3]*Dreibelbis, 2020 U.S. Dist. LEXIS 21142, 2020 WL 605884, at *7* (quoting *Kelly, 2014 U.S. Dist. LEXIS 154711, 2014 WL 5512251, at *4*). C&S is therefore incorrect [*7] to the extent it argues that Mejias must plead prima facie discrimination.

**A. Discrimination Under the ADA**

As discussed above, Mejias is not required to plead the prima facie elements of an ADA discrimination claim; rather, he need only plead facts raising a reasonable expectation that discovery would lead to information capable of satisfying those elements. The Court therefore looks to those elements for guidance. The prima facie elements of an ADA discrimination claim require a plaintiff to allege that he is"(l) disabled within the meaning of the ADA, (2) can perform essential functions of his job with or without reasonable accommodation, and (3) suffered an adverse employment action as a result of his disability." *Drummer v. Trustees of Univ. of Pennsylvania, 286 F. Supp. 3d 674, 682 (E.D. Pa. 2017)* (citing *Shaner v.*

*Synthes, 204 F.3d 494, 500 (3d Cir. 2000)*); *Gaul v. Lucent Technologies, Inc., 134 F.3d 576 (3d Cir. 1998)*.

The ADA prohibits employers from discriminating against qualified individuals "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*. Under the ADA, a disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; [*8] (B) a record of such an impairment; or (C) being regarded as having such an impairment." *42 U.S.C. § 12102(2)*. A qualified individual is anyone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*. As is relevant here, "termination is an adverse employment action." *Bossi v. Bank of Am., No. 3:14-CV-02301, 2016 U.S. Dist. LEXIS 110885, 2016 WL 4446444, at *3 (M.D. Pa. Aug. 19, 2016)*.

C&S' primary contention with respect to Mejias' ADA discrimination claim is that Mejias has failed to adequately plead that he suffered from a disability at the time of his termination. The Court disagrees. Mejias makes clear that he suffered some physical injury as a result of his motorcycle accident which left him unable to perform his order picker obligations. Mejias references limitations to his ability to walk or carry certain items, as well as limitations in the use of his shoulder following his motorcycle accident. *See* Am. Compl. ¶ 23. Although these allegations are somewhat thin, in the Court's view they are sufficient at this stage of the litigation. They state that Mejias suffered "a physical... impairment that substantially limit[ed] one or more [of his] major life activities." *42 U.S.C. § 12102(2)*. Moreover, Mejias [*9] alleges that he informed C&S of that fact. *See* Am. Compl. ¶ 23.

With respect to the other elements of Mejias' ADA discrimination claim—that he was a "qualified individual" and that he suffered an "adverse employment action"— the Court is satisfied that Mejias' allegations are sufficient to put C&S on notice and to indicate that discovery can reasonably be expected to lead to information capable of satisfying these elements. *See* Am. Compl. ¶ 27 (alleging that Mejias was capable of satisfying the duties of a picker after the accident with an accommodation), *id.* ¶ 49 (alleging that he suffered the adverse employment action of termination). For the above reasons, Mejias' ADA discrimination claim

---

[3] This is because if a discrimination plaintiff "is able to produce *direct* evidence of discrimination, he may prevail [at trial] without proving all the elements of a prima facie case." *Swierkiewicz, 534 U.S. at 511* (emphasis added).

KIMBERLY BORLAND

2020 U.S. Dist. LEXIS 123690, *9

survives C&S' motion to dismiss.

## B. Retaliation Under the ADA

For the same reasons he is not required to plead a prima facie claim of discrimination, Mejias is not required to plead the prima facie elements of an ADA retaliation claim. *See Dreibelbis, 2020 U.S. Dist. LEXIS 21142, 2020 WL 605884, at \*11 n.23.* Nonetheless, the Court is satisfied that he has done so here.

"A prima facie claim of retaliation under the ADA requires allegations that (1) a plaintiff be engaged in a 'protected activity,' (2) the plaintiff be subjected to an adverse employment action by the [*10] County, and (3) a causal connection between the protected activity and the adverse employment action exists." *Dreibelbis, 2020 U.S. Dist. LEXIS 21142, 2020 WL 605884, at \* 11* (citing *Monaco v. Limestone Veterinary Hosp., 152 F. Supp. 3d 253, 263 (D. Del. 2016)*). Under the ADA, seeking an accommodation is a "protected activity." *Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010)*. Additionally, for purposes of retaliation, a person need not be a "qualified individual" with a disability, as defined by the ADA, in order to bring a claim. *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 498 (3d Cir. 1997)*.

Mejias has satisfied his pleading burden here: He has alleged that he was engaged in a protected activity, *i.e.*, he sought an accommodation for his disability—the "warm up" period, Am. Compl. ¶ 31; that he suffered an adverse employment action, *i.e.*, he was terminated, *id.* ¶ 44; and that a causal relationship between the two existed, *see id.* ¶ 46. This claim therefore survives C&S' motion to dismiss.

## C. Failure to Accommodate Under the ADA

Mejias' Amended Complaint appears to assert an ADA "failure to accommodate" claim. *See, e.g.,* Am. Compl. ¶¶ 46, 47, 61. While acknowledging that this claim is unclear in Mejias' Amended Complaint, C&S nonetheless moves to dismiss it. *See* Def.'s Mem., ECF No. 10, at 10-11.

Under the ADA, an employer must "reasonably accommodate an employee's disability." *Sube v. Cty. of Allentown, 974 F. Supp. 2d 754, 764 (E.D. Pa. 2013)* (citing *Williams v. Philadelphia Hous. Auth. Police Dept., 380 F.3d 751, 761 (3d Cir. 2004)*). Reasonable

accommodations can take various [*11] forms, such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations." *42 U.S.C. § 12111(9)*. "Moreover, an employer's failure to engage, in good faith, in an interactive process to determine whether an accommodation can reasonably be made for a disabled employee constitutes prohibited discrimination." *Sube, 974 F. Supp. 2d at 765* (citing *Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 311-12 (3d Cir. 1999)*).

In order to state a claim for failure to accommodate under the ADA, a plaintiff must allege: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor, 184 F.3d at 319-20* (citations omitted).

Here, Mejias has stated the prima facie elements of his failure to accommodate claim. He alleges that C&S knew about his disability, Am. Compl. ¶ 23; that he requested an accommodation, [*12] *id.* 131; that C&S did not make a good faith effort to accommodate him, *id.* ¶ 33; and that he could have reasonably been accommodated, *id.* ¶ 27. Specifically, Mejias put C&S on notice of his disability by requesting FMLA leave. *Id.* ¶ 23. He requested the company-wide "warm-up" period as an accommodation to his disability. *Id.* ¶ 31. And in reassigning Mejias to a new position without discussion rather than allowing a "warm-up" period in his former position or engaging in an interactive process, C&S did not make a good faith effort to accommodate him.[4] *Id.* ¶ 33.

In the Court's view, Mejias has sufficiently pleaded facts to state the prima facie elements of his failure to accommodate claim. Consequently, his failure to accommodate claim survives C&S' motion to dismiss.

---

[4] C&S argues that placing Mejias in a different role was a reasonable accommodation to ease him back into the physical demands of his job. Def.'s Mem. at 12. This is a factual issue that the Court does not resolve at this stage of the litigation.

## D. Hostile Work Environment Under the ADA

C&S does not address Mejias' claim of a hostile work environment under the ADA. This is most likely because Mejias does not make clear in his Amended Complaint that he is bringing such a claim. To the extent there exists a hostile work environment claim, it is hidden within "Count I - Violation of the ADA." Am. Compl. ¶ 61. In view of the "liberal" pleading standard under the Federal Rules of [*13] Civil Procedure, especially in cases of employment discrimination, the Court in its discretion construes Mejias' Amended Complaint to be asserting an ADA hostile work environment claim. See _Dreibelbis, 2020 U.S. Dist. LEXIS 21142, 2020 WL 605884, at *11_ (citing _Evancho v. Fisher, 423 F.3d 347, 352 (3d Cir. 2005)_); see _Swierkiewicz, 534 U.S. at 511._

"Although the Third Circuit has not definitely decided whether a hostile work environment cause of action exists under the ADA, it has presumed the existence of such a claim, and numerous district courts in this circuit have concluded that such claims are actionable under the ADA." _Mercer v. Se. Pa. Transit Auth., 26 F. Supp. 3d 432, 443 n.5 (E.D. Pa. 2014)_, aff'd sub nom. _Mercer v. SEPTA, 608 F. App'x 60 (3d Cir. 2015)._ To state a claim under the ADA for a hostile work environment, an employee must allege "that he suffered intentional discrimination because of his disability; the discrimination was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment'; the discrimination detrimentally affected him; and it would have detrimentally affected a reasonable person in his position." _Mercer, 26 F. Supp. 3d at 443_ (quoting _Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999)_ (collecting cases)).

Importantly, workplace conduct must be viewed in its entirety. In examining alleged "severe or pervasive" hostility in a workplace, the court must "'look[ ] at all the circumstances,' including the 'frequency of the discriminatory conduct; [*14] its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" _Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)_ (quoting _Faragher v. Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)_ (quotation omitted)). Comments made in jest, or isolated incidents "will not amount to discriminatory changes in the 'terms and conditions of employment.'" _Clark Cty. Sch. Dist, 532 U.S. at 271_ (quoting _Faragher, 524 U.S. at 788_).

Mejias' allegations do not rise to the level of "severe and pervasive" as required to plead a hostile work environment claim under the ADA. A single instance of workplace discord is not enough to constitute a hostile work environment.[5] As a result, Mejias' hostile work environment claim fails.

## E. Claims Under the FMLA

"The FMLA contains two relatively distinct types of provisions. First, it creates a series of prescriptive substantive rights for eligible employees, often referred to as the 'entitlement' or 'interference' provisions which set floors for employer conduct." _Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)_ (citing _29 U.S.C. §§ 2612(a)(1)(D), 2614(a)(1)_). "Additionally, the FMLA provides protection against discrimination based on the exercise of these rights, often referred to as the 'discrimination' or 'retaliation' provisions." _Callison, 430 F.3d at 119_ (citing _29 U.S.C. § 2615(a)_).

### 1. FMLA Interference

When employees invoke rights granted under the [*15] FMLA, employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights." _Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012)_ (citing _29 U.S.C. § 2615(a)(1)_). To state a claim of "interference" under the FMLA, a plaintiff must allege that:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

_Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014)_ (quoting _Johnson v. Cmty. Coll. of Allegheny Cnty., 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008)_). Stated simply, in order to assert a viable interference claim, an "employee merely needs to show [he] was entitled to benefits under the FMLA and that [he] was denied them." _Hofferica v. St. Mary Med. Ctr., 817 F. Supp. 2d_

---

[5] Mejias' allegations on this point appear to be limited to supervising members of C&S considering Mejias to be a "liability." Am. Compl. ¶ 37.

2020 U.S. Dist. LEXIS 123690, *15

*569, 576 (E.D. Pa. 2011)* (quoting *Thurston v. Cherry Hill Triplex, 941 F. Supp. 2d 520, 2008 WL 9374284, at *11 (D.N.J. 2008)*).

Although C&S seems to accept that Mejias is pleading a claim of FMLA interference, *see* Def.'s Mem. at 7, it is less than clear to the Court that he is doing so. Nevertheless, the Court is satisfied that any such claim fails for the simple reason that there are no allegations in the Amended Complaint that C&S interfered with any of Mejias' rights *under the FMLA*.

Critically, neither being denied a reasonable accommodation under the ADA, nor [*16] being the target of discrimination after requesting and receiving FMLA leave—the only two possible bases for a claim here—constitute a denial of FMLA benefits. *See Ross, 755 F.3d at 192* ("Although Ross argues that his termination and the Addendum to his PIP—actions which were taken after his FMLA leave—amount to a denial of FMLA benefits, we have made it plain that, for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld.... Ross's argument that Gilhuly interfered with his entitlement to take FMLA leave free from later discrimination confuses interference with retaliation and is thus misdirected.").

Moreover, Mejias' allegation that C&S "interfered with entitlements guaranteed to Plaintiff by the FMLA and discriminated against him because he had requested and used FMLA leave," Am. Compl. ¶ 68, fatally undermines any interference claim, as it concedes that he in fact requested and received FMLA leave. Therefore, in the absence of any allegation to the contrary, there can be no inference that he was denied FMLA leave.

Based on the above, any FMLA interference claim contained in the Amended Complaint fails to survive C&S' motion to dismiss.

### 2. FMLA Retaliation [*17]

For reasons already discussed, Mejias does not need to allege the prima facie elements of retaliation under the FMLA. However, they serve as guideposts. "To establish a prima facie case of retaliation under the FMLA, an employee must prove that '(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.'"

*Caplan v. L Brands/Victoria's Secret Stores, LLC, 210 F. Supp. 3d 744, 759 (W.D. Pa. 2016)* (quoting *Lichtenstein, 691 F.3d at 301-02*), *aff'd sub nom. Caplan v. L Brands/Victoria's Secret Stores, 704 F. App'x 152 (3d Cir. 2017)*.

Unlike his FMLA interference claim, Mejias has sufficiently pleaded an FMLA retaliation claim. He alleges that he invoked his FMLA right to leave, Am. Compl. ¶23; suffered an adverse employment action through his termination, *id.* ¶ 44; and that his termination was a direct result of his request for and taking of FMLA leave, *id.* ¶ 49. Mejias has therefore sufficiently put C&S on notice of the basis for his retaliation claim, and, in the Court's view, pleaded facts that could reasonably be expected to lead to further discovery of a causal relationship between Mejias' requesting of FMLA leave and his termination. This claim survives C&S' motion to dismiss.

### V. CONCLUSION

For the reasons discussed herein, C&S' *Rule 12(b)(6)* motion to dismiss is granted as [*18] to Mejias' claims of hostile work environment under the ADA and interference under the FMLA, and denied as to his claims of discrimination, retaliation, and failure to accommodate under the ADA, as well as his claim of retaliation under the FMLA.

A separate Order follows this Opinion.

BY THE COURT:

/s/ Joseph F. Leeson, Jr.

JOSEPH F. LEESON, JR.

United States District Judge

### ORDER

**AND NOW**, this 14th day of July, 2020, upon consideration of Defendant's Motion to Dismiss the Amended Complaint, *see* ECF No. 10, for the reasons stated in the Opinion issued this date, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion to Dismiss, ECF No. 10, is **GRANTED, in part, and DENIED, in part.**

2. The Motion is granted with respect to Plaintiff's claims for hostile work environment under the ADA

2020 U.S. Dist. LEXIS 123690, *18

and interference under the FMLA. These claims are
**DISMISSED, with prejudice.**
3. The Motion is denied as to all other claims.

BY THE COURT:

*/s/Joseph F. Leeson, Jr.*

JOSEPH F. LEESON, JR.

United States District Judge

**End of Document**

 Positive

As of: May 21, 2022 4:06 PM Z

# *Morris v. Phila. Hous. Auth.*

United States District Court for the Eastern District of Pennsylvania

April 28, 2011, Decided; April 28, 2011, Filed

CIVIL ACTION NO. 10-5431

**Reporter**

2011 U.S. Dist. LEXIS 46465 *

VINCENT MORRIS, Plaintiff, v. PHILADELPHIA HOUSING AUTHORITY, et al., Defendants.

**Subsequent History:** Complaint dismissed at, Motion granted by *Morris v. Phila. Hous. Auth., 2011 U.S. Dist. LEXIS 84270 (E.D. Pa., July 29, 2011)*

## Case Summary

**Overview**

A former employee filed claims under *42 U.S.C.S. § 1983* and Pennsylvania's Whistle-blower Law, *43 Pa. Stat. Ann. §§ 1421 - 1428*, against a public housing authority and its officials. He claimed that he discovered two officials directed the use of funds for lobbying efforts in contravention of federal law. Each time he complained about these activities, the officials and others reacted with rage, retaliation, and threats of termination. He further alleged that all the officials conspired to constructively terminate him. The court found that certain allegations by the employee were insufficient.

**Outcome**

Motions to dismiss were granted in part and denied in part. The employee was granted leave to amend his complaint.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN1*[⬇] **Motions to Dismiss, Failure to State Claim**

In deciding a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court must accept as true all well-***pleaded*** factual allegations and must construe them in the light most favorable to the non-moving party.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > ***Pleadings*** > Complaints > Requirements for Complaint

*HN2*[⬇] **Motions to Dismiss, Failure to State Claim**

A three-pronged approach has been established for all civil actions: first, a court must identify the elements the plaintiff must ***plead*** to state a claim; second, the court asks whether the complaint sets forth factual allegations or conclusory statements; third, if the complaint sets forth factual allegations, the court must assume their veracity and draw reasonable inferences in favor of the non-moving party, but then must determine whether the factual allegations plausibly give rise to an entitlement to relief. For the second step, the court should separate the factual and legal elements of the claims, must accept the well-***pleaded*** facts as true, and may disregard any legal conclusions.

Civil Procedure > ... > ***Pleadings*** > Complaints > Requirements for Complaint

Civil Rights Law > Protection of Rights > Procedural Matters > General Overview

*HN3*[⬇] **Complaints, Requirements for Complaint**

2011 U.S. Dist. LEXIS 46465, *46465

The Third Circuit holds that the complaint in a civil rights case is subject to the liberal notice **_pleading_** standard of _Fed. R. Civ. P. 8(a)_.

Civil Procedure > ... > **_Pleadings_** > Complaints > Requirements for Complaint

### HN4[⤓]  Complaints, Requirements for Complaint

Notice **_pleading_** is still the rule, because _Fed. R. Civ. P. 8(a)_ is still in effect, but the concept of notice **_pleading_** has changed — and must be accompanied by either factual or legal assertions satisfying the elements of the claims made. In other words, notice **_pleading_** now requires notice of at least those facts necessary to raise an inference that a plaintiff has a claim. Thus, **_pleading_** a civil rights claim may require fewer factual allegations than **_pleading_** an antitrust conspiracy or other complex business dispute.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > **_Pleadings_** > Complaints > Requirements for Complaint

### HN5[⤓]  Motions to Dismiss, Failure to State Claim

To state a claim, a plaintiff must allege circumstances with enough factual matter to suggest the required claim exists. This does not impose a probability requirement at the **_pleading_** stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the claims. A claim has facial plausibility when the plaintiff **_pleads_** factual content that allows a court to reasonably infer that the defendant is liable for the misconduct alleged.

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Evidence > Burdens of Proof > Allocation

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Evidence > Burdens of Proof > Burden Shifting

### HN6[⤓]  Protection of Rights, Section 1983 Actions

The Third Circuit employs a three-step burden-shifting approach for evaluating a public employee's _42 U.S.C.S. § 1983_ claim of retaliation for engaging in protected activity under the _First Amendment_. Under this approach: (1) the employee must demonstrate that his/her speech is protected, that is, it addresses a matter of public concern and the employee's interest in the speech outweighs the employer's countervailing interest in promoting workplace efficiency and avoiding workplace disruption; (2) the employee must prove that his/her speech was a substantial or motivating factor in the retaliatory action against him/her, which, if proven; (3) shifts the burden to the employer to prove that the allegedly retaliatory action would have been taken absent the protected speech.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

### HN7[⤓]  Freedom of Speech, Public Employees

When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for _First Amendment_ purposes, and the Constitution does not insulate their communications from employer discipline.

Civil Procedure > ... > **_Pleadings_** > Complaints > Requirements for Complaint

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Evidence > Burdens of Proof > Allocation

Constitutional Law > ... > Fundamental
Freedoms > Freedom of Speech > Scope

Evidence > Burdens of Proof > Burden Shifting

### HN8[⬇] Complaints, Requirements for Complaint

The second step in the burden-shifting approach for
evaluating a public employee's _42 U.S.C.S. § 1983_
claim of retaliation for engaging in protected activity
under the _First Amendment_ consists of two parts: (1) the
alleged retaliation must be sufficient to deter a person of
ordinary firmness from exercising _First Amendment_
rights; and (2) there must be a causal connection
between the speech and the retaliation, i.e. the speech
was a substantial or motivating factor. The employee
can show the requisite causal connection through (1) an
unusually suggestive temporal proximity between the
speech and the adverse employment action; (2) a
pattern of antagonism coupled with timing; or (3) an
inference of causation gleaned from the record as a
whole. The employee must also allege that the
decisionmakers for the adverse action were aware of
the allegedly-protected conduct.

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

Civil Procedure > ... > _Pleadings_ > Amendment of
_Pleadings_ > General Overview

Civil
Procedure > ... > _Pleadings_ > Complaints > General Overview

### HN9[⬇] Motions to Dismiss, Failure to State Claim

It is axiomatic that a complaint may not be amended by
the briefs in opposition to a motion to dismiss.

Civil Rights Law > Protection of Rights > Section
1983 Actions > Scope

Evidence > Burdens of Proof > Allocation

### HN10[⬇] Protection of Rights, Section 1983 Actions

A _42 U.S.C.S. § 1983_ plaintiff must show each
defendant's personal involvement in alleged violations.

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

Torts > ... > Concerted Action > Civil
Conspiracy > Elements

Civil
Procedure > ... > _Pleadings_ > Complaints > Requirements for Complaint

### HN11[⬇] Motions to Dismiss, Failure to State Claim

To survive a motion to dismiss a conspiracy claim, a
plaintiff must allege facts allowing an inference of
combination, agreement, or understanding among all or
between any defendants to violate the plaintiff's rights.
Allegations of fact such as the period of the conspiracy,
the object of the conspiracy, and actions of the
conspirators taken to achieve that purpose are
necessary. A mere incantation of the words "conspiracy"
or "acted in concert" does not talismanically satisfy the
_pleading_ requirements for facts to support a conspiracy
claim.

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

### HN12[⬇] Motions to Dismiss, Failure to State Claim

A court cannot consider materials outside the _pleadings_
on a motion to dismiss under _Fed. R. Civ. P. 12(b)(6)_.

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

Civil
Procedure > ... > _Pleadings_ > Complaints > Requirements for Complaint

Civil Procedure > Discovery & Disclosure > General
Overview

### HN13[⬇] Motions to Dismiss, Failure to State Claim

If a plaintiff cannot make sufficient factual allegations to

Case 3:22-cv-00276-JKM  Document 12  Filed 05/23/22  Page 134 of 169

Page 4 of 9
2011 U.S. Dist. LEXIS 46465, *46465

survive a motion to dismiss, he is not entitled to discovery. The plausibility standard calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the claims.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > General Overview

HN14[↴]  **Statute of Limitations, Time Limitations**

The Pennsylvania Whistle-blower Law, _43 Pa. Stat. Ann. §§ 1421 - 1428_, imposes a 180-day statute of limitations for civil actions filed pursuant to its provisions. _43 Pa. Stat. Ann. § 1424(a)._

**Counsel:** **[*1]** For VINCENT MORRIS, Plaintiff: L. KENNETH CHOTINER, LEAD ATTORNEY, THE CHOTINER FIRM, PHILADELPHIA, PA; MICHAEL PILEGGI, LEAD ATTORNEY, LAW OFFICE OF MICHAEL PILEGGI, PHILADELPHIA, PA.

For THE PHILADELPHIA HOUSING AUTHORITY, Defendant: MICHAEL ANTHONY BOWMAN, LEAD ATTORNEY, CHARLES MATTHEW GIBBS, BOWMAN KAVULICH, LTD., PHILADELPHIA, PA.

For PHA-TENANT SUPPORT SERVICES, INC., GLORIA REDD, (individually and in her official capacity), Defendants: JOSEPH ZAFFARESE, LEAD ATTORNEY, ANGELA HALIM, AHMAD & ZAFFARESE LLC, PHILADELPHIA, PA; GEOFFREY PAUL HULING, WHITE AND WILLIAMS, PHILA, PA.

For CARL GREENE, (individually and in his official capacity), ASIA CONEY, (individually and in her official capacity), Defendants: CLIFFORD E. HAINES, LAUREN CATES, LEAD ATTORNEYS, HOLLIE B. KNOX, HAINES & ASSOCIATES, PHILADELPHIA, PA.

For DIANE ROSENTHAL, (individually and in her official capacity), Defendant: KAITLIN M. PICCOLO, RONALD H. LEVINE, SIDNEY R. STEINBERG, LEAD ATTORNEYS POST & SCHELL PC, PHILADELPHIA, PA.

For CAROLYN CARTER, (individually and in her official capacity), NELLIE REYNOLDS, (individually and in her official capacity), Defendants: AMY B. CARVER, LEAD ATTORNEY, WELSH RECKER PC, PHILADELPHIA,

**[*2]** PA; CATHERINE M. RECKER, LEAD ATTORNEY, WELSH & RECKER, P.C., PHILADELPHIA, PA.

For LINDA STALEY, (individually and in her official capacity), Defendant: ALAN B. EPSTEIN, LEAD ATTORNEY, JOHN T. ASHER, III, SPECTOR GADON & ROSEN, PC, PHILADELPHIA, PA; JENNIFER L. MYER, SPECTOR, GADON & ROSEN, PC, PHILA, PA.

**Judges:** Michael M. Baylson, United States District Judge.

**Opinion by:** Michael M. Baylson

# Opinion

**Baylson, J.**

**MEMORANDUM ON MOTIONS TO DISMISS**

Plaintiff Vincent Morris filed claims under _42 U.S.C. § 1983_ and Pennsylvania's Whistleblower Law, _43 Pa. Stat. Ann. §§ 1421-28_ (the "PWL"), against the Philadelphia Housing Authority ("PHA"), PHA Tenant Support Services, Inc. ("TSSI"), Carl Greene, Asia Coney, Diane Rosenthal, Carolyn Carter, Nellie Reynolds, Linda Staley, Gloria Redd, and John Does Number 1-10. (Compl., ECF No. 1.) Plaintiff is a former high ranking employee of PHA. Defendants, for the most part, filed separate motions to dismiss [1] asserting various grounds for dismissal, including insufficient **_pleading_**. Defendants' Motions to Dismiss require analysis of how the Supreme Court's decisions in Twombly and Iqbal impact on **_pleadings_** in civil rights cases, particularly because those decisions do not overrule seemingly **[*3]** contrary prior Supreme Court precedent.

After a review of Plaintiff's Complaint and the Defendants' Motions to Dismiss, the Court will **grant in part** and **deny in part** Defendants' Motions, and will

---

[1] Staley (ECF No. 42), Carter (ECF No. 45), Rosenthal (ECF No. 46), and Greene (ECF No. 53) filed separate Motions to Dismiss. Reynolds filed together with PHA (ECF No. 43) and Coney and Redd filed with TSSI (ECF No. 44). Plaintiff filed a response to Greene's Motion (ECF No. 54) and an omnibus response to all other Defendants' Motions (Omnibus Resp., ECF No. 49.) Staley, Reynolds, and PHA then filed replies (ECF Nos. 50, 51) and the Court granted Plaintiff leave to file an omnibus sur-reply (ECF No. 52).

2011 U.S. Dist. LEXIS 46465, *3

grant Plaintiff leave to file an Amended Complaint. The Court reserves decision on certain other legal arguments made by Defendants until Plaintiff has amended his Complaint. [2]

## I. Factual Background

According to relevant allegations in the Complaint, Plaintiff served as PHA Executive Director Carl Greene's Executive Assistant from 1999 [*4] until his resignation in 2010. (Compl. ¶ 2.) In paragraphs 20 to 23 of his Complaint, Plaintiff asserts that PHA, as directed by Defendants Greene and Coney, abused federal funds granted to PHA under the "Moving to Work Demonstration Program," which the U.S. Department of Housing and Urban Development had funded. According to Plaintiff, the Program prohibited PHA "from using any federal funds for lobbying activity or to influence or attempt to influence the awarding of any federal contract." Certifications to HUD were required. Plaintiff contends that he discovered Greene and Coney directed the use of PHA funds for lobbying efforts in contravention of federal law. (Id. ¶¶ 2, 29-31.) He also alleges that sometime in 2007, while forced to serve as the treasurer of Equity PAC, [3] he discovered discrepancies in its records and refused to sign a Pennsylvania-required certification that no federal funds were used for political purposes. (Id. ¶¶ 1, 32-33.) Each time he complained regarding these activities, he contends Greene, Coney, and "others" reacted with "rage," "retaliation," and threats of termination. (Id. ¶¶ 2, 30-31, 33.)

Plaintiff further alleges that all the individual Defendants conspired to constructively terminate him by demoting and transferring him to a position that paid $30,000 less than his position at the time. (Id. ¶¶ 5, 34.) He does not allege when these acts took place other than the refusal to sign in 2007 and his resignation in 2010. He does not allege any conduct in which the individual Defendants engaged, other than some facts alleged as to Greene and Coney. Plaintiff does not identify any other dates, including the date of his alleged constructive termination.

With regard to the other individual Defendants, Plaintiff identifies their positions at PHA or TSSI and contends they are responsible for ensuring compliance with federal, state, and local laws and regulations. (Id. ¶¶ 11-16.) Otherwise, he alleges, in the most conclusory language, they conspired to deprive Plaintiff of his rights under the First and Fourteenth Amendments. (Id. ¶ 5.)

## II. Jurisdiction and Standard of Review

The Court has jurisdiction over Plaintiff's § 1983 claims pursuant to 28 U.S.C. § 1331 and his state-law claim pursuant to 28 U.S.C. § 1367.

HN1[↑] In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), [*6] the court must accept as true all well-**pleaded** factual allegations and must construe them in the light most favorable to the non-moving party. Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).

The Third Circuit has addressed the effect of the Supreme Court's most recent **pleading**-standard decisions, Twombly v. Bell Atlantic Corp., 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and Ashcroft v. Iqbal, 129 S.Ct. 1937, 173 L. Ed. 2d 868(2009). See Phillips, 515 F.3d at 233-34. HN2[↑] Twombly established a three-pronged approach for all civil actions: first, the court must identify the elements Plaintiff must **plead** to state a claim; second, the court asks whether the complaint sets forth factual allegations or conclusory statements; third, if the complaint sets forth factual allegations, the court must assume their veracity and draw reasonable inferences in favor of the non-moving party, but then must determine whether the factual allegations plausibly give rise to an entitlement to relief. Santiago v. Warminster Twp.. 629 F.3d 121, 130 & n.7 (3d Cir. 2010); see Iqbal 129 S.Ct. at 1950, 1953. For the second step, the court should separate the factual and legal elements of the claims, must accept the well-**pleaded** facts as true, [*7] and may disregard any legal conclusions. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

District Court Judges have experienced difficulty in interpreting the Supreme Court's intent in Twombly and Iqbal. Particularly in the civil rights **context**, in Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, the Supreme Court specifically held that notice **pleading** under Rule 8 was proper. 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993). The difficulty in following Leatherman is that its holding

---

[2] The Court is aware that there are several other pending cases in this District, which implicate similar legal issues, and will pay heed to how those cases proceed.

[3] Equity PAC is a political action committee that Coney directs. [*5] (Compl. ¶ 2.)

appears to be significantly undermined by _Iqbal_, yet _Leatherman_ is not cited in either the majority or dissenting opinions of _Iqbal_, Further, before _Twombly_ and _Iqbal_, _HN3_[⬆] the Third Circuit expressly held that the complaint in a civil rights case is subject to the liberal notice **pleading** standard of _Rule 8(a)_. See _Evancho v. Fisher, 423 F.3d 347, 352 (3d Cir. 2005)_. The Third Circuit has not yet issued a precedential opinion squaring its holding in _Evancho_ with those of _Twombly_ and _Iqbal_, but it did discuss the implications of _Twombly_ in _Phillips_, a _§ 1983_ case. See _Phillips, 515 F.3d at 230-35_.

The undersigned, formerly a member of the Advisory Committee on Civil Rules, knows that many practitioners [*8] and judges share in the confusion resulting from _Iqbal_'s seemingly strong requirement of factual **pleadings** in the absence of any specific overruling of prior cases allowing traditional notice **pleading**. The Court concludes that _HN4_[⬆] notice **pleading** is still the rule, because _Rule 8_ is still in effect, but that the concept of notice **pleading** has changed — and must be accompanied by either factual or legal assertions satisfying the elements of the claims made. See _id. at 234_. In other words, "notice **pleading**" now requires "notice" of at least those facts necessary to raise an inference that Plaintiff has a claim. See _id. at 234-35_ (concluding _Rule 8_ requires "some showing sufficient to justify moving the case beyond the **pleadings** to the next stage of litigation").

Nevertheless, it is "true that judging the sufficiency of a **pleading** is a **context**-dependent exercise. Some claims require more factual explication than others to state a plausible claim for relief." _W. Penn Allegheny Health Sys. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010)_ (reversing district court's application of heightened scrutiny in antitrust **context**) (citations omitted). Thus, **pleading** a civil rights claim may require fewer factual [*9] allegations than **pleading** an antitrust conspiracy or other complex business dispute. Cf _id._ (suggesting a claim for simple assault may require fewer factual allegations than a claim for an antitrust conspiracy).

_HN5_[⬆] To state a claim, a plaintiff must allege circumstances with enough factual matter to suggest the required claim exists. _Phillips, 515 F.3d at 234_. This does not impose a probability requirement at the **pleading** stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the claims, _Iqbal, 129 S. Ct. at 1949_; _Phillips, 515 F.3d at 234_. A claim has facial plausibility when the plaintiff

**pleads** factual content that allows the court to reasonably infer that the defendant is liable for the misconduct alleged. _Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009)_.

### III. Section 1983 Claims

_HN6_[⬆] The Third Circuit employs a three-step burden-shifting approach for evaluating a public employee's _§ 1983_ claim of retaliation for engaging in protected activity under the _First Amendment_. See _Reilly v. City of Atlantic City, 532 F.3d 216, 224 (3d Cir. 2008)_. Under this approach:

> "(1) the employee [*10] must demonstrate that his/her speech is protected, that is, it addresses a matter of public concern and the 'employee's interest in the speech outweighs' the employer's countervailing interest' in promoting workplace efficiency and avoiding workplace disruption' (i.e., the balancing test established in _Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)_); (2) the employee must prove that his/her speech was 'a substantial or motivating factor' in the retaliatory action against him/her, which, if proven; (3) shifts the burden to the employer to prove that the 'allegedly retaliatory action would have been taken absent the protected [speech].'"

_Id._

Although the Court should apply a liberal interpretation to the **pleadings** of a civil rights plaintiff to facilitate individuals litigating alleged deprivations of constitutional rights in Federal Court, the Court cannot ignore the requirements of _Iqbal_. A clear requirement of Plaintiffs _§ 1983_ claim is that his speech was protected, which requires Plaintiff to satisfy the elements set forth above in _Reilly_. However, Plaintiff has failed to allege any facts to raise a plausible inference that his alleged speech is protected. In _Garcetti v. Ceballos_, [*11] the Supreme Court held that _HN7_[⬆] "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for _First Amendment_ purposes, and the Constitution does not insulate their communications from employer discipline." _547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)_. This is a "practical" and "nuanced" question of law and fact. See _Foraker v. Chaffinch, 501 F.3d 231, 239, 240 & n.7 (3d Cir. 2007)_ (citing _Garcetti, 547 U.S. at 424_). Plaintiff should consider, assuming he

Case 3:22-cv-00276-JKM   Document 12   Filed 05/23/22   Page 137 of 169

Page 7 of 9
2011 U.S. Dist. LEXIS 46465, *11

is going to amend his Complaint, alleging such facts as identifying the content of his alleged speech, the **_context_**, the audience, the impetus, or the timing, all of which would give notice to Defendants, and which will raise a plausible inference that his speech is protected. Plaintiff only alleges that he complained to Green, Coney, and "others" of certain conduct, and that those complaints were met with "rage" and "retaliation." (See Compl. ¶¶ 29-33.)

Nor has Plaintiff alleged sufficient facts to show a causal connection between his alleged speech and constructive termination. _HN8_[⬆] The second step in the burden-shifting approach consists of two parts: (1) the alleged retaliation must be sufficient to [*12] deter a person of ordinary firmness from exercising _First Amendment_ rights, and (2) there must be a causal connection between the speech and the retaliation, i.e. the speech was a substantial or motivating factor. See _Revell v. City of Jersey City, 394 F. App'x 903, 906 (3d Cir. 2010)_. The employee can show the requisite causal connection through (1) an unusually suggestive temporal proximity between the speech and the adverse employment action, (2) a pattern of antagonism coupled with timing, or (3) an inference of causation gleaned from the record as a whole. _Id._; see _Gladysiewski v. Allegheny Energy, 398 F. App'x 721, 723-24 (3d Cir. 2010)_. Plaintiff must also allege that the decision-makers for the adverse action were aware of the allegedly-protected conduct. _Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002)_.

Plaintiff's Complaint is deficient with regard to causation. There is no identification of dates, or at least of events taking place in a certain sequence and proximity that led to the Plaintiff's alleged constructive termination. The Court does not suggest that Plaintiff must **_plead_** every specific fact in his Amended Complaint, but he must make general factual or [*13] legal allegations to satisfy these new **_pleading_** standards. In Plaintiff's "Omnibus Response" he does identify some dates, but this discussion in a brief is not part of a **_pleading_**. See _Pennsylvania ex rel. Zimmerman v. Pepsico. Inc., 836 F.2d 173, 181 (3d Cir. 1988)_ (_HN9_[⬆]) "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quotations omitted). Nor are there any factual allegations to suggest a pattern of antagonism because Plaintiff only alleges that each individual complaint was met with "rage" and "retaliation." (See Compl. ¶¶ 29-33.)

Plaintiff has chosen to sue a large number of people. Although he does allege some specific facts as to

Greene and Coney, he fails to allege how the other Defendants were personally involved in the alleged retaliatory acts. See _Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)_ (stating _HN10_[⬆]) _§ 1983_ plaintiff must show each defendant's personal involvement in alleged violations). Plaintiff can satisfy this requirement with factual allegations of direct participation, personal direction, or knowing acquiescence in the retaliatory conduct. See _Santiago, 629 F.3d at 129_; _Rode, 845 F.2d at 1207_. Plaintiff [*14] has offered no factual allegations to show the other Defendants' personal involvement in the retaliatory acts. He offers broad and conclusory allegations that when he complained to Greene, Coney, and "others," they reacted with "rage" and "retaliation." Otherwise, he contends the remaining Defendants are responsible for ensuring compliance with federal, state, and local laws, but nothing in his Complaint suggests they participated, directed, or were even aware of his speech or the alleged retaliation. Allegations that "others" retaliated are not enough. [4]

Further, his conclusory assertion that Defendants "conspired" to retaliate against him is not sufficient. Other Judges in this Court have held, _HN11_[⬆] to survive a motion to dismiss a conspiracy claim, Plaintiff must allege facts allowing an inference of combination, agreement, or understanding among all or between any defendants to violate the plaintiff's rights. _Gerhart v. Pennsylvania, No. 09-1145, 2009 U.S. Dist. LEXIS 73842, 2009 WL 2581715, at *6 (E.D. Pa. Aug. 13, 2009)_ (Golden, [*15] J.). Allegations of fact such as the period of the conspiracy, the object of the conspiracy, and actions of the conspirators taken to achieve that purpose are necessary. "A mere incantation of the words 'conspiracy' or 'acted in concert' does not talismanically satisfy the **_pleading_** requirements for [facts to support] a conspiracy claim." _Kost v. Dep't of Pub. Welfare, No. 07-2404, 2009 U.S. Dist. LEXIS 14874, 2009 WL 466166, at *4 (E.D. Pa. Feb. 24, 2009)_ (Jones II, J.). In his Complaint, Plaintiff merely invokes the terms "conspiracy" and "acted in concert," but it is clear these alone are insufficient to survive a motion to dismiss.

In addition, several Defendants argue that Plaintiff asserted a _Fourteenth Amendment_ Due Process claim in his Complaint; however, Plaintiff disavows making

---

[4] If after further investigation Plaintiff is unable to allege each Defendant's personal involvement, Plaintiff should re-consider the propriety of asserting claims against those Defendants.

any such claim. (Omnibus Resp. § II.B.) Presumably, Plaintiff cites the _Fourteenth Amendment_, quite properly, for the proposition that the _First Amendment_ applies to state actors through the _Fourteenth Amendment_. Plaintiff should amend his Complaint to clarify which claims he is making.

Finally, Plaintiff relies on a PHA internal report to argue that a policy or custom exists to justify his _Monell_ claims. He also contends that discovery **[*16]** will reveal sufficient facts to support his claims. First, _HN12_[⬆] the Court cannot consider materials outside the **pleadings** on a motion to dismiss under _Rule 12(b)(6)_ and, therefore, excludes the internal report. See _Fed. R. Civ. P. 12(d)_. Second, _HN13_[⬆] if Plaintiff cannot make sufficient factual allegations to survive a motion to dismiss, he is not entitled to discovery. The plausibility standard calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the claims. _Iqbal, 129 S. Ct. at 1949_; _Phillips, 515 F.3d at 234_. Plaintiff's Complaint in its current form does not raise this reasonable expectation.

#### IV. Pennsylvania Whistleblower Law

Defendants assert two arguments for dismissing Plaintiff's PWL claim: (1) the Complaint does not identify the date of his constructive discharge and may be barred by the PWL's 180-day statute of limitations, and (2) Plaintiff does not allege a causal connection between his alleged reports and his constructive termination.

_HN14_[⬆] The PWL imposes a 180-day statute of limitations for civil actions filed pursuant to its provisions. See _43 Pa. Stat. Ann. § 1424(a)_. Plaintiff filed his Complaint on October 14, 2010, **[*17]** so any alleged retaliatory acts within the preceding 180 days are actionable. Plaintiff, however, assigns no dates to the alleged retaliation he suffered — not for the alleged "rage" and "retaliation" after each report nor for his constructive termination. Although he clarified the date of his resignation in his Omnibus Response, that is not the proper means of amending a complaint. See _Zimmerman, 836 F.2d at 181_. Plaintiff must set forth the dates of the alleged retaliatory acts in his Amended Complaint.

Further, to make out a prima facie case under the PWL, a plaintiff must allege facts or surrounding circumstances that his report led to the prohibited

retaliation, such as he was specifically directed or informed not to report or that there would be adverse consequences if he made the report. _Golaschevsky v. Dep't of Envtl. Prot., 554 Pa. 157, 720 A.2d 757, 759 (Pa. 1998)_; see _O'Rourke v. Dep't of Corr., 566 Pa. 161, 778 A.2d 1194, 1200 (Pa. 2001)_(stating plaintiff must come forward with some evidence of a connection between the report and the alleged retaliation). Plaintiff cannot rely on vague and inconclusive circumstantial evidence. See _Golaschevsky, 720 A.2d at 759_.

Plaintiff failed to make such factual **[*18]** allegations in his Complaint. He does not allege the content of his claims (to allow the Court to determine whether they are protected by the PWL), or the **context** in which he made the claims, including to whom, when, and how. Further, he has failed to allege any concrete facts or surrounding circumstances to show a causal connection between the report and the alleged retaliation. He does not identify who took what action when, or whether there were any preceding instructions, admonitions, or warnings. Although Plaintiff cannot rely on vague and inconclusive circumstantial evidence, he does not even offer allegations of that quality. [5]

#### V. Conclusion

For the foregoing reasons, the Court will **grant in part** and deny **in part** Defendants' Motions to Dismiss. Plaintiff is granted leave to amend his Complaint in conformity with this Memorandum within twenty-one (21) days. The Court reserves decision on all other grounds for dismissal until that time.

An appropriate Order will follow.

#### ORDER

AND NOW, on this **[*19]** 28th day of April, 2011, upon careful consideration of Defendants' Motions to Dismiss (ECF Nos. 42-46, 53), and the parties' briefing, it is hereby ORDERED as follows:

    1. Defendants' Motions are GRANTED in part, and DENIED in part, in accordance with the accompanying Memorandum.

    2. Plaintiff Vincent Morris is granted leave to file an

---

[5] If after further investigation Plaintiff is unable to make such allegations as to each Defendant, Plaintiff should re-consider the propriety of asserting a PWL claim against those Defendants.

2011 U.S. Dist. LEXIS 46465, *19

amended complaint within twenty-one (21) days of this Order to cure the deficiencies identified in the accompanying Memorandum.

BY THE COURT:

/s/ Michael M. Baylson

Michael M. Baylson, U.S.D.J.

**End of Document**

🛈 Cited
As of: May 22, 2022 4:34 PM Z

## *Sylvester v. DGMB Casino, LLC*

United States District Court for the District of New Jersey, Camden Vicinage

September 6, 2017, Decided; September 6, 2017, Filed

Civil No. 15-8328 (RMB/KMW)

**Reporter**
2017 U.S. Dist. LEXIS 143920 *; 2017 WL 3894964

DEBRA L. SYLVESTER, Plaintiff, v. DGMB CASINO, LLC d/b/a RESORTS CASINO HOTEL, et al., Defendants.

**Counsel:** [*1] For Debra L. Sylvester, Plaintiff: Zachary R. Wall, Esq., Wall & London LLC, Haddonfield, NJ.

For DGMB Casino, LLC, d/b/a Resorts Casino Hotel, Defendant: Russell L. Lichtenstein, Esq., Stephanie E. Farrell, Esq., Cooper Levenson, PA, Atlantic City, NJ.

**Judges:** RENÉE MARIE BUMB, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RENÉE MARIE BUMB

# Opinion

[Docket No. 16]

**OPINION**

**BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court upon the Motion for Summary Judgment [Docket No. 16] by Defendant DGMB Casino, LLC d/b/a Resorts Casino Hotel (the "Defendant" or "Resorts"), seeking the dismissal of the above-captioned matter brought by Plaintiff Debra L. Sylvester (the "Plaintiff") in its entirety. Having considered the parties' submissions and for the reasons set forth below, the Court grants, in part, and denies, in part, Defendant's motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was hired as a dual rate dealer by Resorts Casino Hotel, owned at the time by Defendant's predecessor entity, on or about September 26, 2005. Pl.

Dep. Tr. 25:18-26:1, Def. MSJ Ex. A [Docket No. 16-3]. In 2010, once ownership of the Resorts Casino Hotel was transferred to Defendant, all employees of Resorts Casino Hotel, including [*2] Plaintiff, were required to reapply for their positions. Plaintiff was rehired by Defendant in late 2010. Id. 27:12-28:22. As a dual rate dealer, Plaintiff worked some shifts as a dealer and others as a supervisor. Id. 26:5-22. Plaintiff received satisfactory work performance evaluations throughout her employment and was never disciplined. Def. MSJ Ex. H [Docket No. 16-3]; Pl. Dep. Tr. 118:16-20. On occasion, Plaintiff received commendations based upon positive customer feedback. Pl. Opp. Exs. 4-7 [Docket No. 18-5].

In late August 2015, Plaintiff sought medical treatment for back pain at Atlantic County Family Spine and Rehabilitation Center. Pl. Dep. Tr. 71:1-20; Pl. Opp. Ex. 8 [Docket No. 18-5]. Plaintiff's medical and chiropractic records note back pain, lumbar spondylosis, and facet osteoarthritis. Pl. Opp. Ex. 8. Thereafter, on September 12, 2015, Plaintiff requested and obtained FMLA leave paperwork from Defendant's human resources office. Plaintiff testified that she went to the human resources office, told the human resources representative her name and department and asked for the paperwork for FMLA leave. Pl. Dep. Tr. 57:6-58:13. Plaintiff did not have to fill out any forms [*3] to obtain the FMLA leave paperwork; she "just went and asked for it." Id. 69:10-14. Plaintiff does not know the name or position of the person she spoke with and cannot describe the person. Id. 58:3-19. She did not provide the individual with a doctor's note or indicate why she needed the FMLA paperwork. Id. 58:20-25. Indeed, Plaintiff does not know whether anyone at Resorts was aware that she had a disability. Id. 59:1-3.

There is no evidence that the individual in human resources who gave Plaintiff the blank FMLA leave paperwork recorded Plaintiff's name or request. See id. 69:16-18. Importantly, Barbara Hulsizer, Defendant's Executive Director of Workforce Development,

explained that, pursuant to Defendant's policies, an employee may request an FMLA application packet from the human resources office, but that the office does not ask for or record the employee's name or job title. Hulsizer Dep. Tr. 86:1-24, Def. MSJ Ex. E [Docket No. 16-3].

Plaintiff then took the FMLA leave application paperwork to her chiropractor to complete. She believes she gave the paperwork to her chiropractor before September 22, 2015, but cannot recall the exact date. Pl. Dep. Tr. 125:25-127:1. On September [*4] 23, 2015, Plaintiff's healthcare provider completed the FMLA leave application form, indicating that Plaintiff required chiropractic treatment twice a week for cervical and lumbar spine pain and that Plaintiff would be unable to work during pain flare-ups that may occur one to two times per month for a day or two at a time. Pl. Opp. Ex. 9 [Docket No. 18-5]. Plaintiff never submitted the completed FMLA leave paperwork to Defendant. Pl. Dep. Tr. 69:19-70:2; 109:19-24. Moreover, and significantly, Plaintiff admits that she did not tell anyone at Resorts about her request for FMLA leave. Id. 138:23-139:3.

On or about September 18, 2015, Resorts announced a new customer service initiative called "GET it!" and a training session in connection with the initiative. Def. MSJ Ex. C [Docket No. 16-3]. Plaintiff became aware of the training session via a memo that was placed in the gaming pit where she worked. Pl. Dep. Tr. 41:3-24; Def. MSJ Ex. C. The memo advised employees that the training session would be facilitated by the human resources team and would last approximately three hours. Def. MSJ Ex. C. It also advised employees to be "prepared to do the hula, impersonate Elvis, dance to YMCA, [*5] and many, many more exciting things!" Id. Plaintiff was required to attend the training session on September 22, 2015. Pl. Dep. Tr. 40:11-23; 69:1-3.

The training session on September 22, 2015 involved several team building and icebreaker activities, as well as presentations regarding customer service. These included activities involving nametags, a beach ball, a hula hoop, and blindfolds. The nametag activity, for example, required the attendees to write the name of their first pet and the street on which they lived on a nametag, instead of their real name. Pl. Dep. Tr. 49:2-4. The beach ball activity involved passing around a beach ball and, depending on the color that the participant's thumb landed on, the participant had to answer a question or do a task. Id. 49:4-8. Another activity involved two teams leading blindfolded participants

through an obstacle course set up with small cones. Id. 52:2-13. This activity only required a small number of attendees to participate. Plaintiff was not amongst the participants. Id. 52:18-53:2. Finally, the hula hoop activity involved several people balancing a hula hoop on their fingers and getting it down to the ground. Id. 53:13-19.

According [*6] to Plaintiff, she participated fully in both the nametag and beach ball activities. Id. 49:16-50:17. Plaintiff testified that she wrote the words "Rex" and "Center Street," the names of her pet and street, respectively, on her nametag as part of the nametag activity. Id. 133:3-17. As part of the beach ball activity, Plaintiff was asked her favorite quote, to which she honestly responded that she does not have one. Id. 50:2-17. Plaintiff testified that she participated in the hula hoop activity to the best of her ability, but that she was prevented from fully participating due to back pain. Id. 53:1322; 54:5-12; 116:15-24; 136:25-137:8. Notably, Plaintiff did not inform anyone that she was unable to participate in the training because of pain or disability. Id. 55:2-8; 97:5-23. According to Plaintiff, she was cooperative throughout the training and did not make any negative comments. Id. 134:1-13.

Ms. Hulsizer, however, had a different impression of Plaintiff's participation during the training session. She observed Plaintiff to be "inflexible, uncooperative, [and] unwilling to participate." Hulsizer Dep. Tr. 72:10-15. According to Ms. Hulsizer, who also attended the training session, [*7] Plaintiff did not wear a nametag during the nametag activity and was uncooperative during the beach ball activity. During the beach ball activity, Ms. Hulsizer saw Plaintiff scowling and telling her coworker that she did not want to participate in the activity. Id. 74:4-14. Ms. Hulsizer testified that Plaintiff did not want to answer questions as part of the activity and described the process as "like pulling teeth." Id. 74:15-75:1. As to the hula hoop activity, Ms. Hulsizer heard Plaintiff state that she did not want to participate in the activity, but noted that she eventually did. Id. 75:1-9. Overall, in Ms. Hulsizer's view, Plaintiff's demeanor and conduct during the activity was rude and uncooperative. Id.

Approximately fifteen minutes before the training session ended, Plaintiff and another employee stood up to leave. Pl. Dep. Tr. 55:18-21. Plaintiff stated that she needed to leave because her shift was beginning shortly and she did not want to be late. Id. 95:15-17; 134:19-135:10. Ms. Hulsizer told Plaintiff to retake her seat as the training had not yet concluded. Hulsizer Dep. Tr.

75:10-22; see also Pl. Dep. Tr. 55:25-56:3; 135:11-13. At her deposition, Plaintiff testified [*8] that she later told Kevin Brady, the Resorts Vice President of Casino Operations, that she stood up because she was in pain. Id. 94:23-95:3. In the remaining minutes of the session, Ms. Hulsizer directly addressed Plaintiff by name to "engage her," but Plaintiff did not respond. Hulsizer Dep. Tr. 75:21-25. After the training session had concluded, Ms. Hulsizer was "so furious with [Plaintiff's] behavior," which she found to be "so disrespectful." Id. 75:23-76:5. She described being "incensed by [Plaintiff's] conduct." Id.

Thereafter, Ms. Hulsizer met with Mr. Brady and Daniel Fanty, the Resorts Casino Manager, to discuss Plaintiff's behavior during the training session. Id. 76:4-22; Fanty Dep. Tr. 54:9-55:4, Def. MSJ Ex. E [Docket No. 16-3]. During that meeting, Ms. Hulsizer described Plaintiff's behavior as the "total antithesis to everything that our department stands for." Fanty Dep. Tr. 54:22-55:4. Mr. Brady stated that, according to Ms. Hulsizer, Plaintiff did not participate in the training session and had "numerous pejorative type of encounters in there with the training personnel." Brady Dep. Tr. 15:24-16:16. He had also been informed that Plaintiff refused to answer questions [*9] during the training session, attempted to leave the session before it was over, and refused to participate in the beach ball activity. Id. 16:24-17:13. He testified that Plaintiff's reported conduct and demeanor "was probably the worst behavior [he has] ever encountered . . . by an employee with respect to people participating in a training in a customer service class." Id. 17:14-19. He further described Plaintiff's behavior as "deplorable" and "unbecoming" of a Resorts employee. Id. 21:22-25. Mr. Brady told Ms. Hulsizer that he "won't have somebody like that work for [him]." Hulsizer Dep. Tr. 78:18-22. Mr. Fanty likewise noted that Plaintiff's reported conduct was insubordinate and reflect an unwillingness to participate in the training session. Fanty Dep. Tr. 51:24-52:10. Ms. Hulsizer further informed Mr. Fanty that Plaintiff's "lack of participation was horrible as a manager" and that "her lack of participation was [such that] if she wasn't there she couldn't have participated less." Id. 68:3-11. Ms. Hulsizer stated that "she had never seen anything like that before." Id. 68:19-22.

At that meeting, the decision was made that Plaintiff's employment should be terminated as a result [*10] of the reports about her conduct during the September 22, 2015 training session. Brady Dep. Tr. 15:24-16:16; 44:16-45:3. This decision was the result of a collaborative effort. Id. 15:4-14; Fanty Dep. Tr. 51:13-17.

Mr. Brady explained, however, that the decision was not yet final and that Plaintiff was to be given an opportunity to present a plausible explanation for her behavior. Brady Dep. Tr. 21:16-22:18.

On September 24, 2015, Plaintiff received a call from her direct supervisor, Frank Jakimowicz, informing her that she needed to come to work the following day to meet with Mr. Brady and Mr. Fanty. Pl. Dep. Tr. 60:1-21. Plaintiff told Mr. Jakimowicz that she had a chiropractor's appointment that morning and he informed her that would not be a problem as the meeting was scheduled for 12:00 p.m. Id. 66:4-20. Plaintiff did not tell Mr. Jakimowicz that she was suffering from a disability or why she had an appointment with a chiropractor. Id. 66:21-67:1.

On September 25, 2015, Plaintiff met with Mr. Fanty and Mr. Brady. Id. 59:5-25. Although Plaintiff's termination notice had already been prepared, Mr. Brady retained the ability to reconsider the decision to discharge Plaintiff in the [*11] event that she presented a reasonable explanation or justification for her behavior at the training session. Brady Dep. Tr. 22:1923:6. Mr. Brady informed Plaintiff that he had spoken with someone regarding Plaintiff's conduct and demeanor at the customer service training session and that he was not happy with what he heard. Pl. Dep. Tr. 61:5-62:11.

According to Plaintiff's version, she informed Mr. Fanty and Mr. Brady that she "had been under chiropractor's care" and that she "had a female situation," namely menstrual cramps, at the time of the training session, to which they responded that she "had two choices; to resign or be terminated." Id. 62:13-18; 96:21-97:3. Mr. Brady testified, however, that Plaintiff did not tell him that she had back pain or menstrual cramps during the training session or that she was under the care of a chiropractor. Brady Dep. Tr. 24:7-25:13. Indeed, he stated that she did not say anything during the meeting that justified her conduct. Id. 21:3-11. Similarly, Mr. Fanty does not recall Plaintiff stating that she had back pain or menstrual cramps during the training session or that she was under the care of a chiropractor. Fanty Dep. Tr. 56:16-57:13. Mr. [*12] Brady further testified that Resorts would have reconsidered its decision to terminate Plaintiff's employment if she had presented a "bona fide reason" or justification for her uncooperative conduct at the training session. Brady Dep. Tr. 22:19-22; 25:16-26:21. Mr. Brady was not aware that Plaintiff had requested an FMLA leave application or that she had any intention of taking FMLA leave. Id. 26:22-27:8.

2017 U.S. Dist. LEXIS 143920, *12

During the meeting, the termination notice prepared by Defendant was facedown on the desk. After Plaintiff stated that she would not resign, Mr. Fanty turned the notice over, signed it, and handed it to Plaintiff. Pl. Dep. Tr. 63:2-17. The paper, which had been typed in advance, indicated that Defendant was terminating Plaintiff's employment due to her "uncooperative and unprofessional conduct" at the customer service training session. Id. 63:19-64:6; 67:11-21; 93:23-94:18; Def. MSJ Ex. F [Docket No. 16-3]. Plaintiff refused to sign the termination notice because she did not believe that she deserved to be fired. Pl. Dep. Tr. 93:5-22; see also Def. MSJ Ex. F; Fanty Dep. Tr. 56:3-6. Notably, Plaintiff testified that she has no evidence or facts that suggest that this reason was not [*13] the real reason for her termination. Pl. Dep. Tr. 64:16-65:2.

Based upon these facts, Plaintiff claims that Defendant wrongfully terminated her employment for unlawful discriminatory reasons. On November 30, 2015, Plaintiff commenced the instant litigation, setting forth the following counts: discriminatory termination on the basis of disability in violation of the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, et seq. ("NJLAD") (Count One); failure to provide reasonable accommodations in violation of NJLAD (Count Two); interference and wrongful discharge in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA") (Count Three); and gender discrimination in violation of NJLAD (Count Four) [Docket No. 1]. Thereafter, on January 16, 2017, Defendant moved for summary judgment in its favor on all counts [Docket No. 16]. On February 24, 2017, upon consent of the parties, Count Two and Count Three of the Complaint, Plaintiff's reasonable accommodation and gender discrimination claims, respectively, were dismissed with prejudice [Docket No. 24].

## II. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled [*14] to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id.

In determining the existence of a genuine dispute of

material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party[.]" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [*15] it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (citing Fed. R. Civ. P. 56(e)). In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: she "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")).

## III. ANALYSIS

### A. NJLAD Discriminatory Discharge

The NJLAD prohibits employment discrimination on the basis of disability or perceived disability. Discriminatory discharge claims under the NJLAD are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.

2017 U.S. Dist. LEXIS 143920, *15

_Ct. 1817, 36 L. Ed. 2d 668 (1973)_, _Joseph v. New Jersey Transit Rail Operations Inc., 586 F. App'x 890, 892 (3d Cir. 2014)_ (citing _Viscik v. Fowler Equip. Co., 173 N.J. 1, 13-14, 800 A.2d 826 (2002)_); _Battaglia v. United Parcel Servs., Inc., 214 N.J. 518, 546, 70 A.3d 602 (2013)_ ("All LAD claims are evaluated in accordance with the United States Supreme Court's burden-shifting mechanism.").

Under this burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. _Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 848 (3d Cir. 2016)_ (citing _Victor v. State, 203 N.J. 383, 408-09, 4 A.3d 126 (2010))_. After a plaintiff demonstrates her prima facie case of discriminatory discharge, the burden shifts [*16] to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. _Id. at 842_. "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." _Terry v. Borough, 660 F. App'x 160, 163 (3d Cir. 2016)_ (quoting _Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999))_.

### i. Prima Facie Case

To establish a prima facie case of discriminatory discharge due to a disability, in violation of the NJLAD, a plaintiff must establish: "(1) that [she] is a member of a protected class [i.e. that [she] was disabled or perceived to be disabled]; (2) that [she] was otherwise qualified and performing the essential functions of the job; (3) that [she] was terminated; and (4) that the employer thereafter sought similarly qualified individuals for the job who were not members of [her] protected class." _Joseph, 586 F. App'x at 892_ (citing _Victor, 203 N.J. at 409_).

There is no dispute that Plaintiff satisfies the third element of the prima facie case, as Defendant terminated Plaintiff's employment on September 25, 2015. Def. MSJ Ex. F. Defendant, however, contends that Plaintiff cannot establish the remaining elements of the prima facie case.

First, Defendant [*17] argues that Plaintiff cannot establish that she is disabled because back pain does not rise to the level of a disability under the NJLAD and because Plaintiff's purported disability is not supported by medical evidence. Under the NJLAD, a disability is

defined as any "physical disability, infirmity, malformation or disfigurement which is caused by bodily injury . . . which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." _N.J.S.A. § 10:5-5(q)_.[1] The NJLAD's definition of disability is very broad and does not require that a disability restrict any major life activities to any degree. _Enriquez v. W. Jersey Health Sys., 342 N.J. Super. 501, 519, 777 A.2d 365 (App. Div. 2001)_; see also _Viscik, 173 N.J. at 16_ ("The term 'handicapped' in LAD is not restricted to 'severe' or 'immutable' disabilities and has been interpreted as significantly broader than the analogous provisions of the _Americans with Disabilities Act._"); _Failla v. City of Passaic, 146 F.3d 149, 153-54 (3d Cir. 1998)_ (jury's conclusion that plaintiff, who suffered from a back injury, was not disabled as defined by the ADA was not inconsistent with its finding that he had a "handicap" under the NJLAD).

Here, Plaintiff has produced her medical records from the Atlantic County Family Spine and Rehabilitation [*18] Center, which establish that, prior to the training session and her discharge, she had been treated for back pain caused by back disorders including spondylosis and osteoarthritis. Pl. Opp. Ex. 8. This is sufficient evidence to establish that Plaintiff was disabled under the NJLAD.

Defendant next argues that Plaintiff cannot establish that she was otherwise qualified and performing the essential functions of the job in light of her alleged unprofessional and uncooperative behavior during the training session. As a preliminary matter, the Court notes that the icebreaker and team building games during the training session are not essential functions of Plaintiff's job. Moreover, there is no evidence in the record, however, that indicates that Plaintiff was not performing the essential functions of her job as a dual rate dealer. Indeed, the record establishes that Plaintiff received satisfactory work performance evaluations and, on a handful of occasions, received commendations for

---

[1] An amendment to the NJLAD "replaced statutory references to a 'handicap' with the term 'disability.'" _Russo v. Chico's FAS, Inc., 2011 U.S. Dist. LEXIS 118639, 2011 WL 4901357, at *6 n.5 (D.N.J. Oct. 14, 2011)_ (citing 2003 N.J. Sess. Law Serv. Ch. 180 (Assembly 3774) (West)); _State v. Dixon, 396 N.J. Super. 329, 339, 933 A.2d 978 (App. Div. 2007)_ (noting that NJLAD was amended "to delete the term 'handicap' and substitute 'disability'" but that the "current definition of the term remains essentially the same.").

2017 U.S. Dist. LEXIS 143920, *18

her work performance based upon positive customer feedback. There are, however, material disputes of fact as to Plaintiff's behavior during the training session. While Defendant claims that Plaintiff was insubordinate [*19] and unprofessional during the session, Plaintiff denies such allegations and contends that she participated willingly and to the best of her ability. Although it is a "he said she said" dispute, the record before the Court, presents at least a genuine issue of material fact as to whether Plaintiff was qualified and performing the essential functions of her job at the time of her termination.

Finally, Defendant argues that Plaintiff cannot establish the final element of the prima facie case because there is no evidence in the record that Defendant sought similarly qualified individuals who are not disabled to replace her. The fourth element of the prima facie case, however, is not as strict as Defendant contends. "The fourth element is needed to allow an inference to be drawn of disparate treatment, since if the disabled employee's job was given to a nondisabled person it could be inferred that the disabled employee received the adverse job action because of his or her disability." *Rosenfeld v. Canon Bus. Sols., Inc., 2011 U.S. Dist. LEXIS 115415, 2011 WL 4527959, at \*19 (D.N.J. Sept. 26, 2011)* (quoting *Seiden v. Marina Assocs., 315 N.J. Super. 451, 459, 718 A.2d 1230 (Law. Div. 1998))*. A plaintiff need not "establish unfailingly as part of the prima facie case that plaintiff was replaced by an individual outside the plaintiff's protected class." *Williams v. Pemberton Twp. Pub. Sch., 323 N.J. Super. 490, 502, 733 A.2d 571 (App. Div. 1999)*. Rather, New Jersey courts have [*20] held that "[b]ecause of the variety of adverse employment actions that may occur short of termination . . . [t]he appropriate fourth element of a plaintiff's prima facie case requires a showing that the challenged employment decision . . . took place under circumstances that give rise to an inference of unlawful discrimination." *Id.* (citing *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996); Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995)); accord Gadbois v. State, 2009 N.J. Super. Unpub. LEXIS 1116, 2009 WL 1310973, at \*5 (N.J. Super. Ct. App. Div. May 13, 2009)*. This "formulation permits a plaintiff to satisfy the fourth element in a variety of ways." *Williams, 323 N.J. Super. at 502*.

As Plaintiff concedes, there is no evidence in the record that supports a finding that Defendant knew--prior to the September 25, 2015 meeting--that Plaintiff suffered from a disability in general or that she was experiencing back pain as a result of said disability during the training session. See, e.g., Pl. Dep. Tr. 55:2-8; 58:20-25; 59:1-3; 66:21-67:1; 97:523. Thus, as Defendant was unaware of Plaintiff's back pain or disability prior to meeting with Plaintiff on September 25, 2015, Plaintiff cannot make a showing that Defendant's preliminary decision to terminate her employment due to Ms. Hulsizer's reports of Plaintiff's conduct at the training session took place under circumstances that suggest unlawful discrimination. See *Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 331 (3d Cir. 2003)* (noting in ADA-context that, [*21] while an employer may be liable for discriminating against an employee "based upon the employee's _known_ disability, neither the law nor common sense can demand clairvoyance of an employer in [defendant's] position.") (emphasis in original).

The undisputed evidence, however, establishes that the decision to terminate Plaintiff's employment was not final prior to the September 25, 2015 meeting with Plaintiff. Indeed, Mr. Brady testified that had Plaintiff presented a legitimate explanation or justification for her alleged behavior at the training session, such as back pain, he would have reconsidered the decision to discharge Plaintiff. Brady Dep. Tr. 21:16-23:6; 25:16-26:21.

Herein lie the genuine disputes of material fact. Plaintiff disputes Defendant's accounts of both her conduct at the training session and the September 25, 2015 meeting. According to Plaintiff, she was cooperative during the training session and participated willingly and to the best of her ability in the activities. Pl. Dep. Tr. 53:13-22; 54:5-12; 116:15-24; 134:1-13; 136:25-137:8. More to the point, Plaintiff claims that she informed Mr. Brady and Mr. Fanty at the September 25, 2015 meeting that she suffered from [*22] a disability for which she was under the care of a chiropractor and that any perceived lack of participation during the training session was due to back pain caused by her disability. Id. 62:13-18; 94:23-97:3.

Plaintiff's burden of establishing a prima facie case of disability discrimination under the NJLAD is "'rather modest' at most and should not be onerous." *Swiatek v. Bemis Co., 542 F. App'x 183, 186 (3d Cir. 2013)* (quoting *Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447, 867 A.2d 1133 (2005))*; see also *Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010)* (quoting *Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 67 L. Ed. 2d 207*

(1981)); _Stouch v. Twp. Of Irvington_, 354 F. App'x 660, 667 n.4 (3d Cir. 2009) (noting that "[a] plaintiff's burden to establish a prima facie case of discrimination under the NJLAD is less onerous than under the ADA") (citing _Failla, 146 F.3d at 154_). If a jury believes Plaintiff's account of the training session and the September 25, 2015 meeting, the jury could properly conclude that Defendant fired Plaintiff because she did not participate in team building games that Defendant knew she could not fully participate in due to her disability.[2] Resolving all reasonable inferences in favor of Plaintiff as the non-moving party, the Court finds that Plaintiff has raised a slim but genuine dispute of material fact as to the final element of the prima facie case, precluding summary judgment at this stage of the burden-shifting analysis.[3]

## ii. Legitimate Nondiscriminatory Reason

Assuming that Plaintiff [*23] can establish a prima facie case of discriminatory discharge on the basis of disability, under the _McDonnell Douglas_ framework, the burden then shifts to Defendant to articulate a legitimate nondiscriminatory reason for terminating Plaintiff's employment. _Tourtellotte, 636 F. App'x at 842_; see also _McDonnell Douglas, 411 U.S. at 802_.

Defendant contends that it terminated Plaintiff's employment on September 25, 2015 because of what it viewed as her insubordinate and unprofessional conduct and demeanor during the September 22, 2015 training session. Mr. Brady testified that Plaintiff's conduct at the training session, as reported to him by Ms. Hulsizer, was "deplorable" and the "worst" conduct of which he was aware. Brady Dep. Tr. 17:14-19; 21:22-25. Mr.

Fanty echoed these sentiments, testifying that Plaintiff's observed demeanor was the "total antithesis" to her position and the values of the company. Fanty Dep. Tr. 54:22-55:4. As a result of the insubordination and unprofessionalism by Plaintiff during the training session, reported by Ms. Hulsizer, Defendant terminated Plaintiff's employment immediately. According to Defendant, Plaintiff's disability was not even a factor in her termination as Defendant claims it was unaware that she suffered from [*24] any disability.

The Court finds that Defendant has met its "minimal burden" of articulating a legitimate nondiscriminatory reason for its decision to terminate Plaintiff's employment. See _Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012)_.

## iii. Pretext

As Defendant has articulated a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff's employment, the burden shifts back to Plaintiff to establish that the proffered reason is merely pretext for unlawful disability discrimination. _Tourtellotte, 636 F. App'x at 842_.

A plaintiff may establish pretext and, therefore, survive summary judgment, by discrediting the defendant's proffered reasons or producing evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. _Id._ To do so, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." _Id._ (citing _Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)_); accord _Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)_).

Importantly, "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision [*25] was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." _Fuentes, 32 F.3d at 765_. Instead, the plaintiff "must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them

---

[2] The Court notes, however, that a jury may instead choose to believe Ms. Hulsizer's account of Plaintiff's behavior at the training session, namely that Plaintiff not only did not participate in the activities, but that Plaintiff was rude, insubordinate, and unprofessional. Even if the jury were to find that Plaintiff's back pain and disability justified her lack of participation, it does not follow that any rudeness or unprofessionalism is also justified. In that case, the jury may very well determine that Plaintiff cannot make a showing that her termination took place under circumstances that give rise to an inference of unlawful discrimination and, therefore, that she has not established her prima facie case.

[3] The Court takes this opportunity to note that a party cannot simply deny summary judgment by presenting false testimony. If it turns out that the jury finds that such testimony was false, the Court can always address the issue with measures such as an award of attorney's fees.

2017 U.S. Dist. LEXIS 143920, *25

unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Tourtellotte, 636 F. App'x at 842* (quoting *Tomasso, 445 F.3d at 706* (quoting *Fuentes, 32 F.3d at 765*)).

Defendant argues that Plaintiff cannot establish that its legitimate non-discriminatory reason for terminating Plaintiff's employment is pretext. Mr. Brady, Mr. Fanty, and Ms. Hulsizer each consistently testified that Plaintiff's termination was the direct result of her purportedly unprofessional and insubordinate conduct at the training session. Indeed, even Plaintiff does not genuinely dispute that the reason she was called into the September 25, 2015 termination meeting was because of Ms. Hulsizer's reports about her conduct at the training session.

Plaintiff, however, disputes Ms. Hulsizer's account of her conduct. Additionally, [*26] Plaintiff claims that she informed Mr. Brady and Mr. Fanty at the September 25, 2015 meeting that she suffered from a disability for which she was under a chiropractor's care and that she was experiencing pain as a result of this disability during the training session which limited her ability to fully participate in each of the activities. According to Plaintiff, Defendant nevertheless pushed forward with its decision to fire her, even after learning that Plaintiff was unable to fully participate in each activity during the training session because of her disability and resultant pain. Moreover, Mr. Brady testified that Defendant's policy is to permit an employee to present a legitimate justification or explanation for his or her otherwise problematic conduct prior to formally terminating the employee. He explained that he would reconsider a decision to terminate an employee if the employee presented a bona fide or plausible explanation for his or her behavior, such as a recent death in the family. Brady Dep. Tr. 21:16-23:6; 25:16-26:21. Yet when Plaintiff says she provided a legitimate explanation for any perceived uncooperativeness or lack of participation at the training session—back [*27] pain caused by her disability—Defendant did not reconsider its decision, as Mr. Brady said it would, and terminated Plaintiff's employment.

While the overwhelming evidence supports the conclusion that Defendant was neither aware of Plaintiff's disability nor her back pain during the training session until after Plaintiff was discharged, Plaintiff claims otherwise. This Court may not weigh the evidence or make credibility determinations in resolving the instant motion for summary judgment. If Plaintiff's

account is believed, Defendant fired her not only learning that she was disabled, but, more to the point, because of limitations in her ability to participate in certain activities that were caused by her disability. In light of Plaintiff's testimony regarding her conduct at the training session, as well as her testimony that she informed Defendant at the September 25, 2015 meeting that she was in pain caused by her disability during the training session, the Court finds that Plaintiff has demonstrated inconsistencies with Defendant's explanation for her termination. In this Court's view, Plaintiff's testimony regarding the training session and the September 25, 2015 meeting, coupled [*28] with Mr. Brady's testimony that he would have reconsidered the decision to terminate Plaintiff if she had presented a plausible justification for her behavior at the training session, is sufficient, although barely, to establish pretext and survive summary judgment.

Defendant argues that even if Plaintiff is disabled and informed Defendant of her disability, Defendant is nonetheless entitled to terminate Plaintiff because her disability does not excuse her unprofessionalism, rudeness, and insubordination. The Court agrees--in theory. The evidence in this case, however, demonstrates that there are genuine disputes of material fact as to Plaintiff's purported unprofessionalism. If the evidence presented at trial persuades the jury that Plaintiff was in fact unprofessional, rude, and insubordinate, as Defendant claims, then Defendant is correct that Plaintiff's pain and disability are immaterial. Even if Plaintiff's alleged rudeness and unprofessionalism stemmed from her pain and disability, her pain and disability do not give her license to act disrespectfully or unprofessionally at work.[4] If, on the other hand, the jury is persuaded that

---

[4] Defendant relies upon the Third Circuit's decision in *Sever v. Henderson, 220 F. App'x 159 (3d Cir. 2007)*, for the proposition that Defendant was free to terminate Plaintiff for her misconduct even if that misconduct was related to her disability. The Court notes, however, that the facts involved in *Sever* are markedly different from those presented in this action. The plaintiff in *Sever* claimed that he had been discriminatorily discharged as a result of his mental illness. The defendant, in turn, proffered that it had fired the plaintiff because he had threatened to kill his coworkers and had been convicted of a crime in connection with those threats. *220 F. App'x at 161*. Based upon these facts, the Third Circuit held that, "even assuming that Sever suffers from a disability, his employer may nevertheless hold him to certain 'qualification standards,' including the requirement that an individual not pose a direct threat to the health or safety of other individuals

2017 U.S. Dist. LEXIS 143920, *28

Plaintiff did not make any rude comments or facial [*29] expressions during the training session, but was instead merely limited in her ability to participate in physical activities due to her disability and pain, then the jury could reasonably conclude that Defendant's decision to terminate her employment because of this, even after learning of her disability, is unlawful discrimination. Accordingly, for the reasons set forth above, the Court finds that Plaintiff has presented minimal--but sufficient-- evidence to establish pretext and, thus, has narrowly survived summary judgment on her NJLAD claim.

### iv. Punitive Damages

Finally, Defendant seeks the dismissal of Plaintiff's request for punitive damages. To recover punitive damages under the NJLAD, a plaintiff must establish: (1) "actual participation in or willful indifference to the wrongful conduct on the part of upper management" and (2) "proof that the offending conduct [is] 'especially egregious.'" _Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 113, 735 A.2d 548 (1999)_ (quoting _Rendine v. Pantzer, 141 N.J. 292, 313, 661 A.2d 1202 (1995))_; accord _Muzslay v. City of Ocean City, 238 F. App'x 785, 791 (3d Cir. 2007)_.

Defendant does not appear to dispute that members of Defendant's upper management actually participated in Plaintiff's termination. Rather, Defendant argues that there is no evidence of any especially egregious conduct on the part of Resorts or any members [*30] of its upper management. While the Court sees little to support a punitive damages award, the issue of punitive damages is generally a question of fact for the jury. _Elmiry v. Wachovia Corp., 2007 U.S. Dist. LEXIS 84919, 2007 WL 4117260, at *16 (D.N.J. Nov. 16, 2007)_ (quoting _Fisher v. Volz, 496 F.2d 333, 347 (3d Cir. 1974))_. Therefore, summary judgment is denied without prejudice as to Plaintiff's request for punitive damages. Defendant may revisit the issue at the appropriate time at trial, if it so chooses.[5]

---

in the workplace." _Id._ Thus, the Sever court reasoned, "[t]hough an employer is prohibited from discharging an employee based on his disability, the employer is not prohibited from discharging an employee for misconduct, even if that misconduct is related to his disability." _Id. at 161-62._ Here, as noted above, there are genuine issues of material fact as to whether Plaintiff engaged in misconduct, and, if so, to what degree, during the training session in the first place.

[5] The Court is likely to bifurcate the punitive damages phase of the trial. As a result, this issue may become moot.

### B. Family Medical Leave Act

The FMLA, requires covered employers to provide "12 workweeks of leave" for the following reasons: "(A) because of the birth of a child of the employee and in order to care for such child; (B) because of the placement of a child with the employee for adoption or foster care; (C) in order to care for the spouse, son, daughter, or parent of the employee, if such relative has a serious health condition; and (D) because of a serious health care condition that makes the employee unable to perform the function of the position of such employee." _29 U.S.C. § 2612(a)(1)_. The FMLA grants an employee a private right of action against an employer for violations of the FMLA. _29 U.S.C. § 2617(a)(2)(A)_. The focus of the Plaintiff's FMLA claim is section D, termed the self-care provision, which provides leave to employees because of a serious health care condition. [*31] _29 U.S.C. § 2612(a)(1)(D)_.

The principal objectives of the FMLA are to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." _Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)_ (quoting _29 U.S.C. § 2601(b)(1)_ and _(2)_). To serve those ends, "[t]he FMLA contains two relatively distinct types of provisions. First, it creates a series of prescriptive substantive rights for eligible employees, often referred to as the 'entitlement' or 'interference' provisions which set floors for employer conduct." _Id._ "Additionally, the FMLA provides protection against discrimination based on the exercise of these rights, often referred to as the 'discrimination' or 'retaliation' provisions." _Id._

Count Three of Plaintiff's Complaint appears to assert both an FMLA interference claim and an FMLA retaliation claim. While Defendant moved for summary judgment on both theories, Plaintiff only defends her FMLA interference claim in her brief in opposition to summary judgment. See Pl. Opp. Br. at 18-21 [Docket No. 18]. Indeed, nowhere in her opposition brief does Plaintiff address her FMLA retaliation claim, let alone argue why it should not be dismissed. Thus, the Court finds that by failing to address the FMLA retaliation [*32] claim at all in her opposition brief, Plaintiff has abandoned the FMLA retaliation claim as set forth in her Complaint. _Fischer v. G4S Secure Sols. USA, Inc., 614 F. App'x 87, 91 n.3 (3d Cir. 2015)_ (affirming district court's determination that plaintiff abandoned claim by failing to address it at all in opposition to motion for summary judgment and noting

2017 U.S. Dist. LEXIS 143920, *32

that "[i]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal."); *see also McKenna v. Portman, 538 F. App'x 221, 224 n.5 (3d Cir. 2013)* ("Although their Amended Complaint seeks relief under the *First, Fourth, Fifth, Sixth,* and *Fourteenth Amendments,* in their briefs both before this Court and the District Court, Plaintiffs only oppose the dismissal of their *Fifth* and *Fourteenth Amendment* claims and essentially concede all remaining claims."). Accordingly, summary judgment shall be granted on the FMLA retaliation claim in favor of the Defendant and the claim shall be dismissed.

The Court next turns to Plaintiff's FMLA interference claim. *Section 2615(a)(1) of the FMLA* provides that "[i]t shall be unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *29 U.S.C. § 2615(a)(1)*. To succeed [*33] on an FMLA interference claim, Plaintiff must show that she "was entitled to benefits under the FMLA and that [she] was denied them." *Callison, 430 F.3d at 119*. "An interference claim is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Id. at 120*. As such, the familiar McDonnell Douglas burden-shifting analysis used in employment discrimination matters is not applicable. *Sommer v. The Vanguard Grp., 461 F.3d 397, 399 (3d Cir. 2006)*.

To defeat summary judgment as to her FMLA interference claim, Plaintiff must establish that "(1) [she] was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of [her] intention to take FMLA leave; and (5) the plaintiff was denied benefits to which [she] was entitled under the FMLA." *Capps v. Mondelez Glob., LLC, 847 F.3d 144, 155 (3d Cir. 2017)* (quoting *Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014))*.

Defendant argues that summary judgment must be granted in its favor on Plaintiff's FMLA interference claim because Defendant never actually exercised her rights under the FMLA, as she never submitted a request for FMLA leave, and, therefore, Defendant did not have any notice of her intent to take FMLA leave. Plaintiff counters that [*34] her request for FMLA leave paperwork from the human resources office put

Defendant on notice of her intent to take FMLA leave.

To invoke her rights under the FMLA, an employee must provide her employer with adequate notice of her need to take leave. *29 U.S.C. § 2612(e)(2)*. "In doing so, the employee 'need not expressly assert rights under the FMLA or even mention the FMLA.'" *Lichtenstein, 691 F.3d at 303* (quoting *29 C.F.R. § 825.303(b)*). As the Third Circuit has explained:

> The regulations provide some guidance as to what sort of notice is sufficient. It is clear that an employee need not give his employer a formal written request for anticipated leave. Simple verbal notification is sufficient:
>
> "An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. The employee need not expressly assert rights under the FMLA or even mention the FMLA . . . ."

*Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007)* (quoting *29 C.F.R. § 825.302(c)*). "The issue is whether the employee has 'state[d] a qualifying reason for the needed leave.'" *Id.* (quoting *29 C.F.R. § 825.208(a)(2)*). It is well-established that, "[i]n providing notice, the employee need not use any magic words." *Id.* The Third Circuit has observed, however, that "where courts have found notice to [*35] be deficient, it has been because the employee failed to convey the reason for needing leave." *Id. at 403* (collecting cases).

There is simply no evidence that Plaintiff provided Defendant with adequate notice of her need for FMLA leave. On September 12, 2015, Plaintiff visited Defendant's human resources office and requested FMLA leave paperwork. Pl. Dep. Tr. 57:25-58:16. That is it. Plaintiff cannot identify or describe the person she spoke with in the human resources office. *Id.* 58:3-58:19. Plaintiff advised the individual of her name and department and asked for the paperwork for FMLA leave. *Id.* 58:7-13. By Plaintiff's own admission, however, she did not give the individual a doctor's note or indicate why she needed the paperwork. *Id.* 58:20-25. There is no evidence in the record that the individual recorded Plaintiff's name when she asked for the FMLA leave paperwork. Plaintiff does not know whether the individual wrote her name down. *Id.* 69:16-18. Indeed, Ms. Hulsizer testified that it is not part of Resorts' rules or policies to record the names of employees who request FMLA leave paperwork. Hulsizer Dep. Tr. 86:6-

24.

On or about September 23, 2015, Plaintiff's chiropractor completed the [*36] FMLA paperwork, indicating that Plaintiff needed chiropractic treatment approximately two times per week and that she would be unable to work during flare-ups of her back pain one to two times per month. Pl. Opp. Ex. 9. Although Plaintiff claims that she had the completed FMLA leave paperwork in tow when she was terminated, Plaintiff concedes that she never handed in the completed FMLA paperwork to Defendant. Pl. Dep. Tr. 69:19-70:2. Additionally, Plaintiff admitted in her deposition that, other than picking up the FMLA paperwork, she had no other evidence to support her claim that the decision to terminate her employment was made because she intended to take FMLA leave. Id. 84:1-10. Plaintiff also testified that she did not tell anyone else at Resorts about her intent to take FMLA leave. Id. 139:1-3. There is no evidence that Plaintiff ever informed Defendant that she suffered from any pain or disability that would require her to take leave. Id. 57:3-5; 65:3-66:23. Moreover, she never requested any accommodations for her back pain or disability. Id. 57:6-24; 118:9-15; 144:7-16.

In sum, the only evidence that Plaintiff proffers to support her FMLA interference claim is that she requested [*37] FMLA leave paperwork from an unidentified Resorts employee in the human resources office. Critically, Plaintiff did not advise anyone, including the human resources employee, of why she requested the FMLA leave paperwork or that she intended to take FMLA leave due to her back pain. Given the total absence of evidence in the record to support Plaintiff's claim that Defendant had notice of her intent to take FMLA leave, Plaintiff cannot establish that she invoked any FMLA rights or that she gave notice to Defendant of her intention to take FMLA leave, as required to survive summary judgment. See Sarnowski, 510 F.3d at 403; Johnson v. Thru Point, Inc., 160 F. App'x 159, 162 (3d Cir. 2005); Treaster v. Conestoga Wood Specialties, Corp., 2010 U.S. Dist. LEXIS 63257, 2010 WL 2606479, at *26 (M.D. Pa. Apr. 29, 2010). Accordingly, Plaintiff's FMLA interference claim fails and summary judgment on this claim is granted in favor of Defendant.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted, in part, and denied, in part. Summary judgment is denied as to Plaintiff's

NJLAD disability discrimination claim (Count One). Summary judgment is granted in Defendant's favor as to Plaintiff's FMLA claim (Count Three). An appropriate Order shall issue on this date.

/s/ Renée Marie Bumb

RENÉE MARIE BUMB

UNITED STATES DISTRICT JUDGE

Dated: September 6, 2017

## ORDER

THIS MATTER having [*38] come before the Court upon the Motion for Summary Judgment [Docket No. 16] by Defendant DGMB Casino, LLC d/b/a Resorts Casino Hotel (the "Defendant"), seeking the dismissal of the above-captioned matter brought by Plaintiff Debra L. Sylvester (the "Plaintiff") in its entirety; and the Court having previously dismissed Count Two and Count Four of the Complaint upon consent of the parties [Docket No. 24]; and the Court having considered the parties' submissions; and for the reasons set forth in the accompanying Opinion issued on this date,

IT IS HEREBY, on this **6th** day of **September 2017**,

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 16] is **GRANTED, in part, and DENIED, in part**; and it is further

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 16] is **GRANTED** as to Plaintiff's claims under the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. (Count Three); and it is further

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 16] is **DENIED** as to Plaintiff's claim for disability discrimination under the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, et seq. (Count One).

/s/ Renée Marie Bumb

RENÉE MARIE BUMB

UNITED STATES DISTRICT JUDGE

_____

**End of Document**

◈ Positive
As of: May 20, 2022 9:10 PM Z

## *Szarawara v. County of Montgomery*

United States District Court for the Eastern District of Pennsylvania

June 27, 2013, Decided; June 27, 2013, Filed

CIVIL CASE NO. 12-5714

**Reporter**

2013 U.S. Dist. LEXIS 90386 *; 15 Accom. Disabilities Dec. (CCH) P15-193; 2013 WL 3230691

JAMES SZARAWARA, Plaintiff, v. COUNTY OF MONTGOMERY, Defendant.

**Counsel:** [*1] For JAMES SZARAWARA, Plaintiff: DAVID M. KOLLER, LEAD ATTORNEY, KOLLER LAW PC, PHILADELPHIA, PA.

For THE COUNTY OF MONTGOMERY, Defendant: SHARON W. GLOGOWSKI, LEAD ATTORNEY, MONTGOMERY COUNTY SOLICITOR'S OFFICE, NORRISTOWN, PA.

**Judges:** MICHAEL M. BAYLSON, United States District Judge.

**Opinion by:** MICHAEL M. BAYLSON

# Opinion

## MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION TO DISMISS

**Baylson, J.**

### I. Introduction

Plaintiff James Szarawara ("Plaintiff") alleges that his former employer, Defendant the County of Montgomery ("Defemdant"), unlawfully discriminated against him in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101, et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), *43 P.S. § 951 et seq.* Currently before the Court is Defendant's Motion to Dismiss Plaintiff's claims. For the reasons below, the Court GRANTS the Motion in Part and DENIES it in part. The Court also grants Plaintiff leave to amend his complaint.

### II. Facts Alleged by Plaintiff

In August 2005, Plaintiff began his employment with Defendant in its Emergency Dispatch Services Center, working night shifts as a Telecommunicator. In October 2008, Plaintiff was diagnosed with Type II Diabetes, hypertension, and dyslipidemia. Shortly [*2] after his diagnosis, Plaintiff began experiencing headaches, dizziness, and loss of focus with increasing, though unspecified, frequency.

On or around July 25, 2009, while at work, Plaintiff experienced severe headaches, blurred vision, and dizziness, all induced, Plaintiff believes, by his diabetes. As a result of his performance that day, Defendant issued Plaintiff three disciplinary warnings.

A few days later, Plaintiff met with Defendant's Deputy Public Safety Director and Assistant Public Safety Director regarding these warnings. The meeting included a discussion of Plaintiff's medical conditions, including Plaintiff's belief that his diabetes was the cause of his work performance issues. Plaintiff specifically mentioned that his treating physician advised him to establish healthier sleep patterns, which would require changing his work schedule to include day shifts. Ultimately, the Deputy Public Safety Director and Assistant Public Safety Director determined that Plaintiff should be suspended for three days, but they deferred imposition of the suspension pending the outcome of an investigation into his medical issues.

Sometime after the meeting, Plaintiff provided Defendant with [*3] a letter from his treating physician, dated August 3, 2009, which stated that Plaintiff was "approaching reasonable control of his conditions," and that his prognosis would be improved by compliance with medication, weight loss, increased physical activity, a low-fat and low-carbohydrate diet, as well as "good sleep habits . . . which would be supported by regular diurnal cycles from working during AM hours." (Am. Compl., Ex. C). Defendant telephoned Plaintiff's treating

2013 U.S. Dist. LEXIS 90386, *3

physician, but she would not discuss Plaintiff's condition, because she had not received his consent to do so. (See Id., Ex. D.) On August 7, 2009, Plaintiff's treating physician sent Defendant a second letter, following up on the telephone conversation. (Id.) The letter stated that Plaintiff was "capable of performing the responsibilities of his job . . . but this becomes less clear for the future." (Id.) The letter closed by opining that Plaintiff's long term health would be best served by "proper sleep patterns which . . . includes working during daytime hours." (Id.)

Sometime after receiving the second letter, Defendant offered Plaintiff the opportunity to take unpaid medical leave. Plaintiff declined the leave, [*4] because it was unpaid, and his diabetes would affect him beyond the leave period. Plaintiff also suggested a variety of ways in which Defendant could help him change his working hours, including moving him to part-time status and transferring him to a lower-paying, day-shift position. Defendant, however, agreed to none of Plaintiff's suggestions.

Plaintiff then resigned because he believed his diabetes and other medical conditions rendered him unable to perform his job.

### III. Legal Standard

In deciding a motion to dismiss pursuant to _Federal Rule of Civil Procedure 12(b)(6)_, courts may look only to the facts alleged in the complaint and its attachments. _Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)_. Courts must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. _Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985)_.

A valid complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." _Fed. R. Civ. P. 8(a)(2)_. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to [*5] 'state a claim to relief that is plausible on its face.'" _Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)_. Iqbal clarified that the Court's decision in _Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_, which required a heightened degree of fact pleading in an antitrust case, "expounded the pleading standard for 'all civil actions.'" _556 U.S. at 684_.

Iqbal explained that although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. _Id. at 678, 685_. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." _Id. at 678_ (citing _Twombly, 550 U.S. at 555_); _see also Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008)_ ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." (citing _Twombly, 550 U.S. at 556 n.3_)). Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that [*6] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." _Iqbal, 556 U.S. at 678_ (citing _Twombly, 550 U.S. at 556_).

### V. Discussion

Plaintiff claims disability discrimination under the ADA and PHRA. The ADA was substantially amended by the ADA Amendments Act of 2008 ("ADAAA"), _Pub. L. No. 110-325, 122 Stat. 3553_ (codified in various provisions of _42 U.S.C. §§ 12101 et seq._), which became effective as of January 1, 2009. [1] Prior to the ADAAA, claims under the ADA and PHRA were considered simultaneously "because the acts serve[d] the same goals and [were] interpreted coextensively." _Castellani v. Bucks Cnty. Municipality, 351 F. App'x 774, 777 (3d Cir. 2009)_ (citing _Kelly v. Drexel Univ., 94 F.3d 102, 105_

---

[1] The ADAAA applies to this case because the conduct Plaintiff complains of occurred after the ADAAA's effective date. The Court notes, however, that the Equal Employment Opportunity Commission ("EEOC") regulations interpreting the amended ADA were not effective until May 24, 2011. Regulations To Implement the Equal Employment Provisions of the Americans with _Disabilities Act, as Amended, 76 Fed. Reg. 16,978 (Mar. 25, 2011)_ (codified at 29 C.F.R. pt. 1630). Although the complained-of conduct in this case occurred prior to the effective date of these updated regulations, the Court will be guided by them in applying the amended ADA to Plaintiff's claims. It [*8] would be inappropriate to apply the EEOC's previous regulations in light of the EEOC's position that the ADAAA "change[d] the way that" key "statutory terms should be interpreted in several ways, therefore necessitating revision of the prior regulations and interpretive guidance." _Id. at 16,978_.

2013 U.S. Dist. LEXIS 90386, *8

*(3d Cir.1996))*. This is no longer the case. The ADAAA relaxed the ADA's standard for disability, *42 U.S.C. § 12102(4)(A)* ( "[t]he definition of disability . . . shall be construed in favor of broad coverage, to the maximum extent permitted by the terms of this chapter"); *29 CFR § 1630.2(j)(1)(i)-(iii)* ("[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a **[*7]** major life activity"; "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA . . . . [it] is not meant to be a demanding standard"; "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA"), but the PHRA has not been similarly amended, necessitating separate analysis of Plaintiff's ADA and PHRA claims.

**A. Plaintiff Has a Viable ADA Discrimination Claim for Failure to Provide a Reasonable Accommodation.**

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that he:

1. "[I]s disabled";
2. "[I]s otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer"; and

3. "Suffered . . . an adverse employment action as a result of his disability."

*Stadtmiller v. UPMC Health Plan, Inc., 491 F. App'x 334, 336 (3d Cir. 2012)* (citing *Hohider v. UPS, 574 F.3d 169, 186 (3d Cir. 2009)*). Adverse employment actions "include refusing to make reasonable accommodations for a plaintiff's disabilities." *Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 761 (3d Cir. 2004)*; *42 U.S.C. § 12112(b)(5)(A)*. The third element of Plaintiff's prima facie case is not in dispute, and the allegations in his Amended Complaint **[*9]** are sufficient to satisfy the first two elements.

**1. Disability**

Under the ADA, disability means "a physical . . . impairment that substantially limits one or more major life activities." *Id. § 12102(1)(A)*. "Major life activities" include "[m]ajor bodily functions," such as "endocrine . . . function[]." *Id. § 12102(2)(B)*.

Plaintiff alleges, and Defendant does not dispute, that he suffers from Type II Diabetes. The EEOC has advised that diabetes "will, as a factual matter, virtually always be found to impose a substantial limitation" on endocrine function. *29 CFR § 1630.2(j)(3)(ii)-(iii)*. Defendant provides no basis for the Court to find that the EEOC's general guidance regarding diabetes is inapplicable to Plaintiff. [2]

**2. Otherwise Qualified to Perform the Essential Functions of the Job**

Regarding the second element of his prima facie case, Plaintiff alleges that he would be able to perform all the essential functions of his job if he were permitted to work day shifts. Defendant's only counter argument is that Plaintiff's request to work day shifts is unreasonable, because working night shifts is either:

1. **[*10]** An essential function of Plaintiff's job; or
2. Unrelated to his disability.

**a. Essential Job Function**

"[W]hether a particular function is essential "'is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.'" *Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612-13 (3d Cir. 2006)* (alterations and emphasis in the original) (quoting *Deane v. Pocono Med. Ctr., 142 F.3d 138, 148 (3d Cir. 1998)* (en banc)). [3] While the description of Plaintiff's job indicates that the job requires "work[ing] various shifts, rotating schedules, weekends[,] and holidays," (Mot., Ex. F.) [4] Defendant provides no authority for its

---

[2] Defendant's contrary arguments rely exclusively on pre-ADAAA cases and EEOC regulations.

[3] The Court is aware of no case indicating that the ADAAA has any impact on the standard for essential job functions.

[4] The description of Plaintiff's job is an exhibit to Defendant's Motion. The Court, however, finds that Plaintiff incorporated it into his Amended Complaint, because Exhibit C to his Amended Complaint is a letter from Plaintiff's treating physician in which she opines on Plaintiff's "ability to perform the essential functions of his job as telecommunicator, as set forth in the description of his position that your office provided." *See Winer Family Trust v. Queen, 503 F.3d 319, 328 (3d Cir. 2007)* (stating that in deciding a 12(b)(6) motion, "the District Court properly probed documents attached to defendants' motion to dismiss . . . because these documents

2013 U.S. Dist. LEXIS 90386, *10

contention that such a description, even in combination with the twenty-four-hour staffing requirements of the Emergency Dispatch Services Center, necessarily renders working night shifts an essential function of Plaintiff's job. [5] Absent such authority, and given the fact-intensive nature of the issue, it would be inappropriate at this stage for the Court to decide whether working night shifts is an essential function of Plaintiff's job. See *Lightcap-Steele v. KidsPeace Hosp., Inc., Civil Action No. 05-02578, 2006 U.S. Dist. LEXIS 24518, 2006 WL 1147476, at *10 (E.D. Pa. Apr. 27, 2006)* [*11] (Pratter, J.) (citing *Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir.1998)); 29 C.F.R. § 1630.2(n)(3)(i)- (vii)* ("employer's judgment as to which functions are essential" and "[w]ritten job descriptions" are only two of seven non-exclusive factors relevant to the essential function inquiry).

### b. [*13] Relation of Plaintiff's Requested Accommodation to His Alleged Disability

Defendant also argues that Plaintiff's request to work day shifts is not related to his disability. In support of this contention, Defendant cites the fact that Plaintiff's treating physician:

1. Opined that other changes in Plaintiff's lifestyle would improve his medical conditions, and
2. Stated that anyone, not just Plaintiff, would be healthier by not working night shifts.

---

[5] In support of its proposition that "[i]n [*12] similar circumstances . . . several courts around the country have found a night shift/rotating shift schedule to be an essential function of [a] position," Defendant cited *Hutton v. Elf Atochem North America, Inc., 273 F.3d 884 (9th Cir. 2001)*, and *Laurin v. Providence Hospital, 150 F.3d 52 (1st Cir. 1998)*. (Mot. at 10). *Hutton*, however, made no holding regarding essential functions, stating that "[b]ecause we conclude that summary judgment was properly granted based on the existence of a direct threat, we do not reach the issue of whether Hutton could perform the essential functions of the job." *273 F.3d at 892* (emphasis added). And *Laurin*, while it did hold that working evening and night shifts was an essential function of certain nursing jobs in a hospital with twenty-four hour nursing requirements, did so when deciding a motion for summary judgment and only after extensive discussion of the record. *150 F.3d at 59-61* (noting that the hospital's twenty-four hour environment presented "exceptional nurse-scheduling demands," and the hospital had "always required all" nurses in the plaintiff's position "to rotate shifts and it ha[d] never made an exception" (emphasis in original)).

The Court finds Defendant's position unavailing.

The Court cannot say that Defendant was relieved of its obligations under the ADA because Plaintiff's doctor suggested alternatives to Plaintiff's requested accommodation that would also mitigate the effects of his medical conditions. Defendant cites no authority, and the Court is aware of none, for its implied proposition that Plaintiff must exhaust all other possible methods of mitigating the effects of his alleged disability before requesting an accommodation under the ADA. Nor can the Court say that because Plaintiff's requested accommodation is preferable for anyone, regardless of whether they suffer from a disability, that the accommodation is unrelated to his disability.

The Court recognizes [*14] that there is currently no indication that working daytime shifts would be a "magic pill," surely allowing Plaintiff to fully perform his job duties. Even so, this raises, at best, factual issues regarding the effectiveness of Plaintiff's requested accommodation that are not appropriately resolved on a motion to dismiss. See *Deily v. Waste Mgmt. of Allentown, 55 F. App'x 605, 607 (3d Cir. 2003)* ("Under the ADA, [the plaintiff] must establish that he is qualified to do his job, and if accommodation is required, he must also show that an effective accommodation is available that would enable him to do the job." (emphasis added) (citing *Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 670 (3d Cir. 1999)))); 29 C.F.R. § 1630.2(o)(1)(ii)* ("reasonable accommodation means . . . [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position" (emphasis added)).

### B. Plaintiff Fails to Plead a "Regarded As" Disability Discrimination Claim Under the ADA.

Plaintiff claims, in the alternative, [*15] that Defendant discriminated against him in violation of the ADA because Defendants regarded him as disabled. The only adverse employment action Plaintiff alleges is Defendant's failure to provide him with a reasonable accommodation for his allegedly perceived disability. [6]

---

[6] The Court rejects Plaintiff's contention that Defendant's conduct amounted to a constructive discharge. Plaintiff alleges no facts consistent with his work environment being so

2013 U.S. Dist. LEXIS 90386, *15

This is not a cognizable claim pursuant to the ADAAA, which provides that employers "need not provide a reasonable accommodation . . . to an [employee] who meets the definition of disability . . . solely" because he is regarded as disabled. *42 U.S.C. § 12201(h)*; *accord Hohider v. UPS, Inc., 574 F.3d 169, 199 n.17 (3d Cir. 2009)*.

## C. Plaintiff Fails to Plead a Claim Under the PHRA for Failure to Provide a Reasonable Accommodation.

In order to make out a prima facie case of discrimination under the PHRA, "a plaintiff must **[*17]** establish that he is a 'qualified individual' with a 'disability' who suffered an adverse employment action 'because that disability.'" *Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274 (3d Cir. 2012)* (quoting *Turner, 440 F.3d at 611*). In order to establish a disability, a plaintiff must show that he is more than merely impaired; he must demonstrate:

1. "[A]n actual mental or physical impairment that substantially limits one or more major life activities,"
2. "[A] record of such impairment," or
3. "[T]hat his employer regarded him as having a disability."

*Macfarlan, 675 F.3d at 274.*

---

objectively intolerable that a reasonable person would have been compelled to resign. He also cites no authority for the proposition that a failure to provide a reasonable accommodation, by itself, creates such an environment. Cf. *Kiburz v. England, 361 F. App'x 326, 337 & n.11 (3d Cir. 2010)* ("[the plaintiff's] assertions of a convoluted accommodation request process, even if true, are a far cry from cases where **[*16]** we have concluded that an employee was constructively discharged"; "'[i]ntolerability' is a fairly high standard. . . . requir[ing] a showing that a reasonable person in the employee's position would feel like she had 'no choice but to resign'" (quoting *Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998)*; *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084-85 (3d Cir. 1996)*; *Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)*)); see also *Colwell v. Rite Aid Corp., 602 F.3d 495, 503-04 (3d Cir. 2010)* ("Factors we have found relevant to [constructive discharge] are whether the employer (1) 'threatened [the employee] with discharge' or 'urge[d] or suggest[ed] that she resign or retire,' (2) 'demote[d] her,' (3) 'reduce[d] her pay or benefits,' (4) 'involuntarily transferred [her] to a less desirable position,' (5) altered her 'job responsibilities,' or (6) gave 'unsatisfactory job evaluations.'" (alterations in the original) (quoting *Clowes, 991 F.2d at 1161*)).

Defendant argues that Plaintiff cannot establish that he is disabled within the meaning of the PHRA because his Type II Diabetes is non-insulin dependent and, therefore, per se not a disability under the PHRA. (Mot. at 5). Defendant cites no authority for this per se rule, and the Court is aware of none. [7]

Defendant contends, in the alternative, that Plaintiff's diabetes cannot qualify as a disability, because he fails to allege facts that, if true, would establish that his diabetes prevents him from working in a substantial class of jobs. (Mot. at 11). Plaintiff's PHRA claim, however, is not based on an assertion that he is substantially limited in his ability to work. Rather, Plaintiff claims that he suffers from substantial limitations regarding his abilities to think, concentrate, learn, read, and interact with others. Even assuming that these qualify as major life activities under the PHRA, see *29 CFR § 1630.2(i)* ("Major Life Activities means functions such as . . . learning."); *Bialko v. Quaker Oats Co., 434 F. App'x 139, 142 (3d Cir. 2011)* **[*19]** (treating thinking, concentrating, and socializing as major life activities), Plaintiff fails to allege sufficient facts that, if true, would establish that he is substantially limited with respect to any of them.

"'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Colwell, 602 F.3d 495* (alterations in the original) (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)*). Thus, an impairment is considered substantially limiting only if the plaintiff is:

1. "Unable to perform a major life activity that the average person in the general population can perform; or"

2. "Significantly restricted as to the condition,

---

[7] Defendant cites *Thompson v. Eaton Corp., No. 02-C-051-C, 2002 U.S. Dist. LEXIS 26381, 2002 WL 31995670 (W.D. Wis. Dec. 11, 2002)*, and *Carlson v. Rent-A-Center, Inc., 237 F. Supp. 2d 114 (D. Maine 2003)*, neither of which supports its position. According to *Thompson*, "there is no question that diabetes is an impairment" — the question **[*18]** in that case was whether the plaintiff's diabetes substantially limited a major life activity. *2002 U.S. Dist. LEXIS 26381, 2002 WL 31995670, at *7*. Similarly, the court in *Carlson* addressed the question of whether a walking impairment allegedly caused by the plaintiff's diabetes-related leg circulation issues was sufficiently severe to qualify as a disability; the court did not rule that a plaintiff's diabetes must be insulin-dependent in order for it to result in a disability. *237 F. Supp. 2d at 121-22.*

manner, and duration under which [he] can perform a particular major life activity as compared to the condition, manner, and duration under which the average person in the general population can perform that same major life activity."

29 C.F.R. § 1630.2(j)(1)(i)-(ii); accord Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 782 (3d Cir. 1998) (citing id.). In making this determination, Courts should consider:

1. "'The nature and severity of the impairment;'"

2. "'The duration or expected duration of **[*20]** the impairment;'" and

3. "'The permanent or long term impact of or resulting from the impairment.'"

Mondzelewski, 162 F.3d at 782 (alterations omitted) (quoting 29 C.F.R. § 1630.2(j)(2)(i)-(iii)). It is also helpful to analogize and distinguish the plaintiff's complaint from similar complaints "that were deemed to sufficiently plead a disability." Koller v. Riley Riper Hollin & Colagreco, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012) (Jones, J.).

Plaintiff's allegations are insufficient for any factfinder to perform the requisite analysis. His vague allegations that he has suffers from headaches, dizziness, and loss of focus with increasing frequency, and that he was disciplined at work on one occasion, while certainly consistent with some limitations, do not permit any reasonably accurate assessment of the magnitude of limitation he faces in any major life activity. See Warshaw v. Concentra Health Servs., 719 F. Supp. 2d 484, 495-96 (E.D. Pa. 2010) (Pollak, J.) (summary judgment against the plaintiff was appropriate where "[n]othing in the record . . . indicate[d] that [the] plaintiff [was] substantially — as opposed to slightly or moderately — impaired in his ability to think or concentrate **[*21]** . . . [c]rucially, [the] plaintiff ha[d] not presented any evidence to demonstrate how these limitations affect his quotidian activities" (emphasis in the original)). Additionally, Plaintiff's treating physician stated that he was "approaching reasonably good control" of his medical conditions, and that he was "capable of performing the responsibilities of his job, in the short term, but this becomes less clear for the future." Both of these statements belie Plaintiff's assertion that he suffers from substantial limitations. (Am. Compl., Exs. C and D).

**D. Plaintiff Fails to Plead a "Regarded As"**

**Discrimination Claim Under the PHRA.**

Proper pleading of a claim for discrimination under the PHRA because an employer "regarded" a plaintiff as disabled requires that the plaintiff allege facts that, if true, would establish "that the employer believed that a wholly unimpaired plaintiff had an impairment that substantially limited at least one major life activity or that the employer believed an employee's actual impairment to limit major life activities when it in fact did not." Macfarlan, 675 F.3d at 274.

Plaintiff, however, makes only the conclusory allegation that Defendant "treated him differently **[*22]** than other employees who were not regarded as disabled," (Am. Compl. ¶ 11); nothing in his Amended Complaint even hints at the nature of the limitation from which Defendant allegedly believed him to suffer. This is a patently insufficient pleading: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to survive a motion to dismiss. Iqbal, 556 U.S. at 679.

**VI. Conclusion**

For the reasons above, Defendant's Motion to Dismiss is DENIED in part and GRANTED in part. The Court grants Plaintiff leave to file a second amended complaint to address the issues discussed above. An appropriate Order follows. O:\Matt12\12cv5714.Szarawara    v.    Couny    of Montgomery\12cv5714.Memo    re    Mot.    to Dismiss[6.24.13].doc

**ORDER**

**AND NOW**, this 27th day of June, 2013, for the reasons state in the foregoing Memorandum, it is hereby **ORDERED** that defendant's Motion to Dismiss (ECF 7) is **GRANTED** in part and **DENIED** in part. Plaintiff may file a Second Amended Complaint within twenty-one (21) days.

**BY THE COURT:**

**/s/ Michael M. Baylson**

**MICHAEL M. BAYLSON, U.S.D.J.**

 Positive

As of: May 22, 2022 4:40 PM Z

## *Weisman v. Buckingham Twp.*

United States District Court for the Eastern District of Pennsylvania

June 14, 2005, Decided

CIVIL ACTION NO. 04-CV-4719

**Reporter**

2005 U.S. Dist. LEXIS 11696 *; 10 Wage & Hour Cas. 2d (BNA) 1163

MAX WEISMAN vs. BUCKINGHAM TOWNSHIP, BUCKINGHAM TOWNSHIP BOARD OF SUPERVISORS, RAYMOND STEPNOSKI, HENRY ROWAN, and JANET FRENCH

## Case Summary

### Procedural Posture

Defendants, a township, its board of supervisors, and individuals, including the board's chairman, moved to dismiss plaintiff employee's claims under the Family & Medical Leave Act, *29 U.S.C.S. § 2601 et seq.*, and the Sunshine Act, *65 Pa. Cons. Stat. § 701 et seq.*, and for invasion of privacy and breach of contract and/or promissory estoppel. The chairman moved to dismiss the tortious interference with contractual relationship claim against him.

### Overview

The employee argued that defendants interfered with and/or violated the FMLA under *29 U.S.C.S. 2615* by failing to provide him with adequate notice of his FMLA rights or notice that fully complied with *29 C.F.R. § 825.301(b)(1)*. Although the court found no merit to the employee's contention that defendants violated his FMLA rights by designating him as a "key employee," he sufficiently pled, under *29 U.S.C.S. § 2614(a)(4)*, that the township did not have a uniform policy requiring, as a condition of restoration, that he receive certification that he was able to resume work from his doctor. He also sufficiently pled his claims alleging that defendants interfered with his FMLA rights by failing to provide certain information regarding the township's FMLA policies. The employee sufficiently pled invasion of privacy regarding defendants' knowledge and publication of his mental illness under *Fed. R. Civ. P. 8(a)*'s notice pleading standard. The individuals were not entitled to qualified immunity against that claim. The

employee also sufficiently pled his breach of contract and tortious interference claims, but his Sunshine Act claim was barred as untimely under Pa. Const. Stat. *§ 713*.

### Outcome

The court dismissed the portion of the employee's FMLA claim regarding defendants' designation of the employee as a "key employee" and his Sunshine Act claim. But the employee's remaining FMLA claims and his breach of contract and tortious interference with contractual relationship claims were allowed to proceed.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### *HN1*[⬇] Motions to Dismiss, Failure to State Claim

It has long been the rule that in considering motions to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the district courts must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### *HN2*[⬇] Motions to Dismiss, Failure to State Claim

A motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* may only be granted where the allegations fail to state any claim upon which relief may be granted. The inquiry is

not whether the plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims. Dismissal is warranted only if it is certain that no relief can be granted under any set of facts which could be proved.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN3*[⤓]  **Motions to Dismiss, Failure to State Claim**

Courts, when deciding motions to dismiss under *Fed. R. Civ. P. 12(b)(6)*, are not required to credit bald assertions or legal conclusions improperly alleged in the complaint and legal conclusions may not benefit from the presumption of truthfulness. A court may, however, look beyond the complaint to extrinsic documents when the plaintiff's claims are based on those documents.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

*HN4*[⤓]  **Leaves of Absence, Family & Medical Leaves**

In the Family & Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, Congress explicitly recognizes that there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods. *29 U.S.C.S. § 2601(a)(4)*. Thus, the FMLA provides leave for workers whose personal or medical circumstances necessitate leave in excess of what their employers are willing or able to provide. *29 C.F.R. § 825.101*.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Restoration of Benefits & Positions

*HN5*[⤓]  **Leaves of Absence, Family & Medical Leaves**

One of the chief goals of the Family & Medical Leave Act, *29 U.S.C.S. § 2601 et seq.*, is to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to entitle employees to take reasonable leave for medical reasons, and to accomplish those purposes in a manner that accommodates the legitimate interests of employers. *29 U.S.C.S. § 2601(b)(1)-(3)*. To accomplish these goals, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period. *29 U.S.C.S. § 2612(a)(1)*. Upon return from leave, the employee is entitled to be restored by the employer to the position of employment held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. *29 U.S.C.S. § 2614(a)(1)*.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Employee Leave Requirements

*HN6*[⤓]  **Leaves of Absence, Family & Medical Leaves**

The Family & Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, prohibits employers from interfering with, restraining or denying an employee's exercise or attempted exercise of his leave rights, from discharging or in any other manner discriminating against an employee for opposing any practice made unlawful by the Act or for filing any charges or instituting any proceedings related to the Act. *29 U.S.C.S. § 2615*. Under the FMLA's companion regulations, the employer must communicate with employees regarding their rights under the FMLA, providing individualized notice to employees regarding their FMLA rights and obligations. *29 C.F.R. § 825.208(a)*.

Healthcare Law > Business Administration & Organization > Employment Issues > Employment Discrimination

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Burdens of Proof

2005 U.S. Dist. LEXIS 11696, *11696

Evidence > Burdens of Proof > General Overview

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

Labor & Employment Law > Wrongful Termination > Remedies > Reinstatement

*HN7*[⤓]   **Employment   Issues,   Employment Discrimination**

Courts recognize that the Family & Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, creates two distinct causes of action. First, a plaintiff may pursue recovery under an "entitlement" or "interference" theory. This claim arises under *29 U.S.C.S. § 2615(a)(1)*, which makes it unlawful for an employer to interfere with, restrain, or deny an employee's rights under the FMLA. Under an interference claim, it is the plaintiff's burden to show (1) she is an eligible employee under the FMLA; (2) the defendant is an employer subject to the requirements of the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave notice to the defendant of her intention to take FMLA leave, and (5) the defendant denied her the benefits to which she was entitled under the FMLA. Interference claims are not about discrimination; the issue is simply whether the employer provided its employee the entitlements set forth in the FMLA such as a 12 week leave or reinstatement after taking a medical leave. An interference claim also arises if an employee can demonstrate that his employer did not advise him of his rights under the FMLA and that this failure to advise rendered him unable to exercise his leave rights in a meaningful way thereby causing injury.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

*HN8*[⤓]  **Leaves of Absence, Family & Medical Leaves**

See *29 C.F.R. § 825.208(a)*.

Business & Corporate Compliance > ... > Leaves of Absence > Family & Medical Leaves > Posting & Recordkeeping

Labor & Employment Law > ... > Family & Medical

Leaves > Scope & Definitions > General Overview

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

*HN9*[⤓]   **Family   &   Medical   Leaves,   Posting   & Recordkeeping**

See *29 C.F.R. § 825.301*.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

*HN10*[⤓]  **Leaves of Absence, Family & Medical Leaves**

See *29 U.S.C.S. § 2614(a)(4)*.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

*HN11*[⤓]  **Leaves of Absence, Family & Medical Leaves**

See *29 C.F.R. § 825.700(a)*.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Employee Leave Requirements

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

*HN12*[⤓]  **Leaves of Absence, Family & Medical Leaves**

While the regulations do not specify it, the U.S. Court of Appeals for the Third Circuit has strongly suggested that an employer's Family & Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, notice should include information regarding an employee's options to take medical leave on an intermittent basis.

2005 U.S. Dist. LEXIS 11696, *11696

Constitutional Law > Substantive Due
Process > Privacy > Personal Decisions

Constitutional Law > Substantive Due
Process > Privacy > General Overview

Constitutional Law > Substantive Due
Process > Privacy > Personal Information

Constitutional Law > Substantive Due
Process > Scope

*HN13*[⤓]  **Privacy, Personal Decisions**

The constitutional right to privacy, as recognized by the U.S. Supreme Court, extends to two types of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions. Although the full measure of the constitutional protection of the right to privacy has not yet been fully delineated, it has been found to encompass matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. An employee's medical records, which may contain intimate facts of a personal nature, are also well within the ambit of materials entitled to privacy protection.

Civil
Procedure > ... > Pleadings > Complaints > Require
ments for Complaint

Civil Procedure > Pleading &
Practice > Pleadings > Rule Application &
Interpretation

*HN14*[⤓]  **Complaints, Requirements for Complaint**

Under Fed. R. Civ. P . 8(a), a plaintiff need only provide a short and plain statement of the claim showing that the pleader is entitled to relief.

Civil Rights Law > ... > Immunity From
Liability > Local Officials > Customs & Policies

*HN15*[⤓]  **Local Officials, Customs & Policies**

Qualified immunity protects governmental officials

performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. A right is clearly established if its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right. If a violation exists, the immunity question focuses on whether the law is established to the extent that the unlawfulness of the action would have been apparent to a reasonable official. Thus, while a plaintiff need not show that the very action in question has previously been held unlawful, he needs to show that in light of preexisting law, the unlawfulness was apparent.

Constitutional Law > Substantive Due
Process > Privacy > Personal Information

Torts > ... > Invasion of Privacy > Public Disclosure
of Private Facts > General Overview

Constitutional Law > Substantive Due
Process > Privacy > General Overview

Constitutional Law > Substantive Due
Process > Scope

*HN16*[⤓]  **Privacy, Personal Information**

The law is clearly established, at least as of 1977, that public disclosure and/or dissemination of an individual's medical records, in the absence of a compelling competing interest on the part of the state, constitutes an unlawful violation of one's constitutionally protected right to privacy.

Business & Corporate Compliance > ... > Contracts
Law > Types of Contracts > Oral Agreements

Labor & Employment Law > Employment
Relationships > Employment Contracts > Contract
Interpretation

Contracts Law > Contract
Formation > Offers > General Overview

Labor & Employment Law > Employment
Relationships > General Overview

Labor & Employment Law > Employment
Relationships > Employment Contracts > General

2005 U.S. Dist. LEXIS 11696, *11696

Overview

Labor & Employment Law > ... > Employment Contracts > Conditions & Terms > General Overview

*HN17*[⤓]  **Types of Contracts, Oral Agreements**

Evidence of mutual assent to employ and be employed which contains all the elements of a contract may be construed as a binding contract of employment though not reduced to writing. Thus, in Pennsylvania it is possible for the parties to bind themselves orally even when contemplating a later written contract, provided that the parties have manifested mutual intent to do so and there is agreement on all aspects of the employment relationship.

Commercial Law (UCC) > Sales (Article 2) > Remedies > General Overview

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > Breach > General Overview

*HN18*[⤓]  **Sales (Article 2), Remedies**

Generally, to support a claim for breach of contract under Pennsylvania law, a plaintiff must allege: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.

Torts > ... > Prospective Advantage > Intentional Interference > Elements

Torts > ... > Commercial Interference > Contracts > General Overview

Torts > ... > Commercial Interference > Prospective Advantage > General Overview

*HN19*[⤓]  **Intentional Interference, Elements**

Under Pennsylvania law, a cause of action for tortious interference with contractual relations has the following elements: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm

the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Administrative Law > Governmental Information > Public Information > General Overview

*HN20*[⤓]  **Governmental Information, Public Information**

See *65 Pa. Cons. Stat. § 704*.

Administrative Law > Governmental Information > Public Information > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

*HN21*[⤓]  **Governmental Information, Public Information**

See *65 Pa. Cons. Stat. § 713*.

Administrative Law > Governmental Information > Public Information > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Administrative Law > Judicial Review > Reviewability > Jurisdiction & Venue

*HN22*[⤓]  **Governmental Information, Public Information**

Failure to initiate a legal challenge within the statutory limitations period of *65 Pa. Cons. Stat. § 713* bars jurisdiction by the trial court.

**Counsel:**  [*1]  For MAX WEISMAN, Plaintiff: STACY G. SMITH, LEVIN LEGAL GROUP, P.C., HUNTINGDON VALLEY, PA.

For BUCKINGHAM TOWNSHIP, BUCKINGHAM TOWNSHIP BOARD OF SUPERVISORS, RAYMOND

2005 U.S. Dist. LEXIS 11696, *1

STEPNOSKI, HENRY ROWAN, JANET FRENCH, Defendants: DAVID M. MASELLI, WRIGHT & O'DONNELL, CONSHOHOCKEN, PA.

**Judges:** J. CURTIS JOYNER, J.

**Opinion by:** J. CURTIS JOYNER

# Opinion

*MEMORANDUM AND ORDER*

**JOYNER, J. June 14, 2005**

By way of the motion now pending before this Court, Defendants move for the dismissal of Counts I, VI, VII, VIII and IX of Plaintiff's Amended Complaint. For the reasons discussed below, the motion shall be granted in part.

*Factual Background*

Plaintiff, Max Weisman, first became employed by Defendant Buckingham Township in September, 1998 as the Finance Director. In November, 1999, Plaintiff was appointed by the Buckingham Township Board of Supervisors to the position of Interim Township Manager and then in February, 2000 was offered the position of Township Manager. [1] (Amended Complaint, Ps18-21). Between February and June, 2000, when he presented them with proposed written employment and severance agreements covering his salary, vacation time and other benefits, Plaintiff negotiated [*2] the terms of his employment as Township Manager with the Supervisors. Although Defendants never actually signed the proposed written agreements, Plaintiff alleges that they did implement the terms proposed therein and continued to assure him that the written contracts would be signed in due course. (Am. Compl., Ps 22-29).

Mr. Weisman has been suffering from depression since he was a teenager and, in or about November, 1997, was diagnosed as suffering from bi-polar disorder, panic disorder and major depression. (Am. Compl., P14). To the best of Plaintiff's knowledge, however, no one at the

Township knew that he suffered from these conditions, as he was able to perform the essential functions of his jobs with the Township except during acute and temporary episodes. (Am. Compl., Ps16, 33). In March, 2001, Plaintiff required an extended leave to [*3] donate a kidney to a relative. At that time and pursuant to what Plaintiff alleges was "an unwritten but regularly implemented policy, practice and/or custom of the Township," he was advanced two weeks of sick leave so that he would not have a lapse in salary while he was out. (Am. Compl., Ps31-32).

On December 2, 2002, Plaintiff left work around lunchtime because of symptoms related to his depressive illness and, after seeing his doctor on December 4, began intensive treatment in a partial hospitalization program on December 6, 2002. [2] On December 12, 2002, Defendant Raymond Stepnoski, the then-Chairman of the Board of Supervisors, sent Plaintiff a letter giving formal notice that the township was treating his absence from work as being covered under the Family Medical Leave Act, effective December 2, 2002 and that he was a "key employee" within the meaning of the FMLA. (Am. Compl., P37). On December 20, 2002, Plaintiff was paid for all of his accrued sick, personal and vacation time and was thus not advanced two weeks of sick leave as he had been in March, 2001. When Plaintiff asked Ms. Cozza why he had not been advanced sick leave, she informed him that although she had done the [*4] paperwork to advance him the leave, Mr. Stepnoski had directed her not to do so. (Am. Compl., Ps38-39).

Although Plaintiff had initially advised Township Human Resources Director Dana Cozza that he was suffering from pneumonia and it was pneumonia which was referenced in Mr. Stepnoski's December 12th letter, on December 30, 2002, Mr. Weisman disclosed the true nature of his illness to Ms. Cozza through a letter accompanying his completed medical forms and requesting that the information be kept confidential. (Am. Compl., Ps36, 40). In that same letter, Plaintiff also informed Defendants that he was disabled and requested accommodations due to his disability and that he be paid according to the disability provisions in his employment [*5] contract. While acknowledging that they had been made aware of Mr. Weisman's disability,

---

[1] Plaintiff further avers that between November, 1999 and July, 2000, he was employed as both the Township's Manager and its Finance Director. (Amended Complaint, P20).

[2] Plaintiff's Amended Complaint actually avers that his treatment commenced on December 6, 2004. However, given that all of the other time frames referenced in the amended complaint are to the year 2002, we assume that the reference to 2004 in paragraph 35 is a typographical error.

KIMBERLY BORLAND

the defendants did not offer to engage in any interactive process and did not pay Plaintiff any disability benefits. (Am. Comp., Ps40-43). Thereafter, in January, 2003, several local newspapers published articles indicating that Plaintiff was on an extended leave of absence and that Mr. Stepnoski was "running the Township." Plaintiff also began hearing from other people who had either done business with the township or were otherwise associated with the township that they had heard rumors concerning his specific illness. (Am. Compl., Ps44-46). At the February 12, 2003 meeting of the Township Board of Supervisors, Mr. Stepnoski resigned from his position as Chairman of the Board and was then appointed by the remaining Supervisors to the paid position of "Interim Township Manager." (Am. Compl., Ps55-56).

On February 14, 2003, Plaintiff dual filed complaints with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission against the defendants for their refusal/failure to provide him with rights and benefits to which he was entitled and alleging violations of the [*6] _Pennsylvania Human Relations Act_, the _Americans with Disabilities Act_ and the Family Medical Leave Act. (Am. Compl., P48). On February 28, 2003, Defendant Henry Rowan, Vice-Chairman of the Township Board of Supervisors sent Plaintiff a letter terminating him from his position effective March 1, 2003 because his FMLA leave had expired on February 24, 2003. (Am. Compl., Ps50-51). On July 15, 2004, Plaintiff received Notice of his Right to Sue from the EEOC. He received Notice of his Right to Sue from the PHRC on September 24, 2004. (Exhibit "A" to Amended Complaint). Mr. Weisman then filed this lawsuit on October 7, 2004, against all of the defendants for violations of the Family Medical Leave Act, _29 U.S.C. § 2601, et. seq._, the Americans with Disabilities Act, _42 U.S.C. § 12101, et. seq._, the Pennsylvania Human Relations Act, _43 P.S. § 951, et. seq._, the Sunshine Act, _65 Pa.C.S. § 701, et. seq._, the Second Class Township Code, _53 P.S. § 65101, et. seq._, and for invasion of privacy and breach of contract and/or promissory estoppel and against Defendant Stepnoski [*7] only for tortious interference with contractual relationship. As noted, Defendants now move to dismiss the plaintiff's claims under the FMLA (Count I) and the Sunshine Act (Count IX) and for invasion of privacy, breach of contract/promissory estoppel and his claim against Mr. Stepnoski for tortious interference.

**Standards Applicable to Motions to Dismiss**

_HN1_[⬆] It has long been the rule that in considering motions to dismiss pursuant to _Fed.R.Civ.P. 12(b)(6)_, the district courts must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." _Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000)_(internal quotations omitted). See Also: _Ford v. Schering-Plough Corp., 145 F.3d 601, 604 (3d Cir. 1998)_. _HN2_[⬆] A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief may be granted. See, _Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997)_. The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity [*8] to offer evidence in support of their claims. _In re Rockefeller Center Properties, Inc., 311 F.3d 198, 215 (3d Cir. 2002)_. Dismissal is warranted only "if it is certain that no relief can be granted under any set of facts which could be proved." _Klein v. General Nutrition Companies, Inc., 186 F.3d 338, 342 (3d Cir. 1999)_(internal quotations omitted). It should be noted that _HN3_[⬆] courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint and legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. _In re Rockefeller, 311 F.3d at 216_. A court may, however, look beyond the complaint to extrinsic documents when the plaintiff's claims are based on those documents. _GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004)_; _In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1426_. See Also, _Angstadt v. Midd-West School District, 377 F.3d 338, 342 (3d Cir. 2004)_.

**Discussion**

A. _Dismissal of Plaintiff's FMLA Claims._

_HN4_[⬆] In enacting the FMLA, Congress [*9] explicitly recognized that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." _29 U.S.C. § 2601(a)(4)_. Thus, the FMLA was enacted to provide leave for workers whose personal or medical circumstances necessitate leave in excess of what their employers are willing or able to provide. _Victorelli v. Shadyside Hospital, 128 F.3d 184, 186 (3d Cir. 1997)_, citing _29 C.F.R. § 825.101_. _HN5_[⬆] One of the chief goals of the Act was "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families,... and to entitle employees to take reasonable leave for medical

2005 U.S. Dist. LEXIS 11696, *9

reasons,... and to accomplish [those] purposes in a manner that accommodates the legitimate interests of employers..." *29 U.S.C. § 2601(b)(1)-(3)*. *See Also, Churchill v. Star Enterprises, 183 F.3d 184, 192 (3d Cir. 1999)*. To accomplish these goals, "...an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period..." *29 U.S.C. § 2612(a)(1)*. **[*10]** Upon return from leave, the employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced," or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *29 U.S.C. § 2614(a)(1)*.

In addition to these provisions, *HN6*[⬆] the FMLA also prohibits employers from interfering with, restraining or denying an employee's exercise or attempted exercise of his leave rights, from discharging or in any other manner discriminating against an employee for opposing any practice made unlawful by the Act or for filing any charges or instituting any proceedings related to the Act. *29 U.S.C. § 2615*. Under the FMLA's companion regulations, the employer must communicate with employees regarding their rights under the FMLA, providing individualized notice to employees regarding their FMLA rights and obligations. *Fogleman v. Greater Hazleton Health Alliance, 122 Fed. Appx. 581, 587 (3d Cir. Dec. 23, 2004)*; *29 C.F.R. § 825.208(a)*.

*HN7*[⬆] Courts have thus recognized that the FMLA creates two distinct causes **[*11]** of action. *Coppa v. American Society for Testing and Materials, Civ. A. No. 04-234, 2005 U.S. Dist. LEXIS 8737 at *4 (E.D.Pa. May 11, 2005)*; *Callison v. City of Philadelphia, Civ. A. No. 03-3008, 2004 U.S. Dist. LEXIS 6770 at *9-*10 (E.D.Pa. March 31, 2004)*. First, a plaintiff may pursue recovery under an "entitlement" or "interference" theory. This claim arises under *29 U.S.C. § 2615(a)(1)*, which makes it unlawful for an employer "to interfere with, restrain, or deny" an employee's rights under the FMLA. *Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 570 (M.D.Pa. 2004)*; *Callison, 2004 U.S. Dist. LEXIS at *10*. Under an interference claim, it is the plaintiff's burden to show (1) she is an eligible employee under the FMLA, (2) defendant is an employer subject to the requirements of the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave notice to the defendant of her intention to take FMLA leave, and (5) the defendant denied her the benefits to which she was entitled under the FMLA. *Bearley, 322 F. Supp. 2d at 571*; *Parker v. Hahnemann University Hospital, 234 F. Supp. 2d 478, 483 (D. N.J. 2002)*. **[*12]** Interference claims are not

about discrimination; the issue is simply whether the employer provided its employee the entitlements set forth in the FMLA such as a twelve week leave or reinstatement after taking a medical leave. *Callison, 2004 U.S. Dist. LEXIS at *11*, quoting *Parker, 234 F. Supp. 2d at 485* and *Hodgens v. General Dynamics Corporation, 144 F.3d 151, 159 (1st Cir. 1998)*. An interference claim also arises if an employee can demonstrate that his employer did not advise him of his rights under the FMLA and that this failure to advise rendered him unable to exercise his leave rights in a meaningful way thereby causing injury. *Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004)*.

The second type of recovery under the FMLA is the "retaliation" theory. Retaliation claims are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *Coppa, supra.* To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) she took an FMLA leave, (2) she suffered **[*13]** an adverse employment decision, and (3) the adverse decision was causally related to her leave. *Lepore v. LanVision Systems, Inc., 113 Fed. Appx. 449, 453 (3d Cir. Oct. 19, 2004)*; *Helfrich v. Lehigh Valley Hospital, Civ. A. No. 03-5793, 2005 U.S. Dist. LEXIS 4420 at *65 (E.D.Pa. March 22, 2005)*. After the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. If a legitimate, nondiscriminatory reason is provided, the burden shifts back to plaintiff to establish that the employer's reasons are pretextual. *Coppa, 2005 U.S. Dist. LEXIS 8737 at *5*, citing *Baltuskonis v. U.S. Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D.Pa. 1999)*.

In this case, it appears that the plaintiff is endeavoring to state an "interference" claim in that he contends that he is an "eligible employee," the defendant township is an "employer" and that he had a "serious health condition" within the meaning of the FMLA. (Am. Compl., Ps66-67). Although Plaintiff avers that he did not request FMLA leave, by letter dated December 12, 2002, Defendants **[*14]** notified him that it was designating his absence from work commencing December 2, 2002 as covered under the FMLA. Plaintiff further avers that Defendants interfered with and/or violated his rights under the FMLA by failing to provide him with adequate notice of his rights under the FMLA or notice that fully complied with *29 C.F.R. § 825.301(b)(1)* because they failed to provide (1) notice and/or information as to the

2005 U.S. Dist. LEXIS 11696, *14

right under the policies, practices and customs of the Township to allow employees to substitute paid leave for the FMLA leave and the right to have the FMLA leave commence only after paid leaves were exhausted; and (2) notice of or information of his right to take leave intermittently or on a reduced leave schedule. (Am. Compl., P73). Plaintiff alleges that his FMLA rights were further violated by virtue of Defendants' notification (1) that he needed a fitness for duty certificate, (as the Township did not have a uniformly applied policy) and (2) that he was a "key" employee. (Am. Compl., Ps 74-75).

Under _29 C.F.R. § 825.208(a)_, HN8[↑] "in all circumstances, it is the employer's responsibility to designate leave, paid or [*15] unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section." _29 C.F.R. § 825.301_ provides the following in relevant part with respect to employer notification:

(a)(1) HN9[↑] If an FMLA-covered employer has any eligible employees and has any written guidance to employees concerning employee benefits or leave rights, such as in an employee handbook, information concerning FMLA entitlements and employee obligations under the FMLA must be included in the handbook or other document. For example, if an employer provides an employee handbook to all employees that describes the employer's policies regarding leave, wages, attendance, and similar matters, the handbook must incorporate information on FMLA rights and responsibilities and the employer's policies regarding the FMLA…

(2) If such an employer does not have written policies, manuals or handbooks describing employee benefits and leave provisions, the employer shall provide written guidance to an employee concerning all the employee's rights and obligations under the FMLA. This notice shall be provided to employees each time notice is given pursuant to paragraph [*16] (b) and in accordance with the provisions of that paragraph…

(b)(1) The employer shall also provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations. The written notice must be provided to the employee in a language in which the employee is literate…Such specific notice must include, as appropriate:

(i) that the leave will be counted against the employee's annual FMLA leave entitlement;

(ii) any requirements for the employee to furnish medical certification of a serious health condition and the consequences of failing to do so;

(iii) the employee's right to substitute paid leave and whether the employer will require the substitution of paid leave and the conditions related to any substitution;

(iv) any requirement for the employee to make any premium payments to maintain health benefits and the arrangements for making such payments, and the possible consequences of failure to make such payments on a timely basis (i.e., the circumstances under which coverage may lapse);

(v) any requirement for the employee to present a fitness-for-duty certificate [*17] to be restored to employment;

(vi) the employee's status as a "key employee" and the potential consequence that restoration may be denied following FMLA leave, explaining the conditions required for such denial;

(vii) the employee's right to restoration to the same or an equivalent job upon return from leave; and

(viii) the employee's potential liability for payment of health insurance premiums paid by the employer during the employee's unpaid FMLA leave if the employee fails to return to work after taking FMLA leave.

(2) The specific notice may include other information-e.g., whether the employer will require periodic reports of the employee's status and intent to return to work, but is not required to do so…

(c) Except as provided in this subparagraph, the written notice required by paragraph (b) (and by subparagraph (a)(2) where applicable) must be provided to the employee no less often than the first time in each six-month period that an employee gives notice of the need for FMLA leave (if FMLA leave is taken during the six-month period). The notice shall be given within a reasonable time after notice of the need for leave is given by the employee--within one or two [*18] business days if feasible. If leave has already begun, the notice shall be mailed to the employee's address of record…..

In reviewing the December 12, 2002 notification letter, we find no merit to the plaintiff's contention that his FMLA rights were violated by Defendants' "key employee" designation. Rather, it appears that the Township was merely complying with the requirements

2005 U.S. Dist. LEXIS 11696, *18

of the two foregoing regulations. However, under _Section 2614(a)(4)_, HN10[⬆] "as a condition of restoration under paragraph (1) for an employee who has taken leave?the employer may have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work..." As Plaintiff alleges that the defendant township did not have such a uniform policy, we find he has sufficiently pled a cause of action under the FMLA to withstand the instant motion to dismiss.

Furthermore, under _29 C.F.R. § 825.700(a)_, HN11[⬆] "an employer must observe any employment benefits program or plan that provides greater family or medical leave rights to employees than the rights established by the FMLA." Additionally, [*19] HN12[⬆] while the regulations do not specify it, the Third Circuit's decision in _Conoshenti, supra._, quoting _Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89-90, 122 S. Ct. 1155, 1161, 152 L. Ed. 2d 167 (2002)_ strongly suggests that an employer's FMLA notice should also include information regarding an employee's options to take medical leave on an intermittent basis. ("Consider, for instance, the right under _§ 2612(b)(1)_ to take intermittent leave when medically necessary. An employee who undergoes cancer treatments every other week over the course of 12 weeks might want to work during the off weeks, earning a paycheck and saving six weeks for later. If she is not informed that her absence qualifies as FMLA leave--and if she does not know of her right under the statute to take intermittent leave--she might take all 12 of her FMLA-guaranteed weeks consecutively and have no leave remaining for some future emergency. In circumstances like these,...the employer's failure to give the notice could be said to "deny," "restrain," or "interfere with" the employee's exercise of her right to take intermittent leave...) Accordingly, we shall also deny the [*20] motion to dismiss that part of the plaintiff's FMLA claim which alleges that Defendants interfered with his FMLA rights because they failed to provide information as to the Township's policies, practices and customs to allow employees to substitute paid leave for FMLA leave and the right to have the FMLA leave commence only after paid leaves were exhausted, and of his right to take intermittent leave. Defendants are of course free to re-assert their arguments in support of dismissal should Plaintiff fail to demonstrate prejudice as a result of these alleged failures.

B. _Dismissal of Plaintiff's Invasion of Privacy Claim._

Defendants next move to dismiss Count VI of the amended complaint, which alleges that Plaintiff's constitutionally protected privacy rights were violated by the defendants' purported disclosures of his illness to the public.

HN13[⬆] The constitutional right to privacy, as recognized by the U.S. Supreme Court, extends to two types of interests. _C.N. ex. rel. I.N. v. Ridgewood Board of Education, 319 F. Supp. 2d 483, 493 (D.N.J. 2004)_. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence [*21] in making certain kinds of important decisions. _Whalen v. Roe, 429 U.S. 589, 599, 97 S. Ct. 869, 876, 51 L. Ed. 2d 64 (1977)_. Although the full measure of the constitutional protection of the right to privacy has not yet been fully delineated, it has been found to encompass "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." _United States v. Westinghouse Electric Corp., 638 F.2d 570, 577 (3d Cir. 1980)_, quoting _Paul v. Davis, 424 U.S. 693, 713, 96 S. Ct. 1155, 1166, 47 L. Ed. 2d 405 (1976)_. An employee's medical records, which may contain intimate facts of a personal nature, are also well within the ambit of materials entitled to privacy protection. _Sterling v. Borough of Minersville, 232 F.3d 190, 195 (3d Cir. 2000)_; _Westinghouse, supra._ See Also, _Gruenke v. Seip, 225 F.3d 290, 302-303 (3d Cir. 2000)_ and _Doe v. SEPTA, 72 F.3d 1133, 1137 (3d Cir. 1995)_.

Defendants here move to dismiss on the grounds that the plaintiff ostensibly did not specifically allege that his medical records were either available to Defendants [*22] or were released to the public by Defendants. Rather, Plaintiff avers only that the defendants "made public and/or caused to be published in the newspaper" that he was "ill." Plaintiff, however, also alleges that the defendants "stated to individuals" that he "was ill and/or suffering from a mental illness. (Am. Compl., P114) Furthermore, in that portion of the Amended Complaint captioned "Facts Underlying Causes of Action," Mr. Weisman also alleges that (1) he disclosed the true nature of his illness to the township's human resources director in a letter and via his completed medical forms, (2) that the township defendants acknowledged having been made aware of his specific disability in a letter from Mr. Stepnoski dated January 13, 2003 and (3) that other people who were associated with or did business with the township told him that they had heard rumors and/or were made aware of his specific illness. (Am. Compl., Ps 40, 41, 43-45).

Given that *HN14*[⬆] under *Fed.R.Civ.P. 8(a)*, a plaintiff need only provide "...a short and plain statement of the claim showing that the pleader is entitled to relief," we find that these averments, taken altogether, are [*23] adequate to plead a claim for invasion of privacy. [3]

We likewise find unavailing the defendants' argument that they are entitled to dismissal on the basis of qualified immunity. *HN15*[⬆] Qualified immunity protects governmental officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)*. A right is clearly established if its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right. *Sterling, 232 F.3d at 193*, citing *Kornegay v. Cottingham, 120 F.3d 392, 396 (3d Cir. 1997)*. If a violation exists, [*24] the immunity question focuses on whether the law is established to the extent that "the unlawfulness of the action would have been apparent to a reasonable official." *Id.*, quoting *Assaf v. Fields, 178 F.3d 170, 174 (3d Cir. 1999)*. Thus, while a plaintiff need not show that the very action in question has previously been held unlawful, he needs to show that in light of preexisting law, the unlawfulness was apparent. *Shea v. Smith, 966 F.2d 127, 130 (3d Cir. 1992)*.

In this case, as is apparent from *Whalen v. Roe, supra.*, *HN16*[⬆] the law was clearly established at least as of 1977 that public disclosure and/or dissemination of an individual's medical records, in the absence of a compelling competing interest on the part of the state, constituted an unlawful violation of one's constitutionally protected right to privacy. Accepting the plaintiff's averments as true that "one or more of the individual defendants made public and/or caused to be published in the newspaper that [he] was ill...and/or suffering from a mental illness...," we find that qualified immunity would not be available to the individual defendants here, given the clearly [*25] established law on this issue. The motion to dismiss Count VI of the Amended Complaint is therefore denied.

C. *Dismissal of Plaintiff's Breach of Contract and Tortious Interference with Contract Claims.*

Defendants next move for the dismissal of Plaintiff's breach of contract and tortious interference with contract claims for the reason that the employment contract upon which he bases these claims was never signed.

*HN17*[⬆] Evidence of mutual assent to employ and be employed which contains all the elements of a contract may be construed as a binding contract of employment though not reduced to writing. *George W. Kistler, Inc. v. O'Brien, 464 Pa. 475, 347 A.2d 311, 315 (1975)*. Thus, in Pennsylvania it is possible for the parties to bind themselves orally even when contemplating a later written contract, provided that the parties have manifested mutual intent to do so and there is agreement on all aspects of the employment relationship. *Overseas Strategic Consulting, Ltd. v. Larkins, Civ. A. No. 01-4115, 2001 U.S. Dist. LEXIS 16390 at *12 (E.D.Pa. Oct. 10, 2001)*. *HN18*[⬆] Generally, to support a claim for breach of contract under Pennsylvania law, a plaintiff must [*26] allege: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damages. *Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003)*; *Pittsburgh Construction Co. v. Griffith, 2003 PA Super 374, 834 A.2d 572, 580 (Pa.Super. 2003)*; *Koken v. Steinberg, 825 A.2d 723, 729 (Pa.Cmwlth. 2003)*.

*HN19*[⬆] Under Pennsylvania law, a cause of action for tortious interference with contractual relations has the following elements: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *CGB Occupational Therapy v. RHA Health Services, Inc., 357 F.3d 375, 384 (3d Cir. 2004)*; *Milicic v. Basketball Marketing Co., Inc., 2004 PA Super 333, 857 A.2d 689, 697 (Pa. Super. 2004)*.

In application [*27] of the foregoing principles to the case at hand, we find that the plaintiff has alleged sufficient facts to plead viable claims for breach of an employment contract and for tortious interference with the terms of that contract on the part of Mr. Stepnoski.

To be sure, while it is true that the amended complaint avers that the township never formally executed the proposed written agreements which Plaintiff submitted, there are also allegations that the defendants

---

[3] Of course in order to avoid summary judgment, it remains incumbent upon the plaintiff to amass evidence as to precisely what information was disseminated by the defendants, how it was disseminated and to whom.

2005 U.S. Dist. LEXIS 11696, *27

nevertheless repeatedly verbally assured Plaintiff that the agreement was acceptable and would be signed and implemented the terms of the proposed agreement by paying him the salary he had requested, giving him the use of a township vehicle, paying his dues, subscriptions and continuing education class expenses, giving him the vacation time he had requested and putting into place a life insurance policy and pension plan for him. Plaintiff further alleges that the defendants breached this agreement and damaged him by, inter alia, failing to compensate him for his disability, failing to pay him a lump sum of one-half of his salary upon termination, not allowing him to use his compensatory time off for the hours worked above [*28] and beyond regular business hours and failing to pay for health care coverage for him and his family for six months following his termination. (Am. Compl., Ps119-121, 125-128). Additionally, the amended complaint avers that Defendant Stepnoski, while still the Chairman of the Board of Supervisors acted intentionally and in his own self-interest to have Plaintiff dismissed from his position as Township Manager in order that he could assume the position for himself. As we find that all of these averments, read in the light most favorable to the plaintiff as the non-moving party, are sufficient to plead causes of action for breach of contract and tortious interference with contractual relations, we deny the motion to dismiss Counts VII and VIII.

D. *Dismissal of Plaintiff's Claim under the Sunshine Act.*

Finally, Defendants also seek dismissal of Count IX of Plaintiff's Amended Complaint, which asserts a claim for relief under the Pennsylvania Sunshine Act, *65 Pa.C.S. § 701, et. seq.* on the grounds that Plaintiff failed to bring his legal challenge within thirty (30) days.

Specifically, the plaintiff challenges the defendants' decision to designate him a [*29] "key employee" and to ultimately terminate him under the Sunshine Act as those decisions were not undertaken at an open public meeting nor were they put to a public vote. In general, the Sunshine Act requires:

> *HN20*[⬆] "Official action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under section 707 (relating to exceptions to open meetings), 708 (relating to executive sessions) or 712 (relating to General Assembly meetings covered).

*65 Pa.C.S. § 704.*

In lieu of discussing whether the challenged actions fall within any of the exceptions delineated in *sections 707, 708* or *712*, Defendants instead look to *section 713* in support of their motion for dismissal of Plaintiff's Sunshine Act claim. That section provides:

> *HN21*[⬆] A legal challenge under this chapter shall be filed within 30 days from the date of a meeting which is open, or within 30 days from the discovery of any action that occurred at a meeting which was not open at which this chapter was violated, provided that, in the case of a meeting which was not open, no legal challenge may be commenced more than one year from the [*30] date of said meeting. The court may enjoin any challenged action until a judicial determination of the legality of the meeting at which the action was adopted is reached. Should the court determine that the meeting did not meet the requirements of this chapter, it may in its discretion find that any or all official actions taken at the meeting shall be invalid. Should the court determine that the meeting met the requirements of this chapter, all official action taken at the meeting shall be fully effective.

Thus, *HN22*[⬆] failure to initiate a legal challenge within the statutory limitations period of *Section 713* bars jurisdiction by the trial court. *Belitskus v. Hamlin Township, 764 A.2d 669, 670 (Pa.Cmwlth. 2000),* appeal denied, *565 Pa. 676, 775 A.2d 809 (2001),* citing, *Lawrence County v. Brenner, 135 Pa.Cmwlth. 619, 582 A.2d 79 (1989),* appeal denied, *527 Pa. 652, 593 A.2d 423 (1991).*

In this case, it is clear from the amended complaint that Mr. Weisman knew that the Township had designated him a "key employee" upon receipt of Mr. Stepnoski's letter of December 12, 2002. He further learned that he had been terminated on [*31] or about February 28, 2003. Given that Plaintiff did not institute any legal challenge to the apparent failure of the Township to make these decisions at an open, public meeting until he filed his complaint in this action on October 7, 2004, we find that his Sunshine Act claim is barred as untimely under *Section 713.* Count IX of the Amended Complaint shall therefore be dismissed with prejudice.

For all of the reasons set forth above, the defendants' motion to dismiss is granted in part and denied in part pursuant to the attached order.

*ORDER*

KIMBERLY BORLAND

2005 U.S. Dist. LEXIS 11696, *31

AND NOW, this 14th day of June, 2005, upon consideration of Defendants' Motion to Dismiss Plaintiff's Amended Complaint and Plaintiff's Response thereto, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART and Count IX and that portion of Count I which alleges violation of Plaintiff's FMLA rights by virtue of Defendants' designation of Plaintiff as a "key employee" are DISMISSED.

In all other respects, the Motion is DENIED.

BY THE COURT:

s/J. Curtis Joyner, J.

**End of Document**